1 <u>**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**</u>

2 Name ___PEREZ_____ROGELIO_____

3      (Last)        (First)       (Initial)

Prisoner Number ___D-03602_____

4 Institutional Address ___Correctional Training Facility___

5       ___P.O. Box 689, Soledad, CA 93960_____

6

7 **UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

        **JSW**

8 __ROGELIO PEREZ,_____ )

  (Enter the full name of plaintiff in this action.)   )

9                ) CV 08 2001

           vs.         ) Case No. _____

10                ) (To be provided by the clerk of court)

__BEN CURRY, Warden,_____ )

11 __XXXXXXXXXX_____ ) **PETITION FOR A WRIT**
**OF HABEAS CORPUS**

12 _____ )

13 _____ ) E-filing   **(PR)**

14 _____ )

  (Enter the full name of respondent(s) or jailor in this action)  )

15

16 <u>Read Comments Carefully Before Filling In</u>

17 <u>When and Where to File</u>

18     You should file in the Northern District if you were convicted and sentenced in one of these

19 counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21 this district if you are challenging the manner in which your sentence is being executed, such as loss of

22 good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23     If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

24 one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 District Court for the district in which the state court that convicted and sentenced you is located. If

26 you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 your petition will likely be transferred to the district court for the district that includes the institution

28 where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS

1  Who to Name as Respondent

2       You must name the person in whose actual custody you are. This usually means the Warden or

3  jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced. These are not proper

5  respondents.

6       If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now and the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11       1. What sentence are you challenging in this petition?

12            (a)    Name and location of court that imposed sentence (for example; Alameda

13                   County Superior Court, Oakland):

14  San Bernardino County Superior Court            San Bernardino

15                   Court                          Location

16            (b)    Case number, if known ___SCR-41741___

17            (c)    Date and terms of sentence 15 years to life, Feb. 1985

18            (d)    Are you now in custody serving this term? (Custody means being in jail, on

19                   parole or probation, etc.)         Yes _XX_    No _____

20                   Where?

21                   Name of Institution: Correctional Training Facility

22                   Address: _P.O. Box 689, Soledad, CA 93960_

23       2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  _Second degree murder, with use of a firearm, 187 / 12022.5_

27  _____

28  _____

PET. FOR WRIT OF HAB. CORPUS      - 1 -

3. Did you have any of the following?

Arraignment:                          Yes _____    No _____

Preliminary Hearing:                  Yes _____    No _____

Motion to Suppress:                   Yes _____    No _____

4. How did you plead?

Guilty _____    Not Guilty _____    Nolo Contendere _____

Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

Jury _____    Judge alone _____    Judge alone on a transcript _____

6. Did you testify at your trial?                Yes _____    No _____

7. Did you have an attorney at the following proceedings:

(a)    Arraignment                   Yes _____    No _____

(b)    Preliminary hearing           Yes _____    No _____

(c)    Time of plea                  Yes _____    No _____

(d)    Trial                         Yes _____    No _____

(e)    Sentencing                    Yes _____    No _____

(f)    Appeal                        Yes _____    No _____

(g)    Other post-conviction proceeding    Yes _____    No _____

8. Did you appeal your conviction?               Yes _____    No _____

(a)    If you did, to what court(s) did you appeal?

Court of Appeal                      Yes _____    No _____

Year: _____    Result: _____

Supreme Court of California          Yes _____    No _____

Year: _____    Result: _____

Any other court                      Yes _____    No _____

Year: _____    Result: _____

(b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS        - 2 -

1    petition?                                        Yes _____    No_____

2         (c)    Was there an opinion?                Yes _____    No_____

3         (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                     Yes _____    No_____

5                If you did, give the name of the court and the result:

6

7    _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?              Yes **XX**    No_____

10        [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition. You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15   U.S.C. §§ 2244(b).]

16        (a)    If you sought relief in any proceeding other than an appeal, answer the following

17               questions for each proceeding. Attach extra paper if you need more space.

18        I.     Name of Court: San Bernardino County Superior Court

19               Type of Proceeding: ____ Habeas corpus _____

20               Grounds raised (Be brief but specific):

21               a.   SAME AS RAISED HEREIN _____

22               b._____

23               c._____

24               d._____

25               Result: Denied _____ Date of Result: 1/4/2007

26        II.    Name of Court: Calif. App. Ct., 4th App. Dist.

27               Type of Proceeding: ____ Habeas corpus _____

28               Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS      - **3** -

a. __SAME AS RAISED HEREIN__

b. _____

c. _____

d. _____

Result: __Denied__ _____ Date of Result: __3/14/2007__

III.  Name of Court: __California Supreme Court__

Type of Proceeding: __Habeas corpus__

Grounds raised (Be brief but specific):

a. __SAME AS RAISED HEREIN__

b. _____

c. _____

d. _____

Result: __Denied__ _____ Date of Result: __3/26/2008__

IV.  Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result: _____ Date of Result: _____

(b)  Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes _____    No __XX__

Name and location of court: _____

**B. GROUNDS FOR RELIEF**

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS        - 4 -

need more space.  Answer the same questions for each claim.

### Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION TO FIND HIM UNSUITABLE FOR
PAROLE TWENTY-TWO YEARS AFTER THE COMMITMENT OFFENSE
WHEN THE COMMITMENT OFFENSE IS NO LONGER RELIABLE
EVIDENCE OF CURRENT THREAT TO THE PUBLIC.

---

### I N T R O D U C T I O N

Only facts relevant to the decision to deny parole and the state court decision will be presented.

On June 1, 2006, twenty-two years after his arrest for the commitment offense, and being convicted by a jury for second degree murder, in violation of Penal Code § 187,[1] Rogelio Perez (hereafter Petitioner) was denied parole by the Board of Parole Hearings (hereafter Board) at his FIFTH parole suitability hearing.

#### Supporting facts

Petitioner's life term commenced on March 28, 1985, with his minimum term being fixed at February 22, 1998 (EXHIBIT 1, HT 1:11-12).[2]

Petitioner was sworn to tell the truth (HT 14:4-10).

#### The commitment offense

The Board incorporated the facts from the Probation Officers Report (POR), page 1 (HT 14:11-15).  A summary of the commitment offense was taken from the Life Prisoner Evaluation Report (hereafter LPER) (EXHIBIT 2, p. 1), which was taken from the POR (which Petitioner does not have a copy of).  The facts are, in short:

---

1.  All codes and regulations are California, unless otherwise noted. California Code of Regulations, Title 15, will be cited, Cal. Code Regs., tit. 15.

2.  References to parole hearing transcript, EXHIBIT 1, will be noted by HT followed by page number and line number, e.g., (HT 1:1).

Rogelio Perez was involved in an argument on 5/27/84, at the Tres Hermanos Bar located in Fontana, California. The dispute escalated into a physical fight inside the bar, which was stopped when both parties were ordered to go outside the bar by the bartender, Feliciano Perez. The fight continued in the parking lot. Perez obtained a .22 caliber semi-automatic pistol from his vehicle. The victim (Javier Ortiz) proceeded to walk to his vehicle which was located on the opposite side of the parking lot and attempted to open his vehicle door. Perez returned to the scene and positioned himself directly in front of Ortiz' vehicle. Perez fired 4 rounds from the pistol, striking the victim twice in his left neck area and once in the lower left corner of his mouth.

The Board went over the commitment offense with Petitioner (HT 14-32). When asked, when the victim was not armed, why he shot the victim, Petitioner responded, "I was scared that he was going to get a gun or something. That he was going to kill me, you know" (HT 18:7-9). Although Petitioner could not see Mr. Ortiz' hands because it was dark (HT 23:3-6), while arguing Ortiz said "fuck you, I'm going to kill you" (HT 17:6-9; 24:9-10); it was then when Petitioner obtained his pistol (HT 23:10-16), being in fear for his life thinking Ortiz was going to get a gun and kill him (HT 18:7-9). Petitioner fired at Ortiz four times from over Ortiz' car (HT 27:7-15), striking him three times, "twice in his left neck area and once in the lower left corner of his mouth" (EXHIBIT 2, p.1).

## Prior criminal history

Petitioner has no juvenile record (HT 33:23-24).

As an adult, on May 13, 1980, Petitioner pled guilty to two counts of burglary and sentenced to unsupervised probation. While on probation, on August 12, 1980, Petitioner was again arrested for one count of burglary, for which he was convicted and sentenced to four years, being paroled on April 21, 1983 (HT 34:1-10). Petitioner does not know if he was on parole at the time of the instant offense, the Board assuming he was (HT 34:9-26).

///////

## Prior Social History

Petitioner is a Mexican National, born October 25, 1957, being 46 years old (HT 36:4-6), his parents still being married (HT 45:4-7). Petitioner came to visit the United States in 1975 and stayed with family members in southern California (HT 36:27-37:2).

Petitioner attended elementary school until the eighth grade, at which time he dropped out of school to work (HT 37:3-6), to help support the family. There is also evidence in the record that Petitioner was employed as a forklift operator and upholsterer (EXHIBIT 3, p. 2).

Although there is information in Petitioner's LPER that he "is associated with the members of the 'South Fontanta' Gang" (EXHIBIT 2, p. 3), he denies any gang affiliation but admits that he sometimes hung around with the "3rd Street" gang, which does not exist anymore (HT 38:5-7). The San Bernardino Deputy District Attorney admits there is no information on Petitioner being a gang member or affiliation (HT 39:22-25). The Board admits that there are sometimes misinformation on the LPER's (HT 40:13-15).

Petitioner admitted to using alcohol prior to and the night of the offense, and had an arrest for drunk driving pending at the time of the instant offense (HT 40:17-27).

## Parole plans

Petitioner has an INS hold for Mexico and knows that he will be deported upon parole (HT 41:22-25), where he would live with his parents (HT 42:2-7). Petitioner has job offers from Mexico (HT 42:8-43:18).

The Board told Petitioner, although he has an INS hold for

- 7 -

Mexico, to have parole plans for "both Mexico and California" at
his next hearing (HT 44:14-21).

## Opposition to parole

The Chief of Police of Fontana, California sent a letter opposing
parole in which he stated Petitioner had a "complete disregard for
human life in that, after shooing the victim three times, he walked
closer to the helpless man and fired a final bullet - final bullet
into his head" (HT 46:1-4), recommending that Petitioner never be
paroled. All official reports confirm that although four rounds
were fired Ortiz was struck three times, "twice in the lower neck
area and once in the lower corner of the mouth" (HT 47:10-12).
Petitioner admits firing four rounds, but denies walking over to
Ortiz and shooting him in the head (HT 48:1-20).

The San Bernardico County District Attorney's Office opposed
parole, basically, due to Petitioner not agreeing to all the facts
alleged by the deputy district attorney's rendition of the instant
offense, prior criminal history, and was told to get a GED and has
yet to do so (HT 76:7-78:9).

## Psychological evaluation

Petitioner's psychological evaluation was conducted by Dr.
Macomber, one of the Board's own forensic experts and reviewed by
Dr. Zika. The evaluation "is based upon a single 90 minute interview,
plus review of the central and medical files" (EXHIBIT 3, p. 1).
Dr. Macomber refers to Petitioner's 1999 psychological evaluation
as still being valid, thus it is provided as additional evidence
in support of Petitioner's suitability for parole (EXHIBIT 4).

Deputy Commissioner Moore goes over Dr. Macomber's psycholigical

- 8 -

evaluation (HT 63:11-67:6). Taking directly from the evaluation, Petitioner's "insight and self-awareness were good" (EX. 3, p. 2). Petitioner continues to attend Alcoholics Anonymous, is now a Christian and is determined not to drink, understanding the destructive use of alcohol, and although alcohol is readily available in the prison has refrained from its use, proving "that he is exercising good self-control, maturity and responsibility" (EX. 3, p. 2).

Petitioner has attended several self-help programs, to include "Anger Management, Alternatives to Violence Program, Breaking Barriers, Impact Program, and Project Change" (EX., p. 2).

Petitioner has no diagnosed disorders, with a current Global Assessment of Functioning (GAF) score of 85 (EX. p. 2 [GAF is one's ability to function compared to the world population, the highest score being 90]).

"Soledad is a prison that has frequent racial riots, disturbances and altercations. He has not been involved in any of these altercations. As a result, his potential for dangerous behavior compared to other inmates, is definitely below average" (EX. p. 3).

In clinically assessing Petitioner's current level of threat to public safety when released to the community, "the Level of Service Inventory-Revised was administered." This clinical tool is "am actuarial measure that assesses criminal history, substance abuse history, institutional adjustment, social relationships and other factors to determine current risk level on parole" (EX. p. 3). Taking all into consideration, it is Dr. Macomber's expert opinion, that "compared to the average citizen in the community, at this point

- 9 -

in his life, he does not pose any more risk than the average citizen in the community" (EX. p. 3). "There are no significant risk factors."

Dr. Macomber noted that Petitioner has family support in Mexico with offers of residence, job offers in Mexico, and "skills that will enable him to support himself in the community." Additionally, "since he plans on returning to Mexico, it is not necessary for him to finish his GED in order to get a parole date. The prognosis for successful adjustment in the community is very good" (EX. p. 4). That is the evaluation of the Board's own forensic expert. See also EXHIBIT 4, p. 4, assessment of dangerousness in 1999 forensic evaluation: "If released to the community inmate should not present a problem to society."

## D E C I S I O N

The decision is long, repetitive and convoluted, but Petitioner believes the reasons the Board concluded that he would "pose an unreasonable risk of danger to society or a threat to public safety if released from prison" (HT 83:11-14) are:

1.  The first being "the gravity of the crime" (HT 83:17-18). Reiterating the facts of the offense: (a) "The offense was carried out in a manner which was dispassionate, calculated to the effect that you felt threatened and you then went to your automobile, retrieved a weapon, your .22, and returning to the kill the victim" (HT 83:26-84:4); (b) "The offense was carried out in a manner which demonstrates exceptional disregard for human life"; and (c) "The motive for the crime was truly inexplicable. You murdered a man over a fistfight" (HT 84:15-19).

2. The second being that Petitioner "had an escalating pattern of criminal conduct and violence" (HT 85:20-21). This finding was based on Petitioner dropping out of school in the 8th grade, and in spite of the lack of evidence, becoming involved in street gangs (HT 85: 23-26), and prior non-violent convictions (HT 86: 1-3).

3. The third being "an unstable social history, prior criminality in this regard" (HT 86:4-5). This finding was based on Petitioner entering the United States as a child to visit and staying, thereafter becoming "an illegal alien," attending school in the United Sates but dropping out in the 8th grade, and again, absent any evidence, alleging he "became a member of the 3rd Street Gang" (HT 86:6-10).

4. The fourth finding, Petitioner having to obtain his GED, is based on the fact that Petitioner does not have a GED, although he has marketable skills that can be put to use upon release and will be returning to Mexico. Commissioner Inglee is not certain Dr. Macomber's statement that since Petitioner is returning to Mexico he does not need a GED is correct (HT 89:3-9), and "why the doctor would say that I'm not entirely sure" (HT 89:21-22). Deputy Commissioner Moore tells Petitioner if he gets his GED that to find him unsuitable next time "[w]e're going to have to come up with a new note, a new song" (HT 93:13-19).

The Board commended Petitioner for the following: (1) having "developed...two marketable skills that can be taken into the free world" (HT 87:6-7; 91:6-8); (2) having "participated in beneficial self-help programs" (HT 87:12-13); (3) "should be congratulated for his lack of 115 disciplinary reports"; maintaing "a disciplinary-free record, basically, for 19 and a half years on your 115's. Very good

job" (HT 87:19-20; HT 92:1-4); (4) and although noting Dr. Macomber's expert opinion that Petitioner, "at this point in his life he does not pose any more risk than the average citizen" editoralizes, commenting: "Even though most of the average citizens in the community have not murdered somebody in a parking lot in front of a bar" (HT 88:16-23); acknowledged that Petitioner had parole plans for Mexico but wants letters written in English (HT 90:8-91:4); (6) having "very good reports" (HT 92:9-10); and (7) "attending AA meetings consistently" (HT 92:17-18).

The Board's decision became final on September 29, 2006.

State court decision

The only "reasoned" state court decision is that of the San Bernardino Superior Court (EXHIBIT 5). Habeas corpus petition filed on October 19, 2006, denied January 4, 2007. A review of the decision reveals that the state relied on "any evidence will do" to support a factor rather than "some evidence" to support the ultimate decision of current threat to public safety.

Petitioner filed his habeas corpus in the California Court of Appeals on February 11, 2007, and was summarily denied on March 14, 2007 (EXHIBIT 6).

Petitioner submitted a Petition for Review to correctional staff for mailing to the California Supreme Court on March 20, 2007. After no response from the court in 120 days, Petitioner requested to know the statuts of his case, at which time he was informed the court had no record of receiving a Petition for Review.

Thus, on or about September 1, 2007, Petitioner filed a habeas corpus in the California Supreme Court, being summarily denied on March 26, 2008 (EXHIBIT 7).

* * * * * * *

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

No new grounds presented.

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3    of these cases:

4    PLEASE SEE MEMORANDUM OF LAW ATTACHED HERETO

5    _____

6    _____

7    Do you have an attorney for this petition?                    Yes_____    No_xx_

8    If you do, give the name and address of your attorney:

9    _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on ___4-13-08___            _Rogelio Perez_____

14                    Date                        Signature of Petitioner
                                        Rogelio Perez

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS        — 13 —

## M E M O R A N D U M   O F   L A W

### A.  Petitioner has A Liberty Interest in Parole

Under California's parole statutes, Penal Code § 3041(b), Petitioner has a liberty interest in parole (Greenholtz v. Inmates of Nebraska Penal and Correctional Complex (hereafter Greenholtz), 442 U.S. 1 (1979); Sass v. Board of Prison Terms, 461 F.3d 1123, 1127 (9th Cir. 2006).

Petitioner having a "liberty interest" in parole, being diligent in exhausting his state court remedies, this Court has jurisdiction.

### B.  Jurisdiction of the Court

A state prisoner has 365 days in which to file a federal habeas corpus petition (28 U.S.C. § 2244(d)(1)). In case at bench, the time of limitation began to run when the decision became final after review (§ 2244(d)(1)(A)).

The Board's decision became final on September 9, 2006, after which on October 19, 2006, 20 days later, he filed a state habeas corpus petition in the Superior Court of San Bernardino County. The habeas corpus was denied on January 4, 2007, for a tolling of 76 days.

On February 11, 2007, 35 days later, Petitioner filed a habeas corpus petition in the California Court of Appeals, being summarily denied on March 14, 2007, for a tolling of 30 days.

On or about September 1, 2007, approximately 169 days later, Petitioner filed a habeas corpus petition if the California Supreme Court, being summarily denied on March 26, 2008, for 238 days tolled.

Total days from the Board's decision becoming final, September 29, 2006, until April 15, 2008 is 563 days, of which 344 of those

days are tolled (28 U.S.C. § 2244((d)(2)), leaving Petitioner, as
of April 15, 2008, a reserve of 219 days.

The Court therefore has jurisidction.

## C.   After 22 Plus Years Into A 15 Years to Life Sentence, There Is No Evidence Petitioner Is A CURRENT Threat to the Public.

"It violates a prisoner's right to due process when the Board
or Governor attaches significance to evidence that forewarns no danger
to the public or relies on an unsupported conclusion" (In re Tripp,
150 Cal.App.4th 306, 313 (2007)). The Board's decision in case at
bench is based on four findings: (1) the commitment offense 22 years
in the past; (2) prior non-violent criminal history of three
burglaries; (3) unstable social history, alleging Petitioner was
involved with a gang when even the prosecution stated there is no
evidence to support the allegation; and (4) not having a GED, although
Petitioner will be returned to Mexico. Deputy Commissioner Moore
told Petitioner if he got his GED the Board would "have to come up
with a new note, a new song" to find Petitioner unsuitable for parole
(HT 93:13-19). Petitioner has no way of knowing what that "new note"
will be so there is no possibility of knowing what he must do to
fairly have his suitability for parole considered, the decision being
arbitrary and capricious, violating due process.

After 22 years of imprisonment with an impeccable postconviction
record, and forensic experts as far back as 1999 opining that "[i]f
released to the community inmate should not present a problem to
society" (EXHIBIT 4, p. 4), and in 2006 it was Dr. Macomber's expert
opinion, after thoroughly weighing "criminal history, substance abuse
history, institutional adjustment, social relationships and other
factors to determine current risk" that Petitioner "does not pose

- 15 -

that the 'findings that are necessary to deem a prisoner unsuitable for parole,' Irons [v. Carey], 505 F.3d [846,] at 851 [(9th Cir. 2007)], 2007 WL 2927359, at *3, are not that a particular factor or factors indicating unsuitability exists, but that a prisoner's release will unreasonably endanger public safety. (Citations); see Cal. Penal Code § 3041(b) (providing that the Board 'shall set a release date unless...consideration of the public safety requires a more legthy period of incarceration for this individual'). For our purposes, then, '[t]he test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety.' Lee, 143 Cal. App.4th at 1408 (citations and footnotes omitted); see also In re Elkins, 144 Cal.App.4th 475, 499, 50 Cal.Rptr.3d 503 (Cal. Ct. App. 2006) (holding that the 'governor, in reviewing a suitability determination, must remain focused...on facts indicating that release currently poses 'an unreasonable risk of danger to society'" (citing Cal. Code Regs. tit. 15, § 2402(a))); Scott, 133 Cal.App.4th at 591 ('The factor statutorily required to be considered and the overarching consideration, is "'public safety.'" (citing Cal. Penal Code § 3041(b)))" (emphasis and ellipses in original).

While it may be argued that Hayward v. Marshall is only "dicta," that dicta is instructive authority in the Ninth Circuit. That instruction being that parole suitability turns on two factors: (1) time, the factual predicate, has the prisoner served his minimum term?; and (2) rehabilitation, the legal predicate, is the prisoner rehabilitated? (McCarns v. Dexter, ___ F.Supp.2d ___, 2008 WL 360827, *13 (C.D. Cal. 2008) [factual predicate is satisfied when prisoner has served minimum term; legal predicate is satisfied when prisoner is rehabilitated]).

In that Petitioner's commitment offense will never change, as articulated by the United States Supreme Court: "The decision turns on...primarily what a man is and what he may become rather than simply what he has done" (Greenholtz, 442 U.S., at 10, supra); moreover, "[i]t is important that we not overlook the ultimate purpose of parole which is a component of the long-range objective of rehabilitation" (Id., at 13). Thus, "[t]he behavior record of an inmate during confinement is critical in the sense that it reflects the degree

any more risk than the average citizen in the community" (EXHIBIT
3, p. 3), to which Deputy Commissioner Moore commented "the average
citizens in the community have not murdered somebody in a parking
lot in front of a bar," (HT 88:16-23), obviously being fixated on
the 22 year old offense and Petitioner's CURRENT risk. Petitioner
has served far excess of his minimum term of February 22, 1998 (HT
1:11-12); currently 8 years beyond his minimum of 15 calendar years,
and is, most important, rehabilitated.

Currently, the most persuasive, and instructive authority on
some evidence and how it is to be applied and weighed is the Ninth
Circuit Court of Appeals precedent setting case of Hayward v.
Marshall, 512 F.3d 536, (9th Cir. 2008). Relying on In re Lee, 143
Cal.App.4th,1400 (2006) [Petitioner for Review denied, supersedes
denied, depublications denied]; In re Elkins, 144 Cal.App.4th 475
(2006) [Petition for Review denied, supersedes denied, depublication
denied]; and In re Scott II, 133 Cal.App.4th 573 (2005) (see Ryman
v. Sears and Robuck, 505 F.3d 993, 995 (9th Cir. 2007) ["where there
is no convincing evidence that the state supreme court would decide
differently, a federal court is obligated to follow the decisions
of the state's intermediate appellate courts"] internal quotation
marks omitted), analyzing California's parole law, reviewing federal
constitutional protections of the "some evidence" standard under
the application of California law, the Ninth Circuit Court of Appeals
concluded the suitability and unsuitability factors set out in Cal.
Code Regs., tit. 15, § 2402(c) and (d), in Hayward v. Marshall, 512
F.3d, at 543, supra:

"Even though these suitability and unsuitability factors are helpful in analyzing
whether a prisoner should be granted parole, California courts have made it clear

to which the inmate is prepared to adjust to parole release" (Id., at 15). The Supreme Court also recognized that a prisoner "may become eligible for discretionary parole when the minimum term, less good time credits, has been served" (Id., at 4). While the factual predicate is time, most significant is the legal predicate, rehabilitation. Rehabilitation, of course, being the ultimate determining factor. This is the Greenholtz doctrine: time, plus rehabilitation, equal parole.

The Ninth Circuit warned: "in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from relevant California statutes" (Irons v. Carey, 505 F.3d 846, 854 (9th Cir. 2007); Hayward v. Marshall, 512 F.3d, at 545, supra). While the Board's "reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can initially be justified as fulfilling the requirements of state law[,] [¶] "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and prior criminal history, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation" (Biggs v. Terhune, 334 F.3d 910, 916-917 (9th Cir. 2003); In re Roderick, 154 Cal.App.4th 242, 264 (2007) [a rational connection must be made between the commitment offense 22 years ago and statutory basis for denial-current threat to public safety]; In re Tripp, 150 Cal.App.4th, at 309, supra ["the viciousness of the commitment offense must be balanced against the passage of time and rehabilitation"]). Thus, after exceeding the minimum term

of the sentence, satisfying the factual predicate, suitability turns on the legal predicate, rehabilitation (<u>McCarns v. Dexter</u>, 2008 WL 360827, *13, <u>supra</u>). Unquestionably, Petitioner has satisfied both prongs and any further imprisonment serves no legitimate penological interest.

## C O N C L U S I O N

It is respectfully requested that the Court issue an ORDER for the respondent to show cause why the writ should not be granted; and, in that Petitioner has exceeded his uniform term for the gravity of his commitment offense and its threat to public safety, when his term is fixed, why all excess credits should not be applied to his period of parole (<u>Martin v. Marshall</u>, 448 F.Supp.2d 1143, 1145 (N.D. Cal. 2006); Cal. Code Regs., tit. 15, § 2345).

DATED: ___4/-13-08___

Respectfully submitted,

_Roylis Pent_
Rogelio Perez
Petitioner in pro se

- 19 -

EXHIBIT 1

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:              )          CDC Number D-03602
                         )
ROGELIO PEREZ            )          **INMATE**
                         )
_____)          **COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JUNE 1, 2006

1:14 P.M.

PANEL PRESENT:

Mr. Philip Inglee, Presiding Commissioner
Ms. Barbara Moore, Deputy Commissioner

OTHERS PRESENT:

Mr. Rogelio Perez, Inmate
Mr. DeShawn Lewis, Attorney for Inmate
Mr. Robert Bulloch, Deputy District Attorney,
Two Correctional Officers, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum

**Tracy Richardson, Peters Shorthand Reporting**

ii

## INDEX

PAGE

Proceedings .......................................... 6

Case Factors ........................................ 14

Pre-Commitment Factors ............................. 33

Post-Commitment Factors ............................ 49

Parole Plans ....................................... 42

Closing Statements ................................. 76

Recess ............................................. 82

Decision ........................................... 83

Adjournment ........................................ 97

Transcriber Certification .......................... 98

--oOo--

1

1         **P R O C E E D I N G S**

2         **PRESIDING COMMISSIONER INGLEE:  -**

3    consideration hearing for Rogero –

4         **INMATE PEREZ:** Rogelio, sir.

5         **PRESIDING COMMISSIONER INGLEE:** Rogelio

6    Perez, P-E-R-E-Z, CDC number D-03602.  Today's

7    date is June 1st, 2006.  Time is 1:14.  We are

8    located CTF, Soledad.  Inmate was received on

9    3/28/1985.  He was committed from San Bernardino

10   County.  Life term began on 3/28/1985.  And the

11   inmate's minimum eligible parole date is

12   2/22/1998.  Controlling offense for which the

13   inmate has been committed is set forth Case

14   number SCR-41741.  Charge of count one,

15   violation of Penal Code 187 WP 12022.5 or second

16   degree with use of firearm.  Inmate received a

17   term – a base term of 15 years, seven years

18   enhancement for a total of 22 years to life.

19   The hearing is being tape recorded and for the

20   purpose of voice identification each of – each

21   of us will be required to state our first and

22   last name, spelling our last names.  When it

23   comes to the inmate's turn after you spell your

24   last name state your CDC number.  Starting with

25   myself and going to my left, my name is Philip

26   Inglee.  That's I-N-G-L-E-E.  I'm a

27   commissioner.

2

1        **DEPUTY COMMISSIONER MOORE:**  Good

2   afternoon.  I'm Deputy Commissioner Moore, M-O-

3   O-R-E, with the Board of Parole Hearings.

4        **DEPUTY DISTRICT ATTORNEY BULLOCH:**

5   Robert Bulloch, B-U-L-L-O-C-H, Deputy District

6   Attorney, San Bernardino County.

7        **ATTORNEY LEWIS:**  DeShawn (phonetic)

8   Lewis, L-E-W-I-S, Attorney for Mr. Perez.

9        **INMATE PEREZ:**  Rogelio Perez, R-O-G-E-

10  L-I-O, P-E-R-E-Z.

11       **ATTORNEY LEWIS:**  CDC number.

12       **INMATE PEREZ:**  CDC number D-03602.

13       **PRESIDING COMMISSIONER INGLEE:**  We have

14  two correctional officers in the room for

15  security purposes.  Mr. Perez, in front of you

16  is or at least underneath your file there is an

17  ADA statement.  I'd like to have you read it out

18  loud if you would, please.

19       **INMATE PEREZ:**  "ADA, the Americans

20  with Dis - Dis - disabilities Act - Americans

21  with Disabilities Act, ADA, is a law to help

22  people with disabilities.  Disabilities -

23  disabilities are problems that make it harder

24  for some people to see - see and hear, breath,

25  talk, walk, learn, think, work, or take care of

26  themselves than it is - it is for others.

27  Nobody can be kept out of public places or

1   activities because of a disability.  If you have
2   a disability you have the right to ask for help
3   to get ready for your BPT hearing, get to the
4   hearing, talk, read - read forms and papers, and
5   understand the hearing process.  BPT will look
6   at what you ask for to make sure that you have a
7   disability that is covered by the ADA and that
8   you have asked for the right kind of help.  If
9   you - if you don't help or if you think don't
10  think you got the kind of help you need ask for
11  a BPT 1074 grievance form.  You can also get
12  help to fill - fill it out."

13          **PRESIDING COMMISSIONER INGLEE:**  Did you
14  understand what you read?

15          **INMATE PEREZ:**  Yes.

16          **PRESIDING COMMISSIONER INGLEE:**  All
17  right.  That being the case, let the record
18  reflect BPT form 1073 was signed on 2/7/2005.
19  At that time you said you did not have any
20  disabilities.  Is that still correct?

21          **INMATE PEREZ:**  Still correct.

22          **PRESIDING COMMISSIONER INGLEE:**  Okay.
23  Do you have any problems walking up and down
24  stairs or for a distance of 100 yards or more?

25          **INMATE PEREZ:**  No.

26          **PRESIDING COMMISSIONER INGLEE:**  Do you
27  need glasses or magnifying device in order to

4

1   see or read documents?

2           **INMATE PEREZ:** No.

3           **PRESIDING COMMISSIONER INGLEE:** Let's

4   just go to recess for one second.

5                   (Off The Record)

6           **DEPUTY COMMISSIONER MOORE:** We're on.

7           **PRESIDING COMMISSIONER INGLEE:** Do you

8   need glasses or magnifying glass in order to

9   read documents?

10          **INMATE PEREZ:** No.

11          **PRESIDING COMMISSIONER INGLEE:** Do you

12  have any hearing problems?

13          **INMATE PEREZ:** No.

14          **PRESIDING COMMISSIONER INGLEE:** Have

15  you ever been included in a Triple CMS or EOP

16  program?

17          **INMATE PEREZ:** No.

18          **PRESIDING COMMISSIONER INGLEE:** Do you

19  know what they are?

20          **INMATE PEREZ:** Yes.

21          **PRESIDING COMMISSIONER INGLEE:** What

22  are they?

23          **INMATE PEREZ:** For the people that are

24  not – not there.

25          **PRESIDING COMMISSIONER INGLEE:** Well,

26  you're trying to say to me that there are people

27  that have emotional and mental problems –

5

1          **INMATE PEREZ:**  Uh-huh.

2          **PRESIDING COMMISSIONER INGLEE:**  - and -

3   in the prison system.  That's fine.  And you've

4   never been treated for emotional or mental

5   problems since you've been here?

6          **INMATE PEREZ:**  No.

7          **PRESIDING COMMISSIONER INGLEE:**  Have

8   you ever taken psychiatric medication?

9          **INMATE PEREZ:**  No.

10         **PRESIDING COMMISSIONER INGLEE:**  How far

11  did you go in school before you arrived in

12  prison?

13         **INMATE PEREZ:**  About 8th grade.  8th to

14  7th grade.

15         **PRESIDING COMMISSIONER INGLEE:**  Was

16  that in the United States or Mexico?

17         **INMATE PEREZ:**  Here.

18         **PRESIDING COMMISSIONER INGLEE:**  Okay.

19  Did you take any special education classes while

20  you were growing up?

21         **INMATE PEREZ:**  No.

22         **PRESIDING COMMISSIONER INGLEE:**  Do you

23  suffer from any disability that prevents you

24  from partic - participating in today's hearing?

25         **INMATE PEREZ:**  No.

26         **PRESIDING COMMISSIONER INGLEE:**

27  Counsel, do you have any comments or concerns

6

1   regarding ADA rights of your client?

2         **ATTORNEY LEWIS:**  No, I do not.

3         **PRESIDING COMMISSIONER INGLEE:**  This

4   hearing is being conducted pursuant to Penal

5   Code sections 3041, 3042 and the rules and

6   regulations of the Board of Prison Terms

7   governing parole consideration hearings for life

8   inmates.  The purpose of the hearing today is to

9   consider your suitability for parole.  In doing

10  so we'll consider the nature and number of

11  crimes you were committed for, your prior

12  criminal and social history, your behavior and

13  programming since your commitment.  We've had

14  the opportunity to review your central file and

15  review your hearing transcript.  We'll give you

16  the opportunity to correct or clarify the

17  record..  We will consider your progress since

18  your commitment and since your last hearing.

19  Your updated counselor's report, psychological

20  report will also be considered.  Any changes in

21  parole plans should be brought to our attention.

22  We will reach a decision today and inform you of

23  whether or not we find you suitable for parole

24  and the reasons for our decision.  If you are

25  found suitable for parole the length of time of

26  your confinement will be explained to you.  This

27  hearing will be conducted in two phases.  I'll

1   discuss with you the crime you were committed

2   for, your prior criminal and social history,

3   your parole plans and any letters of support or

4   opposition that may be in the file. Deputy

5   Commissioner Moore will discuss with you your

6   progress since your commitment, your counselor's

7   report and your psychological evaluation. Once

8   that's concluded the commissioners, the district

9   attorney, and your attorney will be given the

10  opportunity to ask you questions. The questions

11  from the district attorney will be asked through

12  the Chair and the answers will be directed to

13  the Panel and not back to the district attorney.

14  Before we recess the district attorney and your

15  attorney will be given an opportunity to make

16  final statements regarding your par - your

17  parole suitability. Your statement should be

18  directed as to why you feel you are suitable for

19  parole. We will then recess, clear the room and

20  deliberate. Once we've completed our

21  deliberations we'll resume our hearing and

22  announce our decision. California Code of

23  Regulations states that regardless of time

24  served a life inmate shall be found unsuitable

25  for and denied parole if, in the judgment of the

26  panel, the inmate would pose an unreasonable

27  risk of danger to society if released from

1   prison.  You have certain rights.  These rights
2   include the right to a timely notice of this
3   hearing, the right to review your central file,
4   and the right present relevant documents.
5   Counsel, has your inmate's rights been met in
6   this regard?

7           **ATTORNEY LEWIS:**  Yes, they have.

8           **PRESIDING COMMISSIONER INGLEE:**  You
9   also have the right to be heard by an impartial
10  panel.  Sir, do you have any ob – any problems
11  with the – excuse me, Mr. Perez, do you have any
12  concern with any member of this Panel?

13          **INMATE PEREZ:**  No.

14          **PRESIDING COMMISSIONER INGLEE:**
15  Counsel, do you have any concern with any member
16  of this Panel?

17          **ATTORNEY LEWIS:**  No, I do not.

18          **PRESIDING COMMISSIONER INGLEE:**  You
19  will receive a written copy of our decision
20  today.  That decision is subject to review by
21  the Decision Review Unit and by entire Board
22  meeting as a body.  It will become effective
23  within 120 days.  It's also subject to review by
24  the governor.  A copy of the tentative decision
25  and a copy of the transcript will be sent to
26  you.  As of May 1st, 2004, there were major
27  changes in your former rights to appeal Board

9

1    decisions (inaudible).  The old Board
2    regulations were repealed.  The current policy's
3    entitled Administrative Appeals Correspondence
4    and Grievances Concerning Prison Board Term
5    Decisions.  (inaudible) at the prison library.
6    You are not required to admit your offense or
7    discuss your offense if you do not wish to do -
8    if you do not wish to do so.  However, this
9    Panel does accept as true the findings of the
10   court and you are invited to discuss the facts
11   and circumstances of your offense if you so
12   desire.  The Board will (inaudible) discuss and
13   consider any prior statements you have made
14   regarding the offense in determining your
15   suitability for parole.  Deputy Commissioner, is
16   there any confidential material in the file and,
17   if so, will it be used today?

18            **DEPUTY COMMISSIONER MOORE:**  Yes, there
19   is confidential material but it is not relevant
20   to these proceedings.

21            **PRESIDING COMMISSIONER INGLEE:**  I'm
22   going to pass the hearing checklist on to - on
23   to your attorney and the district attorney to
24   insure we're all proceeding on the same set of
25   documents.  District attorney, do you have all
26   your documents?

27            **DEPUTY DISTRICT ATTORNEY BULLOCH:**  Yes,

10

1   I do.

2          **PRESIDING COMMISSIONER INGLEE:**  Okay.

3   And counselor, do you have all your documents?

4          **ATTORNEY LEWIS:**  Yes, I do.

5          **PRESIDING COMMISSIONER INGLEE:**  All

6   right.  Are there any additional documents to be

7   submitted?

8          **ATTORNEY LEWIS:**  Yes, we do have some.

9   With respect to this - the letters written in

10  Espanola, those are job offers, I believe.

11         **PRESIDING COMMISSIONER INGLEE:**  Why

12  aren't these translated?

13         **ATTORNEY LEWIS:**  He just received them

14  from what he told me.

15         **PRESIDING COMMISSIONER INGLEE:**  I'm

16  sorry, we - our - the documents in the American

17  court system are - are - the language we work

18  with in English.  It doesn't mean we don't

19  respect Spanish.  This happens to be - that's -

20  I'm not - I don't read Spanish.  What little

21  Spanish I read can hardly - be hardly used in a

22  court of law.  We could've had, if we had known,

23  we could've had possibly a translator here today

24  to - to at least read these to us.  And I know

25  there are people in this business that read

26  Spanish, understand that.  We're supposed to

27  have certified interpreters to do this kind of

11

1   work.   When did you receive these?

2           **INMATE PEREZ:**  Two weeks ago.

3           **PRESIDING COMMISSIONER INGLEE:**  Well, I

4   know you have old ones in here.

5           **INMATE PEREZ:**  Uh-huh.

6           **PRESIDING COMMISSIONER INGLEE:**  But

7   they - most of them are dated and can't be used.

8   They go past the - the normal date of one

9   hearing.  Well, if you don't get a date today -

10  what's the date on this - on these letters?

11  There's - yeah, 2006.  Are these from Mexico or

12  are they from Los Angeles?

13          **INMATE PEREZ:**  One is from Los Angeles.

14          **PRESIDING COMMISSIONER INGLEE:**  I'm

15  sorry.

16          **INMATE PEREZ:**  One is from Los Angeles.

17          **PRESIDING COMMISSIONER INGLEE:**  Oh,

18  this is the one from Los Angeles.

19          **INMATE PEREZ:**  Uh-huh.

20          **PRESIDING COMMISSIONER INGLEE:**  You can

21  tell your - it - it - it's - it's nice that they

22  do this but it's not necessary.

23          **INMATE PEREZ:**  Okay.

24          **PRESIDING COMMISSIONER INGLEE:**

25  Somebody's going to expense and it's - I'm

26  talking about in the United States.  And I know

27  in Mexico it's - it is - it is a - apparently,

12

1  it's something that's not (inaudible) is they

2  have - that you have things notarized or

3  validated.  I've received quite a few.  And how

4  old is this?  This is (inaudible) education

5  program.  Are these your only copies?

6      **ATTORNEY LEWIS:**  Yes, I believe so.

7  Did - did you make copies of these?

8      **INMATE PEREZ:**  No.

9      **PRESIDING COMMISSIONER INGLEE:**  Also,

10 why don't you go ahead and make copies of these

11 so we could -

12     **DEPUTY COMMISSIONER MOORE:**  One of

13 each?

14     **PRESIDING COMMISSIONER INGLEE:**  Yeah,

15 that'd be fine.

16     **DEPUTY COMMISSIONER MOORE:**  Okay.

17     **PRESIDING COMMISSIONER INGLEE:**  Give

18 the original back to the inmate and then I'll

19 put copies in -

20     **DEPUTY COMMISSIONER MOORE:**  Okay.

21     **PRESIDING COMMISSIONER INGLEE:**  Thank

22 you.  So you just received those?

23     **INMATE PEREZ:**  Yes.

24     **PRESIDING COMMISSIONER INGLEE:**  What's

25 the process here of having - of having documents

26 translated?  How long does it take?

27     **INMATE PEREZ:**  Not too long.  Usually

13

1   when - my other lawyer, you know, he translated,

2   you know, himself, you know.

3        **PRESIDING COMMISSIONER INGLEE:**  Well,

4   anyway, that's - that's a timing problem.  How

5   long have you known you were going to have this

6   hearing?

7        **INMATE PEREZ:**  I don't know.

8        **PRESIDING COMMISSIONER INGLEE:**  In a

9   year?

10       **INMATE PEREZ:**  A year.

11       **PRESIDING COMMISSIONER INGLEE:**  When

12   did you start asking people to get these letters

13   in?

14       **INMATE PEREZ:**  This - this (inaudible)

15   letter probably, you know, this one -

16       **PRESIDING COMMISSIONER INGLEE:**  Well,

17   it's a shame they didn't get here early enough

18   to be translated.  Okay, let's go ahead and move

19   on.  Are there any other documents to be

20   submitted?

21       **ATTORNEY LEWIS:**  No.

22       **PRESIDING COMMISSIONER INGLEE:**  Do you

23   have any preliminary objections?

24       **ATTORNEY LEWIS:**  None.

25       **PRESIDING COMMISSIONER INGLEE:**  Will

26   the inmate be speaking to the Panel?

27       **ATTORNEY LEWIS:**  Yes, he will be.

14

1      **PRESIDING COMMISSIONER INGLEE:** On all
2  subjects?

3      **ATTORNEY LEWIS:** Yes.

4      **PRESIDING COMMISSIONER INGLEE:** Okay.
5  With that would you please raise your right
6  hand? Do you solemnly swear or affirm that the
7  testimony you give at this hearing will be the
8  truth, the whole truth, and nothing but the
9  truth?

10      **INMATE PEREZ:** I do.

11      **PRESIDING COMMISSIONER INGLEE:** Thank
12  you. If there is no objection counsel, we'll
13  incorporate by reference the statement of fact
14  and this will come from the probation officer's
15  report page 1.

16      **ATTORNEY LEWIS:** That'll be fine.

17      **PRESIDING COMMISSIONER INGLEE:** Okay.
18  Mr. Perez, tell us what happened.

19      **INMATE PEREZ:** Well, the night of May
20  27th they pick up (inaudible) uncle, you know, a
21  fight -

22      **PRESIDING COMMISSIONER INGLEE:** I'm
23  sorry, you said by - by your uncle?

24      **INMATE PEREZ:** Uh-huh.

25      **PRESIDING COMMISSIONER INGLEE:** Okay.

26      **INMATE PEREZ:** No, just (inaudible).

27      **PRESIDING COMMISSIONER INGLEE:** That's

15

1    fine.

2         **INMATE PEREZ:** Okay. And a fight broke

3    out and the guy was shooting my uncle. I stood

4    up for my uncle and that guy (inaudible) that's

5    how everything started. We (inaudible) for a

6    little bit. We - they throw us out. And they -

7    they throw us out I - I kill a person.

8         **PRESIDING COMMISSIONER INGLEE:** Okay.

9    You apparently had a .22 pistol in your car?

10        **INMATE PEREZ:** Yeah.

11        **PRESIDING COMMISSIONER INGLEE:** Was it

12   an automatic?

13        **INMATE PEREZ:** Automatic.

14        **PRESIDING COMMISSIONER INGLEE:** .22

15   automatic. And where did you get the pistol?

16        **INMATE PEREZ:** I bought it from my

17   uncle.

18        **PRESIDING COMMISSIONER INGLEE:** Was

19   it -

20        **INMATE PEREZ:** (inaudible).

21        **PRESIDING COMMISSIONER INGLEE:** - an

22   illegal weapon?

23        **INMATE PEREZ:** Yeah, it was illegal

24   weapon.

25        **PRESIDING COMMISSIONER INGLEE:** Illegal

26   or legal?

27        **INMATE PEREZ:** Illegal.

16

1      **PRESIDING COMMISSIONER INGLEE:**
2   Illegal.  Had you ever fired a pistol before?
3      **INMATE PEREZ:**  No.
4      **PRESIDING COMMISSIONER INGLEE:**  Never?
5   Why did you have a pistol?
6      **INMATE PEREZ:**  Just protection.
7      **PRESIDING COMMISSIONER INGLEE:**  How
8   long had you owned the pistol?
9      **INMATE PEREZ:**  About two months.
10     **PRESIDING COMMISSIONER INGLEE:**  You
11  never took it out in the field and shot it or
12  (inaudible)?
13     **INMATE PEREZ:**  Oh, yes, (inaudible) to
14  have a pistol.
15     **PRESIDING COMMISSIONER INGLEE:**  But you
16  actually never shot the pistol at any time?
17     **INMATE PEREZ:**  No.  We stop.
18     **PRESIDING COMMISSIONER INGLEE:**  What
19  prompted you to - if you'd never shot the pistol
20  before what prompted you to at that time - I'm
21  sure being the age you were you'd been in a
22  fistfight before?
23     **INMATE PEREZ:**  Uh-huh.
24     **PRESIDING COMMISSIONER INGLEE:**  I think
25  most of have at one time in our lives, males.
26  Why did you think this time, because of a
27  fistfight, you needed to go to your car and get

17

1 a pistol out and kill somebody? That's a big
2 jump from having a fistfight.

3 **INMATE PEREZ:** Uh-huh.

4 **PRESIDING COMMISSIONER INGLEE:** To
5 murdering somebody.

6 **INMATE PEREZ:** Okay, when they threw us
7 out they told the – the person first, you know,
8 he was (inaudible) like I'm going to kill you,
9 you know. It was kind of dark outside when I
10 (inaudible) or something to get my gun and start
11 blasting with (inaudible) just went off.

12 **PRESIDING COMMISSIONER INGLEE:** I'm
13 sorry, I – I – I do apologize. You speak good
14 English and, unfortunately, my ear is not good
15 for hearing Spanish today I guess. I just
16 listened to three hours of Vietnamese and I'm
17 still jumping back to that. So let's – give me
18 that again. The question I asked you was you
19 were in a fistfight –

20 **INMATE PEREZ:** Uh-huh.

21 **PRESIDING COMMISSIONER INGLEE:** –
22 you've been in fistfights before. Now, all of a
23 sudden, you're in a fistfight and you feel the
24 need – you've never fired the pistol before.
25 You – you - apparently, you don't – you didn't
26 think you got to carry it with you cause you
27 kept it in your car. Now all of a sudden you go

18

1   over and take the pistol out of your car and go

2   back and you kill somebody.  And you may have

3   given me that answer but I need to ask you that

4   same question and ask you to give me that answer

5   again.  Why did you feel the need to kill the

6   person?

7        **INMATE PEREZ:**  I was scared that he was

8   going to get a gun (inaudible) or something.

9   That he was going to kill me, you know.

10       **PRESIDING COMMISSIONER INGLEE:**  Did he

11  have a gun in his hand?

12       **INMATE PEREZ:**  No.

13       **PRESIDING COMMISSIONER INGLEE:**  Did he

14  have a baseball in his hand?  Did he have a pool

15  cue in his hand?

16       **INMATE PEREZ:**  I don't think they find

17  anything - I don't think he had anything.

18       **INMATE PEREZ:**  In other words, there

19  was nothing he was threatening you with?  How

20  many times did you shoot him?

21       **INMATE PEREZ:**  It was three or four

22  times.

23       **PRESIDING COMMISSIONER INGLEE:**  Four

24  times.  Or at least that's what the record says.

25  I'll take that back.  You did fire it four

26  times; you hit him twice.  How far away from -

27  from him - how far away from him were you when

19

1   you fired?

2          **ATTORNEY LEWIS:**  I'm sorry,

3   Commissioner, he had actually struck him three

4   times.  He fired it four.

5          **PRESIDING COMMISSIONER INGLEE:**  Says

6   down here Perez fired four rounds from the

7   pistol striking the victim twice in his left –

8   oh, and also, okay.  And once in the lower

9   corner of his (inaudible).

10         **ATTORNEY LEWIS:**  Right.

11         **PRESIDING COMMISSIONER INGLEE:**  Yeah,

12  okay.  Thank you very much.  I hadn't gone to

13  the next – next line.  So of – of the four

14  rounds, four shots you hit him three times.  I

15  guess I'm still questioning why you felt the

16  need to do this because he – he, apparently, he

17  didn't have a weapon.  You didn't see a weapon.

18  He wasn't carrying anything in his hand like a –

19  like a baseball bat or a pool cue or – or

20  something that he could've hit you with.  How

21  large a man was he?

22         **INMATE PEREZ:**  Excuse me?

23         **PRESIDING COMMISSIONER INGLEE:**  How

24  large was he?  How tall was he?

25         **INMATE PEREZ:**  Probably about my size.

26         **PRESIDING COMMISSIONER INGLEE:**  And was

27  it – the weight about the same?

20

1          **INMATE PEREZ:**  The weight was the same
2   but he was about – he was about my size.
3          **PRESIDING COMMISSIONER INGLEE:**  He was
4   about – about the same size then.
5          **INMATE PEREZ:**  Yes.
6          **PRESIDING COMMISSIONER INGLEE:**  I still
7   can't come to grips with why you felt the need
8   to murder him, that's all, because of
9   (inaudible) trying to find out maybe there was
10   some other reasons – something else that may
11   have occurred.  Why do you think he – did you
12   think he had a pistol some –
13          **INMATE PEREZ:**  No.  But the – I – it
14   was like (inaudible) I wasn't thinking, you
15   know.
16          **PRESIDING COMMISSIONER INGLEE:**  Okay.
17          **INMATE PEREZ:**  Like (inaudible).
18          **PRESIDING COMMISSIONER INGLEE:**
19   (inaudible) stupid.  All right.  Anything else
20   about the killing?
21          **INMATE PEREZ:**  Feel sorry for, you
22   know, the person, you know.  There's nothing I
23   can do, you know, to bring him back, you know.
24          **PRESIDING COMMISSIONER INGLEE:**  Well,
25   you're right.  You're right.
26          **INMATE PEREZ:**  If I could, you know, I
27   could bring him back.

21

1        **PRESIDING COMMISSIONER INGLEE:**  That's
2   a crime that's happened.  It's not going to
3   change, is it?
4        **INMATE PEREZ:**  Nothing will change.
5        **PRESIDING COMMISSIONER INGLEE:**  Deputy
6   Commissioner, do you have any questions?
7        **DEPUTY COMMISSIONER MOORE:**  Where were
8   you when you shot Mr. Ortiz?
9        **INMATE PEREZ:**  (inaudible).
10       **DEPUTY COMMISSIONER MOORE:**  In relation
11  - let me be a little bit more clear.  Was there
12  anything between you and Mr. Ortiz, physically?
13  A car, a tree, a building.  Is there anything
14  between the two of you?
15       **INMATE PEREZ:**  Car.
16       **DEPUTY COMMISSIONER MOORE:**  Who's car?
17       **INMATE PEREZ:**  His car.
18       **DEPUTY COMMISSIONER MOORE:**  His - Mr.
19  Ortiz's car?  Is that a yes?  Did you just say
20  yes?
21       **INMATE PEREZ:**  Yes.
22       **DEPUTY COMMISSIONER MOORE:**  Okay.  How
23  far had you walked - you had gone to your car to
24  get your gun?
25       **INMATE PEREZ:**  No, I was going out to -
26  to (inaudible).
27       **DEPUTY COMMISSIONER MOORE:**  And where

22

1    did you get the .22?

2            **INMATE PEREZ:**  From the car.

3            **DEPUTY COMMISSIONER MOORE:**  Your car?

4            **INMATE PEREZ:**  Uh-huh.

5            **DEPUTY COMMISSIONER MOORE:**  And that

6    was in the parking lot?

7            **INMATE PEREZ:**  Yes.

8            **DEPUTY COMMISSIONER MOORE:**  And how far

9    away was Mr. Ortiz when you got the - when you

10   got your .22?

11           **INMATE PEREZ:**  Next to.

12           **DEPUTY COMMISSIONER MOORE:**  Next

13   parking space?

14           **INMATE PEREZ:**  Uh-huh.  Wasn't parking

15   space.  Was just (inaudible).

16           **DEPUTY COMMISSIONER MOORE:**  Was it from

17   you to me?  Or closer or further?

18           **INMATE PEREZ:**  From here to the wall.

19           **DEPUTY COMMISSIONER MOORE:**  Okay, so

20   about 12 or 15 feet?  To -

21           **INMATE PEREZ:**  Some - something around

22   there.

23           **DEPUTY COMMISSIONER MOORE:**  Okay. And

24   there was a car between the two of you?

25           **INMATE PEREZ:**  Yeah, car.

26           **DEPUTY COMMISSIONER MOORE:**  And did you

27   see his hands?

23

1          **INMATE PEREZ:** (inaudible), you know,
2  (inaudible) but that was it.
3          **DEPUTY COMMISSIONER MOORE:** So did you
4  see his hands?
5          **INMATE PEREZ:** No, not - not
6  (inaudible) because it was kind of dark outside.
7          **DEPUTY COMMISSIONER MOORE:** Cause it
8  was around 11 o'clock or midnight?
9          **INMATE PEREZ:** I think midnight.
10          **DEPUTY COMMISSIONER MOORE:** Okay.  And
11  did - did you get your .22 before or after you
12  heard 'I'm going to kill you'?
13          **INMATE PEREZ:**  After.
14          **DEPUTY COMMISSIONER MOORE:** And be -
15  when you heard 'I'm going to kill you' what was
16  Mr. Ortiz doing?
17          **INMATE PEREZ:** Was (inaudible).
18          **DEPUTY COMMISSIONER MOORE:**  In Spanish,
19  English?
20          **INMATE PEREZ:** In Spanish.
21          **DEPUTY COMMISSIONER MOORE:** Okay.  And
22  he's calling you names.  Are you calling him
23  names?
24          **INMATE PEREZ:** I have to say something,
25  you know, back, you know.
26          **DEPUTY COMMISSIONER MOORE:** With names?
27          **INMATE PEREZ:** Yeah.

24

1          **DEPUTY COMMISSIONER MOORE:** Okay. So

2    you were hollering at one another?

3          **INMATE PEREZ:** Yes.

4          **DEPUTY COMMISSIONER MOORE:** And then he

5    said - tell me what it was he said about killing

6    you.  What did he say?

7          **INMATE PEREZ:** (inaudible) -

8          **DEPUTY COMMISSIONER MOORE:** Go ahead.

9          **INMATE PEREZ:** He said 'fuck you, I'm

10   going to kill you'.

11         **DEPUTY COMMISSIONER MOORE:** Okay.  And

12   when he said that were you looking at him?

13         **INMATE PEREZ:** We just - well, kind of,

14   you know, because we were arguing.

15         **DEPUTY COMMISSIONER MOORE:** Okay, so

16   you were about from you to the wall?

17         **INMATE PEREZ:** Uh-huh.

18         **DEPUTY COMMISSIONER MOORE:** And you're

19   arguing.  And he says F-U, I'm going to kill

20   your F-ing uncle and you, too.  Something like

21   that?

22         **INMATE PEREZ:** Uh-huh.

23         **DEPUTY COMMISSIONER MOORE:** What - what

24   was - could you see his hands when he said that?

25         **INMATE PEREZ:** He was (inaudible) with

26   his hands, you know.

27         **DEPUTY COMMISSIONER MOORE:** But you

25

1  couldn't see his hands?

2      **INMATE PEREZ:** No.

3      **DEPUTY COMMISSIONER MOORE:** You never
4  saw a gun?

5      **INMATE PEREZ:** No. I didn't - not that
6  I remember.

7      **DEPUTY COMMISSIONER MOORE:** Okay. And
8  after he said that that's when you you're your
9  .22?

10     **INMATE PEREZ:** Yeah, we - we kept
11  arguing.

12     **DEPUTY COMMISSIONER MOORE:** How long
13  after he said I'm going to kill you yelling at
14  you, after he said that, how long did it take
15  you to go get your .22?

16     **INMATE PEREZ:** About two or three
17  minutes I got the gun.

18     **DEPUTY COMMISSIONER MOORE:** Okay. And
19  when you shot - how long after you got the .22
20  did you fire it?

21     **INMATE PEREZ:** (inaudible)?

22     **DEPUTY COMMISSIONER MOORE:** You went
23  and got the .22 out of your car. How much time
24  from the time you got the .22 from your car to
25  the time you shot Mr. Ortiz?

26     **INMATE PEREZ:** About two or three
27  minutes. He - he was still arguing, you know.

26

1          **DEPUTY COMMISSIONER MOORE:**  Okay.

2          **INMATE PEREZ:**  Telling me he was going

3     to kill me.

4          **DEPUTY COMMISSIONER MOORE:**  And the

5     whole time – well, when you shot him was he from

6     where you're sitting to the wall or was he

7     closer?

8          **INMATE PEREZ:**  He was about the same

9     space.  Same distance.

10          **DEPUTY COMMISSIONER MOORE:**  I – I –

11    after you shot him what – what did he do?  Did

12    his body react?

13          **INMATE PEREZ:**  He just went down.

14          **DEPUTY COMMISSIONER MOORE:**  And there

15    was a car between you and him.  Is that right?

16          **INMATE PEREZ:**  Yeah.

17          **DEPUTY COMMISSIONER MOORE:**  I'm

18    confused about something.  In the report it says

19    that the shell casings from your gun were found

20    right next to Mr. Ortiz.  Do you know what a

21    shell casing is?

22          **INMATE PEREZ:**  Uh-huh.

23          **DEPUTY COMMISSIONER MOORE:**  When you

24    fire the gun they're popping out of the gun,

25    right?

26          **INMATE PEREZ:**  Yeah.

27          **DEPUTY COMMISSIONER MOORE:**  And those

27

1  shell casings were found right next to Mr. Ortiz

2  where he was on the ground.  How did that

3  happen?

4        **INMATE PEREZ:**  Well, I just shot him

5  from here to there.  I don't know, you know, how

6  it get so close.

7        **DEPUTY COMMISSIONER MOORE:**  And there

8  was a car between the two of you?

9        **INMATE PEREZ:**  Yeah.

10       **DEPUTY COMMISSIONER MOORE:**  So you were

11 shooting over the car?

12       **INMATE PEREZ:**  Yeah.

13       **DEPUTY COMMISSIONER MOORE:**  At his

14 head?

15       **INMATE PEREZ:**  Pretty much.

16       **DEPUTY COMMISSIONER MOORE:**  What did

17 you do with the gun afterwards?

18       **INMATE PEREZ:**  I leave it in the – in

19 the house.

20       **DEPUTY COMMISSIONER MOORE:**  You brought

21 it back – you brought it to your house?

22       **INMATE PEREZ:**  Uh-huh.

23       **DEPUTY COMMISSIONER MOORE:**  Was there

24 anyone with you?

25       **INMATE PEREZ:**  Was another guy.

26       **DEPUTY COMMISSIONER MOORE:**  Who?

27       **INMATE PEREZ:**  I don't know his name.

28

1  Just gave me a ride to - to the bar.

2          **DEPUTY COMMISSIONER MOORE:** Was he

3  arguing with Mr. Ortiz, too?

4          **INMATE PEREZ:** Well, just - just, you

5  know, just kind of names, too, to him about -

6  that was it.

7          **DEPUTY COMMISSIONER MOORE:** He was

8  calling Ortiz names? Or he was calling you

9  names?

10         **INMATE PEREZ:** No, (inaudible) each

11  other.

12         **DEPUTY COMMISSIONER MOORE:** Okay. Was

13  he a friend of yours?

14         **INMATE PEREZ:** I - I wasn't like a

15  friend.

16         **DEPUTY COMMISSIONER MOORE:** But you

17  don't remember his name?

18         **INMATE PEREZ:** I don't remember his

19  name.

20         **DEPUTY COMMISSIONER MOORE:** Okay. Had

21  you been drinking that night?

22         **INMATE PEREZ:** Yes.

23         **DEPUTY COMMISSIONER MOORE:** How much?

24         **INMATE PEREZ:** I really (inaudible)

25  much. About five beers.

26         **DEPUTY COMMISSIONER MOORE:** Did you

27  feel the beer in you? Did you have a buzz?

29

1          **INMATE PEREZ:**  Yeah, I got a buzz.

2          **DEPUTY COMMISSIONER MOORE:**  After he,

3   Mr. Ortiz, fell to the ground what did you do?

4          **INMATE PEREZ:**  I was scared.  I - I

5   don't know to run or stay.

6          **DEPUTY COMMISSIONER MOORE:**  What were

7   you afraid of?

8          **INMATE PEREZ:**  That - that I killed a

9   person.

10         **DEPUTY COMMISSIONER MOORE:**  That what?

11         **INMATE PEREZ:**  That I killed a person.

12         **DEPUTY COMMISSIONER MOORE:**  That you

13  had done something wrong?

14         **INMATE PEREZ:**  Yes.

15         **DEPUTY COMMISSIONER MOORE:**  So what did

16  you do?

17         **INMATE PEREZ:**  I just run away from -

18  from there.

19         **DEPUTY COMMISSIONER MOORE:**  To where?

20         **INMATE PEREZ:**  To my house.

21         **DEPUTY COMMISSIONER MOORE:**  And then

22  what did you do?

23         **INMATE PEREZ:**  I go there and don't

24  know what to do.

25         **DEPUTY COMMISSIONER MOORE:**  And then

26  what did you do?

27         **INMATE PEREZ:**  I - I told my uncle, you

30

1    know, what I did and that was it.
2              **DEPUTY COMMISSIONER MOORE:**   Was this a
3    different uncle than the one at the bar or was
4    it the same uncle?
5              **INMATE PEREZ:**   The same uncle.
6              **DEPUTY COMMISSIONER MOORE:**   Okay, who
7    called the police?
8              **INMATE PEREZ:**   Him.
9              **DEPUTY COMMISSIONER MOORE:**   And where
10   was the gun?
11             **INMATE PEREZ:**   That was in my house.
12             **DEPUTY COMMISSIONER MOORE:**   Did you
13   give the gun to anybody?
14             **INMATE PEREZ:**   I - I think brother
15   picked it up and tried to hide it or something.
16             **DEPUTY COMMISSIONER MOORE:**   Did you ask
17   him to?
18             **INMATE PEREZ:**   No.
19             **DEPUTY COMMISSIONER MOORE:**   Did you
20   tell your brother what you had done?
21             **INMATE PEREZ:**   Not at the time.
22             **DEPUTY COMMISSIONER MOORE:**   Why would
23   he hide the gun?
24             **INMATE PEREZ:**   Tried to protect me or
25   something.
26             **DEPUTY COMMISSIONER MOORE:**   From what?
27             **INMATE PEREZ:**   From what I did.

31

1      **DEPUTY COMMISSIONER MOORE:** But you
2  didn't tell him what you had done.  How did he
3  know?
4      **INMATE PEREZ:** Oh, he find out.  He go
5  to my uncle's.
6      **DEPUTY COMMISSIONER MOORE:** You never
7  saw a gun in Mr. Ortiz's hand?
8      **INMATE PEREZ:** None.  No.
9      **DEPUTY COMMISSIONER MOORE:** Why did you
10 shoot him?
11     **INMATE PEREZ:** I was scared that he
12 was, you know, kill me or something.
13     **DEPUTY COMMISSIONER MOORE:** What made
14 you think he was going to kill you?
15     **INMATE PEREZ:** Cause other threats he
16 was doing to me (inaudible).
17     **DEPUTY COMMISSIONER MOORE:** His words
18 made you think he was going to kill you?
19     **INMATE PEREZ:** Yeah.
20     **DEPUTY COMMISSIONER MOORE:** Was he
21 winning in the fistfight in the bar?
22     **INMATE PEREZ:** Yeah.
23     **DEPUTY COMMISSIONER MOORE:** He was
24 winning?
25     **INMATE PEREZ:** Uh-huh.
26     **DEPUTY COMMISSIONER MOORE:** Were you
27 injured?

32

1          **INMATE PEREZ:** (inaudible) fat lip.
2          **DEPUTY COMMISSIONER MOORE:** Okay. Did
3   he have any injuries?
4          **INMATE PEREZ:** I don't know.
5          **DEPUTY COMMISSIONER MOORE:** Thank you,
6   that's all the questions I have about the crime.
7          **PRESIDING COMMISSIONER INGLEE:**
8   Anything else about the crime you'd like to say?
9          **INMATE PEREZ:** I want to say I'm sorry
10  and I know what I did was wrong. (inaudible)
11  back in time and nothing I can do. You know,
12  I'm the one who did that (inaudible). No –
13  nobody else. I accept responsibility for that.
14         **PRESIDING COMMISSIONER INGLEE:** How
15  many other people were around at the time you
16  shot the weapon?
17         **INMATE PEREZ:** A lot of people in the
18  bar. I don't – I don't know how many.
19  (inaudible).
20         **PRESIDING COMMISSIONER INGLEE:** If you
21  had missed him and a round went into the window
22  could it have killed somebody in the bar?
23         **INMATE PEREZ:** No, (inaudible) the –
24  the bar was (inaudible) different – different
25  way.
26         **PRESIDING COMMISSIONER INGLEE:** Was
27  anybody else around him?

33

1          **INMATE PEREZ:**  No.

2          **PRESIDING COMMISSIONER INGLEE:**  He was
3   standing there all by himself?

4          **INMATE PEREZ:**  Yes.

5          **PRESIDING COMMISSIONER INGLEE:**  Was he
6   moving?

7          **INMATE PEREZ:**  Yeah, you know.

8          **PRESIDING COMMISSIONER INGLEE:**  Having
9   never fired a pistol you did a pretty good job.
10  You hit him three times out of four.

11         **INMATE PEREZ:**  Yeah.

12         **PRESIDING COMMISSIONER INGLEE:**  And
13  never fired a pistol before and he was - he was
14  moving.

15         **INMATE PEREZ:**  (inaudible).

16         **PRESIDING COMMISSIONER INGLEE:**  Well,
17  good job is probably a very poor way of putting
18  it but, I mean, you know -

19         **INMATE PEREZ:**  A mistake.

20         **PRESIDING COMMISSIONER INGLEE:**  Yeah.
21  Well, that was surprising that you were able to
22  hit somebody having never fired a weapon before.
23  I'll take a look at your prior criminality. You
24  have no juvenile record.  As an adult you were
25  arrested on 10/9 of 1987 Los Angeles Police
26  Department (inaudible) on 5/11/1980 for four
27  counts of burglary.  (inaudible) pleaded guilty

34

1  on 5/13/1980 for involvement in burglary

2  offense.  You were sentenced to 12 months

3  without supervision, 30 days jail term on two

4  counts and the remaining two counts dismissed.

5  Again you arrested on 8/12/1980 Los Angeles

6  Police Department of one count of burglary.  You

7  were convicted and sentenced to four years with

8  California Department of Corrections.  You were

9  paroled on 4/21/1983.  You were on parole at the

10 time the crime was committed, weren't you?

11         **INMATE PEREZ:**  (inaudible).

12         **PRESIDING COMMISSIONER INGLEE:**  Well,

13 you - you were on parole in 1983 and the crime

14 was committed, what, '85?

15         **ATTORNEY LEWIS:**  May 27th, '84.

16         **PRESIDING COMMISSIONER INGLEE:**  '84 so

17 reasonable to assume that he was on parole at

18 the time, counselor?

19         **DEPUTY DISTRICT ATTORNEY BULLOCH:**

20 (inaudible) in the case.

21         **PRESIDING COMMISSIONER INGLEE:**  So you

22 were on parole at the time the crime was

23 committed?

24         **INMATE PEREZ:**  I guess.

25         **PRESIDING COMMISSIONER INGLEE:**  You

26 really don't know?

27         **INMATE PEREZ:**  (inaudible).

35

```
1           PRESIDING COMMISSIONER INGLEE:   What
2    prison were you incarcerated?
3           INMATE PEREZ:   Before?
4           PRESIDING COMMISSIONER INGLEE:   Yes,
5    before this one.  I mean - I mean -
6           INMATE PEREZ:   I -
7           PRESIDING COMMISSIONER INGLEE:   - for
8    that - for that crime.  For the crime of
9    5/12/1987.
10          INMATE PEREZ:   Tehachapi.
11          PRESIDING COMMISSIONER INGLEE:
12   Tehachapi?
13          INMATE PEREZ:   Uh-huh.
14          PRESIDING COMMISSIONER INGLEE:   Did you
15   spend all your full time up there?
16          INMATE PEREZ:   Well, I went to
17   Susanville first then to Tehachapi.
18          PRESIDING COMMISSIONER INGLEE:   And
19   that's where you stayed?
20          INMATE PEREZ:   Yes.
21          PRESIDING COMMISSIONER INGLEE:   And you
22   were released from up there?  What did you think
23   of Tehachapi?
24          INMATE PEREZ:   It was - was all right.
25   (inaudible).
26          PRESIDING COMMISSIONER INGLEE:   All
27   right, anything you want to tell - talk about in
```

35

1          **PRESIDING COMMISSIONER INGLEE:** What
2   prison were you incarcerated?
3          **INMATE PEREZ:** Before?
4          **PRESIDING COMMISSIONER INGLEE:** Yes,
5   before this one.  I mean - I mean -
6          **INMATE PEREZ:** I -
7          **PRESIDING COMMISSIONER INGLEE:** - for
8   that - for that crime.  For the crime of
9   5/12/1987.
10         **INMATE PEREZ:** Tehachapi.
11         **PRESIDING COMMISSIONER INGLEE:**
12  Tehachapi?
13         **INMATE PEREZ:** Uh-huh.
14         **PRESIDING COMMISSIONER INGLEE:** Did you
15  spend all your full time up there?
16         **INMATE PEREZ:** Well, I went to
17  Susanville first then to Tehachapi.
18         **PRESIDING COMMISSIONER INGLEE:** And
19  that's where you stayed?
20         **INMATE PEREZ:** Yes.
21         **PRESIDING COMMISSIONER INGLEE:** And you
22  were released from up there?  What did you think
23  of Tehachapi?
24         **INMATE PEREZ:** It was - was all right.
25  (inaudible).
26         **PRESIDING COMMISSIONER INGLEE:** All
27  right, anything you want to tell - talk about in

34

1   on 5/13/1980 for involvement in burglary

2   offense.   You were sentenced to 12 months

3   without supervision, 30 days jail term on two

4   counts and the remaining two counts dismissed.

5   Again you arrested on 8/12/1980 Los Angeles

6   Police Department of one count of burglary.  You

7   were convicted and sentenced to four years with

8   California Department of Corrections.  You were

9   paroled on 4/21/1983.  You were on parole at the

10  time the crime was committed, weren't you?

11          **INMATE PEREZ:**  (inaudible).

12          **PRESIDING COMMISSIONER INGLEE:**  Well,

13  you - you were on parole in 1983 and the crime

14  was committed, what, '85?

15          **ATTORNEY LEWIS:**  May 27th, '84.

16          **PRESIDING COMMISSIONER INGLEE:**  '84 so

17  reasonable to assume that he was on parole at

18  the time, counselor?

19          **DEPUTY DISTRICT ATTORNEY BULLOCH:**

20  (inaudible) in the case.

21          **PRESIDING COMMISSIONER INGLEE:**  So you

22  were on parole at the time the crime was

23  committed?

24          **INMATE PEREZ:**  I guess.

25          **PRESIDING COMMISSIONER INGLEE:**  You

26  really don't know?

27          **INMATE PEREZ:**  (inaudible).

36

 1  regard to your prior criminal history?

 2       **INMATE PEREZ:**  Not really.

 3       **PRESIDING COMMISSIONER INGLEE:**  Okay.

 4  Let's take a look at your personal factors.  You

 5  are a 46 year old Mexican National. You were

 6  born October 25th, 1957 and I'll spell the name

 7  of the - of the city or town.  Z-A-C-A-T-E-C-A-

 8  S, Mexico.  What the correct pronunciation?

 9       **ATTORNEY LEWIS:**  Zacatecas.

10       **INMATE PEREZ:**  Zacatecas.

11       **PRESIDING COMMISSIONER INGLEE:**

12  Zacatecas.  To Matias and Juana Perez

13  (inaudible).  Spelled M-A-T-I-A-S.  And then

14  J-U-A-N-A Perez.  The family was supported by

15  his father, a factory employee in Mexico.  His

16  mother was a homemaker until she and her husband

17  purchased a small grocery store in (inaudible).

18  Does your mother still own that store?

19       **INMATE PEREZ:**  No, they sold it to buy

20  a little farm with cows and -

21       **PRESIDING COMMISSIONER INGLEE:**  Is it

22  near the same town you grew up in?

23       **INMATE PEREZ:**  Yes.

24       **PRESIDING COMMISSIONER INGLEE:**  In

25  addition to his parents Perez has multiple

26  brothers and sisters that currently live in

27  Mexico and the United States.  Perez came to the

1  United States in 1975 to visit, decided to stay

2  with his family members in southern California.

3  He attended Belmont Elementary School until the

4  8th grade at which time - at which time he

5  dropped out of school to go to work making

6  furniture.  His (inaudible) dated 2/28/1985

7  identified presently as being affiliated with 90

8  - 90 Street Gang in Los Angeles.  Were you a 19

9  Street Gang member?

10        **INMATE PEREZ:**  There are no (inaudible)

11  in LA.

12        **PRESIDING COMMISSIONER INGLEE:**  I'm

13  sorry?

14        **INMATE PEREZ:**  There are no (inaudible)

15  in LA.  No - no -

16        **DEPUTY COMMISSIONER MOORE:**  No such

17  (speaks Spanish) in LA.

18        **PRESIDING COMMISSIONER INGLEE:**  Was it

19  the - is it the 19th Street?  Is that -

20        **INMATE PEREZ:**  Yes.

21        **PRESIDING COMMISSIONER INGLEE:**  - just

22  a misprint?

23        **INMATE PEREZ:**  Is misprint.

24        **PRESIDING COMMISSIONER INGLEE:**  But

25  there is a 19th Street Gang?

26        **INMATE PEREZ:**  No.

27        **PRESIDING COMMISSIONER INGLEE:**  There's

38

1  not?

2         **INMATE PEREZ:**  No.

3         **PRESIDING COMMISSIONER INGLEE:**  All

4  right, what gang were you in?

5         **INMATE PEREZ:**  I - I was (inaudible)

6  around with (inaudible) but that (inaudible)

7  doesn't exist any more.

8         **PRESIDING COMMISSIONER INGLEE:**  I'm -

9  give me the name of the gang again.

10        **INMATE PEREZ:**  3rd Street.

11        **PRESIDING COMMISSIONER INGLEE:**  3rd

12  Street?

13        **INMATE PEREZ:**  Yeah.

14        **PRESIDING COMMISSIONER INGLEE:**  3rd

15  Street.

16        **DEPUTY COMMISSIONER MOORE:**  (inaudible)

17  LA.

18        **PRESIDING COMMISSIONER INGLEE:**  Also

19  known as associated with a member of the

20  (inaudible) Gang.  Don't laugh now.  This is a

21  very serious thing.  You - this - the

22  information may be correct here.  That's the

23  reason why we have these hearings to find out if

24  they are correct.  So I don't think laughing is

25  necessarily what you should be doing here.  I

26  mean to suggest you just answer the questions.

27  If there's wrong information down here just tell

39

1   us.  All right?

2        **INMATE PEREZ:**  Okay.

3        **PRESIDING COMMISSIONER INGLEE:**  It says

4   that you were also member of the South Fontana

5   Gang?  And apparently you were not a member of

6   the South Fontana?

7        **INMATE PEREZ:**  No.

8        **PRESIDING COMMISSIONER INGLEE:**  Is

9   there such a thing as the South Fontana Gang?

10       **INMATE PEREZ:**  It's a gang in South

11   Fontana.

12       **PRESIDING COMMISSIONER INGLEE:**  And

13   you're not a member of that?

14       **INMATE PEREZ:**  No.

15       **PRESIDING COMMISSIONER INGLEE:**  Why

16   would they have it down here?

17       **INMATE PEREZ:**  I don't know.

18       **PRESIDING COMMISSIONER INGLEE:**  It said

19   that - there were affiliations with Los Angeles

20   gangs.  Can the district attorney bring any

21   light under this?

22       **DEPUTY DISTRICT ATTORNEY BULLOCH:**  I

23   read the same thing.  I don't have any other

24   documentation to - to confirm one way or the

25   other that he was or not a gang member.

26       **PRESIDING COMMISSIONER INGLEE:**  Okay.

27       **ATTORNEY LEWIS:**  Is it listed at Cal

40

1  Gangs?

2  **PRESIDING COMMISSIONER INGLEE:**  I'm
3  sorry?

4  **ATTORNEY LEWIS:**  Is he listed in Cal
5  Gangs?  It's a database for gang members and
6  whatnot.

7  **DEPUTY COMMISSIONER MOORE:**  It started
8  2001, Mr. Lewis.

9  **DEPUTY DISTRICT ATTORNEY BULLOCH:**  But
10  I - I would assume it's based on his prior CDC
11  conf - imprisonment where they document it at
12  that point in time.

13  **PRESIDING COMMISSIONER INGLEE:**  Well,
14  unfortunately, on some of these Board reports
15  there's just mistyping.  I'm not suggesting it
16  is but it could happen.  Some notes down here
17  that you were arrested on 4/9 in 1984 by the
18  California Highway Patrol charge of drunk
19  driving.  This was pending at the time you were
20  arrested for murder.  So you have a history of
21  drinking?

22  **INMATE PEREZ:**  Yes.

23  **PRESIDING COMMISSIONER INGLEE:**  Were
24  you drinking at the time when - I assume you
25  were.  Were you drinking at the time of the
26  murder?

27  **INMATE PEREZ:**  Yes, I was drinking.

41

1          **PRESIDING COMMISSIONER INGLEE:** Were

2   you drunk?

3          **INMATE PEREZ:** Not real drunk but I

4   was -

5          **PRESIDING COMMISSIONER INGLEE:** You

6   were feeling the affects of alcohol?

7          **INMATE PEREZ:** Yes.

8          **PRESIDING COMMISSIONER INGLEE:** Okay.

9   But apparently you still could hold a pistol

10  and -

11         **INMATE PEREZ:** Yeah.

12         **PRESIDING COMMISSIONER INGLEE:** - shoot

13  somebody.  Perez states that he denied using

14  narcotics.  No other information regarding

15  substance abuse.  Says here in your

16  psychological report which we just received on

17  5/9 of '06 in the past the use of alcohol has

18  been a problem his life.  This was related to

19  the commitment offense.  He has been clean and

20  sober now for 20 years.  Claims that the 115 he

21  received some time ago was for alcohol that

22  belonged to his son.  Okay.  And you do have an

23  INS hold for Mexico and I assume that you know

24  that you'll be deported at that time?

25         **INMATE PEREZ:** Yes.

26         **PRESIDING COMMISSIONER INGLEE:** And

27  although we cannot read the letters I know you

42

1  can read them, where will you be living if you
2  were - if you went - if you were let out today
3  and you were sent to Mexico where would you go
4  to live?
5      **INMATE PEREZ:**  With my parents.  They'd
6  take me (inaudible).  They're old, I got to go
7  take care of them.
8      **PRESIDING COMMISSIONER INGLEE:**  And
9  where would you go to work?
10      **INMATE PEREZ:**  They - they got a few
11  jobs offering.
12      **PRESIDING COMMISSIONER INGLEE:**  But
13  they're different from the ones you had down
14  there before?
15      **INMATE PEREZ:**  Uh-huh.
16      **PRESIDING COMMISSIONER INGLEE:**  And
17  that's only a short time ago.  So the jobs that
18  we show down here for the previous year are
19  different than the ones you have this time?
20      **INMATE PEREZ:**  Yes.
21      **PRESIDING COMMISSIONER INGLEE:**  I tried
22  to match them up thinking I may have had an
23  English translation already of this but just an
24  earlier letter and that doesn't appear to be the
25  case.  Okay.  Let's take a look at your parole
26  plans which I've already started discussing.
27  Perez plans to reside with his parents in their

43

1    home in Mexico.  Employment, it says his - and
2    his grocery store but, apparently, grocery store
3    doesn't exist any longer.  Is that right?  They
4    sold it?

5         **INMATE PEREZ:**  The - the one that my
6    parents formed they - they sold it, you know, to
7    buy a little farm.

8         **PRESIDING COMMISSIONER INGLEE:**  Sure.
9         **INMATE PEREZ:**  I got an (inaudible)
10   right there from my friend that give me a job in
11   a store, too.

12        **PRESIDING COMMISSIONER INGLEE:**  All
13   right.  And how far away from that is where your
14   parents live right now?

15        **INMATE PEREZ:**  About 45 minutes.

16        **PRESIDING COMMISSIONER INGLEE:**  What
17   are you going to do?  Just walk, drive?

18        **INMATE PEREZ:**  Drive.

19        **PRESIDING COMMISSIONER INGLEE:**  Okay.
20   Okay.  Let's take a look at the letters that you
21   did have.  And the letters that we have the jobs
22   are different from the letters that we had
23   before.  You do have a letter, a recent letter,
24   whether or not it's here in English.  This is
25   from your brother who was an - who states that
26   he owns a home.  Will offer you a safe place to
27   live.  And his family have strong (inaudible).

44

1  So if you - if you had a reason to stay in

2  California you would stay with your brother. Is

3  that correct?

4      **INMATE PEREZ:**  Yeah, and my - also my

5  sisters.  But I know I - I'm not stay -

6      **PRESIDING COMMISSIONER INGLEE:**  Well,

7  that's the letter we have.  Yeah.  But, by the

8  way, when you do have a - a - I would suggest to

9  you if you don't get a date today the letters

10 that you - if you feel you're going to have an

11 INS hold on you and you're going to be sent back

12 to Mexico there are circumstances that come up

13 occasionally where that doesn't necessarily

14 happen I would come into the next hearing with

15 both residences both in Mexico and California,

16 in the U.S.

17     **INMATE PEREZ:**  Okay.

18     **PRESIDING COMMISSIONER INGLEE:**  And

19 possible, certainly, jobs in Mexico but also, if

20 possible, a job potential in the United States.

21 I would back them up.

22     **INMATE PEREZ:**  Okay.

23     **PRESIDING COMMISSIONER INGLEE:**  I think

24 it'd be a good idea.  And we have letters that

25 go back to 1993 and 1999.  Have a very

26 supportive family 1998.  Year 2000.  '96.  Okay.

27 Anything else that's - as far as your parole

45

1   plans?
2           **INMATE PEREZ:**  That's it.  Just go away
3   and live with my parents.  Take care of them.
4           **PRESIDING COMMISSIONER INGLEE:**  How old
5   are your parents now?
6           **INMATE PEREZ:**  They very old.  Probably
7   70's, mid-70's.
8           **PRESIDING COMMISSIONER INGLEE:**  71, 75,
9   78?
10          **INMATE PEREZ:**  I don't know their age
11  exactly but they're in their 70's.
12          **PRESIDING COMMISSIONER INGLEE:**  You're
13  going to make me feel bad.
14          **INMATE PEREZ:**  Excuse me.  Young.
15          **PRESIDING COMMISSIONER INGLEE:**  Okay.
16  Let's take a look at your 3042 letters.  These
17  are letters that the prison sends out to the
18  various agencies that dealt with your
19  incarceration.  There were five sent out on
20  4/14/2006.  (inaudible)?
21          **DEPUTY COMMISSIONER MOORE:**  It's in the
22  packet that I gave you.
23          **PRESIDING COMMISSIONER INGLEE:**  Okay,
24  this is from Larry Clark, Chief of Police,
25  Fontana.  "(inaudible) circumstances in the
26  murder of Rodrigo Perez on 5/27/1984.
27  Circumstances in the case of above named is

46

1  complete disregard for human life in that, after

2  shooting the victim three times, he walked

3  closer to the helpless man and fired final

4  bullet - final bullet into his head. This type

5  of person is unlikely to be rehabilitated and

6  would likely be a menace to whatever community

7  he resides in. It's my hope that he is not

8  paroled and that he finished the term given to

9  him." Do we have any report that he shot round

10  - type round into his head?

11          **DEPUTY DISTRICT ATTORNEY BULLOCH:**

12  Well, despite, you know, previous recitations I

13  was reading the Court of Appeal and it did

14  indicate that four shots were fired at the

15  victim.

16          **PRESIDING COMMISSIONER INGLEE:** And I

17  show that, as well.

18          (Off The Record)

19          **DEPUTY COMMISSIONER MOORE:** And we're

20  back at 2 o'clock.

21          **PRESIDING COMMISSIONER INGLEE:** I

22  believe the - there may have been a mistype on

23  the part of the prison because when I look at

24  the probation officer's report it, in fact, says

25  - I read off the Board's report that says three

26  shots and if you take a look at the Board report

27  and that is one page 1 which is actually the

47

1   report that I had referenced on as I believe.
2        **DEPUTY COMMISSIONER MOORE:**  Is that the
3   Board report or probation –
4        **PRESIDING COMMISSIONER INGLEE:**  I'm
5   sorry.  The Board, probation and – and
6   appellate's are mixed up here.  This is the
7   probation officer's report.  And it states that
8   from that position Perez fired, and is typed in
9   three and somebody has drawn a line through it
10  and written in four, rounds from the pistol
11  striking Mr. Ortiz twice in the lower neck area
12  and once in the lower corner of his mouth.  Do
13  you recall doing that?
14       **INMATE PEREZ:**  Yeah.
15       **PRESIDING COMMISSIONER INGLEE:**  so you
16  fired four times then?
17       **DEPUTY DISTRICT ATTORNEY BULLOCH:**
18  Could the record indicate that the inmate is
19  nodding his head in an affirmative?
20       **PRESIDING COMMISSIONER INGLEE:**  Yes.
21       **INMATE PEREZ:**  Yes.
22       **PRESIDING COMMISSIONER INGLEE:**  He did
23  say yes.
24       **DEPUTY DISTRICT ATTORNEY BULLOCH:**  Oh,
25  I'm sorry.
26       **PRESIDING COMMISSIONER INGLEE:**  It was
27  low.  I'll ask the question again.  Do you

48

1 recall shooting - shooting the man four times?

2 **INMATE PEREZ:** Yes.

3 **PRESIDING COMMISSIONER INGLEE:** One

4 time, your final shot, to the head?

5 **ATTORNEY LEWIS:** I'm sorry, making four

6 shots but striking him three times.

7 **INMATE PEREZ:** Yeah.

8 **DEPUTY COMMISSIONER MOORE:** Twice in

9 the neck and once in the mouth.

10 **ATTORNEY LEWIS:** In the lower mouth.

11 **PRESIDING COMMISSIONER INGLEE:** From

12 that position first fired four rounds from the

13 pistol and, in the end, it goes back to what I

14 read earlier in the hearing, striking Ortiz

15 twice in the lower neck area and once in the

16 lower corner of the mouth. Okay, so we're back

17 four rounds being fired, three rounds striking

18 the man. Question is, did you walk over and

19 shoot a final round now in the back of his -

20 **INMATE PEREZ:** No, sir.

21 **PRESIDING COMMISSIONER INGLEE:** All

22 right. Okay. I have no other letters from any

23 of the other 3042 letters. However, we do have

24 a representative here from the San Bernardino

25 District Attorney's office who will make a

26 presentation in a few minutes. All right. With

27 that we'll move on to post-conviction factors.

49

1   And that'll be the deputy commissioner.

2   **DEPUTY COMMISSIONER MOORE:** Good

3   afternoon, Mr. Perez.

4   **INMATE PEREZ:** Good afternoon.

5   **DEPUTY COMMISSIONER MOORE:** I'm going

6   to review with you what you've been doing since

7   your last hearing and your last hearing date was

8   on June 17th, 2003. Is that right?

9   **INMATE PEREZ:** Yes.

10   **DEPUTY COMMISSIONER MOORE:** Okay. You

11   were scheduled for one in January.

12   **INMATE PEREZ:** Yes.

13   **DEPUTY COMMISSIONER MOORE:** But the -

14   **INMATE PEREZ:** I think - I think about

15   June.

16   **DEPUTY COMMISSIONER MOORE:** In June?

17   Cause - actually, you - you were scheduled to

18   come to hearing in January of this year but they

19   had - the doctor's report was not done so they

20   postponed it till today's date so your last

21   hearing where you sat before the Board was on

22   June of 2003.,

23   **INMATE PEREZ:** Uh-huh.

24   **DEPUTY COMMISSIONER MOORE:** And I'm

25   going to review with you what you've done since

26   June of 2003 and so that we can make a record

27   and I'll also talk about the documents that you

50

1  gave me today. Okay, sir?

2       **INMATE PEREZ:**  Okay.

3       **DEPUTY COMMISSIONER MOORE:**  I may have

4  some questions for you, too, so you'll help me

5  understand and make a good record.

6       **INMATE PEREZ:**  Okay.

7       **DEPUTY COMMISSIONER MOORE:**  You arrived

8  here at CTF in Soledad on April 5th, 2001, so

9  you've been here for a little over five years

10 now.

11      **INMATE PEREZ:**  Yes.

12      **DEPUTY COMMISSIONER MOORE:**  Okay, at

13 your last hearing you were denied parole for two

14 years.

15      **INMATE PEREZ:**  Yes.

16      **DEPUTY COMMISSIONER MOORE:**  And the

17 Board asked you to remain discipline-free.  No

18 more write-ups.  They asked you to go

19 programming for self-help and they asked you to

20 upgrade vocationally.  And I think there was

21 some comment about getting your GED, as well, in

22 2003.  Do you remember that?

23      **INMATE PEREZ:**  I think I - that's

24 (inaudible).

25      **DEPUTY COMMISSIONER MOORE:**  Right.

26 Your classification is the lowest that you can

27 obtain and you got the score of 19 on April

51

1    1995.  Your current custody level is in Medium-A
2    and you achieved Medium-A in February of 1988.
3    Regarding the gang affiliation, there's
4    notations on the - on - in your C-file on 8/12
5    that you are an East LA 3rd Street member, an
6    ex-member.  There's also some indications of
7    association with the gangs from South Fontana
8    and then - that they do say the 19th Street Gang
9    but they reference specifically East LA 3rd
10   Street and there's one indication that you're an
11   ex-member, as well.  Are you familiar with those
12   labels being used about you?  That you've been
13   told that you're a documented gang member at
14   prior hearings?

15           **INMATE PEREZ:**  Well, that's the way
16   they got me, you know, so.

17           **DEPUTY COMMISSIONER MOORE:**  You heard
18   this before in 2003?

19           **INMATE PEREZ:**  Yes.

20           **DEPUTY COMMISSIONER MOORE:**  Okay.  Your
21   current work assignment is that you're a sewing
22   machine operator?

23           **INMATE PEREZ:**  Uh-huh.

24           **DEPUTY COMMISSIONER MOORE:**  And you are
25   receiving average to above average work
26   evaluations and the last evaluation is from
27   February 1st of this year.  And you've been in

52

1    that position since - excuse me, Mr. Gomez and

2    Mr. Marones (phonetic) are your supervisors?

3            **INMATE PEREZ:**  Yes.

4            **DEPUTY COMMISSIONER MOORE:**  And they

5    wrote that in February that you're doing average

6    to above average work and that you've been in

7    this job since October of 2003.

8            **INMATE PEREZ:**  Yes.

9            **DEPUTY COMMISSIONER MOORE:**  For two and

10   a half years.

11           **INMATE PEREZ:**  Yes.

12           **DEPUTY COMMISSIONER MOORE:**  And from

13   what I was looking for in the file you have been

14   given different assignments as a sewing machine

15   operator.

16           **INMATE PEREZ:**  (inaudible).

17           **DEPUTY COMMISSIONER MOORE:**  Okay.

18           **INMATE PEREZ:**  Cause I couldn't - I

19   (inaudible) the mechanic.

20           **DEPUTY COMMISSIONER MOORE:**  As a

21   mechanic?

22           **INMATE PEREZ:**  Yes.

23           **DEPUTY COMMISSIONER MOORE:**  To repair

24   the sewing machines?

25           **INMATE PEREZ:**  Yes.

26           **DEPUTY COMMISSIONER MOORE:**  Okay, and

27   is that a new - new part of your job that you're

53

1  doing?

2        **INMATE PEREZ:**  No, the (inaudible)
3  everything in the shop so.

4        **DEPUTY COMMISSIONER MOORE:**  Okay.

5        **INMATE PEREZ:**  And (inaudible) mechanic
6  so (inaudible) when they need me.

7        **DEPUTY COMMISSIONER MOORE:**  That makes
8  you a valuable employee.  That's a very positive
9  thing.  Your - regarding your academics, in '03
10  - in '03 - 2003 at your last hearing you're in
11  the Adult Basic Education, Third Level, getting
12  ready to take your - still working towards
13  getting your GED?  Is -

14        **INMATE PEREZ:**  Yes.

15        **DEPUTY COMMISSIONER MOORE:**  - that
16  right?

17        **INMATE PEREZ:**  Yes.

18        **DEPUTY COMMISSIONER MOORE:**  And did you
19  stop going to classes for that?

20        **INMATE PEREZ:**  No, I was in the
21  (inaudible) changing to level three so they move
22  me to his (inaudible).

23        **DEPUTY COMMISSIONER MOORE:**  To Central?

24        **INMATE PEREZ:**  Yeah, to Cent - back to
25  Central

26        **DEPUTY COMMISSIONER MOORE:**  And there's
27  no more Adult Basic Education, Three?

54

1        **INMATE PEREZ:** Yeah, over here in
2    (inaudible).

3        **DEPUTY COMMISSIONER MOORE:** So –

4        **INMATE PEREZ:** I mean, there's
5    (inaudible).

6        **DEPUTY COMMISSIONER MOORE:** Okay.

7        **INMATE PEREZ:** Yes.

8        **DEPUTY COMMISSIONER MOORE:** Are you
9    able to go to education?

10       **INMATE PEREZ:** Right now we work from –
11   from – from Monday through Thursday so – so when
12   – when we go back to our regular (inaudible)
13   they going to have more time on that because
14   (inaudible) from – from Sunday to – to
15   Wednesday.

16       **DEPUTY COMMISSIONER MOORE:** Sunday to
17   Wednesday from 6:30 to –

18       **INMATE PEREZ:** Cannot they combine
19   those two (inaudible), you know, right now we
20   got to work Monday through Thursday.

21       **DEPUTY COMMISSIONER MOORE:** I see.

22       **INMATE PEREZ:** So I don't have that
23   much time, you know, to –

24       **DEPUTY COMMISSIONER MOORE:** To do
25   education.

26       **INMATE PEREZ:** To do education.

27       **DEPUTY COMMISSIONER MOORE:** It's not –

55

1   so you're working when you could be going to
2   education?
3          **INMATE PEREZ:**  Uh-huh.
4          **DEPUTY COMMISSIONER MOORE:**  At the same
5   time?  Is that right?
6          **INMATE PEREZ:**  Yes.
7          **DEPUTY COMMISSIONER MOORE:**  Okay.  Your
8   grade placement is 6. - is 6th grade level for
9   your reading and your math combined.  You tried
10  to take the GED in 1995 and then you took the
11  pre-test for the GED in 2002.  You were
12  improving but you hadn't gotten to the level
13  where you could pass that yet.  Is that right?
14         **INMATE PEREZ:**  Yes.
15         **DEPUTY COMMISSIONER MOORE:**  Okay.  Is
16  that something that you think you still want to
17  do?
18         **INMATE PEREZ:**  If it's (inaudible) to
19  get out of here, you know, I will get it.
20         **DEPUTY COMMISSIONER MOORE:**  Okay.  You
21  have obtained a certificate in vocational
22  electronics.
23         **INMATE PEREZ:**  yes.
24         **DEPUTY COMMISSIONER MOORE:**  And that
25  was back in 1999?
26         **INMATE PEREZ:**  Yeah.
27         **DEPUTY COMMISSIONER MOORE:**  What

56

1  institution were you in when you got that?
2      **INMATE PEREZ:** That was in Avenal.
3      **DEPUTY COMMISSIONER MOORE:** Avenal. I
4  also saw that you obtained some units in
5  computer repair.
6      **INMATE PEREZ:** Yes.
7      **DEPUTY COMMISSIONER MOORE:** but you
8  didn't get to finish that program, did you?
9      **INMATE PEREZ:** No, because there wasn't
10  so (inaudible).
11      **DEPUTY COMMISSIONER MOORE:** Yeah, you
12  were transferred.
13      **INMATE PEREZ:** Yes.
14      **DEPUTY COMMISSIONER MOORE:** Okay. I
15  also note that you've been going to AA for a
16  while now.
17      **INMATE PEREZ:** Yes.
18      **DEPUTY COMMISSIONER MOORE:** How long
19  have you been going?
20      **INMATE PEREZ:** Since '93, I think.
21      **DEPUTY COMMISSIONER MOORE:** Okay, have
22  you been going to the Spanish-speaking groups or
23  the English-speaking groups?
24      **INMATE PEREZ:** I was going to Spanish
25  and then went - went to English now.
26      **DEPUTY COMMISSIONER MOORE:** Okay, it
27  helps you practice your English, too, which is

57

1   very good.

2           **INMATE PEREZ:** Yeah.

3           **DEPUTY COMMISSIONER MOORE:** Okay.

4   What's your - when is the last day you had a

5   drink?  What's your sober date?

6           **INMATE PEREZ:** I guess since - since

7   '85.

8           **DEPUTY COMMISSIONER MOORE:** And have

9   you - what do you do in AA?

10          **INMATE PEREZ:** We - we use

11  participation and listen to other people's, you

12  know, stories and I talk about the - the - the

13  Steps.

14          **DEPUTY COMMISSIONER MOORE:** The Steps?

15          **INMATE PEREZ:** Uh-huh.

16          **DEPUTY COMMISSIONER MOORE:** Have you -

17  do you know the Steps or have you worked the

18  Steps?

19          **INMATE PEREZ:** I know some of them.

20  Not - not all of them.

21          **DEPUTY COMMISSIONER MOORE:** Okay.  Tell

22  me a couple things you've learned from going to

23  AA.

24          **INMATE PEREZ:** Well, I learn to stay

25  out of alcohol and to stay sober (inaudible)

26  time.

27          **DEPUTY COMMISSIONER MOORE:** Is that

58

1  hard?

2      **INMATE PEREZ:** Well, (inaudible), you
3  know, you don't see that much alcohol so it's
4  not hard, you know.

5      **DEPUTY COMMISSIONER MOORE:** You also
6  attended the Inmate Employability Program. It
7  was a video with a discussion about how - if -
8  when released how to get jobs and - and that was
9  in December of '05.

10     **INMATE PEREZ:** Yes.

11     **DEPUTY COMMISSIONER MOORE:** You also
12 attended an anger management workshop in
13 December of '05. Did they ever talk about
14 alcohol? Being angry and drinking and what that
15 does to a man?

16     **INMATE PEREZ:** I, I mean, everybody
17 talks about, you know, have to do with angry,
18 how to control your angry.

19     **DEPUTY COMMISSIONER MOORE:** Uh-huh.

20     **INMATE PEREZ:** You know.

21     **DEPUTY COMMISSIONER MOORE:** The night
22 that you shot Mr. Ortiz were you angry?

23     **INMATE PEREZ:** Probably was.

24     **DEPUTY COMMISSIONER MOORE:** Yeah. What
25 were you angry about?

26     **INMATE PEREZ:** Cause we are fighting,
27 you know.

57

1  very good.

2          **INMATE PEREZ:**  Yeah.

3          **DEPUTY COMMISSIONER MOORE:**  Okay.

4  What's your - when is the last day you had a

5  drink?  What's your sober date?

6          **INMATE PEREZ:**  I guess since - since

7  '85.

8          **DEPUTY COMMISSIONER MOORE:**  And have

9  you - what do you do in AA?

10          **INMATE PEREZ:**  We - we use

11  participation and listen to other people's, you

12  know, stories and I talk about the - the - the

13  Steps.

14          **DEPUTY COMMISSIONER MOORE:**  The Steps?

15          **INMATE PEREZ:**  Uh-huh.

16          **DEPUTY COMMISSIONER MOORE:**  Have you -

17  do you know the Steps or have you worked the

18  Steps?

19          **INMATE PEREZ:**  I know some of them.

20  Not - not all of them.

21          **DEPUTY COMMISSIONER MOORE:**  Okay.  Tell

22  me a couple things you've learned from going to

23  AA.

24          **INMATE PEREZ:**  Well, I learn to stay

25  out of alcohol and to stay sober (inaudible)

26  time.

27          **DEPUTY COMMISSIONER MOORE:**  Is that

58

1  hard?

2         **INMATE PEREZ:**  Well, (inaudible), you

3  know, you don't see that much alcohol so it's

4  not hard, you know.

5         **DEPUTY COMMISSIONER MOORE:**  You also

6  attended the Inmate Employability Program.  It

7  was a video with a discussion about how - if -

8  when released how to get jobs and - and that was

9  in December of '05.

10         **INMATE PEREZ:**  Yes.

11         **DEPUTY COMMISSIONER MOORE:**  You also

12  attended an anger management workshop in

13  December of '05.  Did they ever talk about

14  alcohol?  Being angry and drinking and what that

15  does to a man?

16         **INMATE PEREZ:**  I, I mean, everybody

17  talks about, you know, have to do with angry,

18  how to control your angry.

19         **DEPUTY COMMISSIONER MOORE:**  Uh-huh.

20         **INMATE PEREZ:**  You know.

21         **DEPUTY COMMISSIONER MOORE:**  The night

22  that you shot Mr. Ortiz were you angry?

23         **INMATE PEREZ:**  Probably was.

24         **DEPUTY COMMISSIONER MOORE:**  Yeah. What

25  were you angry about?

26         **INMATE PEREZ:**  Cause we are fighting,

27  you know.

59

1      **DEPUTY COMMISSIONER MOORE:** And do you
2  know why you were fighting?

3      **INMATE PEREZ:** Because was trying to
4  say, you know, kill my uncle. And stepped over,
5  you know.

6      **DEPUTY COMMISSIONER MOORE:** You were
7  stepping up for your uncle?

8      **INMATE PEREZ:** Yes.

9      **DEPUTY COMMISSIONER MOORE:** Also just
10  at - right after your last hearing date you
11  completed a 44-week program in anger management
12  called Project Change. Do you remember that?

13      **INMATE PEREZ:** Yes.

14      **DEPUTY COMMISSIONER MOORE:** What did
15  you learn from that?

16      **INMATE PEREZ:** From them you learn
17  about the - different things about the big
18  things. About that - angry, you know, have to
19  deal with -

20      **DEPUTY COMMISSIONER MOORE:** What are
21  some different -

22      **INMATE PEREZ:** - situations.

23      **DEPUTY COMMISSIONER MOORE:** What are
24  some different ways for you to deal with your
25  anger?

26      **INMATE PEREZ:** Just try to come down
27  (inaudible) or, you know, and talk to somebody.

60

1  I don't know.  But probably, you know.

2       **DEPUTY COMMISSIONER MOORE:**  Okay.  Also

3  you did participate in the Impact Program.

4  About victims - the effect on victims.

5       **INMATE PEREZ:**  Uh-huh.

6       **DEPUTY COMMISSIONER MOORE:**  Do you

7  remember that?

8       **INMATE PEREZ:**  Yes.

9       **DEPUTY COMMISSIONER MOORE:**  Okay.  You

10  do have a laudatory chrono, a very positive

11  chrono, from October of '05 in which your boss,

12  I believe Mr. Gomez, wrote that there were - you

13  helped get rid of all the back orders in

14  textiles.  High work production eliminating all

15  past due orders and you were part of a team that

16  produced over $700,000 worth of product and

17  cleared out all the backlog.  Do you remember

18  that?

19       **INMATE PEREZ:**  Yes.

20       **DEPUTY COMMISSIONER MOORE:**  Were you

21  working very hard during that time?

22       **INMATE PEREZ:**  Well, (inaudible) kind

23  of fun with it.

24       **DEPUTY COMMISSIONER MOORE:**  Okay.

25  Under Disciplinary History, you have two 115's.

26  The last one is in 1986 and you talked a little

27  bit about that.  It was about possession of

61

1  alcohol or pruno.  You indicated that that was

2  your cellie that possessed that?

3         **INMATE PEREZ:**  Yes.

4         **DEPUTY COMMISSIONER MOORE:**  And where

5  was it in your cell?

6         **INMATE PEREZ:**  He was (inaudible)

7  pruno, you know, but, you know, (inaudible) we -

8  we both live in that cell.

9         **DEPUTY COMMISSIONER MOORE:**  Right, and

10  did you smell it before this - the officer found

11  it?

12         **INMATE PEREZ:**  Yes.

13         **DEPUTY COMMISSIONER MOORE:**  So you knew

14  it was there?

15         **INMATE PEREZ:**  I knew it was there.

16         **DEPUTY COMMISSIONER MOORE:**  Okay.  The

17  - under your 128's, your last one is in 1996 and

18  that one was for unauthorized articles.  You had

19  a number of extra items that you weren't allowed

20  to have.  Do you remember that?

21         **INMATE PEREZ:**  No, that was for

22  destroying state property.  We went to our cell

23  that had that windows broken.  We got charged

24  for that.  Was - that was -

25         **DEPUTY COMMISSIONER MOORE:**  Okay, this

26  one, actually, I misspoke.  This one is about

27  failing to have your bed area in satisfactory

62

1   condition and you have unauthorized articles on
2   your bed.  But they don't give me any other
3   information about that.  But that - that was
4   about nine and half years ago.  Nothing since
5   then, is that right?  In nine and a half years?
6        **INMATE PEREZ:**  No.
7        **DEPUTY COMMISSIONER MOORE:**  Okay.
8   Also, in - in the Board and in your C-file I did
9   find this laudatory saying that you have been
10  participating - there's a number of new classes
11  that are being done about prevention and
12  treatment of hepatitis, of HIV, of tuberculosis,
13  and you've participated in the class about
14  hepatitis and that is from April of 2006.
15       **INMATE PEREZ:**  Yes.
16       **DEPUTY COMMISSIONER MOORE:**  Okay, and
17  I'm going to return these to you so that you can
18  keep them for your file.  They are in your C-
19  file and I did see them there.  Is there
20  anything else before I go to your doctor's
21  report, your psychology report that you want to
22  add or change from what I said?
23       **INMATE PEREZ:**  No, that's -
24       **DEPUTY COMMISSIONER MOORE:**  Is -
25       **INMATE PEREZ:**  - that's - that's -
26  that's correct.
27       **DEPUTY COMMISSIONER MOORE:**  Okay.  I'm

61

1   alcohol or pruno.  You indicated that that was

2   your cellie that possessed that?

3          **INMATE PEREZ:**  Yes.

4          **DEPUTY COMMISSIONER MOORE:**  And where

5   was it in your cell?

6          **INMATE PEREZ:**  He was (inaudible)

7   pruno, you know, but, you know, (inaudible) we -

8   we both live in that cell.

9          **DEPUTY COMMISSIONER MOORE:**  Right, and

10  did you smell it before this - the officer found

11  it?

12         **INMATE PEREZ:**  Yes.

13         **DEPUTY COMMISSIONER MOORE:**  So you knew

14  it was there?

15         **INMATE PEREZ:**  I knew it was there.

16         **DEPUTY COMMISSIONER MOORE:**  Okay.  The

17  - under your 128's, your last one is in 1996 and

18  that one was for unauthorized articles.  You had

19  a number of extra items that you weren't allowed

20  to have.  Do you remember that?

21         **INMATE PEREZ:**  No, that was for

22  destroying state property.  We went to our cell

23  that had that windows broken.  We got charged

24  for that.  Was - that was -

25         **DEPUTY COMMISSIONER MOORE:**  Okay, this

26  one, actually, I misspoke.  This one is about

27  failing to have your bed area in satisfactory

62

1    condition and you have unauthorized articles on
2    your bed.  But they don't give me any other
3    information about that.  But that - that was
4    about nine and half years ago.  Nothing since
5    then, is that right?  In nine and a half years?
6            **INMATE PEREZ:**  No.
7            **DEPUTY COMMISSIONER MOORE:**  Okay.
8    Also, in - in the Board and in your C-file I did
9    find this laudatory saying that you have been
10   participating - there's a number of new classes
11   that are being done about prevention and
12   treatment of hepatitis, of HIV, of tuberculosis,
13   and you've participated in the class about
14   hepatitis and that is from April of 2006.
15           **INMATE PEREZ:**  Yes.
16           **DEPUTY COMMISSIONER MOORE:**  Okay, and
17   I'm going to return these to you so that you can
18   keep them for your file.  They are in your C-
19   file and I did see them there.  Is there
20   anything else before I go to your doctor's
21   report, your psychology report that you want to
22   add or change from what I said?
23           **INMATE PEREZ:**  No, that's -
24           **DEPUTY COMMISSIONER MOORE:**  Is -
25           **INMATE PEREZ:**  - that's - that's -
26   that's correct.
27           **DEPUTY COMMISSIONER MOORE:**  Okay.  I'm

63

1    going to give this back to you now, counsel, so
2    that I don't forget later.  All right, Mr.
3    Perez, I'm going to review now your - it's
4    entitled the Mental Health Evaluation.  It's
5    dated May 9th, 2006, and it was completed by Dr.
6    MaComber, M-A-C-O-M-B-E-R.  Also signing off on
7    it is Dr. Zika, Z-I-K-A.  And the doctor says he
8    interviewed you for an hour and a half.  Do you
9    remember that?

10          **INMATE PEREZ:**  Yes.

11          **DEPUTY COMMISSIONER MOORE:**  Okay.  The
12    doctor combines information from prior reports
13    and it goes directly to Clinical Assessment.  He
14    indicates that English is your second language.
15    However, you communicate quite well in English.
16    In the past use of alcohol has been a problem in
17    your life and that it was related to you that
18    alcohol was involved in the shooting and in the
19    murder but that you have been clean and sober
20    now for approximately 20 years.  Prior to coming
21    to prison you indicated to the doctor that you
22    had worked as a forklift operator and that you
23    currently are working, as I said, as a sewing
24    machine operator and sewing machine mechanic,
25    just as you indicated to us.  There's an
26    indication that you completed vocational graphic
27    arts.  Is that true?

64

1              **INMATE PEREZ:**  Yes.

2              **DEPUTY COMMISSIONER MOORE:**  Okay, and

3    when did you do that?

4              **INMATE PEREZ:**  That was in (inaudible).

5              **DEPUTY COMMISSIONER MOORE:**  Early

6    '90's?

7              **INMATE PEREZ:**  Yes.

8              **DEPUTY COMMISSIONER MOORE:**  Okay.

9    That's all right.  I just wanted to double-check

10   with you.  I - I remember seeing something.  I

11   didn't go back that far because it was prior to

12   your last hearing.  You have attended several

13   self-help programs, as I've re - as I've

14   reviewed with you prior.  Regarding any

15   diagnostic - diagnoses for you, you - you appear

16   to be clear of any diagnosis for mental

17   conditions.  And you have a GAF score of 85.

18   Regarding the review of your life crime, it

19   indicates in your conversation with the doctor

20   that you accept full responsibility for the

21   commitment offense.  And you accept the written

22   version of it.  You feel badly about the loss of

23   the victim's life.  You understand now that your

24   behavior at the time was wrong and out of

25   control.  That you were young and immature; in

26   your 20's.  I think you were 26 at the time?

27             **INMATE PEREZ:**  Yes.

65

1        **DEPUTY COMMISSIONER MOORE:** And not
2   living in a responsible way. The doctor goes on
3   to say that your feelings of remorse appear to
4   be sincere and genuine and that you appear to
5   longer be the person who committed this offense.
6   That now your 48 years old you seem to be
7   mature, responsible and have made significant
8   changes in your life over the past 22 years.
9   You now actively attend church and you know that
10  irresponsible behavior is not appropriate. And
11  you do not intend to engage in irresponsible
12  behavior or use of alcohol in the future. Under
13  the - under the heading of Dangerousness,
14  whether or not you - you would be a danger, the
15  doctors says that you have - in considering
16  potential for dangerous behavior you've remained
17  disciplinary- free for 20 years. And I wrote
18  down because I'm  - I'm a stickler, not quite;
19  19 and a half years. But he was - he was looking
20  forward to another six years that you're not
21  going to have any disciplinary write-ups.
22  Although you  - you have had a 128 in the past -
23  one in the past ten years. He notes that
24  Soledad is a prison that has frequent violent
25  activities that occur between riots,
26  disturbances and altercations and you have not
27  been involved in any of these. And compared to

66

1   other inmates you definitely appear to be below
2   average in a level of dangerousness.  In
3   considering dangerous behavior if released into
4   the community he used an assessment tool called
5   the Level of Service Inventory, Revised, and
6   considering a number of factors he determined
7   that you appear to be in the low risk range.
8   That when compared to the average citizen in the
9   community at this time you do not appear to be
10   any more of a risk than the average citizen.  In
11   closing, he makes observations and
12   recommendations.  He indicates that there appear
13   to be no mental or emotional problems currently
14   in your life that interfere with you or your
15   ability to parole.  You plan to return to
16   Mexico.  And that you – he does say you're in
17   the process of studying to complete your GED but
18   that's a little bit different than what you told
19   me that you can't do your GED while you're
20   working because of the current work schedule.
21   Is that right?
22         **INMATE PEREZ:**  No, I can't because of
23   the days.
24         **DEPUTY COMMISSIONER MOORE:**  You have to
25   go to work?
26         **INMATE PEREZ:**  Yes.
27         **DEPUTY COMMISSIONER MOORE:**  Okay.  And

67

1    the doctor goes on to say since you plan on
2    returning to Mexico because of the immigration
3    hold it's not necessary for you to finish your
4    GED in order to get a parole date. And the
5    prognosis for successful adjustment in the
6    community is very good. I wanted to ask you a
7    question about your life crime and what you told
8    the doctor. You said you accept full
9    responsibility for - for what you did. Is that
10   right?

11           **INMATE PEREZ:** Yes.

12           **DEPUTY COMMISSIONER MOORE:** When -
13   after you were convicted by the jury, there was
14   a trial and you were convicted, the probation
15   officer came to talk to you about what happened.

16           **INMATE PEREZ:** Yes.

17           **DEPUTY COMMISSIONER MOORE:** Do you
18   remember what you told him?

19           **INMATE PEREZ:** I don't remember
20   exactly.

21           **DEPUTY COMMISSIONER MOORE:** You told
22   him 'I did not do this. I did not shoot Ortiz.
23   I am an innocent man.' Do you remember telling
24   that to the probation officer after the jury
25   trial?

26           **INMATE PEREZ:** Probably I did. I - I
27   don't remember exactly.

68

1    **DEPUTY COMMISSIONER MOORE:** When did
2    you come to - to be willing to say that you were
3    responsible for this?
4        **INMATE PEREZ:** When - before I started
5    coming to see you guys.
6        **DEPUTY COMMISSIONER MOORE:** About when
7    would you say?
8        **INMATE PEREZ:** (inaudible). The thing
9    was when I first saw him my first hearing.
10       **DEPUTY COMMISSIONER MOORE:** In '97?
11       **INMATE PEREZ:** Yes.
12       **DEPUTY COMMISSIONER MOORE:** Is that the
13   first time you admitted it?
14       **INMATE PEREZ:** Yeah, it was in '97.
15       **DEPUTY COMMISSIONER MOORE:** Okay, why
16   did you change? What changed you to saying I
17   didn't do it; I'm innocent to yes.?
18       **INMATE PEREZ:** Because I (inaudible)
19   said what I did, you know, I (inaudible), you
20   know. (inaudible), you know, what you did but
21   now that (inaudible), you know, I - I don't need
22   to - to be lying anymore.
23       **DEPUTY COMMISSIONER MOORE:** What was
24   the lying doing to you?
25       **INMATE PEREZ:** Well, (inaudible)
26   conception of people, you know, and you can
27   trust a person. That's life.

69

1       **DEPUTY COMMISSIONER MOORE:** What does

2 it say about you that you shot a man that did

3 not have a weapon?

4       **INMATE PEREZ:** That's not right.

5       **DEPUTY COMMISSIONER MOORE:** But what

6 does it say about you? He was - he - he had -

7 he had nothing in his hands to defend himself or

8 to attack you. Is that an act of bravery by

9 you?

10       **INMATE PEREZ:** I (inaudible), you know,

11 angry. Scared.

12       **DEPUTY COMMISSIONER MOORE:** Does

13 drinking alcohol make you braver?

14       **INMATE PEREZ:** I think (inaudible)

15 because (inaudible) before was kind of still,

16 you know, kind of angry.

17       **DEPUTY COMMISSIONER MOORE:** You were

18 still fired up?

19       **INMATE PEREZ:** Yeah.

20       **DEPUTY COMMISSIONER MOORE:** Okay. Is

21 there anything else you'd like to add with the

22 psych - the psychological, the mental health

23 evaluation that I didn't cover?

24       **INMATE PEREZ:** No. That - that's it.

25       **DEPUTY COMMISSIONER MOORE:** Okay, thank

26 you, Mr. Perez.

27       **INMATE PEREZ:** You're welcome.

70

1        **DEPUTY COMMISSIONER MOORE:**  That would
2  be the conclusion of my presentation. That would
3  be the conclusion of my presentation.
4        **PRESIDING COMMISSIONER INGLEE:**  Thank
5  you.  Just once for all (inaudible) how many
6  rounds were fired - oh, I understand.  You fired
7  four rounds, is that correct?
8        **INMATE PEREZ:**  Four rounds.
9        **PRESIDING COMMISSIONER INGLEE:**  And you
10  hit the man three times?  Is -
11        **INMATE PEREZ:**  Yes.
12        **DEPUTY COMMISSIONER MOORE:**  - that
13  correct?
14        **INMATE PEREZ:**  Yes.
15        **PRESIDING COMMISSIONER INGLEE:**  Did you
16  ever walk over, put the gun down to his head and
17  fire it close to his head?
18        **INMATE PEREZ:**  No.  I didn't do that.
19        **PRESIDING COMMISSIONER INGLEE:**  Let's
20  go to the district attorney.  Questions?
21        **DEPUTY DISTRICT ATTORNEY BULLOCH:**  Yes.
22        **PRESIDING COMMISSIONER INGLEE:**  Mr.
23  Perez, you're going to speak to (inaudible).
24        **INMATE PEREZ:**  Okay.
25        **DEPUTY DISTRICT ATTORNEY BULLOCH:**  Does
26  the inmate believe he has any issues with women
27  as far as holding them in lower esteem or any

71

1  form like that?

2       **PRESIDING COMMISSIONER INGLEE:**  Do you

3  have any problems with women as far as

4  respecting them?

5       **INMATE PEREZ:**  No.

6       **DEPUTY DISTRICT ATTORNEY BULLOCH:**  I

7  noticed in numerous statements he's given to

8  various authorities and in his statement today

9  that he indicates that, essentially, this

10  argument started over the victim, Mr. Ortiz,

11  getting into an argument with his uncle.  Is

12  that - does he know why they were in an

13  argument?

14      **PRESIDING COMMISSIONER INGLEE:**  What

15  was your uncle and this man - what were they

16  arguing about?

17      **INMATE PEREZ:**  Well, he - he - he was -

18  he was (inaudible) I guess (inaudible)

19  girlfriend was working right there with him.

20  And I guess that (inaudible) -

21      **PRESIDING COMMISSIONER INGLEE:**  Mr.

22  Ortiz was trying to talk to his girlfriend or to

23  (inaudible)?

24      **DEPUTY DISTRICT ATTORNEY BULLOCH:**

25  Maybe I could add - further clarify -

26      **PRESIDING COMMISSIONER INGLEE:**

27  Certainly.

72

1          **DEPUTY DISTRICT ATTORNEY BULLOCH:** - my
2    questions.  Did the inmate do anything to start
3    that argument?
4          **PRESIDING COMMISSIONER INGLEE:** Did the
5    inmate do anything to start that argument?
6          **INMATE PEREZ:** I - I was talking to
7    that girl.
8          **ATTORNEY LEWIS:** (inaudible).
9          **INMATE PEREZ:** Oh.  I was talking to
10   that girl.
11         **PRESIDING COMMISSIONER INGLEE:** You
12   were talking to the girl?
13         **INMATE PEREZ:** Yes.
14         **PRESIDING COMMISSIONER INGLEE:** This is
15   your uncle's girlfriend?
16         **INMATE PEREZ:** No, no, no.  The worker
17   - she was working with him.
18         **PRESIDING COMMISSIONER INGLEE:** Okay.
19         **DEPUTY DISTRICT ATTORNEY BULLOCH:** So
20   if I under - you - do you - do you mind?
21         **PRESIDING COMMISSIONER INGLEE:** No, not
22   at all.
23         **DEPUTY DISTRICT ATTORNEY BULLOCH:** If I
24   understand the sequence of events Mr. Ortiz, the
25   victim in this case, operated the bar and the
26   inmate's position is that he started to talk to
27   this young lady who was the girlfriend of Mr.

73

1  Ortiz and that's what caused the argument?  Is
2  that his position?
3          **PRESIDING COMMISSIONER INGLEE:**  Is that
4  correct?
5          **INMATE PEREZ:**  Not that I know.  I
6  don't know (inaudible) girlfriend and boyfriend.
7          **PRESIDING COMMISSIONER INGLEE:**  Were
8  you talking to a young lady –
9          **INMATE PEREZ:**  I talk a young lady in
10 the bar.
11         **PRESIDING COMMISSIONER INGLEE:**  Did
12 that make Mr. Ortiz mad?
13         **INMATE PEREZ:**  Probably?
14         **PRESIDING COMMISSIONER INGLEE:**  Well,
15 did it or didn't it?
16         **INMATE PEREZ:**  I guess it did.
17         **DEPUTY DISTRICT ATTORNEY BULLOCH:**  Did
18 the inmate grab or use any physical force
19 against the girlfriend before he got – Mr. Ortiz
20 got angry?
21         **INMATE PEREZ:**  No.
22         **PRESIDING COMMISSIONER INGLEE:**  Did
23 you touch her at all?
24         **INMATE PEREZ:**  No.
25         **DEPUTY DISTRICT ATTORNEY BULLOCH:**  The
26 Court of Appeal opinion indicates that he
27 grabbed her arm and propositioned to meet her –

74

1  him in a motel and that's what the argument

2  between Mr. Ortiz, the victim in this case, and

3  his uncle was all about. Is - is that a correct

4  rendition of what happened at the trial?

5          **INMATE PEREZ:** Can you repeat that?

6          **PRESIDING COMMISSIONER INGLEE:** Did you

7  make a proposition to the young lady to meet her

8  at a motel later on?

9          **INMATE PEREZ:** No.

10         **PRESIDING COMMISSIONER INGLEE:** That

11 never happened?

12         **INMATE PEREZ:** That never happened.

13         **PRESIDING COMMISSIONER INGLEE:** Was

14 that ever discussed during the trial? Do you

15 recall that being discussed during the trial?

16         **INMATE PEREZ:** I think it discussed at

17 the trial.

18         **PRESIDING COMMISSIONER INGLEE:** that's

19 because it was in the appellate - appellate

20 tapes -

21         **INMATE PEREZ:** Yeah.

22         **PRESIDING COMMISSIONER INGLEE:** The

23 information from the trial.

24         **INMATE PEREZ:** I think it discussed at

25 the trial.

26         **DEPUTY DISTRICT ATTORNEY BULLOCH:** And

27 I'm referring to page 2 and 3 of the Appellate

75

1  Court opinion.  Can the inmate explain what the
2  lighting conditions were outside when he was
3  fighting outside with the victim?
4         **PRESIDING COMMISSIONER INGLEE:**  How
5  light was it outside?  Were there a lot of
6  lights around?
7         **INMATE PEREZ:**  Yeah, it was light but
8  wasn't enough to drive.  Was kind of dim.
9         **DEPUTY DISTRICT ATTORNEY BULLOCH:**  So
10  it was dark in the parking lot there?  Is that
11  correct?
12         **INMATE PEREZ:**  It was kind of dark.
13         **DEPUTY DISTRICT ATTORNEY BULLOCH:**  Can
14  he explain how he was able to hit the victim
15  three times in his face when it was dark and he
16  was at the distance he was ex – explaining?
17         **PRESIDING COMMISSIONER INGLEE:**  I'll –
18  I'll preface this by saying considering you
19  never fired a pistol before how is it you were
20  able to hit a person three times in the face or
21  head area at a considerable distance,
22  particularly when it was dim lighting?
23         **INMATE PEREZ:**  It was not too far away.
24         **PRESIDING COMMISSIONER INGLEE:**  How far
25  away?
26         **INMATE PEREZ:**  From here to the wall.
27         **DEPUTY DISTRICT ATTORNEY BULLOCH:**  I

76

1   have nothing further.

2           **PRESIDING COMMISSIONER INGLEE:** All

3   right. Counsel?

4           **ATTORNEY LEWIS:** I have no questions.

5           **PRESIDING COMMISSIONER INGLEE:**

6   Summary, district attorney, please.

7           **DEPUTY DISTRICT ATTORNEY BULLOCH:** I

8   think much is left to be explained about what

9   happened that night and I don't think Mr. Perez

10  is being frankly candid with this Board or at

11  least he hasn't come to terms with what - what

12  happened that night. For him to continue to say

13  that he was coming to his uncle's defense and -

14  and the honor that he was getting his speech by

15  the victim, Mr. Ortiz, is not to tell a whole

16  story and Mr. Perez has been doing that for over

17  20 years now. The fact of the matter is that

18  Mr. Perez started this whole thing by his

19  behavior towards the young lady at the bar that

20  night. Now, that's the real issue here and -

21  and that is Mr. Perez doesn't understand how his

22  behavior and his actions resulted in the conduct

23  that, unfortunately, got one man killed. Mr.

24  Perez offers no reasonable explanation of how,

25  in this darkly - dark parking lot where he has

26  never fired a gun before, he was able to hit

27  this victim point blank in the face and neck.

1   And that the shell casings were found right
2   where the body dropped. Until we can get a - an
3   accurate explanation of that which Mr. Perez has
4   no realization or at least is not being candid
5   about what happened that night. Second of all,
6   Mr. Perez has been to three or four of these
7   hearings and on each hearing the panel has told
8   him that a GED is required and that GED is going
9   to help his situation. On more than one
10  occasion at these parole hearings he has told
11  the panel that he is working on his GED and as
12  late as May of this year when he's talking to
13  the psychologist he told them that he's working
14  on his GED. It still is not forthcoming. Now
15  his comment today is essentially in - in the
16  form of a question to this Panel, if it's
17  necessary to get out of here I'll do it, to get
18  his GED. Well, that's what he's been told for
19  close to ten years now and he still has not got
20  his GED. The fact that he's telling the
21  psychologist that he's working on his GED when
22  he's telling the Panel here that he doesn't have
23  time to work on it is of concern, as well. At
24  any rate, it is clear, based on the numerous
25  discrepancies and his rendition of what's go on
26  back in 1984, the fact that he was on parole at
27  the time, has had the benefit of the opportunity

78

1    to try to correct his ways before through our
2    system and then, unfortunately, when he was
3    released he went right back to alcohol as
4    evidenced by his DUI and is evidenced even after
5    he got arrested for DUI going into a bar and
6    provoking and starting this fight which resulted
7    in Mr. Ortiz's death, that he is not suitable
8    for parole. And I would encourage the Panel not
9    to give him a date at this point in time.

10    **PRESIDING COMMISSIONER INGLEE:** All
11    right, thank you very much. Counselor?

12    **ATTORNEY LEWIS:** Mr. Perez has admitted
13    that he shot an unarmed man on more than one
14    occasion here today. Numerous occasions, in
15    fact. He's admitted that he fired four shots at
16    the victim of which only one missed it's mark.
17    With regard to a GED, a GED probably does not
18    hold as much weight in the country of Mexico as
19    it would here in the United States of America.
20    This fact, coupled with the fact that he, my
21    client, will be deported to Mexico upon release
22    substantiates this position. Nonetheless, Mr.
23    Perez should be found suitable for parole. The
24    following supports Mr. Perez's contention that
25    he has earned a second chance at being suitable
26    for - for - for parole. He has taken
27    responsibility for the life crime for which he

79

1   has been sent here to Soledad to serve out a - a

2   life sentence. He's admitted guilt to this

3   Board here today. And he's admitted guilt to

4   not only Dr. MaComber but other psychiatric

5   evaluators. The circumstances tending to

6   indicate suitability do include, my client has

7   no juvenile record, he has no juvenile record of

8   assaulting others, as well. Mr. Perez has a

9   stable upright bringing and Mr. Perez has

10  experienced reasonable stable relationships with

11  others but, in particular, his family members.

12  Mr. Perez has been commended for satisfactory

13  grades and excellent team participation with

14  regards to his current job as a sewing machine

15  operator by working well with others, with his

16  supervisors and peers and he has a great

17  attitude. Mr. Perez has expressed remorse for

18  his crime not only to other psychiatric

19  evaluators built to this Board. More

20  importantly, Mr. Perez has demonstrated his

21  remorse by programming. He's gone through

22  Alcoholics Anonymous, his - he's involved in

23  vocational training, he's gone through anger

24  management, and enough - and I'll be talking

25  about those in a moment. Mr. Perez committed his

26  crime at - as a result of significant stress in

27  his life at a particular point in his life. The

1   fear that the victim had a gun due to his
2   threats to kill him.  That's no excuse and no,
3   he did not see a gun in his hand but Mr. - the
4   victim in this case was making threats that he
5   would kill my client and his uncle.  Mr. Perez
6   lacks any significant history of violent crime.
7   At the time of the crime Mr. Perez was 26 year
8   old - years old.  He is now age 48.  At age 48
9   the probability of recidivism is vastly reduced.
10  Mr. parole - Mr. Perez's parole plans are solid
11  and feasible.  He plans on residing with his
12  family in Mexico with his mom and dad and there
13  have been support letters in the past submitted
14  with regards to this.  Mr. Perez has a job offer
15  at not only one location but at two.  One of the
16  locations is the town (inaudible) Zacatecas and
17  there's another job offer at a grocery store in
18  Mexico by Mr. Fernando Adanei (phonetic) which
19  is owned by Mr. Adanei.  He indicated in - in
20  his testimony here today that that grocery store
21  is approximately 40 miles from his mother and
22  father's little farm.  Mr. Perez has marketable
23  skills as well enabling him to readily find
24  employment.  His skills include computer repair,
25  although he does not have a certificate in that,
26  graphic arts print shop, and electronics.  Mr.
27  Perez's institutional activities indicate an

1   enhanced ability to function within the law upon
2   his release.  During - during his incarceration
3   here he has only two 115's upon one - upon which
4   one is the - the latest is of 1986.  And he has
5   only one or seven 128's, the last one was being
6   received at 2001.  As I said earlier, he has
7   vocations, computer repair, paint shop, graphic
8   arts, electronics, and he currently works a
9   sewing machine operator in textiles.  My
10  client's assessment of dangerousness as applied
11  by Dr. MaComber is low.  And Dr. MaComber went
12  on to say that my client's assessment of
13  dangerousness is no more than - no more risk
14  than the average citizen in the community.
15  Therefore, in conclusion, Mr. Perez has a
16  network of support which includes his family,
17  organizations.  The family support will not be
18  there forever because, as he's indicated, his
19  parents area aging.  Mr. Perez has a job offer.
20  This will not always be there.  Mr. Perez also
21  has par - parole - he has parole plans that are
22  feasible and Mr. Perez has demonstrated he can
23  succeed without resorting to violence.  As a
24  result, we hereby request that Mr. Perez be
25  granted parole so that he may resume his life
26  and become a productive citizen in the
27  community.  Or at least in the Mexican

82

1    community.   However, if this Board does not

2    believe that my client has quite reached an

3    acceptable level of suitability we would further

4    request that my client be granted a one year

5    denial.   And we submit.

6         **PRESIDING COMMISSIONER INGLEE:**   All

7    right, thank you very much.   Mr. Perez, this is

8    your opportunity.   You can either go with what

9    your attorney has just said or we encourage you

10   to make your own statement as to - as to your

11   suitability for parole.

12        **INMATE PEREZ:**   (inaudible) find me

13   suitable for parole (inaudible) and I thank you

14   for time.

15        **PRESIDING COMMISSIONER INGLEE:**   Okay,

16   very good.   We now want to recess.   The time is

17   2:40.

18                   **R E C E S S**

19                    --oOo--

20

21

22

23

24

25

26

27

83

1      **CALIFORNIA BOARD OF PAROLE HEARINGS**

2            **D E C I S I O N**

3      **DEPUTY COMMISSIONER MOORE:**   3:22.

4      **PRESIDING COMMISSIONER INGLEE:**   Okay.

5   All parties that were here when we went to

6   recess have since returned.   This is the matter

7   of Rogelio, R-O-G-E-L-I-O, Perez, P-E-R-Z-E,

8   pardon me, P-E-R-E-Z. CDC number D-03602.   The

9   Panel reviewed all information received from the

10  public and relied on the following circumstances

11  in concluding that the prisoner is not suitable

12  for parole and would, in fact, pose an

13  unreasonable risk of danger to society or a

14  threat to public safety if released from prison.

15  May factors, Mr. Perez, are considered when we

16  arrive at decisions.   However, the first and

17  foremost, certainly, is the gravity of the

18  crime.   The offense that you carried out was

19  especially violent, callous in that you shot and

20  murdered an unarmed man during a fistfight.   We

21  discussed at great lengths what might have

22  caused this.   Did he have another weapon, was he

23  armed with some kind of - whether it be a

24  firearm or a baseball bat or (inaudible) but it

25  appears that he truly was unarmed man.   The

26  offense was carried out in a manner which was

27  **ROGELIO PEREZ D-03602 DECISION PAGE 1  6/1/06**

84

1    dispassionate, calculated to the effect that you

2    felt threatened and you then went to your

3    automobile, retrieved a weapon, your .22, and

4    returning to then kill the victim.  While the

5    story differs from time to time it appears that

6    rounds or casings were found in and around close

7    to the body.  Therefore, you may have been very,

8    very close to the man when you shot him.  It's

9    also might be substantiating the fact that you

10   said you had never fired a pistol in your life.

11   You know, to shoot a man in the head three times

12   and – at a reasonable distance having never

13   fired a weapon in a darkened parking lot may

14   lend credence to the fact that you were closer

15   than you appear to - will admit.  The offense

16   was carried out in a manner which demonstrates

17   exceptional disregard for human life.  The

18   motive for the crime was truly inexplicable.

19   You murdered a man over a fistfight – fistfight.

20   Also have to note that you murdered a man at  a

21   time when you were on parole and that as a felon

22   you are not supposed to be carrying a weapon.

23   Notwithstanding the fact that it was an illegal

24   weapon to begin with.  This conclusions are

25   drawn from the statement of fact wherein the

26   prisoner and the victim apparently had been

27   **ROGELIO PEREZ D-03602 DECISION PAGE 2  6/1/06**

85

1    drinking at a bar. Subsequently, they became
2    involved in an argument. The victim who was
3    Javier Ortiz and the inmate were both thrown out
4    of the bar, are asked to leave the
5    establishment. The fight ensued out in the
6    parking lot. At this time, the prisoner then
7    went to his automobile, retrieved the handgun
8    from his vehicle, came back and - and shot the
9    vic - victim three or four times. And, in doing
10   so, killed him. The offense was carried out in
11   a manner which demonstrated an exceptional
12   insensitive disregard for human life, as I noted
13   earlier. And, again, the motive of the crime
14   still remains inexplicable. There may have been
15   also indications that the victim was trying to
16   leave at the time that he was shot. Noted
17   again, as we had previously mentioned, the
18   prisoner had been on parole at the time of the
19   incident. These conclusions are drawn from the
20   fact the prisoner had an escalating pattern of
21   criminal conduct and violence, a history of
22   unstable tumultuous relationships with others
23   commencing at a very early age, dropping out of
24   school in the 8th grade, becoming involved with
25   a number of street gangs, apparently the 3rd
26   Street Gang, failed to profit from society's
27   **ROGELIO PEREZ D-03602 DECISION PAGE 3 6/1/06**

86

1    previous attempts to correct his criminality.

2    Such attempts include probation, county jail

3    time, prior prison terms, as well as parole.

4    The prisoner had an unstable social history,

5    prior criminality in this regard.  He entered

6    the United States in 1975 to visit and did not

7    return and became, therefore, an illegal alien.

8    He attended school in the United States but

9    dropped out in the 8th grade.  He eventually

10    became a member of the 3rd Street Gang.

11        **DEPUTY COMMISSIONER MOORE:**  We are

12    stopped now.

13                    (Off The Record)

14        **DEPUTY COMMISSIONER MOORE:**  Tape 2.

15        **PRESIDING COMMISSIONER INGLEE:**  Okay.

16    Repeating social history, the inmate entered the

17    United States in 1975 for a visit and did not

18    return.  Therefore, becoming an illegal alien.

19    He currently has an INS hold.  He dropped out of

20    school which he was attending in the United

21    States.  Dropped out in the 8th grade.  He then

22    in and around this period of time became a

23    member of the 3rd Street Gang, became involved

24    in gang life then proceeded to have a history of

25    crime which began in 1987 when he was arrested

26    for burglary on four counts.  He then moved to

27    **ROGELIO PEREZ D-03602 DECISION PAGE 4  6/1/06**

87

1   19 - again in 1987 that he was convicted and
2   sentenced a four year term in the California
3   State Department of Corrections. Prisoner is
4   (inaudible) to have developed his programming
5   and has shown much progress since 1980, excuse
6   me, 2003 while he's been incarcerated. He has
7   developed two marketable skills. Because they
8   were done in the 1990's they appear to be skills
9   that need to be updated given the potential. He
10  has, in fact, upgraded himself vocationally but
11  not educationally; he still needs to complete
12  his GED. He has participated in beneficial
13  self-help programs. He has had some
14  disciplinary problems but not recently. In his
15  128's he's had six, the last being 10/20 of 1996
16  for unauthorized articles. He's had only two
17  115's disciplinary reports, the last being 10/5
18  in 1986. That was possessing alcohol in his
19  cell. He should be congratulated for his lack
20  of 115 disciplinary reports. His psychiatric
21  reports, the last one is dated - is 5/9 of '06
22  authored by M. MaComber, capital M-A-C-O-M-
23  B-E-R, PhD, is favorable. Mr. MaComber says -
24  and considering the potential dangerousness that
25  he - in the institution he has remained
26  disciplinary-free for 20 years. Not quite the
27  **ROGELIO PEREZ D-03602 DECISION PAGE 5  6/1/06**

88

1   case but he did not have many disciplinary

2   problems but he was not disciplinary-free.

3   Soledad is a prison that has frequent racial

4   riots, disturbances and - and altercations.  He

5   has not been involved in any of these

6   activities.  As the result, his potential for

7   dangerous behavior compared to other inmates is

8   definitely below average.  In considering his

9   potential for dangerous behavior when released

10  to the community level of - of Service

11  Inventory, revised, as administered.  This is an

12  actuarial measure that assesses criminal

13  history, substance abuse history, institutional

14  adjustment, social relationships and other

15  factors to determine the curr - current risk

16  level on parole.  He obtained scores in the low

17  risk area.  As a result, compared to the average

18  citizen (inaudible) at this point in his life he

19  does not pose any more risk than the average

20  citizen in the community.  Even though most of

21  the average citizens in the community have not

22  murdered somebody in a parking lot in front of a

23  bar.  There's one issue that I - I must admit

24  the Panel take exception with in Dr. MaComber's

25  report.  He says under Clinical Observation and

26  Comments and Recommendations and I want to make

27  **ROGELIO PEREZ D-03602 DECISION PAGE 6  6/1/06**

1   sure that you - you understand this, Mr. Perez.
2   He comments the fact that he is the process of
3   studying to complete his GED.  However, says the
4   doctor, it says since he plans to return to
5   Mexico to it's not necessary for him to finish
6   his GED in order to get a parole date.  I am - I
7   don't believe that Dr. MaComber currently is on
8   the Parole Board and he's making a statement
9   that I'm not sure is correct.  But from this
10  Panel we believe it's important that all
11  prisoner's work hard to be able to qualify for
12  parole in different facets.  It's a mosaic of
13  issues that come up that eventually get someone
14  to be paroled.  One of the pieces of the pie, we
15  believe, is a person obtain a minimal education
16  standard before being released.  And that being
17  - GED is the measure of which we have right now
18  to measure that - that standard.  And whether
19  you go to Mexico or stay in the United States
20  education is - is very important to you.  You
21  should never stop getting an education.  And why
22  the doctor would say that I'm not entirely sure.
23  However, it was stated and we would like to tell
24  you that we feel strongly that GED is an
25  important - GED, excuse me, is an important
26  element in that inmates - the inmates travel to
27  **ROGELIO PEREZ D-03602 DECISION PAGE 7  6/1/06**

90

1  eventually being able to go - be able to acquire
2  a date.  Do you understand?

3       **INMATE PEREZ:**  Yes.

4       **PRESIDING COMMISSIONER INGLEE:**  All
5  right.  And we would encourage you to continue
6  working on that.

7       **INMATE PEREZ:**  Okay.

8       **PRESIDING COMMISSIONER INGLEE:**  All
9  right.  Parole plans, he does have updated
10 residential plans supported by letters in
11 English that we were able to read today. He
12 needs to be sure that the next time he has a
13 hearing and this letter - that he leaves letters
14 earlier enough either have his parents or - or
15 his friends that are going to support them
16 either have them done in English for them before
17 they're sent out from Mexico or (inaudible).
18 However, get to them to you earlier enough so
19 that you can get them translated here.  Okay?

20      **INMATE PEREZ:**  Okay.

21      **PRESIDING COMMISSIONER INGLEE:**  The same
22 is true and with employment plans.  You do have
23 employment plans, apparently, but they are
24 recent letters that are in Spanish.  We do not
25 have anybody here who is competent to translate
26 those letters and, therefore, we would request
27 **ROGELIO PEREZ D-03602 DECISION PAGE 8  6/1/06**

1   that you - at your next hearing that you have
2   the letters translated.  Not only for your
3   residential letters but also for your employment
4   letters.  Okay?

5           **INMATE PEREZ:**  Okay.

6           **PRESIDING COMMISSIONER INGLEE:**  You do
7   have two marketable skills that could be taken
8   into the free world.  However, we do suggest
9   that if you have the opportunity to update them,
10  particularly in any of them that have computer
11  aspects to it, we would suggest that you try and
12  get those updated.  3042 responses, we received
13  a letter from the district attorney of San
14  Bernardino, excuse me, he had presentation by
15  the district attorney of San Bernardino County
16  who recommended against parole at this time.  We
17  also received a letter from the Fontana Police
18  Department, that's Larry J. Clark, Chief of
19  Police, Fontana.  And he recommended that you
20  not be paroled in - back into the community at
21  this point in time.  Now, having said all this,
22  you have things that you should be commended
23  for.  And I'll ask the that Barbara, excuse me,
24  Ms. Moore, if she would read those out - those
25  achievements that you have - have in your
26  background since you've been incarcerated.
27  **ROGELIO PEREZ D-03602 DECISION PAGE 9   6/1/06**

92

1       **DEPUTY COMMISSIONER MOORE:**  Mr. Perez,
2    you have done very well.  You've maintained a
3    disciplinary-free record, basically, for 19 and
4    a half years on your 115's.  Very good job.  You
5    also have maintained your - free of 128's for
6    almost ten years.  Continue to do that.  You are
7    following the rules while you are in custody and
8    that is the beginning and continues to grow in -
9    to your benefit.  You have very good work
10   reports and, as you discussed today, you've
11   become even a more valuable employee in - with
12   the textiles because you've now are helping to
13   repair - mechanic, as you described, with the
14   sewing machines and your supervisor needs you in
15   the workplace and finds you a valuable worker.
16   And you seem to enjoy that from when you - from
17   what you were discussing with us.  You've been
18   attending AA meetings consistently.  Continue to
19   do that.  Alcohol was something that you used
20   quite a bit when you were - just before you
21   committed this murder with the DUI's and the
22   other issues.  Try to expand - try to grow in
23   AA.  Understand more - what do the Steps mean to
24   you.  And talk to some of the other men that are
25   sober that have worked the Steps.  Just don't
26   memorize them; you have to know them.  Okay,
27   **ROGELIO PEREZ D-03602 DECISION PAGE 10   6/1/06**

93

1   sir?

2           **INMATE PEREZ:**  Okay.

3           **DEPUTY COMMISSIONER MOORE:**  Your

4   programming in the past three years has

5   increased.  And it's very positive and I

6   reviewed them with you about the attendant –

7   going to the employability program, the anger

8   management and you finished the Project Change

9   program which was a very long program; 44 weeks

10   in length.  Those were all positive things.  Do

11   not hesitate to take them again if offered to

12   see if there's more that you can learn about

13   yourself.  How many times, if you can remember,

14   have you heard the Board say get your GED?

15           **INMATE PEREZ:**  Three or four times.

16           **DEPUTY COMMISSIONER MOORE:**  Okay, if you

17   do it this time you'll never have to hear it

18   from us again.  Okay?  We're going to have to

19   come up with a new note, a new song.

20           **INMATE PEREZ:**  I'm going to get next

21   time.

22           **DEPUTY COMMISSIONER MOORE:**  Okay.

23           **INMATE PEREZ:**  Hope I get to see you.

24           **DEPUTY COMMISSIONER MOORE:**  Okay.  I hope

25   you get it, too.  You – you know, you have –

26   you've progressed towards your GED.  I was

27   **ROGELIO PEREZ D-03602 DECISION PAGE 11  6/1/06**

1 looking at your scores. Your spelling is good.
2 But you have to work on your reading and your
3 math.

4 **INMATE PEREZ:** Yeah, I almost did it.
5 **DEPUTY COMMISSIONER MOORE:** So - and
6 remember the - the math that you learn will work
7 even though - math in Mexico is the same as the
8 math in the United States. It would be to your
9 benefit - your benefit.

10 **INMATE PEREZ:** Okay.

11 **DEPUTY COMMISSIONER MOORE:** Okay, sir?
12 **INMATE PEREZ:** Uh-huh.

13 **DEPUTY COMMISSIONER MOORE:** Thank you.
14 **PRESIDING COMMISSIONER INGLEE:** All
15 right. These positive aspects of your behavior,
16 however, do not outweigh the factors of
17 unsuitability. In a separate decision, the
18 hearing Panel finds that the prisoner has been
19 convicted of second degree murder; it's not
20 reasonable to expect that parole would be
21 granted at a hearing during the next two years.
22 Specific reasons for our finding are as follows.
23 As I mentioned earlier, the offense was
24 paramount. (inaudible) gravity of the offense
25 that you committed was especially vicious and
26 brutal. The offense was carried out in a
27 **ROGELIO PEREZ D-03602 DECISION PAGE 12  6/1/06**

1   manner which demonstrates an exceptional callous
2   - exceptionally insensitive disregard for human
3   life.   The prisoner had been drinking at a bar
4   at the Tres Hermanos, H-E-R-M-A-N-O-S, Bar.  And
5   one of the patrons, Javier Ortiz, had gotten
6   into an argument with him.  A confrontation of
7   sorts went on.  Both were kicked out of the bar.
8   The argument continued in a parking lot.  A
9   fight ensued.  It is unclear how - what the
10  timing was but the inmate returned to his car,
11  acquired a pistol, returned and murdered the -
12  the victim.  Bullet casings were found close to
13  the body.  Question comes up is how far away did
14  the murder and how did he shoot the man.   The
15  motive of the crime is inexplicable.  In terms
16  of the victim appeared to be trying to leave.
17  As well as the prisoner was on parole at the
18  time, as mentioned earlier, and he was an ex-
19  felon in possession of a weapon.  We were also
20  concerned about the fact that we are not sure
21  that you are still minimizing the crime and that
22  we'd like to have you give more thought to the
23  crime, how it occurred, and your feeling as to
24  what your aspect - what caused you to step away
25  from what was a fistfight with a man
26  approximately your size to go to the car, get a
27  **ROGELIO PEREZ D-03602 DECISION PAGE 13  6/1/06**

96

1   weapon out and murder him.  That's a major
2   concern.  As noted earlier, the crime was
3   inexplicable.  Carried out in a manner that
4   demonstrated exceptional callous disregard for
5   human life.  We also note that you had a history
6   of crime prior to the murder.  As an adult.  In
7   this regard you were first arrested in 10/9 of
8   1987 for burglary.  You were then arrested later
9   that year for burglary again at which time you
10  were then sentenced to four years at the
11  California Department of Corrections, to prison.
12  And also, as was noted previously, you were on
13  parole at the time of your instant offense.
14  Panel recommends that you remain disciplinary-
15  free.  If available, try and upgrade yourself
16  vocationally.  In other words, the two vocations
17  you have, if it's possible try to update
18  yourself with them.  Educationally, we've said
19  it on numerous occasions, you're probably tired
20  of hearing those three letters, but one thing
21  you'll know is you have trouble with spelling
22  you surely are going to be able to spell G-E-D.
23  And that's the - that's you're (inaudible) and
24  that's going to take you a time to work on
25  between the work that you're doing now, your
26  self-help programs that you're - you're going in
27  **ROGELIO PEREZ D-03602 DECISION PAGE 14   6/1/06**

97

 1   and to finish this GED is probably going to take
 2   you a year or two to get that accomplished.  And
 3   you should put your full attention to it.  And,
 4   of course, if available continue to participate
 5   in self-help programs.  Deputy commissioner,
 6   anything else to say?
 7       **DEPUTY COMMISSIONER MOORE:**  What are you
 8   going to do before the next hearing?
 9       **INMATE PEREZ:**  Get a GED.
10       **DEPUTY COMMISSIONER MOORE:**  Thank you.
11       **PRESIDING COMMISSIONER INGLEE:**  See you
12   can spell it already.
13       **DEPUTY COMMISSIONER MOORE:**  Okay, good
14   luck to you, Mr. Perez.
15       **PRESIDING COMMISSIONER INGLEE:**  Good
16   luck, Mr. Perez.  This hearing is now over.  The
17   time is 3:44.
18                    --oOo--
19
20
21
22
23   **PAROLE DENIED TWO YEARS**
                                **SEP 2 9 2006**
24   **THIS DECISION WILL BE FINAL ON:**_____
25   **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**
26   **DATE, THE DECISION IS MODIFIED.**
27   **ROGELIO PEREZ D-03602 DECISION PAGE 15  6/1/06**

98

1                              CERTIFICATE AND
                        DECLARATION OF TRANSCRIBER


            I, TRACY RICHARDSON, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total two in number and

cover a total of pages numbered 1 - 97 and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF ROGELIO

PEREZ, CDC NO. D-03602, on JUNE 1, 2006, and that the

foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

            I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

            Dated AUGUST 28, 2006, at Sacramento,

California.



                            TRACY RICHARDSON
                            TRANSCRIBER
                            **PETERS SHORTHAND REPORTING**

EXHIBIT 2

## LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING
## JUNE 2005 CALENDAR

**PEREZ, ROGELIO**                                          **D-03602**

## I.   COMMITMENT FACTORS:

**A.**   **Life Crime:** PC 187, Murder 2nd Degree with PC 12022.5 (A), Use of Weapon (.22 caliber semi-automatic pistol); 15 year base term sentence with a 7 year enhancement for a total term of 22 years to Life; received by the California Department of Corrections (CDC) from San Bernardino County on 3/28/85; MEPD: 2/22/98. Victim: Javier Bravo Ortiz, age unknown.

**1.**   **Summary of Crime:** Per the Probation Officer's Report (POR) dated, 2/21/85, (Page 1). Rogelio Perez was involved in an argument on 5/27/84, at the Tres Hermanos Bar located in Fontana, California. The dispute escalated into a physical fight inside the bar, which was stopped when both parties were ordered to go outside the bar by the bartender, Feliciano Perez. The fight continued in the parking lot. Perez obtained a .22 caliber semi-automatic pistol from his vehicle. The victim, (Javier Ortiz) proceeded to walk to his vehicle which was located on the opposite side of the parking lot and attempted to open his vehicle door. Perez returned to the scene and positioned himself directly in front of Ortiz' vehicle. Perez fired 4 rounds from the pistol, striking the victim twice in his left neck area and once in the lower left corner of his mouth. The POR notes that Perez and a second suspect fled from the scene.

**2.**   **Prisoner's Version:** After interviewing Perez for this report, Perez stated that his version of the crime remains the same as stated in prior reports. The report reads as follows: Perez was at the Tres Hermanos Bar and became involved in an argument and fight with Javier Ortiz (the victim), on the night of the murder. He stated that he had been drinking, two or three beers, at his house prior to a friend asking him for a ride to the Tres Hermanos Bar. After Perez and his friend arrived, the victim, Javier Ortiz, who Perez didn't know, started to "bad mouth" Perez' uncle, who managed the bar. Perez stated that he told the victim to relax and back off from his uncle. The victim approached Perez and started to swing at him, at that time Perez began to defend himself. The fight was broken up and the victim was told to leave first. About three or four minutes later, Perez and his friend were told to leave, which they did. As

they were walking out, Perez heard Javier Ortiz loudly calling him names.
Perez thought he had a gun or something in his hand as Perez stood by his
car door. At this point, the victim said "You guys are through, I'm going
to kill you". At this time, Perez' friend went to the car and got out Perez'
gun, returned and gave it to Perez. Perez started shooting first. He stated
that he was scared after the first shot went off and the gun just kept going
off. Perez stated that he didn't know if he had wounded Javier Ortiz,
(victim). Perez didn't tell his uncle about what happened because he
didn't want to involve him. Perez and his friend ran to his car and drove
to Perez' house, where his friend then left to go home. Perez stated that he
told his brother, Matias, what had happened and he stated that his brother
took the gun to his trailer, to hide it and to protect Perez. Perez stated that
he didn't know the victim, he had never seen him before, and that
everything just happened wrong.

   **3.**   **Aggravating/Mitigating Circumstances:**

      **a.**   **Aggravating Factors:**

1. Perez had a clear opportunity to cease his involvement, but chose to continue.
2. Perez was on parole with the California Department of Corrections as a result of a 1980, 4 year conviction for Burglary First Degree, for which he paroled on 4/21/83.

      **b.**   **Mitigating Factors:**

1. Perez had no apparent disposition to commit the instant offense.

**B.**   **Multiple Crime(s):** None.

   **1.**   **Summary of Crime:** None.

   **2.**   **Prisoner's Version:** None.

**II.**   **PRECONVICTION FACTORS:**

**A.**   **Juvenile Record:** No known juvenile history.

**B.**   **Adult Convictions and Arrests:** Per Federal Bureau of Investigations ( FBI)
report dated, 10/9/87, the Los Angeles Police Department (LAPD) arrested Perez
on 5/11/80 on four (4) counts of PC 459 Burglary. The State of California

Department of Justice (DOJ) report CI&I dated 5/12/87, states that Perez plead guilty on 5/13/80 on the above burglary offenses. He was sentenced to 12 months without supervision, 30 days jail term on 2 counts, with the remaining 2 counts dismissed. Perez was also arrested on 8/12/80 by the LAPD on charges of 1 count of PC 459, Burglary. The CI&I Report dated 5/12/87 shows that Perez was convicted and sentenced to a 4 year term with the California Department of Corrections, from which he paroled on 4/21/83,

**C.** **Personal Factors:** Perez is a 46 year old Mexican National. He was born on October 25, 1957 in Zacatecas, Mexico to Matias and Juana Perez. The family was supported by his father's factory employment in Mexico. His mother was a homemaker until she and her husband purchased a small grocery store that she manages. In addition to his parents, Perez has multiple brothers and sisters who currently reside in Mexico and the United States. Perez came to the United States in 1975 to visit and decided to stay with his family members in southern California. He attended Bellmont Elementary School until completing the 8th grade at which time he dropped out of school to go to work making furniture. The POR page 2, dated 2/21/85 identified Perez as being affiliated with the "Ninety Street" Gang in Los Angeles County. Also noted, that he is associated with the members of the "South Fontana" Gang, which had affiliations with the Los Angeles Gangs. The POR dated 2/21/85, indicates that Perez was arrested on 4/9/84, by the California Highway Patrol (CHP) on charges of drunk driving. Disposition was pending at the time of his arrest for murder. Perez states that he did not use narcotics and there is no information regarding substance abuse.

## III. POSTCONVICTION FACTORS:

**A.** **Special Programming/Accommodations:** None.

**B.** **Custody History:** Inmate Perez was received into the Department of Corrections on March 28, 1985 from San Bernardino County. He was housed at Deuel Vocation Institute (DVI) from California Institute for Men, (RCC-CIM) on 4/22/85. Perez transferred to Richard J. Donovan (RJD-CF) on 1/27/88, and then to Soledad Correctional Training Facility (CTF) on 2/8/93. On 7/9/96, he was transferred to the California Correctional Institution (CCI). Perez transferred to Solano State Prison (CSP-SOL) on 5/29/97. He was received at Avenal State Prison on 5/19/98. On 5/31/00, Perez was received at Corcoran State Prison and on 7/12/00, he transferred to Avenal State Prison. Perez then transferred on 4/5/01, to the Correctional Training Facility (CTF). He remains at CTF with Medium A custody.

**C.** **Therapy and Self-Help Activities:** Perez received a certificate and a laudatory chrono for participating and completing a 44 week anger management course in the project change program. He has been an active member in the Spanish

Alcoholic Anonymous program during the first, second, third and fourth quarter of 2003.

**D.**    **Disciplinary History:** During this review period, Inmate Perez remained disciplinary free.

**E.**    **Other:** On 6/17/03, Perez was seen by the Board of Prison Terms for his Subsequent Parole Consideration Hearing #3. The Board's decision was to deny parole for two years, and recommend the following: 1) Remain disciplinary free, 2) Upgrade vocationally/educationally and 3) Participate in self help programs.

## IV.    **FUTURE PLANS:**

**A.**    **Residence:** Perez plans to reside with his parents, Matias and Juana Perez in their home in Zacatecas, Mexico.

**B.**    **Employment:** Fernando Almaraz Adame has offered Perez employment at his grocery store located at RFC AAAF 660107T95 Avenue, Trevino No. 205 Pte. Matamoros De La Laguna, Coah.

**C.**    **Assessment:** Perez has support letters from both family and friends.

## V.    **USINS STATUS:** Perez has a USINS Hold, #A27149524.

## VI.    **SUMMARY:**

**A.**    Prior to release the prisoner could benefit from:

1.    Remaining disciplinary free.
2.    Obtaining his GED.
3.    Continuing his participation in self help programs when available.

**B.**    This report is based upon an interview with the prisoner on 2/7/05, lasting approximately 1/2 hour and a complete review of his Central File lasting 2 hours.

**C.**    Prisoner was afforded an opportunity to examine his Central File, per the Olson Decision. On 2/7/05, Perez reviewed his Central File.

**D.**    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

LIFE PRISONER EVALUATI⎡ ⎤ REPORT
PAROLE CONSIDERATION HEARING
JUNE 2005 CALENDAR

_____  4/5/05
J. Palmer                Date
Correctional Counselor I


_____  4.5.05
G. Williams              Date
Correctional Counselor II(A)


_____  4-5-05
R. Pope                  Date
Facility Captain


_____  4/8/05
D. S. Levorse            Date
Classification and Parole Representative

BOARD OF PRISON TERMS
## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

STATE OF CALIFORNIA

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

### INSTRUCTIONS

TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2  MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 3/03 to 2/04 | | | **PLACEMENT**: He remained at CTF among the general population. **CUSTODY**: Medium A. **VOC. TRAINING**: On 10/8/03 Perez was assigned to the PIA "Y" Shift as a Sewing Machine Operator. There were no work supervisory reports during this review period. **ACADEMICS**: He remained assigned to ABE III with satisfactory ratings per CDC 128-E, dated: 4/1/03, 6/30/03 and 9/03. Supervisory comments: Inmate Perez actively participated in class. He works diligently on his self study packet. On 9/22/03, he successfully completed a voluntary independent learning course in fractions, decimals and percentages. **WORK RECORD**: None noted during this period. **GROUP ACTIVITIES**: Perez received a certificate and a laudatory chrono dated, 6/20/03 for participating and completing a 44 week Anger Management course in the Project Change Program, per CDC 128B, dated, 6/20/03. He has been an active member in the Spanish Alcoholic Anonymous Program during the first, second, third and fourth quarter of 2003, dated 4/2/03, 8/2/03, 11/20/03 and 2/17/04. **PSYCH. TREATMENT**: None. **PRISON BEHAVIOR**: He remained disciplinary free during this review period. **OTHER**: On 7/8/02, Perez received a certificate for completing a 14 week Impact Program. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | | DATE 4/5/05 |
|---|---|---|
| PEREZ | D03602 | CTF-SOLEDAD          JUN/2005 |

BPT 1004 (REV 7/86)

BOARD OF PRISON TERMS                                                            STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 03/04 to 2/05 (Present) | | | **PLACEMENT**: He remained at CTF among the general population.<br>**CUSTODY**: Medium A.<br>**VOC. TRAINING**: Perez remained assigned to the PIA "Y" Shift as a Sewing Machine Operator. He received satisfactory ratings on his work performance per CDC 101's dated, 4/1/04, 7/1/04, 10/1/04 and 1/1/05. On 10/1/04, Perez received an annual work experience evaluation. He received the following ratings: Under Job Skills and Equipment he was rated 3 (trainee/skilled worker with limited knowledge, requiring close supervision and guidance. He received formal job training on 10/20/03 in the following: injury/illness prevention program, operator mechanic training single needle, employee safety orientation and safety data sheet. Perez received satisfactory work ratings on his work attitude and performance.<br>**ACADEMICS**: None during this review period.<br>**WORK RECORD**: None during this review period.<br>**GROUP ACTIVITIES**: None.<br>**PSYCH. TREATMENT**: None noted.<br>**PRISON BEHAVIOR**: He remained disciplinary free during this review period.<br>**OTHER**: N/A. |

ORDER:
- ☐ BPT date advanced by   months.
- ☐ PBR date advanced by   months.
- ☐ BPT date affirmed without change.
- ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- ☐ Previously imposed conditions affirmed.
- ☐ Add or modify

- ☐ Schedule for Progress Hearing on appropriate institutional calendar

| PEREZ | D03602 | CTF-SOLEDAD | JUN/2005 |
|---|---|---|---|

BOARD OF PRISON TERMS                                                            STATE OF CALIFORNIA

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

[ ]  DOCUMENTATION HEARING

[X]  PAROLE CONSIDERATION HEARING                **ADDENDUM**

[ ]  PROGRESS HEARING

INSTRUCTIONS
TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 2/1/05 to 1/31/06 | | | **PLACEMENT**: Remained at CTF Soledad and housed with the general population.<br>**CUSTODY**: Medium A.<br>**VOC. TRAINING**: None noted.<br>**ACADEMICS**: None noted.<br>**WORK RECORD**: Perez continued with his PIA Work assignment as a Sewing Machine Operator in Textiles. CDC 101's dated 3/1/05, 5/1/05 and 8/1/05 reflect grades of "satisfactory" in all categories, with CDC 101's dated 5/1/05 and 8/1/05 reflecting his supervisor's rating Perez' "Teamwork and Participation" as "above average". There are also three CDC 128B training certification chronos (dated 1/12/06) reflecting Perez' training in the proper operation and safety procedures of the single needle sewing machine, overlock sewing machine, and the bar tack sewing machine. Lastly, CDC 128B Laudatory chrono dated 10/25/05 is authored by his work supervisor who commends Perez for his team efforts in achieving more than a $700,000.00 production level with no past due orders for the month of September 2005. Refer to the Miscellaneous section of the C-File to view CTF memo dated 12/2/05 authored by PIA Superintendent II Charlie Walker which indicates Perez' most recent PIA work experience evaluation as well as a "former PIA worker card".<br>**GROUP ACTIVITIES**: CDC 128B Laudatory chrono dated 12/30/05 reflects Perez' active participation in Alcoholics Anonymous/Narcotic Anonymous. He has been an active participant since 12/2005. CDC 128B Laudatory chrono dated 12/2/05 reflects Perez' participation in 3 hours of Video Instruction/Discussion as part of the Inmate Employability Program (I.E.P.). CDC 128 B Laudatory chrono dated 12/23/05 reflects Perez' participation in 3 hours of I.E.P. Video Review and dialogue of issues related to Anger Management.<br>**PSYCH. TREATMENT**: None noted.<br>**PRISON BEHAVIOR**: Remained disciplinary free during this period of review.<br>**OTHER**: On 1/10/06, Perez was granted a "Postponement" (by the BPT) based on his own request for a postponement until the next calender date after he receives an updated Psychological Evaluation Report. Refer to BPT 1001A form dated 1/10/06 located in the BPT section of the C-File. |

CORRECTIONAL COUNSELOR'S SIGNATURE                                      DATE

C. Eltula                                                               5-19-06

PEREZ                    D03602              CTF-SOLEDAD

SENT TO I/M ON ___5/25/06___

BPT 1004 (REV 7/86)                      Page _1_

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 2/1/06 to 5/15/06 (Present) | | | **PLACEMENT**: Remained at CTF Soledad and continues to be housed with the general population. **CUSTODY**: Medium A. **VOC. TRAINING**: None noted. **ACADEMICS**: None noted. **WORK RECORD**: Continues with his PIA work assignment as a Sewing Machine Operator in Textiles. CDC 101 dated 2/1/06 reflects ratings of mostly satisfactory with ratings of above average in four categories. His supervisor comments that Perez has a good attitude towards his job assignment. **GROUP ACTIVITIES**: CDC 128B Laudatory chrono dated 3/31/06 reflects Perez' active participation in Alcoholics Anonymous/Narcotics Anonymous. **PSYCH. TREATMENT**: None noted. **PRISON BEHAVIOR**: Remained disciplinary free during this period of review. **OTHER**: None noted. |

ORDER:

☒ BPT date advanced by     months.
☐ PBR date advanced by     months.

☐ BPT date affirmed without change.
☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

PEREZ        D03602        CTF-SOLEDAD

BPT 1004 (REV 7/86)

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT    **ADDENDUM**


_C. Ellison_                    5-19-06
_____
C. Ellison                    Date
Correctional Counselor I


_R. Leach_                     5-19-06
_____
R. Leach                      Date
Correctional Counselor II


_R. Pope_                      5-19-06
_____
R. Pope                       Date
Facility Captain


_D.S. Levorse_ CPR  5-22-06
_____
D.S. Levorse                  Date
Classification and Parole Representative


PEREZ                D03602            CTF-SOLEDAD

EXHIBIT 3

**MENTAL HEALTH EVALUATION FOR**
**THE BOARD OF PRISON HEARINGS**
**June, 2006 Lifer Calendar**

**CORRECTIONAL TRAINING FACILITY SOLEDAD**
**MAY, 2006**

| | |
|---|---|
| **NAME:** | **PEREZ, ROGELIO** |
| **CDC#:** | **D-03062** |
| **DOB:** | **10/25/57** |
| **OFFENSE:** | **PC 187 MURDER, SECOND DEGREE** |
| **DATE OF OFFENSE:** | **6/26/84** |
| **SENTENCE:** | **22 YEARS TO LIFE** |
| **MEPD:** | **2/22/98** |
| **EVALUATION DATE:** | **5/9/06** |

### I.    IDENTIFYING INFORMATION:

Mr. Rogelio Perez is a 48 year old, second term, single, Hispanic male from San Bernardino County. He is a Christian. He has served 22 years in custody on this term. He has a US-INS hold and will be returning to Mexico, when he is released.

### SOURCES OF INFORMATION:

This evaluation is based upon a single 90 minute interview, plus review of the central and medical files.

The psychological evaluation, dated 3/17/99, from Avenal State Prison by Dr. Kroes, Psychologist, contains a Psychosocial Assessment. This information was reviewed with the inmate and is still current and valid. As a result, this information will not be repeated at this time.

PEREZ, ROGELIO
D-03802
5/9/06
PAGE 2

## CLINICAL ASSESSMENT

## XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Perez related during the interview in an open, friendly and cooperative manner. His mental status was within normal limits. He was alert and well oriented. His thinking was rational, logical and coherent. His speech was normal, fluent and goal oriented. English is his second language. However, he communicates quite well in English. There is no need for an interpreter. His eye contact was good. His affect was appropriate. There was no evidence of anxiety or of depression. Intellectually, he was functioning in the average ranges. His memory was intact. His judgment was intact. His insight and self-awareness were good.

In the past, the use of alcohol has been a problem in his life. This was related to the commitment offense. He has been clean and sober now for 20 years. The 115 that he received 20 years ago, he stated was for alcohol that belonged to his cellie. He continues to attend Alcoholics Anonymous and has certificates to prove his attendance. He is now a Christian, and he is determined not to drink. He understands how destructive the use of alcohol can be. Alcohol is available in the institution. The fact that he has not been involved in it is proof that he is exercising good self-control, maturity and responsibility. It is evident that this is not a problem in his life.

Prior to coming to prison he worked as a forklift operator in a warehouse. He also worked in upholstery. He has skills in these areas. He is currently working in PIA Textiles as a machine operator and sewing machine mechanic. In addition, he has completed Vocational Graphic Arts.

Mr. Perez has also attended several self-help programs. He has attended Anger Management, Alternatives to Violence Program, Breaking Barriers, Impact Program, and Project Change.

### CURRENT DIAGNOSTIC IMPRESSION

| | |
|---|---|
| Axis I: | No mental disorder |
| Axis II: | No personality disorder |
| Axis III: | No physical disorder |
| Axis IV: | Life term incarceration |
| Axis V: | Current GAF: 85 |

PEREZ, ROGELIO
D-03802
5/9/06
PAGE 3


## XIII.  REVIEW OF LIFE CRIME

Mr. Perez accepts full responsibility for the commitment offense.  He accepts the
written version of the commitment offense.  He does feel very badly about the
victim's loss of life.  He understands now that his behavior at that time was wrong
and out of control.  He was young, immature, in his 20s, and not living in a
responsible way.  His feelings of remorse appear to be sincere and genuine.  Mr.
Perez is no longer the person who committed the commitment offense.  He is now
48 years of age.  He is a mature, responsible person, who has made significant
changes in his life over his 22 years of incarceration.  He now actively attends
church, and he knows that irresponsible behavior is not appropriate.  He does not
intend to engage in irresponsible behavior or alcohol in the future.


## XIV.  ASSESSMENT OF DANGEROUSNESS

A. In considering potential for dangerous behavior in the institution, he has
   remained disciplinary free for 20 years.  Soledad is a prison that has
   frequent racial riots, disturbances and altercations.  He has not been
   involved in any of these activities.  As a result, his potential for dangerous
   behavior compared to other inmates, is definitely below average.

B. In considering potential for dangerous behavior when released to the
   community, the Level of Service Inventory-Revised was administered.
   This is an actuarial measure that assesses criminal history, substance abuse
   history, institutional adjustment, social relationships and other factors to
   determine current risk level on parole.  He obtained a score in the low risk
   range.  As a result, compared to the average citizen in the community, at
   this point in his life, he does not pose any more risk than the average
   citizen in the community.

C. There are no significant risk factors in this case.

PEREZ, ROGELIO
D-03802
5/9/06
PAGE 4

## XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere with
routine parole planning. He plans on returning to Mexico as soon as he is
released from prison. He has family support in Mexico, including his mother and
father who are waiting for him to return and to help out on the family farm. He
has job offers and residence offers in the file from Mexico. He has skills that will
enable him to support himself in the community. He is in the process of studying
to complete his GED. However, since he plans on returning to Mexico, it is not
necessary for him to finish his GED in order to get a parole date. The prognosis
for successful adjustment in the community is very good.

*M. Macomber, PhD*

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

*B. Zika, Ph.D.*

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

**D:**    **5/9/06**
**T:**    **5/10/06**

EXHIBIT 4

LIFE-TERM INMATE MENTAL HEALTH EVALUATION FOR
THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
AVENAL STATE PRISON
FEBRUARY 1999 CALENDAR

NAME: Perez, Rogelio
CDC #: D-03602
DATE OF EVALUATION: 3/13/99

PROCEDURE UTILIZED: Inmate Perez was clinically interviewed by the
undersigned clinician in an approximately 60-minute interview.  The Medical and
Central Files were reviewed for background data.  Inmate was made aware that
the purpose of the evaluation was for submission to the Board of Prison Terms
(BPTs), and as such was not a confidential exchange.  Having been duly
informed, inmate agreed to the interview process on this basis.

PSYCHOSOCIAL ASSESSMENT

IDENTIFYING INFORMATION: This Life-Term Inmate Mental Health Evaluation
is submitted to the BPTs on Perez, CDC#: D-03602, for the upcoming
Subsequent Board Hearing # 1. Inmate  is a 41-year-old Hispanic single male.
He identifies his religious preference as Christian. The inmate had no unusual
physical characteristics that were readily apparent.  He reports that he is not
using any nicknames or aliases at present, nor has he in the past.

DEVELOPMENTAL HISTORY:  Inmate was born in Mexico and raised by both
natural parents.  He could not recall his parents telling him of  any  problems or
concerns during his prenatal or perinatal periods and he is not aware of any
known birth defects.  He states he was not a drug baby.  Developmental
milestones such as speech, language and motor development were reported to
have been normal.  Socialization also appears to have been normal and inmate
reports having made friends easily and maintained such throughout his school
years. Inmate denies any significant health problems as a child. He denies a
childhood history of cruelty to animals, enuresis, arson or physical or sexual
abuse as  perpetrator or victim.  He denies violent or aggressive acts through his
early teen years.    At the age of seventeen he joined the Third Street Gang.

EDUCATIONAL HISTORY:  Inmate reports having completed through the 8th
grade.  He then dropped out of school because "I had to work."   Since
incarceration, he reports no further educational activities, "just been taking
vocational."

FAMILY HISTORY: Inmate relates that his mother was a house wife and his
father did both field and factory work.  He believes his father is educated

**INMATE COPY**

LIFE-TERM INMATE MENTAL HEALTH EVALUATION
FOR THE BOARD OF PRISON TERMS
PEREZ   CDC#: C-20413 , ASP
Page 2

through the 10th grade. He has three brothers and six sisters. The inmate is
aware of no family history of mental illness, substance abuse or problems with
the law, commenting "I'm the black sheep of the family." He states that his
family was and remains "real close."

PSYCHOSOCIAL DEVELOPMENT AND SEXUAL ORIENTATION:
Psychosocial development appears to have been normal. He recalls his first
sexual encounter occurring at the age of 15/16. Inmate considers his sexual
orientation to be heterosexual. He denies having had high-risk behaviors that
would place him at risk for AIDS. He denies forcing himself on any other person
sexually, nor does he fantasize about doing so.

MARITAL HISTORY: Inmate Perez appears not to have had any long-term
relationships.   He has never been married, nor has he fathered any children.

MILITARY HISTORY: None.

EMPLOYMENT/INCOME HISTORY: Prior to incarceration inmate worked only a
few jobs. He states, "I was working in a warehouse, using forklift, before that I
was working upholstery." Since incarceration inmate reports having received
training in computer repair and has experience working in the print shop. At
Avenal, he is learning "electrical work," which he enjoys. In his words, "It's
pretty good. I really like it."

SUBSTANCE ABUSE HISTORY: Inmate reports that he was a weekend
drinker. He has two drunk driving arrests. He feels his alcohol problem is
behind him and proudly stated, "I haven't drank since a week before I got
busted." Inmate undertook AA because "they told me to go." He found AA to be
"pretty good, I learn all different experiences people had."

PSYCHIATRIC AND MEDICAL HISTORY: Inmate Perez denies prior treatment
by mental health professionals, or of having been prescribed psychotropic
medication, or having been hospitalized for any mental health problem. He
denies history of serious accident or head injury. He denies prior history of
suicidal/homicidal or assaultive behavior. He denies seizure or other
neurological conditions. In regards to his physical health condition, inmate denies
any past disabilities, significant impairments or illnesses. With regards to his
present physical condition, inmate reports he is in good health. While
incarcerated, inmate has received no psychological treatment, nor has he been
prescribed any psychotropic medication.

**INMATE COPY**

LIFE-TERM INMATE MENTAL HEALTH EVALUATION
FOR THE BOARD OF PRISON TERMS
PEREZ   CDC#: C-20413 , ASP
Page 3

Past evaluations are relatively uniform in giving him an Axis I  diagnosis of
(303.90) Alcohol Dependence, in institutional remission and also Psychoactive
Substance Abuse (Alcohol), in institutional remission, and an Axis II diagnosis
of(301.70) Antisocial Personality Disorder.

PLANS IF GRANTED RELEASE:  Inmate is under an USINS hold and
anticipates that, if released, he would be deported to Mexico. His plans, if
deported, are to live with his family (mother and father) and work with his
brother-in-law in construction.  He appears to have a supportive network in
Mexico and with the job potential provided through the family member, he should
have the financial support needed to help him readjust.  His prognosis for
community living is assessed at being good.

CLINICAL ASSESSMENT: A Mental Health Status Review reveals the following:
Appearance: Clean, well-groomed.
Orientation: Oriented to person, place, time and situation.
Speech: Organized, coherent and clear.
Behavior and Psychomotor Activity: No signs of unusual mannerisms such as
twitches, tics, stereotyped behavior. Inmate appeared somewhat nervous.
Thought Processes: Organized, coherent.
Thought Content: Normal.
Perceptual Processes: Normal.
Insight: Average.
Judgment: Good.
Mood: Within normal limits.
Affect: Appropriate to thought content.
Memory: Appears intact for Immediate, Recent and Long Term Memory
Estimated Intellectual Functioning: Average.
Suicidal Risk:  None.

DIAGNOSTIC IMPRESSIONS:

AXIS I:  CLINICAL DISORDERS
        V71.09 No Diagnosis or Condition

AXIS II: PERSONALITY DISORDERS/MENTAL RETARDATION
        V71.09 No Diagnosis

AXIS III: MEDICAL CONDITION
        None

**INMATE COPY**

LIFE-TERM INMATE MENTAL HEALTH EVALUATION
FOR THE BOARD OF PRISON TERMS
PEREZ   CDC#: C-20413 , ASP
Page 3

Past evaluations are relatively uniform in giving him an Axis I diagnosis of
(303.90) Alcohol Dependence, in institutional remission and also Psychoactive
Substance Abuse (Alcohol), in institutional remission, and an Axis II diagnosis
of(301.70) Antisocial Personality Disorder.

PLANS IF GRANTED RELEASE: Inmate is under an USINS hold and
anticipates that, if released, he would be deported to Mexico. His plans, if
deported, are to live with his family (mother and father) and work with his
brother-in-law in construction.  He appears to have a supportive network in
Mexico and with the job potential provided through the family member, he should
have the financial support needed to help him readjust.  His prognosis for
community living is assessed at being good.

CLINICAL ASSESSMENT: A Mental Health Status Review reveals the following:
Appearance: Clean, well-groomed.
Orientation: Oriented to person, place, time and situation.
Speech: Organized, coherent and clear.
Behavior and Psychomotor Activity: No signs of unusual mannerisms such as
twitches, tics, stereotyped behavior. Inmate appeared somewhat nervous.
Thought Processes: Organized, coherent.
Thought Content: Normal.
Perceptual Processes: Normal.
Insight: Average.
Judgment: Good.
Mood: Within normal limits.
Affect: Appropriate to thought content.
Memory: Appears intact for Immediate, Recent and Long Term Memory
Estimated Intellectual Functioning: Average.
Suicidal Risk: None.

DIAGNOSTIC IMPRESSIONS:

AXIS I: CLINICAL DISORDERS
        V71.09 No Diagnosis or Condition

AXIS II: PERSONALITY DISORDERS/MENTAL RETARDATION
        V71.09 No Diagnosis

AXIS III: MEDICAL CONDITION
        None

**INMATE COPY**

LIFE-TERM INMATE MENTAL HEALTH EVALUATION
FOR THE BOARD OF PRISON TERMS
PEREZ   CDC#: C-20413 , ASP
Page 2

through the 10th grade. He has three brothers and six sisters. The inmate is
aware of no family history of mental illness, substance abuse or problems with
the law, commenting "I'm the black sheep of the family." He states that his
family was and remains "real close."

PSYCHOSOCIAL DEVELOPMENT AND SEXUAL ORIENTATION:
Psychosocial development appears to have been normal. He recalls his first
sexual encounter occurring at the age of 15/16. Inmate considers his sexual
orientation to be heterosexual. He denies having had high-risk behaviors that
would place him at risk for AIDS. He denies forcing himself on any other person
sexually, nor does he fantasize about doing so.

MARITAL HISTORY: Inmate Perez appears not to have had any long-term
relationships.  He has never been married, nor has he fathered any children.

MILITARY HISTORY: None.

EMPLOYMENT/INCOME HISTORY: Prior to incarceration inmate worked only  a
few jobs. He states, "I was working in a warehouse, using forklift, before that I
was working upholstery." Since incarceration inmate reports having received
training in computer repair and has experience working in the print shop. At
Avenal, he is learning "electrical work," which he enjoys. In his words, "It's
pretty good. I really like it."

SUBSTANCE ABUSE HISTORY: Inmate reports that he was a weekend
drinker. He has two drunk driving arrests. He feels his alcohol problem is
behind him and proudly stated, "I haven't drank since a week before I got
busted." Inmate undertook AA because "they told me to go." He found AA to be
"pretty good, I learn all different experiences people had."

PSYCHIATRIC AND MEDICAL HISTORY: Inmate Perez denies prior treatment
by mental health professionals, or of having been prescribed psychotropic
medication, or having been hospitalized for any mental health problem. He
denies history of serious accident or head injury. He denies prior history of
suicidal/homicidal or assaultive behavior. He denies seizure or other
neurological conditions. In regards to his physical health condition, inmate denies
any past disabilities, significant impairments or illnesses. With regards to his
present physical condition, inmate reports he is in good health. While
incarcerated, inmate has received no psychological treatment, nor has he been
prescribed any psychotropic medication.

**INMATE COPY**

LIFE-TERM INMATE MENTAL HEALTH EVALUATION
FOR THE BOARD OF PRISON TERMS
PEREZ   CDC#: C-20413 , ASP
Page 4

AXIS IV: PSYCHOSOCIAL STRESSORS
        Incarceration
AXIS V: GLOBAL ASSESSMENT OF FUNCTIONING (GAF)
        72 (Current)

REVIEW OF LIFE CRIME: Inmate Perez acknowledges the official version of his
offense, commenting, "I feel remorse for that person". He was not very
expressive in his feelings, but he appers to have an understanding now of the
wrong he committed and his responsibility for it.

For psychopathology that related to his crime, inmate's alcohol
abuse/dependence and antisocial personality disorder as succinctly reported by
Dr. W. White had "a direct relationship to his criminal behavior." Precursors and
causal factors involved in setting the stage for his violent act were his substance
abuse with diminished capacity to control his actions, his involvement in gang-
related activities, his previous life of crime with its disregard for the welfare of
others and the consequences of potentially violent actions.

ASSESSMENT OF DANGEROUSNESS:

Within a controlled setting, based on inmate's incarceration record and present
personality, there is no manifest danger to self or others. If released to the
community inmate should not present a problem to society. Inmate appears,
while incarcerated, to have developed adequate impulse control and should be
capable of controlling any sexual, anger or aggressive impulses. Significant risk
factors and precursors to violence are considered to be less than average in
comparison to other inmates if he continues to stay away from alcohol or other
substance abuse.

CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

Inmate appears to be slowly improving in regards to his personality growth and
development. In 1991, Dr. White writes that; "During his incarceration he has
improved from a psychological point-of-view only very slightly. He does not
appear to have profited from programmatic offerings. The effects of age/time
would probably account for any improvement." Since then, in this examiner's
opinion, inmate has matured to a degree. He has remained disciplinary free for
many years now. His last write up was in 1986, and inmate maintains it was his
cell mate who was at fault. Age may be the guiding light in his continued
improvement since 1991 (as age is for many of us), but inmate at this

**INMATE COPY**

LIFE-TERM INMATE MENTAL HEALTH EVALUATION
FOR THE BOARD OF PRISON TERMS
PEREZ   CDC#: C-20413 , ASP
Page 5

assessment presented with more understanding and insight than he apparently
had in the past. There is room for more growth, but he is on a better path now.

Regarding recommendations, Perez should continue in his present program,
continue to be disciplinary free, should definitely continue to remain active in AA,
and avail himself of self-help opportunities that are made available within the
prison setting. In regards to  psychiatric or psychological treatment, inmate
would benefit from group therapy in a group comprised of individuals in similar
circumstances to himself.

William H. Kroes                3/17/99
WILLIAM H. KROES, Ph.D.         Date
Staff Psychologist

**INMATE COPY**

EXHIBIT 5

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF SAN BERNARDINO

ACIS Case No.:                        JUDGE:  BOB N. KRUG        DATE: January 4, 2007

CASE NO.:SWHSS – **8994**              CLERK:  V. GAYTON          COUNSEL:

DEPT.:  S-16                           BAILIFF:  --

CASE TITLE:      In the Matter of the Application of
                 **ROGELIO PEREZ**
                 on Habeas Corpus

NATURE OF PROCEEDINGS:

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

MINUTE ORDER:

The court has received, read and considered the Petition for Writ of Habeas Corpus filed on October 19, 2006; the Informal Response filed by the Respondent on November 27, 2006; and the Informal Reply filed by the Petitioner on December 11, 2006.

The Petitioner has filed his Petition for Writ of Habeas Corpus contending that the Board of Parole Hearings improperly found him on June 1, 2006, unsuitable for parole. He contends that his due process rights were violated in that the Board continued to use the facts of the underlying crime as a basis for denial. He also contends that the hearing held by the Board was arbitrary and capricious and without lawful basis.

The Petitioner was convicted of a violation of Penal Code § 187(a), murder in the second degree with a gun enhancement and was sentenced to a period in State Prison of twenty-two years to life. He was received at the institution on March 28, 1985. Apparently, the Petitioner had four appearances before the Board seeking parole.

A review of the file on record reveals that on May 27, 1984, the Petitioner was involved in a fight with a Mr. Ortiz. It is unclear to the court whether the fight between the Petitioner and Mr. Ortiz was concerning the Petitioner's uncle or exactly the circumstances that gave rise to the fight. Apparently, the Petitioner and Mr. Ortiz were told to leave the bar and the Petitioner obtained a .22 caliber handgun from his vehicle and shot Mr. Ortiz three or four times.

The Petitioner claims he shot the victim because he was afraid the victim was going to "get a gun or something" and kill him. As it turns out the victim was completely unarmed. The Petitioner fired the

1

gun apparently three or four times and the victim was struck three times. The Petitioner was on parole from State Prison when the crime was committed.

The court has reviewed the record of the proceedings before the Board of Prison Terms on June 1, 2006 and finds that the Board considered each and every element or criteria it is required to consider in making it's findings as set forth in In re Rosenkrantz 29 Cal. 4th 616.

The last and most definitive word on the area of law controlling judicial review of Board of Parole Hearing decisions denying a finding of suitability for parole has been made by the Supreme Court in In re Rosenkrantz, Supra, and in In re John E. Dannenberg 34 Cal. 4th 1061(2005).

Penal Code Section 3041(b) provides for parole review of inmates such as Petitioner and further provides that such inmates shall be given a release date unless the Board determines that the gravity of the current convicted offense is such that consideration of the public safety requires a more lengthy period of incarceration. California Code of Regulations, Title 15, Section 2402(a)(b)(c)(d) sets forth the rules by which the Board is to make its determination. As stated by the Court, parole applicants have an expectation of being granted parole unless the Board finds in the exercise of its discretion that the applicant is unsuitable.

The operative words are "in the exercise of its discretion". Judicial review of this discretion is limited only to a determination of whether there is "some evidence" in the record to support the decision. As held by the Court, this standard of "some evidence" is extremely deferential.

The reviewing Court is prohibited from conducting an independent assessment of merits or considering whether substantial evidence supports the findings of the Board and its underlying decision. The Board is required to consider the Petitioner's background, his institutional participation, post-parole plans, as well as the psychological evaluations. The High Court held, however, that the nature of the inmate's offense, alone, could constitute a sufficient basis for denying parole. This does not permit the paroling authority to automatically exclude parole for individuals who have been convicted of a particular type of offense.

A review of the record supports a finding that there was "some evidence" which led the Board to its finding of unsuitability of the Petitioner for parole, for as the High Court described such evidence, it need be only a "modicum" of evidence.

The Board did consider the positive factors which favored parole and made its finding that these did not outweigh the factors surrounding the circumstances of the crime. While the decision did not reflect the weighing process of the Board, the Rosenkrantz Court, at page 677, clearly states that the Board need not explain its decision or the precise manner in which the specific facts were relevant to parole suitability. This consideration and balancing lie within the discretion of the Board.

It is plain and the Board stated in its decision that the primary basis for the finding of the Petitioner being unsuitable for parole and that he would impose an unreasonable risk or threat to society was the circumstances of the committed offense. The Board considered the actions of the Defendant particularly violent in that he shot and killed an unarmed man while being involved with a fight that started in a bar. Apparently the Board felt that the shooting was done from a short distance and that

2

the victim was shot three times in the head. The Board felt that the killing demonstrated a disregard for human life and that the victim was killed without motive except for the involvement in the fist fight.

The Board further considered that the Petitioner was apparently on parole at the time of the killing and that the killing resulted from a fight started in a bar where the Petitioner had been drinking.

The Board found that the Petitioner had a history of an escalating pattern of violence and criminal conduct. The Board considered that he had dropped out of school at the eighth grade level and became involved with street gangs. The Board further found that the Petitioner had failed in society's previous attempts to correct his behavior by probation, a time of confinement in the County Jail and State Prison and parole.

The Board considered the mental health evaluation done in May of 2006, the Petitioner's parole plans and employment plans and found that he needed to upgrade him employment skills. The Board recommended that the Petitioner obtain his G.E.D. and continue to participate is self-help programs.

The court finds that there was more than "some evidence" to justify the finding of unsuitably of the Petitioner for parole and to impose a two year denial on that finding.

The Petition for Writ of Habeas Corpus is denied.

EXHIBIT 6

COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO

**ORDER**



MAR **1 4** 2007

COURT OF APPEAL FOURTH DISTRICT

In re

E042379

ROGELIO PEREZ

on Habeas Corpus.

(Super.Ct.Nos. SCR41741 &
SWHSS8994)

The County of San Bernardino

THE COURT

    The petition for writ of habeas corpus is DENIED.

**MILLER**

Acting P.J.

cc:    See attached list



EXHIBIT 7

S156734

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re ROGELIO PEREZ on Habeas Corpus

The petition for writ of habeas corpus is denied.

SUPREME COURT
**FILED**

MAR 2 6 2008

Frederick K. Ohlrich Clerk

_____
Deputy

GEORGE
_____
Chief Justice