1 │ EDMUND G. BROWN JR.
Attorney General of the State of California
2 │ DANE R. GILLETTE
Chief Assistant Attorney General
3 │ JULIE L. GARLAND
Senior Assistant Attorney General
4 │ JESSICA N. BLONIEN
Supervising Deputy Attorney General
5 │ STACEY D. SCHESSER, State Bar No. 245735
Deputy Attorney General
6 │  455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
7 │  Telephone:  (415) 703-5774
Fax:  (415) 703-5843
8 │  Email:  Stacey.Schesser@doj.ca.gov

9 │ Attorneys for Respondent Warden Curry
SF2008200056
10

11 │          IN THE UNITED STATES DISTRICT COURT

12 │        FOR THE NORTHERN DISTRICT OF CALIFORNIA

13 │            SAN FRANCISCO DIVISION

14

15 │ **ROGELIO PEREZ,**                    No. C 08-2001 JSW (PR)

16 │                    Petitioner,    **ANSWER TO PETITION FOR WRIT
OF HABEAS CORPUS;**
17 │          v.                **MEMORANDUM OF POINTS AND
AUTHORITIES**
18 │ **BEN CURRY, Warden**

19 │                    Respondent.
Judge:   The Honorable Jeffrey S. White
20

21 │      As an Answer to the Petition for Writ of Habeas Corpus filed by inmate Rogelio Perez,

22 │ Respondent Ben Curry, admits, alleges, and denies that:

23 │      1.    Perez is in the lawful custody of the California Department of Corrections and

24 │ Rehabilitation following his March 28, 1985 conviction of second-degree murder with a weapon

25 │ enhancement.  (Ex. 1, Super. Ct. Order.)  Perez is serving a sentence totaling twenty-two years to

26 │ life in prison.  (*Id.*)

27 │      2.    In 2006, Perez filed a petition for writ of habeas corpus in San Bernardino County

28 │ Superior Court, alleging that Board of Parole Hearings' 2006 decision denying him parole

Answer; Supporting Mem. of P. & A.
1

1   violated his due process rights. (Ex. 1[1].) The superior court denied the petition, finding that

2   "there was more than 'some evidence' to justify the finding of unsuitability of Perez for parole

3   and to impose a two-year denial on that finding." (Ex. 1 at 3.)

4       3.    Perez then raised the same claim in petitions to the California Court of Appeal and the

5   California Supreme Court. (Ex. 2, Ct. App. Pet.; Ex. 3, Ct. App. Order; Ex. 4, Sup. Ct. Pet; Ex.

6   5, Sup. Ct. Order.) Both petitions were summarily denied. (Exs. 3, 5.)

7       4.    Respondent admits that Perez exhausted his state court remedies regarding the claim

8   that the Board's 2006 decision violated his due process rights. Respondent denies that Perez has

9   exhausted his claims to the extent they are interpreted more broadly to encompass any systematic

10  issues beyond this claim.

11      5.    Respondent admits that the Petition is timely under 28 U.S.C. § 2244(d)(1).

12  Respondent admits that the Petition is not subject to any other procedural bar.

13      6.    Respondent denies that Perez is entitled to federal habeas relief under 28 U.S.C. § 2254

14  because the state court decisions were not contrary to, or an unreasonable application of clearly

15  established federal law as determined by the United States Supreme Court, or based on an

16  unreasonable determination of the facts.

17      7.    Respondent denies that Perez has a federally protected liberty interest in parole and,

18  therefore, alleges that he has not stated a federal question invoking this court's jurisdiction. The

19  Supreme Court has not clarified the methodology for determining whether a state has created a

20  federally protected liberty interest in parole. *See Greenholtz v. Inmates of Neb. Penal & Corr.*

21  *Complex*, 442 U.S. 1, 12 (1979) (liberty interest in conditional parole release date created by

22  unique structure and language of state parole statute); *Sandin v. Connor*, 515 U.S. 472, 484

23  (1995) (federal liberty interest in correctional setting created only when issue creates an "atypical

24  or significant hardship" compared with ordinary prison life); *Wilkinson v. Austin*, 545 U.S. 209,

25  229 (2005) (*Sandin* abrogated *Greenholtz's* methodology for establishing the liberty interest).

26  ─────────────────────────────────────────────────────────

27      1. Although the Attorney General's Office placed a request with the San Bernardino Superior
    Court for Perez's superior court state petition, the request was filled with the incorrect document.

28  As soon as the Attorney General receives the correct state court petition, the document will be lodged
    with this Court.

    Answer; Supporting Mem. of P. & A.

                                        2

1    California's parole statute does not contain mandatory language giving rise to a protected liberty

2    interest in parole under the mandatory-language approach announced in *Greenholtz*. *In re*

3    *Dannenberg*, 34 Cal. 4th 1061, 1087 (2005) (California's parole scheme is a two-step process

4    that does not impose a mandatory duty to grant life inmates parole before a suitability finding).

5    And continued confinement under an indeterminate life sentence does not impose an "atypical or

6    significant hardship" under *Sandin* since a parole denial does not alter an inmate's sentence,

7    impose a new condition of confinement, or otherwise restrict his liberty while he serves his

8    sentence. Thus, Respondent asserts that Perez does not have a federal liberty interest in parole

9    under either *Greenholtz* or *Sandin*. This issue is currently under review by an en banc panel in

10   the Ninth Circuit. *Hayward v. Marshall*, 527 F.3d 797 (9th Cir. 2008), *but see Sass v. California*

11   *Board of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006).

12       8.    Even if Perez has a federal liberty interest in parole, he received all due process to

13   which he is entitled under clearly established federal law because he was provided with an

14   opportunity to be heard and a statement of reasons for the Board's decision. *Greenholtz*, 442

15   U.S. at 16.

16       9.    Respondent denies that the some-evidence test is clearly established federal law in the

17   parole context.

18       10.   Respondent denies that the Board's 2006 decision was arbitrary or capricious. The

19   Board's decision to deny parole was based on an individualized consideration of Perez's

20   suitability and is supported by evidence in the record.

21       11.   Respondent denies that when considering an inmate's parole suitability, the Board

22   must only consider the length of time an inmate was in prison, or whether an inmate is

23   rehabilitated. *See* Cal. Penal Code § 3041 (requiring the Board to consider the gravity and nature

24   of the commitment offense); Cal. Code Regs. tit 15, § 2402 (2008) (allowing the Board to

25   consider any relevant, reliable information in addition to specific suitability guidelines).

26       12.   Respondent denies that *Greenholtz* stands for the proposition that due process in the

27   parole context requires that "time, plus rehabilitation, equal parole." *See* Pet. at 18.

28       13.   Respondent denies that clearly established federal law mandates that a parole denial be

Answer; Supporting Mem. of P. & A.

1  based on a finding that an inmate poses a current danger to society.

2      14.  Respondent denies that clearly established federal law precludes the parole authority

3  from relying on the commitment offense or other unchanging factors when reviewing an inmate's

4  parole suitability.

5      15.  Respondent denies that clearly established federal law prohibits the Board from relying

6  on the crime as a basis for denying Perez parole because he has served more than the minimum

7  term for second-degree murder.

8      16.  Respondent alleges that at the time of Perez's June 1, 2006 parole hearing, Perez had

9  only served twenty-one years of a twenty-two-year-to-life sentence.

10     17.  Respondent alleges that on May 16, 2008, the Ninth Circuit granted en banc review in

11 *Hayward v. Marshall*, 527 F.3d 797 (9th Cir. 2008).  Petitioner's arguments in his Petition rely

12 heavily on reasoning that is no longer valid nor citable.  (See Pet. at 16, 17, 18; P&A, generally.)

13     18.  Respondent submits that an evidentiary hearing is not necessary because Perez's claims

14 can be resolved on the existing state court record.  *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th

15 Cir. 1999).

16     19.  Respondent alleges that the Board is not required to consider the uniform-term matrix

17 for sentencing until after determining that a prisoner is suitable for parole.  *In re Dannenberg*, 34

18 Cal. 4th 1061, 1094 (Cal. 2005).

19     20.  Respondent denies that Perez is entitled to release or parole.  The remedy is limited to

20 the process that is due, which is a new review by the Board comporting with due process.  *See*

21 *Benny v. U.S. Parole Comm'n*, 295 F.3d 977, 984-85 (9th Cir. 2002) (a liberty interest in parole

22 is limited by the Board's exercise of discretion, and a due process error does not entitle an inmate

23 to a favorable parole decision).

24     21.  Perez fails to state or establish any grounds for habeas corpus relief.

25     22.  Except as expressly admitted in this Answer, Respondent denies the allegations of the

26 Petition.

27 ///

28 ///

Answer; Supporting Mem. of P. & A.

4

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### INTRODUCTION

3    Perez claims that the Board's 2006 decision finding him unsuitable for parole violated his

4    due process rights, specifically because the Board continued to rely on the commitment offense

5    as a basis for the denial. Perez merely alleges a disagreement with the Board's decision, and fails

6    to establish that the state court decisions denying his due process claims are contrary to, or an

7    unreasonable application of clearly established federal law as determined by the United States

8    Supreme Court, or were based on an unreasonable determination of the facts. Thus, there are no

9    grounds for federal habeas relief. Accordingly, this Court should deny the petition.

10

### ARGUMENT

11

### I.

12    **PEREZ HAS NOT SHOWN THAT HE IS ENTITLED TO RELIEF UNDER AEDPA.**

13

14    Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) a federal court

15    may not grant a writ of habeas corpus unless the state court's adjudication was either:

16    1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as

17    determined by the Supreme Court of the United States;" or 2) "based on an unreasonable

18    determination of the facts in light of the evidence presented at the State Court proceeding."

19    28 U.S.C. § 2254(d)(1-2) (2000). Perez has not demonstrated that he is entitled to relief under

20    this standard.

21    **A.    Perez Has Not Shown that the State Court Decisions Were Contrary to Clearly Established Federal Law.**

22

23    As a threshold matter, the Court must decide what, if any, "clearly established Federal law"

24    applies. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). In making this determination, the Court

25    may look only to the holdings of the United States Supreme Court governing at the time of the

26    state court's adjudication. *Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 653 (quoting

27    *Williams v. Taylor*, 529 U.S. 362 (2000)). The only case in which the Supreme Court has

28    addressed the process due in state parole proceedings is *Greenholtz*. *Greenholtz*, 442 U.S. 1.

Answer; Supporting Mem. of P. & A.

1   The Supreme Court there held that due process is satisfied when the state provides an inmate an

2   opportunity to be heard and a statement of the reasons for the parole decision. *Id.* at 16. "The

3   Constitution does not require more." *Id.*[2]  No other Supreme Court holdings require more at a

4   parole hearing.

5       Perez does not contest that he received the *Greenholtz* protections. (*See generally* Pet.)

6   Because *Greenholtz* was satisfied and *Greenholtz* is the only Supreme Court authority regarding

7   an inmate's due process rights during parole proceedings, the state court decisions upholding the

8   Board's decision were not contrary to clearly established federal law.  Thus, the Petition should

9   be denied.

10      Although Perez alleges that the Board's decision must be supported by some evidence, there

11  is no clearly established federal law applying this standard to parole decisions.  The Supreme

12  Court has held that under AEDPA a test announced in one context is not clearly established

13  federal law when applied to another context. *Wright v. Van Patten*, ___U.S.___ 128 S. Ct. 743,

14  746-47 (2008); *Schriro v. Landrigan*, ___U.S.___, 127 S. Ct. 1933 (2007); *Musladin*, 127 S. Ct.

15  at 652-54; *see also*, *Foote v. Del Papa*, 492 F.3d 1026, 1029 (9th Cir. 2007); *Nguyen v. Garcia*,

16  477 F.3d 716, 718, 727 (9th Cir. 2007); *Crater v. Galaza*, 491 F.3d 1119, 1122 (9th Cir. 2007).

17  The Supreme Court developed the some-evidence standard in the context of a prison disciplinary

18  hearing, *Superintendent v. Hill*, 472 U.S. 445, 457 (1985), which is a fundamentally different

19  context than a parole proceeding.  Because the tests and standards developed by the Supreme

20  Court in one context cannot be transferred to distinguishable factual circumstances for AEDPA

21  purposes, it is not appropriate to apply the some-evidence standard of judicial review to parole

22  decisions.  While the Ninth Circuit has applied the some-evidence standard to parole decisions,

23  this is improper under AEDPA, and the issue is currently pending before an en banc panel of the

24  Ninth Circuit. *Hayward*, 527 F.3d 797.

25

26      2. The Supreme Court has cited *Greenholtz* approvingly for the proposition that the "level
27  of process due for inmates being considered for release on parole includes an opportunity to be heard
    and notice of any adverse decision" and noted that, although *Sandin* abrogated *Greenholtz's*
28  methodology for establishing the liberty interest, *Greenholtz* remained "instructive for [its]
    discussion of the appropriate level of procedural safeguards." *Austin*, 545 U.S. at 229.

Answer; Supporting Mem. of P. & A.

1    AEDPA does not permit relief based on circuit caselaw. *Crater*, 491 F.3d at 1123, 1126 (§

2    2254(d)(1) renders decisions by lower courts non-dispositive for habeas appeals); *Earp v.*

3    *Ornoski*, 431 F.3d 1158, 1182 (9th Cir. 2005) ("Circuit court precedent is relevant only to the

4    extent it clarifies what constitutes clearly established law." . . . "Circuit precedent derived from

5    an extension of a Supreme Court decision is not clearly established federal law as determined by

6    the Supreme Court."); *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000). Therefore,

7    the Ninth Circuit's use of the some-evidence standard is not clearly established federal law, is not

8    binding on this Court, and is under review by an en banc panel. *Hayward*, 527 F.3d 797; *Biggs*

9    *v. Terhune*, 334 F.3d 910 (9th Cir. 2003); *Sass*, 461 F.3d at 1128; *Irons v. Carey*, 505 F.3d 846,

10   851 (9th Cir. 2007).

11   Similarly, Perez's claim that the Board's reliance on the unchanging factor of his

12   commitment offense violates due process finds no support in Supreme Court precedent.

13   Although the Ninth Circuit has suggested that this may amount to an additional due process

14   claim, *Biggs*, 334 F.3d at 917, Perez does not and cannot cite to any clearly established federal

15   law prohibiting the Board from relying on unchanging factors. Thus, federal habeas relief is not

16   available. 28 U.S.C. § 2254(d).

17   Finally, Perez's claim that the Board's decision was arbitrary and capricious lacks merit.

18   The Board individually considered Perez's pre- and post-conviction factors and therefore, did not

19   make an arbitrary decision when denying him parole.

20   In sum, the only clearly established federal law setting forth the process due in the parole

21   context is *Greenholtz*. Perez does not allege that he failed to receive these protections.

22   Therefore, Perez has not shown that the state court decisions denying habeas relief were contrary

23   to clearly established federal law.

24   **B.    Perez Has Not Shown that the State Courts Unreasonably Applied**
     **Clearly Established Federal Law.**

25

26   Habeas relief may only be granted based on AEDPA's unreasonable-application clause

27   where the state court identifies the correct governing legal rule from Supreme Court cases but

28   unreasonably applies it to the facts of the particular state case. *Williams*, 529 U.S. at 406. The

Answer; Supporting Mem. of P. & A.

7

1   Perez must do more than merely establish that the state court was wrong or erroneous. *Id.* at 410;

2   *Lockyer*, 538 U.S. at 75.  Respondent recognizes that the Ninth Circuit applies the some-evidence

3   standard as clearly established federal law, but even accepting that premise, Perez is not entitled

4   to federal habeas relief.  Indeed, the California Supreme Court has adopted *Hill*'s some-evidence

5   test as the judicial standard to be used in evaluating parole decisions, *In re Rosenkrantz*, 29 Cal.

6   4th 616 (2002), and Perez has not shown that the state courts unreasonably applied the standard.

7       When, as here, the California Supreme Court denies a petition for review without comment,

8   the federal court will look to the last reasoned decision as the basis for the state court's judgment.

9   *Ylst v. Nunnemaker*, 501 U.S. 797, 804-06 (1991).  In this case, the last reasoned decision is the

10  Superior Court of San Bernadino County's order denying Perez's habeas petition. (Ex. 1.)  The

11  superior court found that there was some evidence in the record to support the Board's finding

12  that Perez was unsuitable for parole. (Ex. 1 at 2-3.)  Perez has not shown that the state court has

13  unreasonably applied *Hill*, but rather asks this Court to re-weigh his suitability.  Such a re-

14  weighing has no basis in United States Supreme Court law.  Accordingly, Perez's claim fails.

15  **C.  Perez Has Not Shown that the State Court Decisions Were Based on an**
    **Unreasonable Determination of the Facts.**

16

17      Under § 2254(d)(2), habeas corpus can not be granted unless the state courts' decisions were

18  based on an unreasonable determination of the facts in light of the evidence presented in the state

19  court.  The state court's factual determinations are presumed to be correct, and Perez has the

20  burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

21      Although Perez alleges that the Board's decision is not supported by any evidence, he does

22  not show by clear and convincing evidence that the state court made factual errors.  The state

23  court found that Perez's crime was "particularly violent," demonstrating a "disregard for human

24  life," and was "without motive except for a fist fight," based on evidence that the victim was

25  unarmed and shot from a short distance three times in the head over a bar fight. (Ex. 1 at 2-3.)

26  The state court found that Perez needed to upgrade his employment skills and obtain his GED.

27  (*Id.* at 3.)  The state court also found that Perez had a "history of an escalating pattern of violence

28  and criminal conduct," because he was involved in gangs, dropped out of school in eighth grade,

1 and "had failed in society's attempts to correct his behavior by probation, a time of confinement

2 in the Court jail and State prison and parole." (*Id.*)  While Perez disagrees with some of these

3 findings, conclusory statements of fact do not amount to clear and convincing evidence that the

4 state court erred.   (Pet. at 7.)  Furthermore, Perez's uncertainty regarding whether he was on

5 parole at the time of the current offense does not amount to clear and convincing evidence that

6 the state court erred.   (*Id.* at 6-7.)  Perez merely disagrees with the weight the Board assigned to

7 the evidence.  Such disagreement does not entitle Perez to federal habeas relief. *Hill*, 472 U.S. at

8 455.

9                                                **CONCLUSION**

10        Perez has not demonstrated that the state court decisions denying habeas relief were contrary

11 to, or an unreasonable application of, United States Supreme Court authority, or based on an

12 unreasonable determination of the facts.  Thus, the Petition should be denied.

13

14        Dated: July 29, 2008

15                                        Respectfully submitted,

16                                        EDMUND G. BROWN JR.
                                          Attorney General of the State of California

17                                        DANE R. GILLETTE
                                          Chief Assistant Attorney General
18
                                          JULIE L. GARLAND
19                                        Senior Assistant Attorney General

20                                        JESSICA N. BLONIEN
                                          Supervising Deputy Attorney General
21
                                          *Stacey D. Schesser*
22
                                          STACEY D. SCHESSER[3]
23                                        Deputy Attorney General
                                          Attorneys for Respondent
24

25
20127795.wpd
26

27
_____
28        3.   The Attorney General wishes to acknowledge the contribution of Tania Chozet in
preparing this pleading.

Answer; Supporting Mem. of P. & A.

                                          9

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **Perez v. Curry**

No.:   **C 08-2001 JSW**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On <u>July 29, 2008,</u> I served the attached

### ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS;
### MEMORANDUM OF POINTS AND AUTHORITIES

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004, addressed as follows:

**Rogelio Perez**
**D-03602**
**Correctional Training Facility**
**P.O. Box 686**
**Soledad, CA  93960-0686**
In Pro Per

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on July 29, 2008, at San Francisco, California.

| L. Santos | |
| --- | --- |
| Declarant | Signature |

20129227.wpd

# EXHIBIT 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF SAN BERNARDINO

| | | |
|---|---|---|
| ACIS Case No.: | JUDGE: BOB N. KRUG | DATE: January 4, 2007 |
| CASE NO.:SWHSS – 8994 | CLERK: V. GAYTON | COUNSEL: |
| DEPT.: S-16 | BAILIFF: -- | |

CASE TITLE:      In the Matter of the Application of
**ROGELIO PEREZ**
on Habeas Corpus

NATURE OF PROCEEDINGS:

### ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

MINUTE ORDER:

The court has received, read and considered the Petition for Writ of Habeas Corpus filed on October 19, 2006; the Informal Response filed by the Respondent on November 27, 2006; and the Informal Reply filed by the Petitioner on December 11, 2006.

The Petitioner has filed his Petition for Writ of Habeas Corpus contending that the Board of Parole Hearings improperly found him on June 1, 2006, unsuitable for parole. He contends that his due process rights were violated in that the Board continued to use the facts of the underlying crime as a basis for denial. He also contends that the hearing held by the Board was arbitrary and capricious and without lawful basis.

The Petitioner was convicted of a violation of Penal Code § 187(a), murder in the second degree with a gun enhancement and was sentenced to a period in State Prison of twenty-two years to life. He was received at the institution on March 28, 1985. Apparently, the Petitioner had four appearances before the Board seeking parole.

A review of the file on record reveals that on May 27, 1984, the Petitioner was involved in a fight with a Mr. Ortiz. It is unclear to the court whether the fight between the Petitioner and Mr. Ortiz was concerning the Petitioner's uncle or exactly the circumstances that gave rise to the fight. Apparently, the Petitioner and Mr. Ortiz were told to leave the bar and the Petitioner obtained a .22 caliber handgun from his vehicle and shot Mr. Ortiz three or four times.

The Petitioner claims he shot the victim because he was afraid the victim was going to "get a gun or something" and kill him. As it turns out the victim was completely unarmed. The Petitioner fired the

1

gun apparently three or four times and the victim was struck three times. The Petitioner was on parole from State Prison when the crime was committed.

The court has reviewed the record of the proceedings before the Board of Prison Terms on June 1, 2006 and finds that the Board considered each and every element or criteria it is required to consider in making it's findings as set forth in <u>In re Rosenkrantz</u> 29 Cal. 4th 616.

The last and most definitive word on the area of law controlling judicial review of Board of Parole Hearing decisions denying a finding of suitability for parole has been made by the Supreme Court in <u>In re Rosenkrantz</u>, Supra, and in <u>In re John E. Dannenberg</u> 34 Cal. 4th 1061(2005).

Penal Code Section 3041(b) provides for parole review of inmates such as Petitioner and further provides that such inmates shall be given a release date <u>unless</u> the Board determines that the gravity of the current convicted offense is such that consideration of the public safety requires a more lengthy period of incarceration. California Code of Regulations, Title 15, Section 2402(a)(b)(c)(d) sets forth the rules by which the Board is to make its determination. As stated by the Court, parole applicants have an expectation of being granted parole unless the Board finds <u>in the exercise of its discretion</u> that the applicant is unsuitable.

The operative words are "in the exercise of its discretion". Judicial review of this discretion is limited only to a determination of whether there is "some evidence" in the record to support the decision. As held by the Court, this standard of "some evidence" is extremely deferential.

The reviewing Court is prohibited from conducting an independent assessment of merits or considering whether substantial evidence supports the findings of the Board and its underlying decision. The Board is required to consider the Petitioner's background, his institutional participation, post-parole plans, as well as the psychological evaluations. The High Court held, however, that the nature of the inmate's offense, <u>alone</u>, could constitute a sufficient basis for denying parole. This does not permit the paroling authority to automatically exclude parole for individuals who have been convicted of a particular type of offense.

A review of the record supports a finding that there was "some evidence" which led the Board to its finding of unsuitability of the Petitioner for parole, for as the High Court described such evidence, it need be only a "modicum" of evidence.

The Board did consider the positive factors which favored parole and made its finding that these did not outweigh the factors surrounding the circumstances of the crime. While the decision did not reflect the weighing process of the Board, the <u>Rosenkrantz</u> Court, at page 677, clearly states that the Board need not explain its decision or the precise manner in which the specific facts were relevant to parole suitability. This consideration and balancing lie within the discretion of the Board.

It is plain and the Board stated in its decision that the primary basis for the finding of the Petitioner being unsuitable for parole and that he would impose an unreasonable risk or threat to society was the circumstances of the committed offense. The Board considered the actions of the Defendant particularly violent in that he shot and killed an unarmed man while being involved with a fight that started in a bar. Apparently the Board felt that the shooting was done from a short distance and that

the victim was shot three times in the head. The Board felt that the killing demonstrated a disregard for human life and that the victim was killed without motive except for the involvement in the fist fight.

The Board further considered that the Petitioner was apparently on parole at the time of the killing and that the killing resulted from a fight started in a bar where the Petitioner had been drinking.

The Board found that the Petitioner had a history of an escalating pattern of violence and criminal conduct. The Board considered that he had dropped out of school at the eighth grade level and became involved with street gangs. The Board further found that the Petitioner had failed in society's previous attempts to correct his behavior by probation, a time of confinement in the County Jail and State Prison and parole.

The Board considered the mental health evaluation done in May of 2006, the Petitioner's parole plans and employment plans and found that he needed to upgrade him employment skills. The Board recommended that the Petitioner obtain his G.E.D. and continue to participate is self-help programs.

The court finds that there was more than "some evidence" to justify the finding of unsuitably of the Petitioner for parole and to impose a two year denial on that finding.

The Petition for Writ of Habeas Corpus is denied.

THE DOCUMENT TO WHICH THIS CERTIFICATION IS ATTACHED IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE AND OF RECORD IN MY OFFICE.

ATTEST: TRESSA S. KENTNER
Clerk of the Superior Court of the State of California, in and for the County of, San Bernardino. JUL 2 3 2008
Date:
By_____ Deputy

3

**EXHIBIT 2**
**Part 1 of 3**

MC-275

Name __Rogelio Perez__

Address __Correctional Training Facility__

__P.O. Box 689 (ED-28U)__

__Soledad, CA 93960__

CDC or ID Number __D-03602__

## CALIFORNIA COURT OF APPEALS

## FOURTH APPELLATE DISTRICT
(Court)

ROGELIO PEREZ,
Petitioner

vs.

BEN CURRY (Warden),
Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. _____
(To be supplied by the Clerk of the Court)

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.,
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

This petition concerns:

- [ ] A conviction
- [X] A sentence
- [ ] Jail or prison conditions
- [X] Other (specify): **Parole suitability hearing**

- [ ] Parole
- [ ] Credits
- [ ] Prison discipline

1. Your name: **Rogelio Perez**

2. Where are you incarcerated? **Correctional Training Facility, P.O. box 689, Soledad, CA 93960**

3. Why are you in custody?  [X] Criminal Conviction   [ ] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   **Second degree murder with use of a firearm**

   b. Penal or other code sections: **187 / 12022.5**

   c. Name and location of sentencing or committing court: **Superior Court, San Barnardino County**

   d. Case number: **SCR-41741**

   e. Date convicted or committed: _____

   f. Date sentenced: _____

   g. Length of sentence: **15 years to life**

   h. When do you expect to be released? **To be determined**

   i. Were you represented by counsel in the trial court? **N/A**  [ ] Yes.   [ ] No.  If yes, state the attorney's name and address:

4. What was the LAST plea you entered? *(check one)*

   [ ] Not guilty   [ ] Guilty   [ ] Nolo Contendere   [ ] Other: _____
   **N/A**

5. If you pleaded not guilty, what kind of trial did you have?

   [ ] Jury   [ ] Judge without a jury   [ ] Submitted on transcript   [ ] Awaiting trial
   **N/A**

6. GROUNDS FOR RELIEF

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

PLEASE SEE APPENDIX "A" AT PAGE 5 FOR ANSWER TO 6

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

PLEASE SEE APPENDIX "A" AT PAGE 5 FOR ANSWER TO 6a

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

PLEASE SEE APPENDIX "B" STARTING AT PAGE 14 FOR ANSWERS TO 6b

8. Did you appeal from the conviction, sentence, or commitment? ☐ Yes. ☐ No.    If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"): N/A

   b. Result: _____    c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised:    (1) _____

      (2) _____

      (3) _____

   f. Were you represented by counsel on appeal? ☐ Yes. ☐ No.  If yes, state the attorney's name and address, if known:

   _____

9. Did you seek review in the California Supreme Court? ☐ Yes. ☐ No.    If yes, give the following information:

   a. Result: _____    b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised:    (1) _____

      (2) _____

      (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

   N/A _____

11. Administrative Review:

   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

                    THERE IS NO ADMINISTRATIVE REVIEW

   _____

   _____

   _____

   _____

   _____

   _____

   b. Did you seek the highest level of administrative review available? ☐ Yes. ☐ No.  N/A
   *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  [X] Yes. If yes, continue with number 13.  [ ] No. If no, skip to number 15.

13. a. (1) Name of court: Superior Court, San Bernardino County

    (2) Nature of proceeding (for example, "habeas corpus petition"):  Habeas corpus petition

    (3) Issues raised: (a)  SAME AS RAISED HEREIN

        (b) 

    (4) Result (Attach order or explain why unavailable): DENIED (ATTACHMENT A) after exhibits
    The decision was a rubber stamping of the parole board's decision, making no rational connection between immutable factors and current threat to public safety.
    (5) Date of decision: 1/4/2007

    b. (1) Name of court: 

    (2) Nature of proceeding: 

    (3) Issues raised: (a) 

        (b) 

    (4) Result (Attach order or explain why unavailable): 

    (5) Date of decision: 

    c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
    No delay

16. Are you presently represented by counsel?  [ ] Yes.  [X] No.  If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court?  [ ] Yes.  [X] No.  If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
    N/A

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: FEBRUARY 11, 2007                    (SIGNATURE OF PETITIONER)

MC-275 [Rev. January 1, 1999]              PETITION FOR WRIT OF HABEAS CORPUS

A P P E N D I X   "A"

Answers to 6, et seq.

Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION TO FIND HIM UNSUITABLE FOR
PAROLE FOR THE FIFTH TIME AFTER TWENTY-TWO YEARS BASED ON
IMMUTABLE FACTORS WHEN THOSE FACTORS ARE NO LONGER
RELIABLE EVIDENCE AND OTHER FINDINGS ARE NOT
"CIRCUMSTANCES SPECIFIED BY STATUTE AND BY REGULATION,"
THE DECISION BEING ARBITRARY AND AN ABUSE OF DISCRETION.

---

## Answers to 6a: supporting facts

Only facts relative to the decision to deny parole will be presented.

On June 1, 2006, twenty-two years after his arrest for the commitment offense, and being convicted by a jury for second degree murder in violation of Penal Code § 187,[1/] Rogelio Perez (hereafter Petitioner) appeared before the Board of Parole Hearings (hereafter Board) for his FIFTH parole suitability hearing. Petitioner's life term commenced on March 28, 1985, with his minimum eligible parole date being fixed at February 22, 1998 (EXHIBIT 1, HT 1:11-12).[2/]

Petitioner was sworn to tell the truth (HT 14:4-10).

## The commitment offense

The Board incorporated the facts from the Probation Officer's Report, p. 1 (HT 14:11-15). A summary of the commitment offense is taken from the Life Prisoner Evaluation Report (hereafter LPER) (EXHIBIT 2, p. 1), which was taken from the Probation Officer's Report, which Petitioner does not have a copy of. In short:

---

1. All and codes and regulations are California, unless otherwise noted.

2. Reference to parole hearing transcript will be designated by HT followed by page and, when necessary, line number, e.g., (HT 1:1).

- 5 -

Rogelio Perez was involved in an argument on 5/27/84, at the Tres Hermanos Bar located in Fontana, California. The dispute escalated into a physical fight inside the bar, which was stopped when both parties were ordered to go outside the bar by the bartender, Feliciano Perez. The fight continued in the parking lot. Perez obtained a .22 caliber semi-automatic pistol from his vehicle. The victim (Javier Ortiz) proceeded to walk to his vehicle which was located on the opposite side of the parking lot and attempted to open his vehicle door. Perez returned to the scene and positioned himself directly in front of Ortiz' vehicle. Perez fired 4 rounds from the pistol, striking the victim twice in his left neck area and once in the lower left corner of his mouth.

The Board went over the commitment offense with Petitioner (HT 14-32). When asked, when the victim was not armed, why he shot the victim, Petitioner responded, "I was scared that he was going to get a gun or something. That he was going to kill me, you know" (HT 18:7-9). Although Petitioner could not see Mr. Ortiz' hands because it was dark (HT 23:3-6), while arguing Ortiz said "fuck you, I'm going to kill you" (HT 17:6-9; 24:9-10); it was then when Petitioner obtained his pistol (HT 23:10-16), being in fear for his life thinking Ortiz was going to get a gun and kill him (HT 18:7-9). Petitioner fired at Ortiz four times from over Ortiz' car (HT 27:7-15), striking him three times, "twice in his left neck area and once in the lower left corner of his mouth" (EXHIBIT 2, p.1).

Prior criminal history

Petitioner has no juvenile record (HT 33:23-24).

As an adult, on May 13, 1980, Petitioner pled guilty to two counts of burglary and sentenced to unsupervised probation. While on probation, on August 12, 1980, Petitioner was again arrested for one count of burglary, for which he was convicted and sentenced to four years, being paroled on April 21, 1983 (HT 34:1-10). Petitioner does not know if he was on parole at the time of the instant offense, the Board assuming he was (HT 34:9-26).

///////

<u>Prior Social History</u>

Petitioner is a Mexican National, born October 25, 1957, being
46 years old (HT 36:4-6), his parents still being married (HT 45:4-7).
Petitioner came to visit the United States in 1975 and stayed with
family members in southern California (HT 36:27-37:2).

Petitioner attended elementary school until the eighth grade,
at which time he dropped out of school to work (HT 37:3-6), to help
support the family.  There is also evidence in the record that
Petitioner was employed as a forklift operator and upholsterer
(EXHIBIT 3, p. 2).

Although there is information in Petitioner's LPER that he "is
associated with the members of the 'South Fontanta' Gang" (EXHIBIT
2, p. 3), he denies any gang affiliation but admits that he sometimes
hung around with the "3rd Street" gang, which does not exist anymore
(HT 38:5-7).  The San Bernardino Deputy District Attorney admits
there is no information on Petitioner being a gang member or
affiliation (HT 39:22-25).  The Board admits that there are sometimes
misinformation on the LPER's (HT 40:13-15).

Petitioner admitted to using alcohol prior to and the night
of the offense, and had an arrest for drunk driving pending at the
time of the instant offense (HT 40:17-27).

<u>Parole plans</u>

Petitioner has an INS hold for Mexico and knows that he will
be deported upon parole (HT 41:22-25), where he would live with his
parents (HT 42:2-7).  Petitioner has job offers from Mexico (HT
42:8-43:18).

The Board told Petitioner, although he has an INS hold for

Mexico, to have parole plans for "both Mexico and California" at his next hearing (HT 44:14-21).

## Opposition to parole

The Chief of Police of Fontana, California sent a letter opposing parole in which he stated Petitioner had a "complete disregard for human life in that, after shooing the victim three times, he walked closer to the helpless man and fired a final bullet - final bullet into his head" (HT 46:1-4), recommending that Petitioner never be paroled. All official reports confirm that although four rounds were fired Ortiz was struck three times, "twice in the lower neck area and once in the lower corner of the mouth" (HT 47:10-12). Petitioner admits firing four rounds, but denies walking over to Ortiz and shooting him in the head (HT 48:1-20).

The San Bernardico County District Attorney's Office opposed parole, basically, due to Petitioner not agreeing to all the facts alleged by the deputy district attorney's rendition of the instant offense, prior criminal history, and was told to get a GED and has yet to do so (HT 76:7-78:9).

## Psychological evaluation

Petitioner's psychological evaluation was conducted by Dr. Macomber, one of the Board's own forensic experts and reviewed by Dr. Zika. The evaluation "is based upon a single 90 minute interview, plus review of the central and medical files" (EXHIBIT 3, p. 1). Dr. Macomber refers to Petitioner's 1999 psychological evaluation as still being valid, thus it is provided as additional evidence in support of Petitioner's suitability for parole (EXHIBIT 4).

Deputy Commissioner Moore goes over Dr. Macomber's psycholigical

- 8 -

evaluation (HT 63:11-67:6). Taking directly from the evaluation, Petitioner's "insight and self-awareness were good" (EX. 3, p. 2). Petitioner continues to attend Alcoholics Anonymous, is now a Christian and is determined not to drink, understanding the destructive use of alcohol, and although alcohol is readily available in the prison has refrained from its use, proving "that he is exercising good self-control, maturity and responsibility" (EX. 3, p. 2).

Petitioner has attended several self-help programs, to include "Anger Management, Alternatives to Violence Program, Breaking Barriers, Impact Program, and Project Change" (EX., p. 2).

Petitioner has no diagnosed disorders, with a current Global Assessment of Functioning (GAF) score of 85 (EX. p. 2 [GAF is one's ability to function compared to the world population, the highest score being 90]).

"Soledad is a prison that has frequent racial riots, disturbances and altercations. He has not been involved in any of these altercations. As a result, his potential for dangerous behavior compared to other inmates, is definitely below average" (EX. p. 3).

In clinically assessing Petitioner's current level of threat to public safety when released to the community, "the Level of Service Inventory-Revised was administered." This clinical tool is "am actuarial measure that assesses criminal history, substance abuse history, institutional adjustment, social relationships and other factors to determine current risk level on parole" (EX. p. 3). Taking all into consideration, it is Dr. Macomber's expert opinion, that "compared to the average citizen in the community, at this point

in his life, he does not pose any more risk than the average citizen in the community" (EX. p. 3). "There are no significant risk factors."

Dr. Macomber noted that Petitioner has family support in Mexico with offers of residence, job offers in Mexico, and "skills that will enable him to support himself in the community." Additionally, "since he plans on returning to Mexico, it is not necessary for him to finish his GED in order to get a parole date. The prognosis for successful adjustment in the community is very good" (EX. p. 4). That is the evaluation of the Board's own forensic expert. See also EXHIBIT 4, p. 4, assessment of dangerousness in 1999 forensic evaluation: "If released to the community inmate should not present a problem to society."

### D E C I S I O N

The decision is long, repetitive and convoluted, but Petitioner believes the reasons the Board concluded that he would "pose an unreasonable risk of danger to society or a threat to public safety if released from prison" (HT 83:11-14) are:

1. The first being "the gravity of the crime" (HT 83:17-18). Reiterating the facts of the offense: (a) "The offense was carried out in a manner which was dispassionate, calculated to the effect that you felt threatened and you then went to your automobile, retrieved a weapon, your .22, and returning to the kill the victim" (HT 83:26-84:4); (b) "The offense was carried out in a manner which demonstrates exceptional disregard for human life"; and (c) "The motive for the crime was truly inexplicable. You murdered a man over a fistfight" (HT 84:15-19).

2. The second being that Petitioner "had an escalating pattern of criminal conduct and violence" (HT 85:20-21). This finding was based on Petitioner dropping out of school in the 8th grade, and in spite of the lack of evidence, becoming involved in street gangs (HT 85: 23-26), and prior non-violent convictions (HT 86: 1-3).

3. The third being "an unstable social history, prior criminality in this regard" (HT 86:4-5). This finding was based on Petitioner entering the United States as a child to visit and staying, thereafter becoming "an illegal alien," attending school in the United Sates but dropping out in the 8th grade, and again, absent any evidence, alleging he "became a member of the 3rd Street Gang" (HT 86:6-10).

4. The fourth finding, Petitioner having to obtain his GED, is based on the fact that Petitioner does not have a GED, although he has marketable skills that can be put to use upon release and will be returning to Mexico. Commissioner Inglee is not certain Dr. Macomber's statement that since Petitioner is returning to Mexico he does not need a GED is correct (HT 89:3-9), and "why the doctor would say that I'm not entirely sure" (HT 89:21-22). Deputy Commissioner Moore tells Petitioner if he gets his GED that to find him unsuitable next time "[w]e're going to have to come up with a new note, a new song" (HT 93:13-19).

The Board commended Petitioner for the following: (1) having "developed...two marketable skills that can be taken into the free world" (HT 87:6-7; 91:6-8); (2) having "participated in beneficial self-help programs" (HT 87:12-13); (3) "should be congratulated for his lack of 115 disciplinary reports"; maintaing "a disciplinary-free record, basically, for 19 and a half years on your 115's. Very good

job" (HT 87:19-20; HT 92:1-4); (4) and although noting the forensic
expert's finding that Petitioner, "at this point in his life he does
not pose any more risk than the average citizen" editorializes,
commenting, "Even though most of the average citizens in the community
have not murdered somebody in a parking lot in front of a bar" (HT
88:16-23); (5) acknowledged that Petitioner has parole plans for
Mexico but wants letters written in English (HT 90:8-91:4); (6) having
"very good work reports" (HT 92:9-10); and (7) "attending AA meetings
consistently" (HT 92:1718).

## C O N C L U S I O N

Based on the foregoing facts, Petitioner being convicted of
second degree murder and now, with conduct credits, has exceeded
the term for first degree murder under similar circumstances, and
the Board having no evidence, forensic or otherwise, contravening
evidence that Petitioner is not a _current_ threat to public safety,
and therefore not "presently too dangerous to grant a fixed parole
release date," it is respectfully requested that the Court order
the respondent to show cause why the writ should not be granted and
the Board ordered to fix Petitioner's term and, why any excess conduct
credits should not applied to any period of parole.

Date: FEBRUARY 11, 2007

Respectfully submitted,

Rogelio Perez
Petitioner in pro per

VERIFICATION

I, Rogelio Perez, hereby declare under penalty of perjury that I have read the foregoing facts and state that they are true and correct, and the exhibits attached hereto in support of those facts are true copies of the originals. Doing so this 11TH day of February 2007 at Soledad, California.

_R. Perez_
Rogelio Perez
Petitioner in pro per

PRAYER FOR RELIEF

I, Rogelio Perez, do hereby state that I have no other relief save habeas corpus, and I therefore pray that this Honorable Court:

1. Issue an Order to Show Cause why relief should not be granted;

2. Appoint counsel to protect the rights of Petitioner;

3. Conduct an evidentiary hearing as necessary;

4. Declare the rights of Petitioner;

5. Any other relief in the furtherance of justice.

_R. Perez_
Rogelio Perez
Petitioner in pro per

- 13 -

A P P E N D I X  "B"

M E M O R A N D U M  O F  L A W

Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION TO FIND HIM UNSUITABLE FOR
PAROLE FOR THE FIFTH TIME AFTER TWENTY-TWO YEARS BASED ON
IMMUTABLE FACTORS WHEN THOSE FACTORS ARE NO LONGER
RELIABLE EVIDENCE AND OTHER FINDINGS ARE NOT
"CIRCUMSTANCES SPECIFIED BY STATUTE AND BY REGULATION,"
THE DECISION BEING ARBITRARY AND AN ABUSE OF DISCRETION.

---

Answers to 6b: Supporting cases, rules, or other authorities

Indeterminately sentenced prisoners in this state have a "liberty

interest" in parole and "an expectation that [they] will be granted

parole unless the Board finds, in the exercise of its discretion,

that [the prisoner is] unsuitable for parole in light of the

circumstances specified by statute and regulations" (In re Rosenkrantz

(2002) 29 Cal.4th 616, 654; see also In re Dannenberg (2005) 34

Cal.4th 1061, 1094 [Dannenberg "does not contravene Rosenkrantz"]).

Relying on Superintendent v. Hill (1985) 472 U.S. 445, the Rosenkrantz

court held that the Due Process Clause is satisfied as long as the

Board's/Governor's decision has "some basis in fact" and "some

evidence" to support the decision (In re Rosenkrantz, supra, 29

Cal.4th, at 655-658). The "some evidence" standard, however, does

not suggests how to apply itself when both the decision at the

administrative level and judicial level of review is based on

a "modicum of evidence." The Hill decision was ambiguous, but that

ambiguity was cleared up in the recent United States Supreme Court

decision of Hamdi v. Rumsfeld (2004) 542 U.S. 507, 124 S.Ct. 2633,

at 2651 [the "some evidence" standard applies to judicial review after an administrative review in which "a preponderance of the evidence" standard was applied.] See Cal. Code Regs., tit. 15, § 2000(b)(50). <u>See also</u> the Minnisote Supreme Court's discussion in <u>Carrillo v. Fabian</u> (2005) 701 N.W.2d 763 for an analysis of <u>Hamdi</u>.

The trial court's order (ATTACHMENT A) is unreasonable in light of the facts and the law. It may be true the "operative words are 'in the exercise of its discretion'" (ATTACHMENT A, p. 2), but simply citing preconviction factors and the commitment offense that are static factors, and in this case historic relics, is not reliable, nor relevant evidence of the operative word <u>current</u> threat to public safety. Moreover, the United States Supreme Court in <u>Hamdi v. Rumsfeld</u>, <u>supra</u>, 542 U.S. 507 [a preponderance of the evidence as a standard of proof] supersedes the "some evidence" standard of <u>In re Rosenkrantz</u>, <u>supra</u>, 29 Cal.4th, at 655-658).

a. <u>The Commitment Offense Is Static and No Longer Reliable Evidence.</u>

"'The gravity of the commitment offense may be a sufficient basis for denying a parole application, <u>so long as the Board does not fail to consider all other relevant factors</u>'" (In re Scott II (2005) 133 Cal.App.4th 573, 595, quoting <u>In re Ramirez</u> (2002) 94 Cal.App.4th 549, 569 [emphasis added by the court]; <u>see also In re Rosenkrantz</u>, <u>supra</u>, 29 Cal.4th, at 655 [the Board must consider all relevant factors]). Petitioner was convicted of second degree murder and has exceeded the maximum legislatively prescribed punishment for second degree murder established in Cal. Code Regs., tit. 15, § 2403(c), 21 years and now, with conduct credits, is within the legislatively prescribed range of punishment for first degree murder,

Cal. Code Regs., tit. 15, § 2403(b), 25-33 years.  In fact, the facts
and manner of death in case at bench calls for punishment of 18-19-
20 years (Cal. Code Regs., tit. 15, § 2403(c)(III-B), and with conduct
credits, 22 calendar years plus 7 years for conduct credits,
Petitioner has served 29 years, in which his offense, if convicted
of first degree murder, would be 28-29-30 years.  For Petitioner
to now be found unsuitable for parole based on the commitment offense,
the offense must be "particularly egregious" for a first degree murder
(In re Rosenkrantz, supra, 29 Cal.4th, at 689-690, concurring opinion
by Moreno, J.).

Petitioner's offense is not "particularly egregious" for a first
degree murder, much less a second degree murder.  When one considers
Rosenkrantz as a guidepost, the facts so well known they need not
be repeated here, and 21 years after his offense, a day apart both
a federal district court and a state court held enough is enough,
then after 22 years in case at bench, crime for crime, enough is
enough.

In case at bench, the Board did not weigh several suitability
factors pertinent to Petitioner's suitability for parole (Cal. Code
Regs., tit. 15, § 2402(d)), but made its decision by viewing the
commitment offense in a vacuum.  Indeed, in commenting on the forensic
evidence that Petitioner is, "at this point in his life, he does
not pose any more risk than the average citizen in the community"
(EXHIBIT 3, p. 3), Commissioner Englee commented, "Even though most
of the average citizens in the community have not murdered somebody
in a parking lot in front of a bar" (HT 88:16-23), demonstrating
the Board is fixated on the offense as though it happened yesterday

rather than viewing Petitioner for the person he is over two decades after the offense, as the forensic experts have done. The Board's fixation on the offense over two decades ago is not the "fair and impartial" hearing Petitioner is entitled to.

The primary concern is whether Petitioner is presently a threat to public safety (In re Dannenberg, supra, 34 Cal.4th, at 1071, 1080, 1083, 1085-1086). The commitment offense after twenty-two years is not reliable evidence of Petitioner's current threat to public safety (In re Scott II, supra, 133 Cal.App.4th, at 595; Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910, 916-917; Irons v. Warden of California State Prison-Solano (E.D. Cal. 2005) 358 F.Supp.2d 942, 947 fn. 2; Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038, 1047-1048; Sanchez v. Kane (C.D. Cal. 2006) ___ F.Supp.2d ___, 2006 WL 2252640, *11; Rosenkrantz v. Marshall (C.D. Cal. 2006) ___ F.Supp.2d ___, 2006 WL 2327085, *16-17).

The Board found the offense to be "carried out in a manner which was dispassionate, calculated..."; "exceptional disregard for human life" (HT 83:26-84:4); and "the motive for the crime was truly inexplicable" (HT 84:15-19). It appears the Board was relying on Cal. Code Regs., tit. 15, § 2402(c)(1)(B),(D), and (E), respectively, "the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder"; "the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering"; and "the motive for the crime is inexplicable or very trivial in relation to the offense."

In support of the offense being dispassionate and calculated, it was "to the effect that you felt threatened and you then went

- 17 -

to your automobile, retrieved a weapon, your .22, and returning to kill the victim" (HT 84:1-4). What the Board relied on is far from "an execution-style murder." It is true the victim was shot in the neck twice and once in the jaw, but those shots were fired when Petitioner was facing the victim, believing the victim was going inside his car to retrieve a weapon to carry out his threat of killing Petitioner, Petitioner firing, as the Commissioner said, feeling "threatened." Cf Rosas v. Nielsen (9th Cir. 2005) 428 F.3d 1229, 1232 ["two shots in the back, while the victim was running away, and one shot execution-style into the back of the victim's head."]

That also goes directly to the "motive for the crime was truly inexplicable" (HT 84:17-18). How, in one breath Commissioner Inglee state that the crime was "calculated" relying on the fact that Petitioner "felt threatened" then in the next breath say the motive was "truly inexplicable"? The only thing that is inexplicable is the Board's pretext for finding Petitioner unsuitable for parole when there is no evidence he is "presently" a threat to public safety. Indeed, "[a]s the California courts have concluded, an 'inexplicable motive' is 'one that is unexplained or unintelligible, as where the commitment offense does not appear to be related to the conduct of the victim and has no other discernable purpose" (Rosenkrantz v. Marshall, supra, 2006 WL 2327085, *14, quoting In re Scott I (2004) 119 Cal.App.4th 871, 892-893). It is simply illogical for Commissioner Inglee to in one breath state the motive being one of feeling threatened in the midst of a fistfight then in the next breath say the motive is "truly inexplicable." Such contradicts all evidence in the record, being arbitrary and an abuse of discretion.

- 18 -

As to the offense "being carried out in a manner that demonstrates an exceptionally callous disregard for human suffering," "[s]imilarly, the statement that the crime was 'especially callous' does not fit within the regulations, which provide that one factor to consider...this provision contemplates that the victim was made to suffer in some exceptional way" (Id., citing In re Scott I, supra, 119 Cal.App.4th, at 892). An "exceptionaly callous disregard for human suffering" requires "more than the simple cruelty and callousness necessary to find that a defendant killed with malice" (Id, citing In re Smith (2003) 114 Cal.App.4th 343, 366-367).

Petitioner's two most recent psychological evaluations prepared by the Board's own forensic experts gave full consideration to Petitioner's prior history of substance abuse and minor disciplinary history. Both forensic experts concluded that Petitioner is not a current threat to public safety. The Board presented no contravening evidence, medical or otherwise. The Board's decision, based on the offense twenty-two years after the fact, in light of the evidence that he is not presently a threat to public safety, was arbitrary and an abuse of discretion, violating his right to due process guaranteed by the fifth and fourteenth amendments.

b.  Petitioner's Prior Non-Violent Criminal History Is Not Evidence That He Is Currently A Threat To Public Safety.

To support the finding that Petitioner "had an escalating pattern of criminal conduct and violence" (HT 85:20-21), Commissioner Englee relied on Petitioner dropping out of school in the 8th grade, becoming involved in street gangs, and prior non-violent convictions.

On the one hand, if Petitioner would have had a previous record of violence, that is "on previous occasions inflicted or attempted

to inflict serious injury on a victim" that would be a factor weighing against suitability for parole (Cal. Code Regs., tit. 15, § 2402(c)(2)); on the other hand, when "[t]he prisoner lacks any significant history of violent crime" that is to weigh in favor of suitability (Cal. Code Regs., tit. 15, § 2402(d)(6)).

First, even by the Deputy District Attorney's own admission, there is no evidence that Petitioner ever belonged to any "street gang" (HT 39:22-25), and the Board admitting that the LPER's sometimes contain misinformation (HT 40:17-27). Petitioner himself denies ever belonging to or being associated with a street gang, thus this finding is without any evidence (Sanchez v. Kane (C.D. Cal. 2006) ___ F.Supp.2d ___, 2006 WL 2252640, *10). Growing up around street gangs and belonging are two different things, and reliance on this factor was arbitrary and an abuse of discretion.

Secondly, Petitioner's three prior convictions for burglary are not "violent" felonies (Penal Code § 667.5), nor is there any evidence that Petitioner ever committed a violent offense prior to the instant offense. This finding is not even close to the controlling regulation, thus was arbitrary (In re Mark Smith (2003) 109 Cal.App.4th 489, 505; In re Scott II, supra, 133 Cal.App.4th, at 601-602). Moreover, Petitioner's prior convictions, like the instant offense, is an "immutable factor" and will remain static, forever, and have lost all predictive value after twenty-two years.

Thirdly, dropping out of school in the 8th grade to go to work must be looked at culturally, and from the Mexican culture, Petitioner being from Mexico, children dropping out of school after completing their elementary education to help support the family is the norm

and acceptable. Moreover, dropping out of school is not one of the criteria specified by statute or regulation nor does it go to a prior criminal history. This entire finding is arbitrary and an abuse of discretion, violating Petitioner's right to due process.

c.  Petitioner Does Not Have An "Unstable Social History."

To support the finding that Petitioner had "an unstable social history" the Board relied on: "prior criminality in this regard" (HT 86:4-5); coming to the United States as a child to visit and staying, being "an illegal alian"; attending school but dropping out; and "became a member of the 3rd Street Gang" (HT 86:6-10).

Petitioner's prior criminal history is not evidence of "a history of unstable or tumultuous relationships with others" (Cal. Code Regs., tit. 15, § 2402(c)(3)). The language of the regulation clearly contemplates that Petitioner might be unsuitable for parole if he was chronically unable to form stable relationships. Three non-violent convictions over a span of a decade hardly suggests a chronic inability to form stable relationships with others. There is zero evidence that Petitioner dropping out of school satisfies the controlling regulation in this instant (In re Rosenkrantz, supra, 29 Cal.4th at 654). Using non-violent convictions is totally contrary to the statutes and regulations, the Board disregarding it's own regulations to justify a decision already made, violating Petitioner's right to due process.

Again, relying on Petitioner being a gang member when there is no evidence to support such a finding is arbitrary and capricious, the decision being based on whim, violating Petitioner's right to due process. When even the Deputy District Attorney states that

there is no evidence Petitioner was a gang member, and the Board
finds that he was, puts the integrity of the whole parole hearing
in question, Commissioner Englee being a dishonest decisionmaker,
making his decision prior to the hearing then going in search of
a justification to support that decision, violating Petitioner's
right to due process.

d.    Having A GED To Be Found Suitable For Parole Is Not Supported
      By Statute Or Regulations.

        The final reason to support the Board's decision to find
Petitioner unsuitable for parole was not having a GED. It violates
due process to find Petitioner unsuitable for parole based on not
having a GED when there is nothing in the statute or regulations
as having being a criteria for parole suitability (In re Rosenkrantz,
supra, 29 Cal.4th, at 654). The regulations only require that a
prisoner "has developed marketable skills that can be put to use
upon release" (Cal. Code Regs., tit. 15, § 2402(d)(8)). The Board
found that, and commended Petitioner for "having developed...two
marketable skills that can be taken into the free world" (HT 87:
6-7; 91:6-8.). Perhaps Dr. Macomber got the idea that Petitioner
does not need a GED to be found suitable for parole because he is
familiar with the principles of law in court decisions (In re DeLuna
(2005) 126 Cal.App.4th 585, 595 [limited education did not prevent
employment or contribute to offense, seeing "no evidence that
defendant had an 'unstable social history'"]). Moreover, again,
culturally, Petitioner is returning to Mexico where skills are more
important than education because it is skills that make a living
in Mexico. Moreover, being that Petitioner has an INS hold and will
be deported to Mexico, it is simply illogical for the Board to want

- 22 -

Petitioner to have alternative parole plans for the United States
(HT 44:14-21) (In re Andrade (2006) 141 Cal.App.4th 807, 815-818;
Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038, 1046).
Petitioner has, although the letters of support are written in
Spanish, realistic parole plans, and marketable skills that can be
put to use upon release. That is all that is required of him (Cal.
Code Regs., tit. 15, § 2402(d)(8)).

When Petitioner was told if he gets his GED, to find him
unsuitable for parole next time "[w]e're going to have to come up
with a new note, a new song" (HT 93:13-19), the translation is, the
Board will have to find a new excuse. Petitioner's consideration
for parole should not be a search for excuses, but an honest
assessment of his "current" threat to public safety.

Petitioner needing a GED to be found suitable for parole is
not supported by statute or regulations, therefore being arbitrary
and an abuse of discretion, violating Petitioner's right to due
process.

e.   The Board Failed To Consider All Relevant And Reliable Information.

"'The gravity of the commitment offense may be a sufficient
basis for denying a parole application, so long as the Board does
not fail to consider all other relevant factors'" (In re Scott II,
supra, 113 Cal.App.4th, at 595 [emphasis added by the court, quoting
In re Ramirez, supra 94 Cal.App.4th, at 569]; see also In re
Rosenkrantz, supra, 29 Cal.4th, at 655 [the Board must consider all
relevant factors]). In case at bench, the Board did not weigh several
suitability factors pertinent to Petitioner's suitability for parole
(Cal. Code Regs., tit. 15, § 2402(d)), but made its decision by

viewing the commitment offense in a vacuum.

There are nine (9) factors that weigh in favor of suitability for parole (Cal. Code Regs., tit. 15, § 2402(d)). The Board failed to consider and weigh in Petitioner's favor: (1) no juvenile record; (2) "reasonably stable relationships with others"; (3) signs of remorse, "indicating that he understands the nature and magnitude of the offense"; (4) motivation for the crime, committing the crime under stress, feeling "threatened" is stressful but can be weighed differently by different views of the situation; (5) battered woman syndrome not applicable; (6) "lacks any significant history of violent crime; and (7), Petitioner's age, currently 48 years old "reduces the probability of recidivism." Those regulatory factors absolutely were not considered, violating Petitioner's right to due process.

As to the eighth and ninth suitability factors, aside from considering Petitioner's parole plans, which in spite of letters being written in Spanish and having an INS hold for deportation are "realistic plans for release" (Cal. Code Regs., tit. 15, § 2402(d)(8)), it is not clear if the Board considered this criteria in favor of Petitioner or just gave it lip service.

As to factor nine, the only factor the Board did consider for certain (Cal. Code Regs., tit. 15, § 2402(d)(9) ["Institutional activities indicate an enhanced ability to function within the law upon release"]), the Board did cover and commend Petitioner for his postconviction behavior and participation in activities. That is not enough, and failure to consider all relevant and reliable factors violated Petitioner's right to due process.

///////

C O N C L U S I O N

Parole decisions turn on a "discretionary assessment of a multiplicity of imponderables, entailing primarily what a man is and what he may become rather than simply what he has done" (Greenholtz v. Inmates of Nebraska Penal and Correctional Institute (1979) 442 U.S. 1, 10, citation). Additionally, "[T]he behavior record of an inmate during confinement is critical in the sense that it reflects the degree to which the inmate is prepared to adjust to parole release" (Id., at 15). The Board's decision was not only fixated on immutable factors over two decades in the past, being historical relics, but the Board presented no contravening evidence to the two psychological forensic experts finding that Petitioner would not pose a threat to public safety if released from prison at this time, nor did the Board make any rational connection between its findings and Petitioner's present threat to public safety.

WHEREFORE, it is respectfully requested that this Court order the respondent to show cause why the writ should not be granted and Petitioner's term fixed, and, why any excess credits should not be applied to any time of parole he may serve.

Date: February 11 2007

Respectfully submitted,

Rogelio Perez
Petitioner in pro per

EXHIBIT 1

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )
                   )
ROGELIO PEREZ )
                   )
_____ )

CDC Number D-03602

INMATE
COPY

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JUNE 1, 2006

1:14 P.M.

PANEL PRESENT:

Mr. Philip Inglee, Presiding Commissioner
Ms. Barbara Moore, Deputy Commissioner

OTHERS PRESENT:

Mr. Rogelio Perez, Inmate
Mr. DeShawn Lewis, Attorney for Inmate
Mr. Robert Bulloch, Deputy District Attorney,
Two Correctional Officers, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No      See Review of Hearing
_____ Yes     Transcript Memorandum

Tracy Richardson, Peters Shorthand Reporting

ii

## INDEX

| | PAGE |
|---|---|
| Proceedings | 6 |
| Case Factors | 14 |
| Pre-Commitment Factors | 33 |
| Post-Commitment Factors | 49 |
| Parole Plans | 42 |
| Closing Statements | 76 |
| Recess | 82 |
| Decision | 83 |
| Adjournment | 97 |
| Transcriber Certification | 98 |

--oOo--

1

```
1                  P R O C E E D I N G S
2              PRESIDING COMMISSIONER INGLEE:   —
3      consideration hearing for Rogero —
4              INMATE PEREZ:  Rogelio, sir.
5              PRESIDING COMMISSIONER INGLEE:  Rogelio
6      Perez, P-E-R-E-Z, CDC number D-03602.   Today's
7      date is June 1st, 2006.  Time is 1:14.   We are
8      located CTF, Soledad.  Inmate was received on
9      3/28/1985.  He was committed from San Bernardino
10     County.  Life term began on 3/28/1985.   And the
11     inmate's minimum eligible parole date is
12     2/22/1998.  Controlling offense for which the
13     inmate has been committed is set forth Case
14     number SCR-41741.  Charge of count one,
15     violation of Penal Code 187 WP 12022.5 or second
16     degree with use of firearm.  Inmate received a
17     term — a base term of 15 years, seven years
18     enhancement for a total of 22 years to life.
19     The hearing is being tape recorded and for the
20     purpose of voice identification each of — each
21     of us will be required to state our first and
22     last name, spelling our last names.  When it
23     comes to the inmate's turn after you spell your
24     last name state your CDC number.  Starting with
25     myself and going to my left, my name is Philip
26     Inglee.  That's I-N-G-L-E-E.  I'm a
27     commissioner.
```

2

1            DEPUTY COMMISSIONER MOORE:  Good

2    afternoon.  I'm Deputy Commissioner Moore, M-O-

3    O-R-E, with the Board of Parole Hearings.

4            DEPUTY DISTRICT ATTORNEY BULLOCH:

5    Robert Bulloch, B-U-L-L-O-C-H, Deputy District

6    Attorney, San Bernardino County.

7            ATTORNEY LEWIS:  DeShawn (phonetic)

8    Lewis, L-E-W-I-S, Attorney for Mr. Perez.

9            INMATE PEREZ:  Rogelio Perez, R-O-G-E-

10   L-I-O, P-E-R-E-Z.

11           ATTORNEY LEWIS:  CDC number.

12           INMATE PEREZ:  CDC number D-03602.

13           PRESIDING COMMISSIONER INGLEE:  We have

14   two correctional officers in the room for

15   security purposes.  Mr. Perez, in front of you

16   is or at least underneath your file there is an

17   ADA statement.  I'd like to have you read it out

18   loud if you would, please.

19           INMATE PEREZ:  "ADA, the Americans

20   with Dis - Dis - disabilities Act - Americans

21   with Disabilities Act, ADA, is a law to help

22   people with disabilities.  Disabilities -

23   disabilities are problems that make it harder

24   for some people to see - see and hear, breath,

25   talk, walk, learn, think, work, or take care of

26   themselves than it is - it is for others.

27   Nobody can be kept out of public places or

3

1   activities because of a disability.  If you have

2   a disability you have the right to ask for help

3   to get ready for your BPT hearing, get to the

4   hearing, talk, read - read forms and papers, and

5   understand the hearing process.  BPT will look

6   at what you ask for to make sure that you have a

7   disability that is covered by the ADA and that

8   you have asked for the right kind of help.  If

9   you - if you don't help or if you think don't

10  think you got the kind of help you need ask for

11  a BPT 1074 grievance form.  You can also get

12  help to fill - fill it out."

13          PRESIDING COMMISSIONER INGLEE:  Did you

14  understand what you read?

15          INMATE PEREZ:  Yes.

16          PRESIDING COMMISSIONER INGLEE:  All

17  right.  That being the case, let the record

18  reflect BPT form 1073 was signed on 2/7/2005.

19  At that time you said you did not have any

20  disabilities.  Is that still correct?

21          INMATE PEREZ:  Still correct.

22          PRESIDING COMMISSIONER INGLEE:  Okay.

23  Do you have any problems walking up and down

24  stairs or for a distance of 100 yards or more?

25          INMATE PEREZ:  No.

26          PRESIDING COMMISSIONER INGLEE:  Do you

27  need glasses or magnifying device in order to

4

1    see or read documents?

2            INMATE PEREZ:  No.

3            PRESIDING COMMISSIONER INGLEE:  Let's

4    just go to recess for one second.

5                    (Off The Record)

6            DEPUTY COMMISSIONER MOORE:  We're on.

7            PRESIDING COMMISSIONER INGLEE:  Do you

8    need glasses or magnifying glass in order to

9    read documents?

10            INMATE PEREZ:  No.

11            PRESIDING COMMISSIONER INGLEE:  Do you

12    have any hearing problems?

13            INMATE PEREZ:  No.

14            PRESIDING COMMISSIONER INGLEE:  Have

15    you ever been included in a Triple CMS or EOP

16    program?

17            INMATE PEREZ:  No.

18            PRESIDING COMMISSIONER INGLEE:  Do you

19    know what they are?

20            INMATE PEREZ:  Yes.

21            PRESIDING COMMISSIONER INGLEE:  What

22    are they?

23            INMATE PEREZ:  For the people that are

24    not – not there.

25            PRESIDING COMMISSIONER INGLEE:  Well,

26    you're trying to say to me that there are people

27    that have emotional and mental problems –

5

1          INMATE PEREZ:  Uh-huh.

2          PRESIDING COMMISSIONER INGLEE:   - and -

3    in the prison system.  That's fine.  And you've

4    never been treated for emotional or mental

5    problems since you've been here?

6          INMATE PEREZ:  No.

7          PRESIDING COMMISSIONER INGLEE:  Have

8    you ever taken psychiatric medication?

9          INMATE PEREZ:  No.

10          PRESIDING COMMISSIONER INGLEE:  How far

11    did you go in school before you arrived in

12    prison?

13          INMATE PEREZ:  About 8th grade.  8th to

14    7th grade.

15          PRESIDING COMMISSIONER INGLEE:  Was

16    that in the United States or Mexico?

17          INMATE PEREZ:  Here.

18          PRESIDING COMMISSIONER INGLEE:  Okay.

19    Did you take any special education classes while

20    you were growing up?

21          INMATE PEREZ:  No.

22          PRESIDING COMMISSIONER INGLEE:  Do you

23    suffer from any disability that prevents you

24    from partic - participating in today's hearing?

25          INMATE PEREZ:  No.

26          PRESIDING COMMISSIONER INGLEE:

27    Counsel, do you have any comments or concerns

6

1    regarding ADA rights of your client?

2            **ATTORNEY LEWIS:**  No, I do not.

3            **PRESIDING COMMISSIONER INGLEE:**  This

4    hearing is being conducted pursuant to Penal

5    Code sections 3041, 3042 and the rules and

6    regulations of the Board of Prison Terms

7    governing parole consideration hearings for life

8    inmates.  The purpose of the hearing today is to

9    consider your suitability for parole.  In doing

10   so we'll consider the nature and number of

11   crimes you were committed for, your prior

12   criminal and social history, your behavior and

13   programming since your commitment.  We've had

14   the opportunity to review your central file and

15   review your hearing transcript.  We'll give you

16   the opportunity to correct or clarify the

17   record.  We will consider your progress since

18   your commitment and since your last hearing.

19   Your updated counselor's report, psychological

20   report will also be considered.  Any changes in

21   parole plans should be brought to our attention.

22   We will reach a decision today and inform you of

23   whether or not we find you suitable for parole

24   and the reasons for our decision.  If you are

25   found suitable for parole the length of time of

26   your confinement will be explained to you.  This

27   hearing will be conducted in two phases.  I'll

7

1   discuss with you the crime you were committed

2   for, your prior criminal and social history,

3   your parole plans and any letters of support or

4   opposition that may be in the file.  Deputy

5   Commissioner Moore will discuss with you your

6   progress since your commitment, your counselor's

7   report and your psychological evaluation.  Once

8   that's concluded the commissioners, the district

9   attorney, and your attorney will be given the

10  opportunity to ask you questions.  The questions

11  from the district attorney will be asked through

12  the Chair and the answers will be directed to

13  the Panel and not back to the district attorney.

14  Before we recess the district attorney and your

15  attorney will be given an opportunity to make

16  final statements regarding your par — your

17  parole suitability.  Your statement should be

18  directed as to why you feel you are suitable for

19  parole.  We will then recess, clear the room and

20  deliberate.  Once we've completed our

21  deliberations we'll resume our hearing and

22  announce our decision.  California Code of

23  Regulations states that regardless of time

24  served a life inmate shall be found unsuitable

25  for and denied parole if, in the judgment of the

26  panel, the inmate would pose an unreasonable

27  risk of danger to society if released from

8

1   prison.  You have certain rights.  These rights

2   include the right to a timely notice of this

3   hearing, the right to review your central file,

4   and the right present relevant documents.

5   Counsel, has your inmate's rights been met in

6   this regard?

7           ATTORNEY LEWIS:  Yes, they have.

8           PRESIDING COMMISSIONER INGLEE:  You

9   also have the right to be heard by an impartial

10  panel.  Sir, do you have any ob – any problems

11  with the – excuse me, Mr. Perez, do you have any

12  concern with any member of this Panel?

13          INMATE PEREZ:  No.

14          PRESIDING COMMISSIONER INGLEE:

15  Counsel, do you have any concern with any member

16  of this Panel?

17          ATTORNEY LEWIS:  No, I do not.

18          PRESIDING COMMISSIONER INGLEE:  You

19  will receive a written copy of our decision

20  today.  That decision is subject to review by

21  the Decision Review Unit and by entire Board

22  meeting as a body.  It will become effective

23  within 120 days.  It's also subject to review by

24  the governor.  A copy of the tentative decision

25  and a copy of the transcript will be sent to

26  you.  As of May 1st, 2004, there were major

27  changes in your former rights to appeal Board

9

1    decisions (inaudible).  The old Board
2    regulations were repealed.  The current policy's
3    entitled Administrative Appeals Correspondence
4    and Grievances Concerning Prison Board Term
5    Decisions.  (inaudible) at the prison library.
6    You are not required to admit your offense or
7    discuss your offense if you do not wish to do -
8    if you do not wish to do so.  However, this
9    Panel does accept as true the findings of the
10   court and you are invited to discuss the facts
11   and circumstances of your offense if you so
12   desire.  The Board will (inaudible) discuss and
13   consider any prior statements you have made
14   regarding the offense in determining your
15   suitability for parole.  Deputy Commissioner, is
16   there any confidential material in the file and,
17   if so, will it be used today?.

18         DEPUTY COMMISSIONER MOORE:  Yes, there
19   is confidential material but it is not relevant
20   to these proceedings.

21         PRESIDING COMMISSIONER INGLEE:  I'm
22   going to pass the hearing checklist on to - on
23   to your attorney and the district attorney to
24   insure we're all proceeding on the same set of
25   documents.  District attorney, do you have all
26   your documents?

27         DEPUTY DISTRICT ATTORNEY BULLOCH:  Yes,

10

1   I do.

2           PRESIDING COMMISSIONER INGLEE:   Okay.

3   And counselor, do you have all your documents?

4           ATTORNEY LEWIS:   Yes, I do.

5           PRESIDING COMMISSIONER INGLEE:   All

6   right.   Are there any additional documents to be

7   submitted?

8           ATTORNEY LEWIS:   Yes, we do have some.

9   With respect to this - the letters written in

10  Espanola, those are job offers, I believe.

11          PRESIDING COMMISSIONER INGLEE:   Why

12  aren't these translated?

13          ATTORNEY LEWIS:   He just received them

14  from what he told me.

15          PRESIDING COMMISSIONER INGLEE:   I'm

16  sorry, we - our - the documents in the American

17  court system are - are - the language we work

18  with in English.   It doesn't mean we don't

19  respect Spanish.   This happens to be - that's -

20  I'm not - I don't read Spanish.   What little

21  Spanish I read can hardly - be hardly used in a

22  court of law.   We could've had, if we had known,

23  we could've had possibly a translator here today

24  to - to at least read these to us.   And I know

25  there are people in this business that read

26  Spanish, understand that.   We're supposed to

27  have certified interpreters to do this kind of

11

1   work.  When did you receive these?

2        INMATE PEREZ:  Two weeks ago.

3        PRESIDING COMMISSIONER INGLEE:  Well, I

4   know you have old ones in here.

5        INMATE PEREZ:  Uh-huh.

6        PRESIDING COMMISSIONER INGLEE:  But

7   they - most of them are dated and can't be used.

8   They go past the - the normal date of one

9   hearing.  Well, if you don't get a date today -

10   what's the date on this - on these letters?

11   There's - yeah, 2006.  Are these from Mexico or

12   are they from Los Angeles?

13        INMATE PEREZ:  One is from Los Angeles.

14        PRESIDING COMMISSIONER INGLEE:  I'm

15   sorry.

16        INMATE PEREZ:  One is from Los Angeles.

17        PRESIDING COMMISSIONER INGLEE:  Oh,

18   this is the one from Los Angeles.

19        INMATE PEREZ:  Uh-huh.

20        PRESIDING COMMISSIONER INGLEE:  You can

21   tell your - it - it - it's - it's nice that they

22   do this but it's not necessary.

23        INMATE PEREZ:  Okay.

24        PRESIDING COMMISSIONER INGLEE:

25   Somebody's going to expense and it's - I'm

26   talking about in the United States.  And I know

27   in Mexico it's - it is - it is a - apparently,

12

1  it's something that's not (inaudible) is they

2  have – that you have things notarized or

3  validated.  I've received quite a few.  And how

4  old is this?  This is (inaudible) education

5  program.  Are these your only copies?

6          ATTORNEY LEWIS:  Yes, I believe so.

7  Did – did you make copies of these?

8          INMATE PEREZ:  No.

9          PRESIDING COMMISSIONER INGLEE:  Also,

10  why don't you go ahead and make copies of these

11  so we could –

12          DEPUTY COMMISSIONER MOORE:  One of

13  each?

14          PRESIDING COMMISSIONER INGLEE:  Yeah,

15  that'd be fine.

16          DEPUTY COMMISSIONER MOORE:  Okay.

17          PRESIDING COMMISSIONER INGLEE:  Give

18  the original back to the inmate and then I'll

19  put copies in –

20          DEPUTY COMMISSIONER MOORE:  Okay.

21          PRESIDING COMMISSIONER INGLEE:  Thank

22  you.  So you just received those?

23          INMATE PEREZ:  Yes.

24          PRESIDING COMMISSIONER INGLEE:  What's

25  the process here of having – of having documents

26  translated?  How long does it take?

27          INMATE PEREZ:  Not too long.  Usually

13

1  when — my other lawyer, you know, he translated,

2  you know, himself, you know.

3         PRESIDING COMMISSIONER INGLEE:  Well,

4  anyway, that's — that's a timing problem.  How

5  long have you known you were going to have this

6  hearing?

7         INMATE PEREZ:  I don't know.

8         PRESIDING COMMISSIONER INGLEE:  In a

9  year?

10        INMATE PEREZ:  A year.

11        PRESIDING COMMISSIONER INGLEE:  When

12  did you start asking people to get these letters

13  in?

14        INMATE PEREZ:  This — this (inaudible)

15  letter probably, you know, this one —

16        PRESIDING COMMISSIONER INGLEE:  Well,

17  it's a shame they didn't get here early enough

18  to be translated.  Okay, let's go ahead and move

19  on.  Are there any other documents to be

20  submitted?

21        ATTORNEY LEWIS:  No.

22        PRESIDING COMMISSIONER INGLEE:  Do you

23  have any preliminary objections?

24        ATTORNEY LEWIS:  None.

25        PRESIDING COMMISSIONER INGLEE:  Will

26  the inmate be speaking to the Panel?

27        ATTORNEY LEWIS:  Yes, he will be.

14

1          PRESIDING COMMISSIONER INGLEE:  On all

2    subjects?

3          ATTORNEY LEWIS:  Yes.

4          PRESIDING COMMISSIONER INGLEE:  Okay.

5    With that would you please raise your right

6    hand?  Do you solemnly swear or affirm that the

7    testimony you give at this hearing will be the

8    truth, the whole truth, and nothing but the

9    truth?

10          INMATE PEREZ:  I do.

11          PRESIDING COMMISSIONER INGLEE:  Thank

12    you.  If there is no objection counsel, we'll

13    incorporate by reference the statement of fact

14    and this will come from the probation officer's

15    report page 1.

16          ATTORNEY LEWIS:  That'll be fine.

17          PRESIDING COMMISSIONER INGLEE:  Okay.

18    Mr. Perez, tell us what happened.

19          INMATE PEREZ:  Well, the night of May

20    27th they pick up (inaudible) uncle, you know, a

21    fight -

22          PRESIDING COMMISSIONER INGLEE:  I'm

23    sorry, you said by - by your uncle?

24          INMATE PEREZ:  Uh-huh.

25          PRESIDING COMMISSIONER INGLEE:  Okay.

26          INMATE PEREZ:  No, just (inaudible).

27          PRESIDING COMMISSIONER INGLEE:  That's

15

1  fine.

2           INMATE PEREZ:  Okay.  And a fight broke

3  out and the guy was shooting my uncle.  I stood

4  up for my uncle and that guy (inaudible) that's

5  how everything started.  We (inaudible) for a

6  little bit.  We - they throw us out.  And they -

7  they throw us out I - I kill a person.

8           PRESIDING COMMISSIONER INGLEE:  Okay.

9  You apparently had a .22 pistol in your car?

10          INMATE PEREZ:  Yeah.

11          PRESIDING COMMISSIONER INGLEE:  Was it

12 an automatic?

13          INMATE PEREZ:  Automatic.

14          PRESIDING COMMISSIONER INGLEE:  .22

15 automatic.  And where did you get the pistol?

16          INMATE PEREZ:  I bought it from my

17 uncle.

18          PRESIDING COMMISSIONER INGLEE:  Was

19 it -

20          INMATE PEREZ:  (inaudible).

21          PRESIDING COMMISSIONER INGLEE:  - an

22 illegal weapon?

23          INMATE PEREZ:  Yeah, it was illegal

24 weapon.

25          PRESIDING COMMISSIONER INGLEE:  Illegal

26 or legal?

27          INMATE PEREZ:  Illegal.

16

1        PRESIDING COMMISSIONER INGLEE:
2   Illegal.  Had you ever fired a pistol before?
3        INMATE PEREZ:  No.
4        PRESIDING COMMISSIONER INGLEE:  Never?
5   Why did you have a pistol?
6        INMATE PEREZ:  Just protection.
7        PRESIDING COMMISSIONER INGLEE:  How
8   long had you owned the pistol?
9        INMATE PEREZ:  About two months.
10       PRESIDING COMMISSIONER INGLEE:  You
11  never took it out in the field and shot it or
12  (inaudible)?
13       INMATE PEREZ:  Oh, yes, (inaudible) to
14  have a pistol.
15       PRESIDING COMMISSIONER INGLEE:  But you
16  actually never shot the pistol at any time?
17       INMATE PEREZ:  No.  We stop.
18       PRESIDING COMMISSIONER INGLEE:  What
19  prompted you to - if you'd never shot the pistol
20  before what prompted you to at that time - I'm
21  sure being the age you were you'd been in a
22  fistfight before?
23       INMATE PEREZ:  Uh-huh.
24       PRESIDING COMMISSIONER INGLEE:  I think
25  most of have at one time in our lives, males.
26  Why did you think this time, because of a
27  fistfight, you needed to go to your car and get

17

1    a pistol out and kill somebody?  That's a big

2    jump from having a fistfight.

3              INMATE PEREZ:  Uh-huh.

4              PRESIDING COMMISSIONER INGLEE:    To

5    murdering somebody.

6              INMATE PEREZ:  Okay, when they threw us

7    out they told the - the person first, you know,

8    he was (inaudible) like I'm going to kill you,

9    you know.  It was kind of dark outside when I

10   (inaudible) or something to get my gun and start

11   blasting with (inaudible) just went off.

12             PRESIDING COMMISSIONER INGLEE:  I'm

13   sorry, I - I - I do apologize.  You speak good

14   English and, unfortunately, my ear is not good

15   for hearing Spanish today I guess.  I just

16   listened to three hours of Vietnamese and I'm

17   still jumping back to that.  So let's - give me

18   that again.  The question I asked you was you

19   were in a fistfight -

20             INMATE PEREZ:  Uh-huh.

21             PRESIDING COMMISSIONER INGLEE:  -

22   you've been in fistfights before.  Now, all of a

23   sudden, you're in a fistfight and you feel the

24   need - you've never fired the pistol before.

25   You - you - apparently, you don't - you didn't

26   think you got to carry it with you cause you

27   kept it in your car.  Now all of a sudden you go

18

1    over and take the pistol out of your car and go

2    back and you kill somebody.  And you may have

3    given me that answer but I need to ask you that

4    same question and ask you to give me that answer

5    again.  Why did you feel the need to kill the

6    person?

7              INMATE PEREZ:  I was scared that he was

8    going to get a gun (inaudible) or something.

9    That he was going to kill me, you know.

10             PRESIDING COMMISSIONER INGLEE:  Did he

11   have a gun in his hand?

12             INMATE PEREZ:  No.

13             PRESIDING COMMISSIONER INGLEE:  Did he

14   have a baseball in his hand?  Did he have a pool

15   cue in his hand?

16             INMATE PEREZ:  I don't think they find

17   anything - I don't think he had anything...

18             INMATE PEREZ:  In other words, there

19   was nothing he was threatening you with?  How

20   many times did you shoot him?

21             INMATE PEREZ:  It was three or four

22   times.

23             PRESIDING COMMISSIONER INGLEE:  Four

24   times.  Or at least that's what the record says.

25   I'll take that back.  You did fire it four

26   times; you hit him twice.  How far away from -

27   from him - how far away from him were you when

19

1    you fired?

2         ATTORNEY LEWIS:  I'm sorry,

3    Commissioner, he had actually struck him three

4    times.  He fired it four.

5         PRESIDING COMMISSIONER INGLEE:  Says

6    down here Perez fired four rounds from the

7    pistol striking the victim twice in his left -

8    oh, and also, okay.  And once in the lower

9    corner of his (inaudible).

10        ATTORNEY LEWIS:  Right.

11        PRESIDING COMMISSIONER INGLEE:  Yeah,

12   okay.  Thank you very much.  I hadn't gone to

13   the next - next line.  So of - of the four

14   rounds, four shots you hit him three times.  I

15   guess I'm still questioning why you felt the

16   need to do this because he - he, apparently, he

17   didn't have a weapon.  You didn't see a weapon.

18   He wasn't carrying anything in his hand like a -

19   like a baseball bat or a pool cue or - or

20   something that he could've hit you with.  How

21   large a man was he?

22        INMATE PEREZ:  Excuse me?

23        PRESIDING COMMISSIONER INGLEE:  How

24   large was he?  How tall was he?

25        INMATE PEREZ:  Probably about my size.

26        PRESIDING COMMISSIONER INGLEE:  And was

27   it - the weight about the same?

20

1          INMATE PEREZ:  The weight was the same

2  but he was about - he was about my size.

3          PRESIDING COMMISSIONER INGLEE:  He was

4  about - about the same size then.

5          INMATE PEREZ:  Yes.

6          PRESIDING COMMISSIONER INGLEE:  I still

7  can't come to grips with why you felt the need

8  to murder him, that's all, because of

9  (inaudible) trying to find out maybe there was

10  some other reasons - something else that may

11  have occurred.  Why do you think he - did you

12  think he had a pistol some -

13          INMATE PEREZ:  No.  But the - I - it

14  was like (inaudible) I wasn't thinking, you

15  know.

16          PRESIDING COMMISSIONER INGLEE:  Okay.

17          INMATE PEREZ:  Like (inaudible).

18          PRESIDING COMMISSIONER INGLEE:

19  (inaudible) stupid.  All right.  Anything else

20  about the killing?

21          INMATE PEREZ:  Feel sorry for, you

22  know, the person, you know.  There's nothing I

23  can do, you know, to bring him back, you know.

24          PRESIDING COMMISSIONER INGLEE:  Well,

25  you're right.  You're right.

26          INMATE PEREZ:  If I could, you know, I

27  could bring him back.

21

1          PRESIDING COMMISSIONER INGLEE:    That's

2    a crime that's happened.    It's not going to

3    change, is it?

4          INMATE PEREZ:    Nothing will change.

5          PRESIDING COMMISSIONER INGLEE:    Deputy

6    Commissioner, do you have any questions?

7          DEPUTY COMMISSIONER MOORE:    Where were

8    you when you shot Mr. Ortiz?

9          INMATE PEREZ:    (inaudible).

10          DEPUTY COMMISSIONER MOORE:    In relation

11    - let me be a little bit more clear.    Was there

12    anything between you and Mr. Ortiz, physically?

13    A car, a tree, a building.    Is there anything

14    between the two of you?

15          INMATE PEREZ:    Car.

16          DEPUTY COMMISSIONER MOORE:    Who's car?

17          INMATE PEREZ:    His car.

18          DEPUTY COMMISSIONER MOORE:    His - Mr.

19    Ortiz's car?    Is that a yes?    Did you just say

20    yes?

21          INMATE PEREZ:    Yes.

22          DEPUTY COMMISSIONER MOORE:    Okay.    How

23    far had you walked - you had gone to your car to

24    get your gun?

25          INMATE PEREZ:    No, I was going out to -

26    to (inaudible).

27          DEPUTY COMMISSIONER MOORE:    And where

22

1  did you get the .22?

2          INMATE PEREZ:  From the car.

3          DEPUTY COMMISSIONER MOORE:  Your car?

4          INMATE PEREZ:  Uh-huh.

5          DEPUTY COMMISSIONER MOORE:  And that

6  was in the parking lot?

7          INMATE PEREZ:  Yes.

8          DEPUTY COMMISSIONER MOORE:  And how far

9  away was Mr. Ortiz when you got the - when you

10  got your .22?

11          INMATE PEREZ:  Next to.

12          DEPUTY COMMISSIONER MOORE:  Next

13  parking space?

14          INMATE PEREZ:  Uh-huh.  Wasn't parking

15  space.  Was just (inaudible).

16          DEPUTY COMMISSIONER MOORE:  Was it from

17  you to me?  Or closer or further?

18          INMATE PEREZ:  From here to the wall.

19          DEPUTY COMMISSIONER MOORE:  Okay, so

20  about 12 or 15 feet?  To -

21          INMATE PEREZ:  Some - something around

22  there.

23          DEPUTY COMMISSIONER MOORE:  Okay.  And

24  there was a car between the two of you?

25          INMATE PEREZ:  Yeah, car.

26          DEPUTY COMMISSIONER MOORE:  And did you

27  see his hands?

23

1        INMATE PEREZ:  (inaudible), you know,

2  (inaudible) but that was it.

3        DEPUTY COMMISSIONER MOORE:  So did you

4  see his hands?

5        INMATE PEREZ:  No, not - not

6  (inaudible) because it was kind of dark outside.

7        DEPUTY COMMISSIONER MOORE:  Cause it

8  was around 11 o'clock or midnight?

9        INMATE PEREZ:  I think midnight.

10        DEPUTY COMMISSIONER MOORE:  Okay.  And

11  did - did you get your .22 before or after you

12  heard 'I'm going to kill you'?

13        INMATE PEREZ:  After.

14        DEPUTY COMMISSIONER MOORE:  And be -

15  when you heard 'I'm going to kill you' what was

16  Mr. Ortiz doing?

17        INMATE PEREZ:  Was (inaudible).

18        DEPUTY COMMISSIONER MOORE:  In Spanish,

19  English?

20        INMATE PEREZ:  In Spanish.

21        DEPUTY COMMISSIONER MOORE:  Okay.  And

22  he's calling you names.  Are you calling him

23  names?

24        INMATE PEREZ:  I have to say something,

25  you know, back, you know.

26        DEPUTY COMMISSIONER MOORE:  With names?

27        INMATE PEREZ:  Yeah.

24

1          DEPUTY COMMISSIONER MOORE:   Okay. So

2  you were hollering at one another?

3          INMATE PEREZ:   Yes.

4          DEPUTY COMMISSIONER MOORE:   And then he

5  said - tell me what it was he said about killing

6  you.   What did he say?

7          INMATE PEREZ:   (inaudible) -.

8          DEPUTY COMMISSIONER MOORE:   Go ahead.

9          INMATE PEREZ:   He said 'fuck you, I'm

10  going to kill you'.

11          DEPUTY COMMISSIONER MOORE:   Okay.  And

12  when he said that were you looking at him?

13          INMATE PEREZ:   We just - well, kind of,

14  you know, because we were arguing.

15          DEPUTY COMMISSIONER MOORE:   Okay, so

16  you were about from you to the wall?

17          INMATE PEREZ:   Uh-huh.

18          DEPUTY COMMISSIONER MOORE:   And you're

19  arguing.  And he says F-U, I'm going to kill

20  your F-ing uncle and you, too.   Something like

21  that?

22          INMATE PEREZ:   Uh-huh.

23          DEPUTY COMMISSIONER MOORE:   What - what

24  was - could you see his hands when he said that?

25          INMATE PEREZ:   He was (inaudible) with

26  his hands, you know.

27          DEPUTY COMMISSIONER MOORE:   But you

25

1  couldn't see his hands?

2          INMATE PEREZ:  No.

3          DEPUTY COMMISSIONER MOORE:  You never

4  saw a gun?

5          INMATE PEREZ:  No.  I didn't – not that

6  I remember.

7          DEPUTY COMMISSIONER MOORE:  Okay.  And

8  after he said that that's when you you're your

9  .22?

10          INMATE PEREZ:  Yeah, we – we kept

11  arguing.

12          DEPUTY COMMISSIONER MOORE:  How long

13  after he said I'm going to kill you yelling at

14  you, after he said that, how long did it take

15  you to go get your .22?

16          INMATE PEREZ:  About two or three

17  minutes I got the gun.

18          DEPUTY COMMISSIONER MOORE:  Okay.  And

19  when you shot – how long after you got the .22

20  did you fire it?

21          INMATE PEREZ:  (inaudible)?

22          DEPUTY COMMISSIONER MOORE:  You went

23  and got the .22 out of your car.  How much time

24  from the time you got the .22 from your car to

25  the time you shot Mr. Ortiz?

26          INMATE PEREZ:  About two or three

27  minutes.  He – he was still arguing, you know.

26

1           DEPUTY COMMISSIONER MOORE:  Okay.

2           INMATE PEREZ:  Telling me he was going

3    to kill me.

4           DEPUTY COMMISSIONER MOORE:  And the

5    whole time — well, when you shot him was he from

6    where you're sitting to the wall or was he

7    closer?

8           INMATE PEREZ:  He was about the same

9    space.  Same distance.

10          DEPUTY COMMISSIONER MOORE:  I — I —

11   after you shot him what — what did he do?  Did

12   his body react?

13          INMATE PEREZ:  He just went down.

14          DEPUTY COMMISSIONER MOORE:  And there

15   was a car between you and him.  Is that right?

16          INMATE PEREZ:  Yeah.

17          DEPUTY COMMISSIONER MOORE:  I'm

18   confused about something.  In the report it says

19   that the shell casings from your gun were found

20   right next to Mr. Ortiz.  Do you know what a

21   shell casing is?

22          INMATE PEREZ:  Uh-huh.

23          DEPUTY COMMISSIONER MOORE:  When you

24   fire the gun they're popping out of the gun,

25   right?

26          INMATE PEREZ:  Yeah.

27          DEPUTY COMMISSIONER MOORE:  And those

27

1  shell casings were found right next to Mr. Ortiz

2  where he was on the ground.  How did that

3  happen?

4          INMATE PEREZ:  Well, I just shot him

5  from here to there.  I don't know, you know, how

6  it get so close.

7          DEPUTY COMMISSIONER MOORE:  And there

8  was a car between the two of you?

9          INMATE PEREZ:  Yeah.

10          DEPUTY COMMISSIONER MOORE:  So you were

11  shooting over the car?

12          INMATE PEREZ:  Yeah.

13          DEPUTY COMMISSIONER MOORE:  At his

14  head?

15          INMATE PEREZ:  Pretty much.

16          DEPUTY COMMISSIONER MOORE:  What did

17  you do with the gun afterwards?

18          INMATE PEREZ:  I leave it in the - in

19  the house.

20          DEPUTY COMMISSIONER MOORE:  You brought

21  it back - you brought it to your house?

22          INMATE PEREZ:  Uh-huh.

23          DEPUTY COMMISSIONER MOORE:  Was there

24  anyone with you?

25          INMATE PEREZ:  Was another guy.

26          DEPUTY COMMISSIONER MOORE:  Who?

27          INMATE PEREZ:  I don't know his name.

# EXHIBIT 2
# Part 2 of 3

28

1  Just gave me a ride to — to the bar.

2          DEPUTY COMMISSIONER MOORE:  Was he

3  arguing with Mr. Ortiz, too?

4          INMATE PEREZ:  Well, just — just, you

5  know, just kind of names, too, to him about —

6  that was it.

7          DEPUTY COMMISSIONER MOORE:  He was

8  calling Ortiz names?  Or he was calling you

9  names?

10          INMATE PEREZ:  No, (inaudible) each

11  other.

12          DEPUTY COMMISSIONER MOORE:  Okay.  Was

13  he a friend of yours?

14          INMATE PEREZ:  I — I wasn't like a

15  friend.

16          DEPUTY COMMISSIONER MOORE:  But you

17  don't remember his name?

18          INMATE PEREZ:  I don't remember his

19  name.

20          DEPUTY COMMISSIONER MOORE:  Okay.  Had

21  you been drinking that night?

22          INMATE PEREZ:  Yes.

23          DEPUTY COMMISSIONER MOORE:  How much?

24          INMATE PEREZ:  I really (inaudible)

25  much.  About five beers.

26          DEPUTY COMMISSIONER MOORE:  Did you

27  feel the beer in you?  Did you have a buzz?

1          INMATE PEREZ:  Yeah, I got a buzz.

2          DEPUTY COMMISSIONER MOORE:  After he,

3    Mr. Ortiz, fell to the ground what did you do?

4          INMATE PEREZ:  I was scared.  I - I

5    don't know to run or stay.

6          DEPUTY COMMISSIONER MOORE:  What were

7    you afraid of?

8          INMATE PEREZ:  That - that I killed a

9    person.

10          DEPUTY COMMISSIONER MOORE:  That what?

11          INMATE PEREZ:  That I killed a person.

12          DEPUTY COMMISSIONER MOORE:  That you

13    had done something wrong?

14          INMATE PEREZ:  Yes.

15          DEPUTY COMMISSIONER MOORE:  So what did

16    you do?

17          INMATE PEREZ:  I just run away from -

18    from there.

19          DEPUTY COMMISSIONER MOORE:  To where?

20          INMATE PEREZ:  To my house.

21          DEPUTY COMMISSIONER MOORE:  And then

22    what did you do?

23          INMATE PEREZ:  I go there and don't

24    know what to do.

25          DEPUTY COMMISSIONER MOORE:  And then

26    what did you do?

27          INMATE PEREZ:  I - I told my uncle, you

1    know, what I did and that was it.

2            DEPUTY COMMISSIONER MOORE:  Was this a

3    different uncle than the one at the bar or was

4    it the same uncle?

5            INMATE PEREZ:  The same uncle.

6            DEPUTY COMMISSIONER MOORE:  Okay, who

7    called the police?

8            INMATE PEREZ:  Him.

9            DEPUTY COMMISSIONER MOORE:  And where

10   was the gun?

11           INMATE PEREZ:  That was in my house.

12           DEPUTY COMMISSIONER MOORE:  Did you

13   give the gun to anybody?

14           INMATE PEREZ:  I - I think brother

15   picked it up and tried to hide it or something.

16           DEPUTY COMMISSIONER MOORE:  Did you ask

17   him to?

18           INMATE PEREZ:  No.

19           DEPUTY COMMISSIONER MOORE:  Did you

20   tell your brother what you had done?

21           INMATE PEREZ:  Not at the time.

22           DEPUTY COMMISSIONER MOORE:  Why would

23   he hide the gun?

24           INMATE PEREZ:  Tried to protect me or

25   something.

26           DEPUTY COMMISSIONER MOORE:  From what?

27           INMATE PEREZ:  From what I did.

31

1          DEPUTY COMMISSIONER MOORE:   But you

2    didn't tell him what you had done.   How did he

3    know?

4          INMATE PEREZ:   Oh, he find out.   He go

5    to my uncle's.

6          DEPUTY COMMISSIONER MOORE:   You never

7    saw a gun in Mr. Ortiz's hand?

8          INMATE PEREZ:   None.   No.

9          DEPUTY COMMISSIONER MOORE:   Why did you

10   shoot him?

11         INMATE PEREZ:   I was scared that he

12   was, you know, kill me or something.

13         DEPUTY COMMISSIONER MOORE:   What made

14   you think he was going to kill you?

15         INMATE PEREZ:   Cause other threats he

16   was doing to me (inaudible).

17         DEPUTY COMMISSIONER MOORE:   His words

18   made you think he was going to kill you?

19         INMATE PEREZ:   Yeah.

20         DEPUTY COMMISSIONER MOORE:   Was he

21   winning in the fistfight in the bar?

22         INMATE PEREZ:   Yeah.

23         DEPUTY COMMISSIONER MOORE:   He was

24   winning?

25         INMATE PEREZ:   Uh-huh.

26         DEPUTY COMMISSIONER MOORE:   Were you

27   injured?

.32

1          INMATE PEREZ:  (inaudible) fat lip.

2          DEPUTY COMMISSIONER MOORE:  Okay.  Did

3  he have any injuries?

4          INMATE PEREZ:  I don't know.

5          DEPUTY COMMISSIONER MOORE:  Thank you,

6  that's all the questions I have about the crime.

7          PRESIDING COMMISSIONER INGLEE:

8  Anything else about the crime you'd like to say?

9          INMATE PEREZ:  I want to say I'm sorry

10  and I know what I did was wrong.  (inaudible)

11  back in time and nothing I can do.  You know,

12  I'm the one who did that (inaudible).  No –

13  nobody else.  I accept responsibility for that.

14          PRESIDING COMMISSIONER INGLEE:  How

15  many other people were around at the time you

16  shot the weapon?

17          INMATE PEREZ:  A lot of people in the

18  bar.  I don't – I don't know how many.

19  (inaudible).

20          PRESIDING COMMISSIONER INGLEE:  If you

21  had missed him and a round went into the window

22  could it have killed somebody in the bar?

23          INMATE PEREZ:  No, (inaudible) the –

24  the bar was (inaudible) different – different

25  way.

26          PRESIDING COMMISSIONER INGLEE:  Was

27  anybody else around him?

33

1           INMATE PEREZ:  No.

2           PRESIDING COMMISSIONER INGLEE:  He was

3    standing there all by himself?

4           INMATE PEREZ:  Yes.

5           PRESIDING COMMISSIONER INGLEE:  Was he

6    moving?

7           INMATE PEREZ:  Yeah, you know.

8           PRESIDING COMMISSIONER INGLEE:  Having

9    never fired a pistol you did a pretty good job.

10   You hit him three times out of four.

11          INMATE PEREZ:  Yeah.

12          PRESIDING COMMISSIONER INGLEE:  And

13   never fired a pistol before and he was - he was

14   moving.

15          INMATE PEREZ:  (inaudible).

16          PRESIDING COMMISSIONER INGLEE:  Well,

17   good job is probably a very poor way of putting

18   it but, I mean, you know -

19          INMATE PEREZ:  A mistake.

20          PRESIDING COMMISSIONER INGLEE:  Yeah.

21   Well, that was surprising that you were able to

22   hit somebody having never fired a weapon before.

23   I'll take a look at your prior criminality. You

24   have no juvenile record.  As an adult you were

25   arrested on 10/9 of 1987 Los Angeles Police

26   Department (inaudible) on 5/11/1980 for four

27   counts of burglary.  (inaudible) pleaded guilty

34

1   on 5/13/1980 for involvement in burglary

2   offense.  You were sentenced to 12 months

3   without supervision, 30 days jail term on two

4   counts and the remaining two counts dismissed.

5   Again you arrested on 8/12/1980 Los Angeles

6   Police Department of one count of burglary.  You

7   were convicted and sentenced to four years with

8   California Department of Corrections.  You were

9   paroled on 4/21/1983.  You were on parole at the

10  time the crime was committed, weren't you?

11          INMATE PEREZ:  (inaudible).

12          PRESIDING COMMISSIONER INGLEE:  Well,

13  you - you were on parole in 1983 and the crime

14  was committed, what, '85?

15          ATTORNEY LEWIS:  May 27th, '84.

16          PRESIDING COMMISSIONER INGLEE:  '84 so

17  reasonable to assume that he was on parole at

18  the time, counselor?

19          DEPUTY DISTRICT ATTORNEY BULLOCH:

20  (inaudible) in the case.

21          PRESIDING COMMISSIONER INGLEE:  So you

22  were on parole at the time the crime was

23  committed?

24          INMATE PEREZ:  I guess.

25          PRESIDING COMMISSIONER INGLEE:  You

26  really don't know?

27          INMATE PEREZ:  (inaudible).

35

1        PRESIDING COMMISSIONER INGLEE:  What

2   prison were you incarcerated?

3        INMATE PEREZ:  Before?

4        PRESIDING COMMISSIONER INGLEE:  Yes,

5   before this one.  I mean – I mean –

6        INMATE PEREZ:  I –

7        PRESIDING COMMISSIONER INGLEE:  – for

8   that – for that crime.  For the crime of

9   5/12/1987.

10        INMATE PEREZ:  Tehachapi.

11        PRESIDING COMMISSIONER INGLEE:

12   Tehachapi?

13        INMATE PEREZ:  Uh-huh.

14        PRESIDING COMMISSIONER INGLEE:  Did you

15   spend all your full time up there?

16        INMATE PEREZ:  Well, I went to

17   Susanville first then to Tehachapi.

18        PRESIDING COMMISSIONER INGLEE:  And

19   that's where you stayed?

20        INMATE PEREZ:  Yes.

21        PRESIDING COMMISSIONER INGLEE:  And you

22   were released from up there?  What did you think

23   of Tehachapi?

24        INMATE PEREZ:  It was – was all right.

25   (inaudible).

26        PRESIDING COMMISSIONER INGLEE:  All

27   right, anything you want to tell – talk about in

36

1   regard to your prior criminal history?

2             INMATE PEREZ:  Not really.

3             PRESIDING COMMISSIONER INGLEE:  Okay.

4   Let's take a look at your personal factors.  You

5   are a 46 year old Mexican National.  You were

6   born October 25th, 1957 and I'll spell the name

7   of the - of the city or town.  Z-A-C-A-T-E-C-A-

8   S, Mexico.  What the correct pronunciation?

9             ATTORNEY LEWIS:  Zacatecas.

10            INMATE PEREZ:  Zacatecas.

11            PRESIDING COMMISSIONER INGLEE:

12  Zacatecas.  To Matias and Juana Perez

13  (inaudible).  Spelled M-A-T-I-A-S.  And then

14  J-U-A-N-A Perez.  The family was supported by

15  his father, a factory employee in Mexico.  His

16  mother was a homemaker until she and her husband

17  purchased a small grocery store in (inaudible).

18  Does your mother still own that store?

19            INMATE PEREZ:  No, they sold it to buy

20  a little farm with cows and -

21            PRESIDING COMMISSIONER INGLEE:  Is it

22  near the same town you grew up in?

23            INMATE PEREZ:  Yes.

24            PRESIDING COMMISSIONER INGLEE:  In

25  addition to his parents Perez has multiple

26  brothers and sisters that currently live in

27  Mexico and the United States.  Perez came to the

37

1    United States in 1975 to visit, decided to stay

2    with his family members in southern California.

3    He attended Belmont Elementary School until the

4    8th grade at which time - at which time he

5    dropped out of school to go to work making

6    furniture.  His (inaudible) dated 2/28/1985

7    identified presently as being affiliated with 90

8    - 90 Street Gang in Los Angeles.  Were you a 19

9    Street Gang member?

10            INMATE PEREZ:  There are no (inaudible)

11   in LA.

12            PRESIDING COMMISSIONER INGLEE:  I'm

13   sorry?

14            INMATE PEREZ:  There are no (inaudible)

15   in LA.  No - no -

16            DEPUTY COMMISSIONER MOORE:  No such

17   (speaks Spanish) in LA.

18            PRESIDING COMMISSIONER INGLEE:  Was it

19   the - is it the 19th Street?  Is that -

20            INMATE PEREZ:  Yes.

21            PRESIDING COMMISSIONER INGLEE:  - just

22   a misprint?

23            INMATE PEREZ:  Is misprint.

24            PRESIDING COMMISSIONER INGLEE:  But

25   there is a 19th Street Gang?

26            INMATE PEREZ:  No.

27            PRESIDING COMMISSIONER INGLEE:  There's

37

1    United States in 1975 to visit, decided to stay

2    with his family members in southern California.

3    He attended Belmont Elementary School until the

4    8th grade at which time - at which time he

5    dropped out of school to go to work making

6    furniture.  His (inaudible) dated 2/28/1985

7    identified presently as being affiliated with 90

8    - 90 Street Gang in Los Angeles.  Were you a 19

9    Street Gang member?

10            INMATE PEREZ:  There are no (inaudible)

11   in LA.

12            PRESIDING COMMISSIONER INGLEE:  I'm

13   sorry?

14            INMATE PEREZ:  There are no (inaudible)

15   in LA.  No - no -

16            DEPUTY COMMISSIONER MOORE:  No such

17   (speaks Spanish) in LA.

18            PRESIDING COMMISSIONER INGLEE:  Was it

19   the - is it the 19th Street?  Is that -

20            INMATE PEREZ:  Yes.

21            PRESIDING COMMISSIONER INGLEE:  - just

22   a misprint?

23            INMATE PEREZ:  Is misprint.

24            PRESIDING COMMISSIONER INGLEE:  But

25   there is a 19th Street Gang?

26            INMATE PEREZ:  No.

27            PRESIDING COMMISSIONER INGLEE:  There's

38

1   not?

2            INMATE PEREZ:  No.

3            PRESIDING COMMISSIONER INGLEE:  All

4   right, what gang were you in?

5            INMATE PEREZ:  I — I was (inaudible)

6   around with (inaudible) but that (inaudible)

7   doesn't exist any more.

8            PRESIDING COMMISSIONER INGLEE:  I'm —

9   give me the name of the gang again.

10           INMATE PEREZ:  3rd Street.

11           PRESIDING COMMISSIONER INGLEE:  3rd

12  Street?

13           INMATE PEREZ:  Yeah.

14           PRESIDING COMMISSIONER INGLEE:  3rd

15  Street.

16           DEPUTY COMMISSIONER MOORE:  (inaudible)

17  LA.

18           PRESIDING COMMISSIONER INGLEE:  Also

19  known as associated with a member of the

20  (inaudible) Gang.  Don't laugh now.  This is a

21  very serious thing.  You — this — the

22  information may be correct here.  That's the

23  reason why we have these hearings to find out if

24  they are correct.  So I don't think laughing is

25  necessarily what you should be doing here.  I

26  mean to suggest you just answer the questions.

27  If there's' wrong information down here just tell

39

1   us.   All right?

2           INMATE PEREZ:   Okay.

3           PRESIDING COMMISSIONER INGLEE:   It says

4   that you were also member of the South Fontana

5   Gang?  And apparently you were not a member of

6   the South Fontana?

7           INMATE PEREZ:   No.

8           PRESIDING COMMISSIONER INGLEE:   Is

9   there such a thing as the South Fontana Gang?

10          INMATE PEREZ:   It's a gang in South

11  Fontana.

12          PRESIDING COMMISSIONER INGLEE:   And

13  you're not a member of that?

14          INMATE PEREZ:   No.

15          PRESIDING COMMISSIONER INGLEE:   Why

16  would they have it down here?

17          INMATE PEREZ:   I don't know.

18          PRESIDING COMMISSIONER INGLEE:   It said

19  that - there were affiliations with Los Angeles

20  gangs.  Can the district attorney bring any

21  light under this?

22          DEPUTY DISTRICT ATTORNEY BULLOCH:   I

23  read the same thing.  I don't have any other

24  documentation to - to confirm one way or the

25  other that he was or not a gang member.

26          PRESIDING COMMISSIONER INGLEE:   Okay.

27          ATTORNEY LEWIS:   Is it listed at Cal

40

1    Gangs?

2              PRESIDING COMMISSIONER INGLEE:   I'm

3    sorry?

4              ATTORNEY LEWIS:   Is he listed in Cal

5    Gangs?   It's a database for gang members and

6    whatnot.

7              DEPUTY COMMISSIONER MOORE:   It started

8    2001, Mr. Lewis.

9              DEPUTY DISTRICT ATTORNEY BULLOCH:   But

10   I - I would assume it's based on his prior CDC

11   conf - imprisonment where they document it at

12   that point in time.

13             PRESIDING COMMISSIONER INGLEE:   Well,

14   unfortunately, on some of these Board reports

15   there's just mistyping.   I'm not suggesting it

16   is but it could happen.   Some notes down here

17   that you were arrested on 4/9 in 1984 by the

18   California Highway Patrol charge of drunk

19   driving.   This was pending at the time you were

20   arrested for murder.   So you have a history of

21   drinking?

22             INMATE PEREZ:   Yes.

23             PRESIDING COMMISSIONER INGLEE:   Were

24   you drinking at the time when - I assume you

25   were.   Were you drinking at the time of the

26   murder?

27             INMATE PEREZ:   Yes, I was drinking.

41

1          PRESIDING COMMISSIONER INGLEE:   Were

2   you drunk?

3          INMATE PEREZ:   Not real drunk but I

4   was —

5          PRESIDING COMMISSIONER INGLEE:   You

6   were feeling the affects of alcohol?

7          INMATE PEREZ:   Yes.

8          PRESIDING COMMISSIONER INGLEE:   Okay.

9   But apparently you still could hold a pistol

10  and —

11         INMATE PEREZ:   Yeah.

12         PRESIDING COMMISSIONER INGLEE:   — shoot

13  somebody.   Perez states that he denied using

14  narcotics.   No other information regarding

15  substance abuse.   Says here in your

16  psychological report which we just received on

17  5/9 of '06 in the past the use of alcohol has

18  been a problem his life.   This was related to

19  the commitment offense.   He has been clean and

20  sober now for 20 years.   Claims that the 115 he

21  received some time ago was for alcohol that

22  belonged to his son.   Okay.   And you do have an

23  INS hold for Mexico and I assume that you know

24  that you'll be deported at that time?

25         INMATE PEREZ:   Yes.

26         PRESIDING COMMISSIONER INGLEE:   And

27  although we cannot read the letters I know you

42

1    can read them, where will you be living if you
2    were – if you went – if you were let out today
3    and you were sent to Mexico where would you go
4    to live?
5           INMATE PEREZ:  With my parents.  They'd
6    take me (inaudible).   They're old, I got to go
7    take care of them.
8           PRESIDING COMMISSIONER INGLEE:   And
9    where would you go to work?
10          INMATE PEREZ:  They – they got a few
11   jobs offering.
12          PRESIDING COMMISSIONER INGLEE:   But
13   they're different from the ones you had down
14   there before?
15          INMATE PEREZ:  Uh-huh.
16          PRESIDING COMMISSIONER INGLEE:   And
17   that's only a short time ago.  So the jobs that
18   we show down here for the previous year are
19   different than the ones you have this time?
20          INMATE PEREZ:  Yes.
21          PRESIDING COMMISSIONER INGLEE:   I tried
22   to match them up thinking I may have had an
23   English translation already of this but just an
24   earlier letter and that doesn't appear to be the
25   case.  Okay.  Let's take a look at your parole
26   plans which I've already started discussing.
27   Perez plans to reside with his parents in their

43

1   home in Mexico.  Employment, it says his - and

2   his grocery store but, apparently, grocery store

3   doesn't exist any longer.  Is that right?  They

4   sold it?

5           INMATE PEREZ:  The - the one that my

6   parents formed they - they sold it, you know, to

7   buy a little farm.

8           PRESIDING COMMISSIONER INGLEE:  Sure.

9           INMATE PEREZ:  I got an (inaudible)

10  right there from my friend that give me a job in

11  a store, too.

12          PRESIDING COMMISSIONER INGLEE:  All

13  right.  And how far away from that is where your

14  parents live right now?

15          INMATE PEREZ:  About 45 minutes.

16          PRESIDING COMMISSIONER INGLEE:  What

17  are you going to do?  Just walk, drive?

18          INMATE PEREZ:  Drive.

19          PRESIDING COMMISSIONER INGLEE:  Okay.

20  Okay.  Let's take a look at the letters that you

21  did have.  And the letters that we have the jobs

22  are different from the letters that we had

23  before.  You do have a letter, a recent letter,

24  whether or not it's here in English.  This is

25  from your brother who was an - who states that

26  he owns a home.  Will offer you a safe place to

27  live.  And his family have strong (inaudible).

44

1  So if you — if you had a reason to stay in

2  California you would stay with your brother. Is

3  that correct?

4         INMATE PEREZ:  Yeah, and my — also my

5  sisters.  But I know I — I'm not stay —

6         PRESIDING COMMISSIONER INGLEE:  Well,

7  that's the letter we have.  Yeah.  But, by the

8  way, when you do have a — a — I would suggest to

9  you if you don't get a date today the letters

10 that you — if you feel you're going to have an

11 INS hold on you and you're going to be sent back

12 to Mexico there are circumstances that come up

13 occasionally where that doesn't necessarily

14 happen I would come into the next hearing with

15 both residences both in Mexico and California,

16 in the U.S.

17        INMATE PEREZ:  Okay.

18        PRESIDING COMMISSIONER INGLEE:  And

19 possible, certainly, jobs in Mexico but also, if

20 possible, a job potential in the United States.

21 I would back them up.

22        INMATE PEREZ:  Okay.

23        PRESIDING COMMISSIONER INGLEE:  I think

24 it'd be a good idea.  And we have letters that

25 go back to 1993 and 1999.  Have a very

26 supportive family 1998.  Year 2000.  '96.  Okay.

27 Anything else that's — as far as your parole

45

1 plans?

2          INMATE PEREZ:  That's it.  Just go away

3  and live with my parents.  Take care of them.

4          PRESIDING COMMISSIONER INGLEE:  How old

5  are your parents now?

6          INMATE PEREZ:  They very old.  Probably

7  70's, mid-70's.

8          PRESIDING COMMISSIONER INGLEE:  71, 75,

9  78?.

10          INMATE PEREZ:  I don't know their age

11  exactly but they're in their 70's.

12          PRESIDING COMMISSIONER INGLEE:  You're

13  going to make me feel bad.

14          INMATE PEREZ:  Excuse me.  Young.

15          PRESIDING COMMISSIONER INGLEE:  Okay.

16  Let's take a look at your 3042 letters.  These

17  are letters that the prison sends out to the

18  various agencies that dealt with your

19  incarceration.  There were five sent out on

20  4/14/2006.  (inaudible)?

21          DEPUTY COMMISSIONER MOORE:  It's in the

22  packet that I gave you.

23          PRESIDING COMMISSIONER INGLEE:  Okay,

24  this is from Larry Clark, Chief of Police,

25  Fontana.  "(inaudible) circumstances in the

26  murder of Rodrigo Perez on 5/27/1984.

27  Circumstances in the case of above named is

46

1   complete disregard for human life in that, after

2   shooting the victim three times, he walked

3   closer to the helpless man and fired final

4   bullet - final bullet into his head.  This type

5   of person is unlikely to be rehabilitated and

6   would likely be a menace to whatever community

7   he resides in.  It's my hope that he is not

8   paroled and that he finished the term given to

9   him."  Do we have any report that he shot round

10  - type round into his head?

11          DEPUTY DISTRICT ATTORNEY BULLOCH:

12  Well, despite, you know, previous recitations I

13  was reading the Court of Appeal and it did

14  indicate that four shots were fired at the

15  victim.

16          PRESIDING COMMISSIONER INGLEE:  And I

17  show that, as well.

18                  (Off The Record)

19          DEPUTY COMMISSIONER MOORE:  And we're

20  back at 2 o'clock.

21          PRESIDING COMMISSIONER INGLEE:  I

22  believe the - there may have been a mistype on

23  the part of the prison because when I look at

24  the probation officer's report it, in fact, says

25  - I read off the Board's report that says three

26  shots and if you take a look at the Board report

27  and that is one page 1 which is actually the

47

1   report that I had referenced on as I believe.

2          DEPUTY COMMISSIONER MOORE:   Is that the

3   Board report or probation –

4          PRESIDING COMMISSIONER INGLEE:   I'm

5   sorry.  The Board, probation and – and

6   appellate's are mixed up here.  This is the

7   probation officer's report.  And it states that

8   from that position Perez fired, and is typed in

9   three and somebody has drawn a line through it

10  and written in four, rounds from the pistol

11  striking Mr. Ortiz twice in the lower neck area

12  and once in the lower corner of his mouth.  Do

13  you recall doing that?

14         INMATE PEREZ:   Yeah.

15         PRESIDING COMMISSIONER INGLEE:   so you

16  fired four times then?

17         DEPUTY DISTRICT ATTORNEY BULLOCH:

18  Could the record indicate that the inmate is

19  nodding his head in an affirmative?

20         PRESIDING COMMISSIONER INGLEE:   Yes.

21         INMATE PEREZ:   Yes.

22         PRESIDING COMMISSIONER INGLEE:   He did

23  say yes.

24         DEPUTY DISTRICT ATTORNEY BULLOCH:   Oh,

25  I'm sorry.

26         PRESIDING COMMISSIONER INGLEE:   It was

27  low.  I'll ask the question again.  Do you

48

1   recall shooting — shooting the man four times?

2            INMATE PEREZ:  Yes.

3            PRESIDING COMMISSIONER INGLEE:  One

4   time, your final shot, to the head?

5            ATTORNEY LEWIS:  I'm sorry, making four

6   shots but striking him three times.

7            INMATE PEREZ:  Yeah.

8            DEPUTY COMMISSIONER MOORE:  Twice in

9   the neck and once in the mouth.

10            ATTORNEY LEWIS:  In the lower mouth.

11            PRESIDING COMMISSIONER INGLEE:  From

12   that position first fired four rounds from the

13   pistol and, in the end, it goes back to what I

14   read earlier in the hearing, striking Ortiz

15   twice in the lower neck area and once in the

16   lower corner of the mouth.  Okay, so we're back

17   four rounds being fired, three rounds striking

18   the man.  Question is, did you walk over and

19   shoot a final round now in the back of his —

20            INMATE PEREZ:  No, sir.

21            PRESIDING COMMISSIONER INGLEE:  All

22   right.  Okay.  I have no other letters from any

23   of the other 3042 letters.  However, we do have

24   a representative here from the San Bernardino

25   District Attorney's office who will make a

26   presentation in a few minutes. All right.  With

27   that we'll move on to post-conviction factors.

49

1   And that'll be the deputy commissioner.

2              DEPUTY COMMISSIONER MOORE:   Good

3   afternoon, Mr. Perez.

4              INMATE PEREZ:   Good afternoon.

5              DEPUTY COMMISSIONER MOORE:   I'm going

6   to review with you what you've been doing since

7   your last hearing and your last hearing date was

8   on June 17th, 2003.   Is that right?

9              INMATE PEREZ:   Yes.

10              DEPUTY COMMISSIONER MOORE:   Okay.   You

11  were scheduled for one in January.

12              INMATE PEREZ:   Yes.

13              DEPUTY COMMISSIONER MOORE:   But the -

14              INMATE PEREZ:   I think - I think about

15  June.

16              DEPUTY COMMISSIONER MOORE:   In June?

17  Cause - actually, you - you were scheduled to

18  come to hearing in January of this year but they

19  had - the doctor's report was not done so they

20  postponed it till today's date so your last

21  hearing where you sat before the Board was on

22  June of 2003.,

23              INMATE PEREZ:   Uh-huh.

24              DEPUTY COMMISSIONER MOORE:   And I'm

25  going to review with you what you've done since

26  June of 2003 and so that we can make a record

27  and I'll also talk about the documents that you

50

1    gave me today. Okay, sir?

2         INMATE PEREZ:  Okay.

3         DEPUTY COMMISSIONER MOORE:  I may have

4    some questions for you, too, so you'll help me

5    understand and make a good record.

6         INMATE PEREZ:  Okay.

7         DEPUTY COMMISSIONER MOORE:  You arrived

8    here at CTF in Soledad on April 5th, 2001, so

9    you've been here for a little over five years

10   now.

11        INMATE PEREZ:  Yes.

12        DEPUTY COMMISSIONER MOORE:  Okay, at

13   your last hearing you were denied parole for two

14   years.

15        INMATE PEREZ:  Yes.

16        DEPUTY COMMISSIONER MOORE:  And the

17   Board asked you to remain discipline-free.  No

18   more write-ups.  They asked you to go

19   programming for self-help and they asked you to

20   upgrade vocationally.  And I think there was

21   some comment about getting your GED, as well, in

22   2003.  Do you remember that?

23        INMATE PEREZ:  I think I - that's

24   (inaudible).

25        DEPUTY COMMISSIONER MOORE:  Right.

26   Your classification is the lowest that you can

27   obtain and you got the score of 19 on April

51

1   1995.   Your current custody level is in Medium-A

2   and you achieved Medium-A in February of 1988.

3   Regarding the gang affiliation, there's

4   notations on the — on — in your C-file on 8/12

5   that you are an East LA 3rd Street member, an

6   ex-member.   There's also some indications of

7   association with the gangs from South Fontana

8   and then — that they do say the 19th Street Gang

9   but they reference specifically East LA 3rd

10  Street and there's one indication that you're an

11  ex-member, as well.  Are you familiar with those

12  labels being used about you?  That you've been

13  told that you're a documented gang member at

14  prior hearings?

15          INMATE PEREZ:   Well, that's the way

16  they got me, you know, so.

17          DEPUTY COMMISSIONER MOORE:  You heard

18  this before in 2003?

19          INMATE PEREZ:   Yes.

20          DEPUTY COMMISSIONER MOORE:   Okay.  Your

21  current work assignment is that you're a sewing

22  machine operator?

23          INMATE PEREZ:   Uh-huh.

24          DEPUTY COMMISSIONER MOORE:   And you are

25  receiving average to above average work

26  evaluations and the last evaluation is from

27  February 1st of this year.  And you've been in

52

1  that position since – excuse me, Mr. Gomez and

2  Mr. Marones (phonetic) are your supervisors?

3           INMATE PEREZ:  Yes.

4           DEPUTY COMMISSIONER MOORE:  And they

5  wrote that in February that you're doing average

6  to above average work and that you've been in

7  this job since October of 2003.

8           INMATE PEREZ:  Yes.

9           DEPUTY COMMISSIONER MOORE:  For two and

10 a half years.

11          INMATE PEREZ:  Yes.

12          DEPUTY COMMISSIONER MOORE:  And from

13 what I was looking for in the file you have been

14 given different assignments as a sewing machine

15 operator.

16          INMATE PEREZ:  (inaudible).

17          DEPUTY COMMISSIONER MOORE:  Okay.

18          INMATE PEREZ:  Cause I couldn't – I

19 (inaudible) the mechanic.

20          DEPUTY COMMISSIONER MOORE:  As a

21 mechanic?

22          INMATE PEREZ:  Yes.

23          DEPUTY COMMISSIONER MOORE:  To repair

24 the sewing machines?

25          INMATE PEREZ:  Yes.

26          DEPUTY COMMISSIONER MOORE:  Okay, and

27 is that a new – new part of your job that you're

53

1   doing?

2         INMATE PEREZ:  No, the (inaudible)

3   everything in the shop so.

4         DEPUTY COMMISSIONER MOORE:  Okay.

5         INMATE PEREZ:  And (inaudible) mechanic

6   so (inaudible) when they need me.

7         DEPUTY COMMISSIONER MOORE:  That makes

8   you a valuable employee.  That's a very positive

9   thing.  Your - regarding your academics, in '03

10  - in '03 - 2003 at your last hearing you're in

11  the Adult Basic Education, Third Level, getting

12  ready to take your - still working towards

13  getting your GED?  Is -

14        INMATE PEREZ:  Yes.

15        DEPUTY COMMISSIONER MOORE:  - that

16  right?

17        INMATE PEREZ:  Yes.

18        DEPUTY COMMISSIONER MOORE:  And did you

19  stop going to classes for that?

20        INMATE PEREZ:  No, I was in the

21  (inaudible) changing to level three so they move

22  me to his (inaudible).

23        DEPUTY COMMISSIONER MOORE:  To Central?

24        INMATE PEREZ:  Yeah, to Cent - back to

25  Central

26        DEPUTY COMMISSIONER MOORE:  And there's

27  no more Adult Basic Education, Three?

54

1          INMATE PEREZ:  Yeah, over here in

2     (inaudible).

3          DEPUTY COMMISSIONER MOORE:  So -

4          INMATE PEREZ:  I mean, there's

5     (inaudible).

6          DEPUTY COMMISSIONER MOORE:  Okay.

7          INMATE PEREZ:  Yes.

8          DEPUTY COMMISSIONER MOORE:  Are you

9     able to go to education?

10          INMATE PEREZ:  Right now we work from -

11    from - from Monday through Thursday so - so when

12    - when we go back to our regular (inaudible)

13    they going to have more time on that because

14    (inaudible) from - from Sunday to - to

15    Wednesday.

16          DEPUTY COMMISSIONER MOORE:  Sunday to

17    Wednesday from 6:30 to -

18          INMATE PEREZ:  Cannot they combine

19    those two (inaudible), you know, right now we

20    got to work Monday through Thursday.

21          DEPUTY COMMISSIONER MOORE:  I see.

22          INMATE PEREZ:  So I don't have that

23    much time, you know, to -

24          DEPUTY COMMISSIONER MOORE:  To do

25    education.

26          INMATE PEREZ:  To do education.

27          DEPUTY COMMISSIONER MOORE:  It's not -

55

1    so you're working when you could be going to

2    education?

3            INMATE PEREZ:  Uh-huh.

4            DEPUTY COMMISSIONER MOORE:  At the same

5    time?  Is that right?

6            INMATE PEREZ:  Yes.

7            DEPUTY COMMISSIONER MOORE:  Okay.  Your

8    grade placement is 6. - is 6th grade level for

9    your reading and your math combined.  You tried

10   to take the GED in 1995 and then you took the

11   pre-test for the GED in 2002.  You were

12   improving but you hadn't gotten to the level

13   where you could pass that yet.  Is that right?

14           INMATE PEREZ:  Yes.

15           DEPUTY COMMISSIONER MOORE:  Okay.  Is

16   that something that you think you still want to

17   do?

18           INMATE PEREZ:  If it's (inaudible) to

19   get out of here, you know, I will get it.

20           DEPUTY COMMISSIONER MOORE:  Okay.  You

21   have obtained a certificate in vocational

22   electronics.

23           INMATE PEREZ:  yes.

24           DEPUTY COMMISSIONER MOORE:  And that

25   was back in 1999?

26           INMATE PEREZ:  Yeah.

27           DEPUTY COMMISSIONER MOORE:  What

56

1   institution were you in when you got that?

2           INMATE PEREZ:  That was in Avenal.

3           DEPUTY COMMISSIONER MOORE:  Avenal.  I

4   also saw that you obtained some units in

5   computer repair.

6           INMATE PEREZ:  Yes.

7           DEPUTY COMMISSIONER MOORE:  but you

8   didn't get to finish that program, did you?

9           INMATE PEREZ:  No, because there wasn't

10  so (inaudible).

11          DEPUTY COMMISSIONER MOORE:  Yeah, you

12  were transferred.

13          INMATE PEREZ:  Yes.

14          DEPUTY COMMISSIONER MOORE:  Okay.  I

15  also note that you've been going to AA for a

16  while now.

17          INMATE PEREZ:  Yes.

18          DEPUTY COMMISSIONER MOORE:  How long

19  have you been going?

20          INMATE PEREZ:  Since '93, I think.

21          DEPUTY COMMISSIONER MOORE:  Okay, have

22  you been going to the Spanish-speaking groups or

23  the English-speaking groups?

24          INMATE PEREZ:  I was going to Spanish

25  and then went — went to English now.

26          DEPUTY COMMISSIONER MOORE:  Okay, it

27  helps you practice your English, too, which is

57

1   very good.

2           INMATE PEREZ:   Yeah.

3           DEPUTY COMMISSIONER MOORE:   Okay.

4   What's your - when is the last day you had a

5   drink?  What's your sober date?

6           INMATE PEREZ:   I guess since - since

7   '85.

8           DEPUTY COMMISSIONER MOORE:   And have

9   you - what do you do in AA?

10          INMATE PEREZ:   We - we use

11  participation and listen to other people's, you

12  know, stories and I talk about the - the - the

13  Steps.

14          DEPUTY COMMISSIONER MOORE:   The Steps?

15          INMATE PEREZ:   Uh-huh.

16          DEPUTY COMMISSIONER MOORE:   Have you -

17  do you know the Steps or have you worked the

18  Steps?

19          INMATE PEREZ:   I know some of them.

20  Not - not all of them.

21          DEPUTY COMMISSIONER MOORE:   Okay.  Tell

22  me a couple things you've learned from going to

23  AA.

24          INMATE PEREZ:   Well, I learn to stay

25  out of alcohol and to stay sober (inaudible)

26  time.

27          DEPUTY COMMISSIONER MOORE:   Is that

58

1  hard?

2          INMATE PEREZ:  Well, (inaudible), you

3  know, you don't see that much alcohol so it's

4  not hard, you know.

5          DEPUTY COMMISSIONER MOORE:  You also

6  attended the Inmate Employability Program.  It

7  was a video with a discussion about how - if -

8  when released how to get jobs and - and that was

9  in December of '05.

10          INMATE PEREZ:  Yes.

11          DEPUTY COMMISSIONER MOORE:  You also

12  attended an anger management workshop in

13  December of '05.  Did they ever talk about

14  alcohol?  Being angry and drinking and what that

15  does to a man?

16          INMATE PEREZ:  I, I mean, everybody

17  talks about, you know, have to do with angry,

18  how to control your angry.

19          DEPUTY COMMISSIONER MOORE:  Uh-huh.

20          INMATE PEREZ:  You know.

21          DEPUTY COMMISSIONER MOORE:  The night

22  that you shot Mr. Ortiz were you angry?

23          INMATE PEREZ:  Probably was.

24          DEPUTY COMMISSIONER MOORE:  Yeah. What

25  were you angry about?

26          INMATE PEREZ:  Cause we are fighting,

27  you know.

1          DEPUTY COMMISSIONER MOORE:  And do you

2   know why you were fighting?

3          INMATE PEREZ:  Because was trying to

4   say, you know, kill my uncle.  And stepped over,

5   you know.

6          DEPUTY COMMISSIONER MOORE:  You were

7   stepping up for your uncle?

8          INMATE PEREZ:  Yes.

9          DEPUTY COMMISSIONER MOORE:  Also just

10   at – right after your last hearing date you

11   completed a 44-week program in anger management

12   called Project Change.  Do you remember that?

13          INMATE PEREZ:  Yes.

14          DEPUTY COMMISSIONER MOORE:  What did

15   you learn from that?

16          INMATE PEREZ:  From them you learn

17   about the – different things about the big

18   things.  About that – angry, you know, have to

19   deal with –

20          DEPUTY COMMISSIONER MOORE:  What are

21   some different –

22          INMATE PEREZ:  – situations.

23          DEPUTY COMMISSIONER MOORE:  What are

24   some different ways for you to deal with your

25   anger?

26          INMATE PEREZ:  Just try to come down

27   (inaudible) or, you know, and talk to somebody.

1    I don't know.  But probably, you know.

2              DEPUTY COMMISSIONER MOORE:  Okay.  Also

3    you did participate in the Impact Program.

4    About victims - the effect on victims.

5              INMATE PEREZ:  Uh-huh.

6              DEPUTY COMMISSIONER MOORE:  Do you

7    remember that?

8              INMATE PEREZ:  Yes.

9              DEPUTY COMMISSIONER MOORE:  Okay.  You

10   do have a laudatory chrono, a very positive

11   chrono, from October of '05 in which your boss,

12   I believe Mr. Gomez, wrote that there were - you

13   helped get rid of all the back orders in

14   textiles.  High work production eliminating all

15   past due orders and you were part of a team that

16   produced over $700,000 worth of product and

17   cleared out all the backlog.  Do you remember

18   that?

19              INMATE PEREZ:  Yes.

20              DEPUTY COMMISSIONER MOORE:  Were you

21   working very hard during that time?

22              INMATE PEREZ:  Well, (inaudible) kind

23   of fun with it.

24              DEPUTY COMMISSIONER MOORE:  Okay.

25   Under Disciplinary History, you have two 115's.

26   The last one is in 1986 and you talked a little

27   bit about that.  It was about possession of

1  alcohol or pruno.  You indicated that that was

2  your cellie that possessed that?

3        INMATE PEREZ:  Yes.

4        DEPUTY COMMISSIONER MOORE:  And where

5  was it in your cell?

6        INMATE PEREZ:  He was (inaudible)

7  pruno, you know, but, you know, (inaudible) we -

8  we both live in that cell.

9        DEPUTY COMMISSIONER MOORE:  Right, and

10 did you smell it before this - the officer found

11 it?

12       INMATE PEREZ:  Yes.

13       DEPUTY COMMISSIONER MOORE:  So you knew

14 it was there?

15       INMATE PEREZ:  I knew it was there.

16       DEPUTY COMMISSIONER MOORE:  Okay.  The

17 - under your 128's, your last one is in 1996 and

18 that one was for unauthorized articles.  You had

19 a number of extra items that you weren't allowed

20 to have.  Do you remember that?

21       INMATE PEREZ:  No, that was for

22 destroying state property.  We went to our cell

23 that had that windows broken.  We got charged

24 for that.  Was - that was -

25       DEPUTY COMMISSIONER MOORE:  Okay, this

26 one, actually, I misspoke.  This one is about

27 failing to have your bed area in satisfactory

1   condition and you have unauthorized articles on

2   your bed.  But they don't give me any other

3   information about that.  But that - that was

4   about nine and half years ago.  Nothing since

5   then, is that right?  In nine and a half years?

6          INMATE PEREZ:  No.

7          DEPUTY COMMISSIONER MOORE:  Okay.

8   Also, in - in the Board and in your C-file I did

9   find this laudatory saying that you have been

10  participating - there's a number of new classes

11  that are being done about prevention and

12  treatment of hepatitis, of HIV, of tuberculosis,

13  and you've participated in the class about

14  hepatitis and that is from April of 2006.

15         INMATE PEREZ:  Yes.

16         DEPUTY COMMISSIONER MOORE:  Okay, and

17  I'm going to return these to you so that you can

18  keep them for your file.  They are in your C-

19  file and I did see them there.  Is there

20  anything else before I go to your doctor's

21  report, your psychology report that you want to

22  add or change from what I said?

23         INMATE PEREZ:  No, that's -

24         DEPUTY COMMISSIONER MOORE:  Is -

25         INMATE PEREZ:  - that's - that's -

26  that's correct.

27         DEPUTY COMMISSIONER MOORE:  Okay.  I'm

63

1    going to give this back to you now, counsel, so

2    that I don't forget later. All right, Mr.

3    Perez, I'm going to review now your - it's

4    entitled the Mental Health Evaluation. It's

5    dated May 9th, 2006, and it was completed by Dr.

6    MaComber, M-A-C-O-M-B-E-R. Also signing off on

7    it is Dr. Zika, Z-I-K-A. And the doctor says he

8    interviewed you for an hour and a half. Do you

9    remember that?

10             **INMATE PEREZ:** Yes.

11             **DEPUTY COMMISSIONER MOORE:** Okay. The

12    doctor combines information from prior reports

13    and it goes directly to Clinical Assessment. He

14    indicates that English is your second language.

15    However, you communicate quite well in English.

16    In the past use of alcohol has been a problem in

17    your life and that it was related to you that

18    alcohol was involved in the shooting and in the

19    murder but that you have been clean and sober

20    now for approximately 20 years. Prior to coming

21    to prison you indicated to the doctor that you

22    had worked as a forklift operator and that you

23    ~~currently are working, as I said, as a sewing~~

24    machine operator and sewing machine mechanic,

25    just as you indicated to us. There's an

26    indication that you completed vocational graphic

27    arts. Is that true?

1          INMATE PEREZ:  Yes.

2          DEPUTY COMMISSIONER MOORE:  Okay, and

3    when did you do that?

4          INMATE PEREZ:  That was in (inaudible).

5          DEPUTY COMMISSIONER MOORE:  Early

6    '90's?

7          INMATE PEREZ:  Yes.

8          DEPUTY COMMISSIONER MOORE:  Okay.

9    That's all right.  I just wanted to double-check

10   with you.  I – I remember seeing something.  I

11   didn't go back that far because it was prior to

12   your last hearing.  You have attended several

13   self-help programs, as I've re – as I've

14   reviewed with you prior.  Regarding any

15   diagnostic – diagnoses for you, you – you appear

16   to be clear of any diagnosis for mental

17   conditions.  And you have a GAF score of 85.

18   Regarding the review of your life crime, it

19   indicates in your conversation with the doctor

20   that you accept full responsibility for the

21   commitment offense.  And you accept the written

22   version of it.  You feel badly about the loss of

23   the victim's life.  You understand now that your

24   behavior at the time was wrong and out of

25   control.  That you were young and immature; in

26   your 20's.  I think you were 26 at the time?

27         INMATE PEREZ:  Yes.

 1          DEPUTY COMMISSIONER MOORE:  And not

 2    living in a responsible way.  The doctor goes on

 3    to say that your feelings of remorse appear to

 4    be sincere and genuine and that you appear to

 5    longer be the person who committed this offense.

 6    That now your 48 years old you seem to be

 7    mature, responsible and have made significant

 8    changes in your life over the past 22 years.

 9    You now actively attend church and you know that

10    irresponsible behavior is not appropriate.  And

11    you do not intend to engage in irresponsible

12    behavior or use of alcohol in the future.  Under

13    the - under the heading of Dangerousness,

14    whether or not you - you would be a danger, the

15    doctors says that you have - in considering

16    potential for dangerous behavior you've remained

17    disciplinary- free for 20 years.  And I wrote

18    down because I'm  - I'm a stickler, not quite;

19    19 and a half years. But he was - he was looking

20    forward to another six years that you're not

21    going to have any disciplinary write-ups.

22    Although you  - you have had a 128 in the past -

23    one in the past ten years.  He notes that

24    Soledad is a prison that has frequent violent

25    activities that occur between riots,

26    disturbances and altercations and you have not

27    been involved in any of these.  And compared to

1   other inmates you definitely appear to be below

2   average in a level of dangerousness.    In

3   considering dangerous behavior if released into

4   the community he used an assessment tool called

5   the Level of Service Inventory, Revised, and

6   considering a number of factors he determined

7   that you appear to be in the low risk range.

8   That when compared to the average citizen in the

9   community at this time you do not appear to be

10   any more of a risk than the average citizen.    In

11   closing, he makes observations and

12   recommendations.    He indicates that there appear

13   to be no mental or emotional problems currently

14   in your life that interfere with you or your

15   ability to parole.    You plan to return to

16   Mexico.    And that you - he does say you're in

17   the process of studying to complete your GED but

18   that's a little bit different than what you told

19   me that you can't do your GED while you're

20   working because of the current work schedule.

21   Is that right?

22         INMATE PEREZ:    No, I can't because of

23   the days.

24         DEPUTY COMMISSIONER MOORE:    You have to

25   go to work?

26         INMATE PEREZ:    Yes.

27         DEPUTY COMMISSIONER MOORE:    Okay.    And

1    the doctor goes on to say since you plan on

2    returning to Mexico because of the immigration

3    hold it's not necessary for you to finish your

4    GED in order to get a parole date.  And the

5    prognosis for successful adjustment in the

6    community is very good.  I wanted to ask you a

7    question about your life crime and what you told

8    the doctor.  You said you accept full

9    responsibility for - for what you did.  Is that

10   right?

11          INMATE PEREZ:  Yes.

12          DEPUTY COMMISSIONER MOORE:  When -

13   after you were convicted by the jury, there was

14   a trial and you were convicted, the probation

15   officer came to talk to you about what happened.

16          INMATE PEREZ:  Yes.

17          DEPUTY COMMISSIONER MOORE:  Do you

18   remember what you told him?

19          INMATE PEREZ:  I don't remember

20   exactly.

21          DEPUTY COMMISSIONER MOORE:  You told

22   him 'I did not do this.  I did not shoot Ortiz.

23   I am an innocent man.'  Do you remember telling

24   that to the probation officer after the jury

25   trial?

26          INMATE PEREZ:  Probably I did.  I - I

27   don't remember exactly.

1          DEPUTY COMMISSIONER MOORE:   When did

2    you come to — to be willing to say that you were

3    responsible for this?

4          INMATE PEREZ:   When — before I started

5    coming to see you guys.

6          DEPUTY COMMISSIONER MOORE:   About when

7    would you say?

8          INMATE PEREZ:   (inaudible).   The thing

9    was when I first saw him my first hearing.

10         DEPUTY COMMISSIONER MOORE:   In '97?

11         INMATE PEREZ:   Yes.

12         DEPUTY COMMISSIONER MOORE:   Is that the

13   first time you admitted it?

14         INMATE PEREZ:   Yeah, it was in '97.

15         DEPUTY COMMISSIONER MOORE:   Okay, why

16   did you change?  What changed you to saying I

17   didn't do it; I'm innocent to yes.?

18         INMATE PEREZ:   Because I (inaudible)

19   said what I did, you know, I (inaudible), you

20   know.  (inaudible), you know, what you did but

21   now that (inaudible), you know, I — I don't need

22   to — to be lying anymore.

23         DEPUTY COMMISSIONER MOORE:   What was

24   the lying doing to you?

25         INMATE PEREZ:   Well, (inaudible)

26   conception of people, you know, and you can

27   trust a person.  That's life.

1          DEPUTY COMMISSIONER MOORE:  What does

2   it say about you that you shot a man that did

3   not have a weapon?

4          INMATE PEREZ:  That's not right.

5          DEPUTY COMMISSIONER MOORE:  But what

6   does it say about you?  He was - he - he had -

7   he had nothing in his hands to defend himself or

8   to attack you.  Is that an act of bravery by

9   you?

10          INMATE PEREZ:  I (inaudible), you know,

11  angry. Scared.

12          DEPUTY COMMISSIONER MOORE:  Does

13  drinking alcohol make you braver?

14          INMATE PEREZ:  I think (inaudible)

15  because (inaudible) before was kind of still,

16  you know, kind of angry.

17          DEPUTY COMMISSIONER MOORE:  You were

18  still fired up?

19          INMATE PEREZ:  Yeah.

20          DEPUTY COMMISSIONER MOORE:  Okay.  Is

21  there anything else you'd like to add with the

22  psych - the psychological, the mental health

23  evaluation that I didn't cover?

24          INMATE PEREZ:  No.  That - that's it.

25          DEPUTY COMMISSIONER MOORE:  Okay, thank

26  you, Mr. Perez.

27          INMATE PEREZ:  You're welcome.

1          DEPUTY COMMISSIONER MOORE:  That would

2    be the conclusion of my presentation. That would

3    be the conclusion of my presentation.

4          PRESIDING COMMISSIONER INGLEE:  Thank

5    you.  Just once for all (inaudible) how many

6    rounds were fired - oh, I understand.  You fired

7    four rounds, is that correct?

8          INMATE PEREZ:  Four rounds.

9          PRESIDING COMMISSIONER INGLEE:  And you

10   hit the man three times?  Is -

11         INMATE PEREZ:  Yes.

12         DEPUTY COMMISSIONER MOORE:  - that

13   correct?

14         INMATE PEREZ:  Yes.

15         PRESIDING COMMISSIONER INGLEE:  Did you

16   ever walk over, put the gun down to his head and

17   fire it close to his head?

18         INMATE PEREZ:  No.  I didn't do that.

19         PRESIDING COMMISSIONER INGLEE:  Let's

20   go to the district attorney.  Questions?

21         DEPUTY DISTRICT ATTORNEY BULLOCH:  Yes.

22         PRESIDING COMMISSIONER INGLEE:  Mr.

23   Perez, you're going to speak to (inaudible).

24         INMATE PEREZ:  Okay.

25         DEPUTY DISTRICT ATTORNEY BULLOCH:  Does

26   the inmate believe he has any issues with women

27   as far as holding them in lower esteem or any

1    form like that?

2           PRESIDING COMMISSIONER INGLEE:  Do you

3    have any problems with women as far as

4    respecting them?

5           INMATE PEREZ:  No.

6           DEPUTY DISTRICT ATTORNEY BULLOCH:  I

7    noticed in numerous statements he's given to

8    various authorities and in his statement today

9    that he indicates that, essentially, this

10   argument started over the victim, Mr. Ortiz,

11   getting into an argument with his uncle.  Is

12   that - does he know why they were in an

13   argument?

14          PRESIDING COMMISSIONER INGLEE:  What

15   was your uncle and this man - what were they

16   arguing about?

17          INMATE PEREZ:  Well, he - he - he was -

18   he was (inaudible) I guess (inaudible)

19   girlfriend was working right there with him.

20   And I guess that (inaudible) -

21          PRESIDING COMMISSIONER INGLEE:  Mr.

22   Ortiz was trying to talk to his girlfriend or to

23   (inaudible)?

24          DEPUTY DISTRICT ATTORNEY BULLOCH:

25   Maybe I could add - further clarify -

26          PRESIDING COMMISSIONER INGLEE:

27   Certainly.'

1          DEPUTY DISTRICT ATTORNEY BULLOCH:  - my

2   questions.  Did the inmate do anything to start

3   that argument?

4          PRESIDING COMMISSIONER INGLEE:  Did the

5   inmate do anything to start that argument?

6          INMATE PEREZ:  I - I was talking to

7   that girl.

8          ATTORNEY LEWIS:  (inaudible).

9          INMATE PEREZ:  Oh.  I was talking to

10   that girl.

11          PRESIDING COMMISSIONER INGLEE:  You

12   were talking to the girl?

13          INMATE PEREZ:  Yes.

14          PRESIDING COMMISSIONER INGLEE:  This is

15   your uncle's girlfriend?

16          INMATE PEREZ:  No, no, no.  The worker

17   - she was working with him.

18          PRESIDING COMMISSIONER INGLEE:  Okay.

19          DEPUTY DISTRICT ATTORNEY BULLOCH:  So

20   if I under - you - do you - do you mind?

21          PRESIDING COMMISSIONER INGLEE:  No, not

22   at all.

23          DEPUTY DISTRICT ATTORNEY BULLOCH:  If I

24   understand the sequence of events Mr. Ortiz, the

25   victim in this case, operated the bar and the

26   inmate's position is that he started to talk to

27   this young lady who was the girlfriend of Mr.

1  Ortiz and that's what caused the argument?  Is

2  that his position?

3           PRESIDING COMMISSIONER INGLEE:  Is that

4  correct?

5           INMATE PEREZ:  Not that I know.  I

6  don't know (inaudible) girlfriend and boyfriend.

7           PRESIDING COMMISSIONER INGLEE:  Were

8  you talking to a young lady -.

9           INMATE PEREZ:  I talk a young lady in

10 the bar.

11          PRESIDING COMMISSIONER INGLEE:  Did

12 that make Mr. Ortiz mad?

13          INMATE PEREZ:  Probably?

14          PRESIDING COMMISSIONER INGLEE:  Well,

15 did it or didn't it?

16          INMATE PEREZ:  I guess it did.

17          DEPUTY DISTRICT ATTORNEY BULLOCH:  Did

18 the inmate grab or use any physical force

19 against the girlfriend before he got - Mr. Ortiz

20 got angry?

21          INMATE PEREZ:  No.

22          PRESIDING COMMISSIONER INGLEE:  Did

23 you touch her at all?

24          INMATE PEREZ:  No.

25          DEPUTY DISTRICT ATTORNEY BULLOCH:  The

26 Court of Appeal opinion indicates that he

27 grabbed her arm and propositioned to meet her -

1    him in a motel and that's what the argument

2    between Mr. Ortiz, the victim in this case, and

3    his uncle was all about.  Is - is that a correct

4    rendition of what happened at the trial?

5              INMATE PEREZ:  Can you repeat that?

6              PRESIDING COMMISSIONER INGLEE:  Did you

7    make a proposition to the young lady to meet her

8    at a motel later on?

9              INMATE PEREZ:  No.

10              PRESIDING COMMISSIONER INGLEE:  That

11   never happened?

12              INMATE PEREZ:  That never happened.

13              PRESIDING COMMISSIONER INGLEE:  Was

14   that ever discussed during the trial?  Do you

15   recall that being discussed during the trial?

16              INMATE PEREZ:  I think it discussed at

17   the trial.

18              PRESIDING COMMISSIONER INGLEE:  that's

19   because it was in the appellate - appellate

20   tapes -

21              INMATE PEREZ:  Yeah.

22              PRESIDING COMMISSIONER INGLEE:  The

23   information from the trial.

24              INMATE PEREZ:  I think it discussed at

25   the trial.

26              DEPUTY DISTRICT ATTORNEY BULLOCH:  And

27   I'm referring to page 2 and 3 of the Appellate

1   Court opinion.  Can the inmate explain what the

2   lighting conditions were outside when he was

3   fighting outside with the victim?

4           PRESIDING COMMISSIONER INGLEE:  How

5   light was it outside?  Were there a lot of

6   lights around?

7           INMATE PEREZ:  Yeah, it was light but

8   wasn't enough to drive.  Was kind of dim.

9           DEPUTY DISTRICT ATTORNEY BULLOCH:  So

10  it was dark in the parking lot there?  Is that

11  correct?

12          INMATE PEREZ:  It was kind of dark.

13          DEPUTY DISTRICT ATTORNEY BULLOCH:  Can

14  he explain how he was able to hit the victim

15  three times in his face when it was dark and he

16  was at the distance he was ex - explaining?

17          PRESIDING COMMISSIONER INGLEE:  I'll -

18  I'll preface this by saying considering you

19  never fired a pistol before how is it you were

20  able to hit a person three times in the face or

21  head area at a considerable distance,

22  particularly when it was dim lighting?

23          INMATE PEREZ:  It was not too far away.

24          PRESIDING COMMISSIONER INGLEE:  How far

25  away?

26          INMATE PEREZ:  From here to the wall.

27          DEPUTY DISTRICT ATTORNEY BULLOCH:  I

1   have nothing further.

2           PRESIDING COMMISSIONER INGLEE:   All

3   right.   Counsel?

4           ATTORNEY LEWIS:   I have no questions.

5           PRESIDING COMMISSIONER INGLEE:

6   Summary, district attorney, please.

7           DEPUTY DISTRICT ATTORNEY BULLOCH:   I

8   think much is left to be explained about what

9   happened that night and I don't think Mr. Perez

10  is being frankly candid with this Board or at

11  least he hasn't come to terms with what - what

12  happened that night.   For him to continue to say

13  that he was coming to his uncle's defense and -

14  and the honor that he was getting his speech by

15  the victim, Mr. Ortiz, is not to tell a whole

16  story and Mr. Perez has been doing that for over

17  20 years now.   The fact of the matter is that

18  Mr. Perez started this whole thing by his

19  behavior towards the young lady at the bar that

20  night.   Now, that's the real issue here and -

21  and that is Mr. Perez doesn't understand how his

22  behavior and his actions resulted in the conduct

23  that, unfortunately, got one man killed.   Mr.

24  Perez offers no reasonable explanation of how,

25  in this darkly - dark parking lot where he has

26  never fired a gun before, he was able to hit

27  this victim point blank in the face and neck.

1   And that the shell casings were found right

2   where the body dropped.  Until we can get a - an

3   accurate explanation of that which Mr. Perez has

4   no realization or at least is not being candid

5   about what happened that night.  Second of all,

6   Mr. Perez has been to three or four of these

7   hearings and on each hearing the panel has told

8   him that a GED is required and that GED is going

9   to help his situation.  On more than one

10  occasion at these parole hearings he has told

11  the panel that he is working on his GED and as

12  late as May of this year when he's talking to

13  the psychologist he told them that he's working

14  on his GED.  It still is not forthcoming.  Now

15  his comment today is essentially in - in the

16  form of a question to this Panel, if it's

17  necessary to get out of here I'll do it, to get

18  his GED.  Well, that's what he's been told for

19  close to ten years now and he still has not got

20  his GED.  The fact that he's telling the

21  psychologist that he's working on his GED when

22  he's telling the Panel here that he doesn't have

23  time to work on it is of concern, as well.  At

24  any rate, it is clear, based on the numerous

25  discrepancies and his rendition of what's go on

26  back in 1984, the fact that he was on parole at

27  the time, has had the benefit of the opportunity

1    to try to correct his ways before through our

2    system and then, unfortunately, when he was

3    released he went right back to alcohol as

4    evidenced by his DUI and is evidenced even after

5    he got arrested for DUI going into a bar and

6    provoking and starting this fight which resulted

7    in Mr. Ortiz's death, that he is not suitable

8    for parole.  And I would encourage the Panel not

9    to give him a date at this point in time.

10              PRESIDING COMMISSIONER INGLEE:  All

11    right, thank you very much.  Counselor?

12              ATTORNEY LEWIS:  Mr. Perez has admitted

13    that he shot an unarmed man on more than one

14    occasion here today.  Numerous occasions, in

15    fact.  He's admitted that he fired four shots at

16    the victim of which only one missed it's mark.

17    With regard to a GED, a GED probably does not

18    hold as much weight in the country of Mexico as

19    it would here in the United States of America.

20    This fact, coupled with the fact that he, my

21    client, will be deported to Mexico upon release

22    substantiates this position.  Nonetheless, Mr.

23    Perez should be found suitable for parole.  The

24    following supports Mr. Perez's contention that

25    he has earned a second chance at being suitable

26    for - for - for parole.  He has taken

27    responsibility for the life crime for which he

1   has been sent here to Soledad to serve out a - a

2   life sentence. He's admitted guilt to this

3   Board here today. And he's admitted guilt to

4   not only Dr. MaComber but other psychiatric

5   evaluators. The circumstances tending to

6   indicate suitability do include, my client has

7   no juvenile record, he has no juvenile record of

8   assaulting others, as well. Mr. Perez has a

9   stable upright bringing and Mr. Perez has

10  experienced reasonable stable relationships with

11  others but, in particular, his family members.

12  Mr. Perez has been commended for satisfactory

13  grades and excellent team participation with

14  regards to his current job as a sewing machine

15  operator by working well with others, with his

16  supervisors and peers and he has a great

17  attitude. Mr. Perez has expressed remorse for

18  his crime not only to other psychiatric

19  evaluators built to this Board. More

20  importantly, Mr. Perez has demonstrated his

21  remorse by programming. He's gone through

22  Alcoholics Anonymous, his - he's involved in

23  vocational training, he's gone through anger

24  management, and enough - and I'll be talking

25  about those in a moment. Mr. Perez committed his

26  crime at - as a result of significant stress in

27  his life at a particular point in his life. The

# EXHIBIT 2
# Part 3 of 3

1   fear that the victim had a gun due to his

2   threats to kill him.  That's no excuse and no,

3   he did not see a gun in his hand but Mr. - the

4   victim in this case was making threats that he

5   would kill my client and his uncle.  Mr. Perez

6   lacks any significant history of violent crime.

7   At the time of the crime Mr. Perez was 26 year

8   old - years old.  He is now age 48.  At age 48

9   the probability of recidivism is vastly reduced.

10   Mr. parole - Mr. Perez's parole plans are solid

11   and feasible.  He plans on residing with his

12   family in Mexico with his mom and dad and there

13   have been support letters in the past submitted

14   with regards to this.  Mr. Perez has a job offer

15   at not only one location but at two.  One of the

16   locations is the town (inaudible) Zacatecas and

17   there's another job offer at a grocery store in

18   Mexico by Mr. Fernando Adanei (phonetic) which

19   is owned by Mr. Adanei.  He indicated in - in

20   his testimony here today that that grocery store

21   is approximately 40 miles from his mother and

22   father's little farm.  Mr. Perez has marketable

23   skills as well enabling him to readily find

24   employment.  His skills include computer repair,

25   although he does not have a certificate in that,

26   graphic arts print shop, and electronics.  Mr.

27   Perez's institutional activities indicate an

1    enhanced ability to function within the law upon

2    his release.  During – during his incarceration

3    here he has only two 115's upon one – upon which

4    one is the – the latest is of 1986.  And he has

5    only one or seven 128's, the last one was being

6    received at 2001.  As I said earlier, he has

7    vocations, computer repair, paint shop, graphic

8    arts, electronics, and he currently works a

9    sewing machine operator in textiles.  My

10   client's assessment of dangerousness as applied

11   by Dr. MaComber is low.  And Dr. MaComber went

12   on to say that my client's assessment of

13   dangerousness is no more than – no more risk

14   than the average citizen in the community.

15   Therefore, in conclusion, Mr. Perez has a

16   network of support which includes his family,

17   organizations.  The family support will not be

18   there forever because, as he's indicated, his

19   parents area aging.  Mr. Perez has a job offer.

20   This will not always be there.  Mr. Perez also

21   has par – parole – he has parole plans that are

22   feasible and Mr. Perez has demonstrated he can

23   succeed without resorting to violence.  As a

24   result, we hereby request that Mr. Perez be

25   granted parole so that he may resume his life

26   and become a productive citizen in the

27   community.  Or at least in the Mexican

1    community.  However, if this Board does not

2    believe that my client has quite reached an

3    acceptable level of suitability we would further

4    request that my client be granted a one year

5    denial.  And we submit.

6        PRESIDING COMMISSIONER INGLEE:  All

7    right, thank you very much.  Mr. Perez, this is

8    your opportunity.  You can either go with what

9    your attorney has just said or we encourage you

10   to make your own statement as to - as to your

11   suitability for parole.

12       INMATE PEREZ:  (inaudible) find me

13   suitable for parole (inaudible) and I thank you

14   for time.

15       PRESIDING COMMISSIONER INGLEE:  Okay,

16   very good.  We now want to recess.  The time is

17   2:40.

18                    R E C E S S

19                     --oOo—

20

21

22

23

24

25

26

27

```
 1          CALIFORNIA BOARD OF PAROLE HEARINGS
 2                  D E C I S I O N
 3          DEPUTY COMMISSIONER MOORE:  3:22.
 4          PRESIDING COMMISSIONER INGLEE:  Okay.
 5   All parties that were here when we went to
 6   recess have since returned.  This is the matter
 7   of Rogelio, R-O-G-E-L-I-O, Perez, P-E-R-Z-E,
 8   pardon me, P-E-R-E-Z.  CDC number D-03602.  The
 9   Panel reviewed all information received from the
10   public and relied on the following circumstances
11   in concluding that the prisoner is not suitable
12   for parole and would, in fact, pose an
13   unreasonable risk of danger to society or a
14   threat to public safety if released from prison.
15   May factors, Mr. Perez, are considered when we
16   arrive at decisions.  However, the first and
17   foremost, certainly, is the gravity of the
18   crime.  The offense that you carried out was
19   especially violent, callous in that you shot and
20   murdered an unarmed man during a fistfight.  We
21   discussed at great lengths what might have
22   caused this.  Did he have another weapon, was he
23   armed with some kind of - whether it be a
24   firearm or a baseball bat or (inaudible) but it
25   appears that he truly was unarmed man.  The
26   offense was carried out in a manner which was
27   ROGELIO PEREZ D-03602 DECISION PAGE 1  6/1/06
```

1   dispassionate, calculated to the effect that you

2   felt threatened and you then went to your

3   automobile, retrieved a weapon, your .22, and

4   returning to then kill the victim.  While the

5   story differs from time to time it appears that

6   rounds or casings were found in and around close

7   to the body.  Therefore, you may have been very,

8   very close to the man when you shot him.  It's

9   also might be substantiating the fact that you

10  said you had never fired a pistol in your life.

11  You know, to shoot a man in the head three times

12  and - at a reasonable distance having never

13  fired a weapon in a darkened parking lot may

14  lend credence to the fact that you were closer

15  than you appear to - will admit.  The offense

16  was carried out in a manner which demonstrates

17  exceptional disregard for human life.  The

18  motive for the crime was truly inexplicable.

19  You murdered a man over a fistfight - fistfight.

20  Also have to note that you murdered a man at  a

21  time when you were on parole and that as a felon

22  you are not supposed to be carrying a weapon.

23  Notwithstanding the fact that it was an illegal

24  weapon to begin with.  This conclusions are

25  drawn from the statement of fact wherein the

26  prisoner and the victim apparently had been

27  **ROGELIO PEREZ D-03602 DECISION PAGE 2  6/1/06**

1   drinking at a bar.  Subsequently, they became

2   involved in an argument.  The victim who was

3   Javier Ortiz and the inmate were both thrown out

4   of the bar, are asked to leave the

5   establishment. The fight ensued out in the

6   parking lot.  At this time, the prisoner then

7   went to his automobile, retrieved the handgun

8   from his vehicle, came back and - and shot the

9   vic - victim three or four times.  And, in doing

10  so, killed him.  The offense was carried out in

11  a manner which demonstrated an exceptional

12  insensitive disregard for human life, as I noted

13  earlier.  And, again, the motive of the crime

14  still remains inexplicable.  There may have been

15  also indications that the victim was trying to

16  leave at the time that he was shot.  Noted

17  again, as we had previously mentioned, the

18  prisoner had been on parole at the time of the

19  incident. These conclusions are drawn from the

20  fact the prisoner had an escalating pattern of

21  criminal conduct and violence, a history of

22  unstable tumultuous relationships with others

23  commencing at a very early age, dropping out of

24  school in the 8th grade, becoming involved with

25  a number of street gangs, apparently the 3rd

26  Street Gang, failed to profit from society's

27  ROGELIO PEREZ D-03602 DECISION PAGE 3  6/1/06

1    previous attempts to correct his criminality.

2    Such attempts include probation, county jail

3    time, prior prison terms, as well as parole.

4    The prisoner had an unstable social history,

5    prior criminality in this regard.  He entered

6    the United States in 1975 to visit and did not

7    return and became, therefore, an illegal alien.

8    He attended school in the United States but

9    dropped out in the 8th grade.  He eventually

10   became a member of the 3rd Street Gang.

11          DEPUTY COMMISSIONER MOORE:  We are

12   stopped now.

13                    (Off The Record)

14          DEPUTY COMMISSIONER MOORE:  Tape 2.

15          PRESIDING COMMISSIONER INGLEE:  Okay.

16   Repeating social history, the inmate entered the

17   United States in 1975 for a visit and did not

18   return.  Therefore, becoming an illegal alien.

19   He currently has an INS hold.  He dropped out of

20   school which he was attending in the United

21   States.  Dropped out in the 8th grade.  He then

22   in and around this period of time became a

23   member of the 3rd Street Gang, became involved

24   in gang life then proceeded to have a history of

25   crime which began in 1987 when he was arrested

26   for burglary on four counts.  He then moved to

27   ROGELIO PEREZ D-03602 DECISION PAGE 4  6/1/06

1   19 - again in 1987 that he was convicted and

2   sentenced a four year term in the California

3   State Department of Corrections.  Prisoner is

4   (inaudible) to have developed his programming

5   and has shown much progress since 1980, excuse

6   me, 2003 while he's been incarcerated. He has

7   developed two marketable skills. Because they

8   were done in the 1990's they appear to be skills

9   that need to be updated given the potential.  He

10  has, in fact, upgraded himself vocationally but

11  not educationally; he still needs to complete

12  his GED.  He has participated in beneficial

13  self-help programs.  He has had some

14  disciplinary problems but not recently.  In his

15  128's he's had six, the last being 10/20 of 1996

16  for unauthorized articles.  He's had only two

17  115's disciplinary reports, the last being 10/5

18  in 1986.  That was possessing alcohol in his

19  cell.  He should be congratulated for his lack

20  of 115 disciplinary reports.  His psychiatric

21  reports, the last one is dated - is 5/9 of '06

22  authored by M. MaComber, capital M-A-C-O-M-

23  ~~B-E-R, PhD, is favorable.  Mr. MaComber says -~~

24  and considering the potential dangerousness that

25  he - in the institution he has remained

26  disciplinary-free for 20 years.  Not quite the

27  ROGELIO PEREZ D-03602 DECISION PAGE 5   6/1/06

1  case but he did not have many disciplinary

2  problems but he was not disciplinary-free.

3  Soledad is a prison that has frequent racial

4  riots, disturbances and - and altercations.  He

5  has not been involved in any of these

6  activities.  As the result, his potential for

7  dangerous behavior compared to other inmates is

8  definitely below average.  In considering his

9  potential for dangerous behavior when released

10  to the community level of - of Service

11  Inventory, revised, as administered.  This is an

12  actuarial measure that assesses criminal

13  history, substance abuse history, institutional

14  adjustment, social relationships and other

15  factors to determine the curr - current risk

16  level on parole.  He obtained scores in the low

17  risk area.  As a result, compared to the average

18  citizen (inaudible) at this point in his life he

19  does not pose any more risk than the average

20  citizen in the community.  Even though most of

21  the average citizens in the community have not

22  murdered somebody in a parking lot in front of a

23  bar.  There's one issue that I - I must admit

24  the Panel take exception with in Dr. MaComber's

25  report.  He says under Clinical Observation and

26  Comments and Recommendations and I want to make

27  ROGELIO PEREZ D-03602 DECISION PAGE 6 · 6/1/06

1   sure that you - you understand this, Mr. Perez.

2   He comments the fact that he is the process of

3   studying to complete his GED. However, says the

4   doctor, it says since he plans to return to

5   Mexico to it's not necessary for him to finish

6   his GED in order to get a parole date. I am - I

7   don't believe that Dr. MaComber currently is on

8   the Parole Board and he's making a statement

9   that I'm not sure is correct. But from this

10  Panel we believe it's important that all

11  prisoner's work hard to be able to qualify for

12  parole in different facets. It's a mosaic of

13  issues that come up that eventually get someone

14  to be paroled. One of the pieces of the pie, we

15  believe, is a person obtain a minimal education

16  standard before being released. And that being

17  - GED is the measure of which we have right now

18  to measure that - that standard. And whether

19  you go to Mexico or stay in the United States

20  education is - is very important to you. You

21  should never stop getting an education. And why

22  the doctor would say that I'm not entirely sure.

23  However, it was stated and we would like to tell

24  you that we feel strongly that GED is an

25  important - GED, excuse me, is an important

26  element in that inmates - the inmates travel to

27  ROGELIO PEREZ D-03602 DECISION PAGE 7  6/1/06

1    eventually being able to go - be able to acquire

2    a date.  Do you understand?

3          INMATE PEREZ:  Yes.

4          PRESIDING COMMISSIONER INGLEE:  All

5    right.  And we would encourage you to continue

6    working on that.

7          INMATE PEREZ:  Okay.

8          PRESIDING COMMISSIONER INGLEE:  All

9    right.  Parole plans, he does have updated

10   residential plans supported by letters in

11   English that we were able to read today. He

12   needs to be sure that the next time he has a

13   hearing and this letter - that he leaves letters

14   earlier enough either have his parents or - or

15   his friends that are going to support them

16   either have them done in English for them before

17   they're sent out from Mexico or (inaudible).

18   However, get to them to you earlier enough so

19   that you can get them translated here.  Okay?

20         INMATE PEREZ:  Okay.

21         PRESIDING COMMISSIONER INGLEE:  The same

22   is true and with employment plans.  You do have

23   employment plans, apparently, but they are

24   recent letters that are in Spanish.  We do not

25   have anybody here who is competent to translate

26   those letters and, therefore, we would request

27   ROGELIO PEREZ D-03602 DECISION PAGE 8  6/1/06

1    that you - at your next hearing that you have

2    the letters translated.  Not only for your

3    residential letters but also for your employment

4    letters.  Okay?

5            INMATE PEREZ:  Okay.

6            PRESIDING COMMISSIONER INGLEE:  You do

7    have two marketable skills that could be taken

8    into the free world.  However, we do suggest

9    that if you have the opportunity to update them,

10   particularly in any of them that have computer

11   aspects to it, we would suggest that you try and

12   get those updated.  3042 responses, we received

13   a letter from the district attorney of San

14   Bernardino, excuse me, he had presentation by

15   the district attorney of San Bernardino County

16   who recommended against parole at this time.  We

17   also received a letter from the Fontana Police

18   Department, that's Larry J. Clark, Chief of

19   Police, Fontana.  And he recommended that you

20   not be paroled in - back into the community at

21   this point in time.  Now, having said all this,

22   you have things that you should be commended

23   for.  And I'll ask the that Barbara, excuse me,

24   Ms. Moore, if she would read those out - those

25   achievements that you have - have in your

26   background since you've been incarcerated.

27   ROGELIO PEREZ D-03602 DECISION PAGE 9  6/1/06

1           DEPUTY COMMISSIONER MOORE:   Mr. Perez,

2    you have done very well.  You've maintained a

3    disciplinary-free record, basically, for 19 and

4    a half years on your 115's.  Very good job.  You

5    also have maintained your - free of 128's for

6    almost ten years.  Continue to do that.  You are

7    following the rules while you are in custody and

8    that is the beginning and continues to grow in -

9    to your benefit.  You have very good work

10   reports and, as you discussed today, you've

11   become even a more valuable employee in - with

12   the textiles because you've now are helping to

13   repair - mechanic, as you described, with the

14   sewing machines and your supervisor needs you in

15   the workplace and finds you a valuable worker.

16   And you seem to enjoy that from when you - from

17   what you were discussing with us.  You've been

18   attending AA meetings consistently.  Continue to

19   do that.  Alcohol was something that you used

20   quite a bit when you were - just before you

21   committed this murder with the DUI's and the

22   other issues.  Try to expand - try to grow in

23   AA.  Understand more - what do the Steps mean to

24   you.  And talk to some of the other men that are

25   sober that have worked the Steps.  Just don't

26   memorize them; you have to know them.  Okay,

27   ROGELIO PEREZ D-03602 DECISION PAGE 10  6/1/06

1    sir?

2            INMATE PEREZ:  Okay.

3            DEPUTY COMMISSIONER MOORE:  Your

4    programming in the past three years has

5    increased.  And it's very positive and I

6    reviewed them with you about the attendant —

7    going to the employability program, the anger

8    management and you finished the Project Change

9    program which was a very long program; 44 weeks

10   in length.  Those were all positive things.  Do

11   not hesitate to take them again if offered to

12   see if there's more that you can learn about

13   yourself.  How many times, if you can remember,

14   have you heard the Board say get your GED?

15           INMATE PEREZ:  Three or four times.

16           DEPUTY COMMISSIONER MOORE:  Okay, if you

17   do it this time you'll never have to hear it

18   from us again.  Okay?  We're going to have to

19   come up with a new note, a new song.

20           INMATE PEREZ:  I'm going to get next

21   time.

22           DEPUTY COMMISSIONER MOORE:  Okay.

23           INMATE PEREZ:  Hope I get to see you.

24           DEPUTY COMMISSIONER MOORE:  Okay.  I hope

25   you get it, too.  You — you know, you have —

26   you've progressed towards your GED.  I was

27   ROGELIO PEREZ D-03602 DECISION PAGE 11  6/1/06

1  looking at your scores.  Your spelling is good.

2  But you have to work on your reading and your

3  math.

4       INMATE PEREZ:  Yeah, I almost did it.

5       DEPUTY COMMISSIONER MOORE:  So - and

6  remember the - the math that you learn will work

7  even though - math in Mexico is the same as the

8  math in the United States.  It would be to your

9  benefit - your benefit.

10      INMATE PEREZ:  Okay.

11      DEPUTY COMMISSIONER MOORE:  Okay, sir?

12      INMATE PEREZ:  Uh-huh.

13      DEPUTY COMMISSIONER MOORE:  Thank you.

14      PRESIDING COMMISSIONER INGLEE:  All

15  right.  These positive aspects of your behavior,

16  however, do not outweigh the factors of

17  unsuitability.  In a separate decision, the

18  hearing Panel finds that the prisoner has been

19  convicted of second degree murder; it's not

20  reasonable to expect that parole would be

21  granted at a hearing during the next two years.

22  Specific reasons for our finding are as follows.

23  As I mentioned earlier, the offense was

24  paramount.  (inaudible) gravity of the offense

25  that you committed was especially vicious and

26  brutal.  The offense was carried out in a

27  ROGELIO PEREZ D-03602 DECISION PAGE 12  6/1/06

1   manner which demonstrates an exceptional callous

2   - exceptionally insensitive disregard for human

3   life.  The prisoner had been drinking at a bar

4   at the Tres Hermanos, H-E-R-M-A-N-O-S, Bar.  And

5   one of the patrons, Javier Ortiz, had gotten

6   into an argument with him.  A confrontation of

7   sorts went on.  Both were kicked out of the bar.

8   The argument continued in a parking lot.  A

9   fight ensued.  It is unclear how - what the

10   timing was but the inmate returned to his car,

11   acquired a pistol, returned and murdered the -

12   the victim.  Bullet casings were found close to

13   the body.  Question comes up is how far away did

14   the murder and how did he shoot the man.  The

15   motive of the crime is inexplicable.  In terms

16   of the victim appeared to be trying to leave.

17   As well as the prisoner was on parole at the

18   time, as mentioned earlier, and he was an ex-

19   felon in possession of a weapon.  We were also

20   concerned about the fact that we are not sure

21   that you are still minimizing the crime and that

22   we'd like to have you give more thought to the

23   crime, how it occurred, and your feeling as to

24   what your aspect - what caused you to step away

25   from what was a fistfight with a man

26   approximately your size to go to the car, get a

27   ROGELIO PEREZ D-03602 DECISION PAGE 13  6/1/06

1   weapon out and murder him.   That's a major

2   concern.   As noted earlier, the crime was

3   inexplicable.  Carried out in a manner that

4   demonstrated exceptional callous disregard for

5   human life.   We also note that you had a history

6   of crime prior to the murder.   As an adult.   In

7   this regard you were first arrested in 10/9 of

8   1987 for burglary.   You were then arrested later

9   that year for burglary again at which time you

10  were then sentenced to four years at the

11  California Department of Corrections, to prison.

12  And also, as was noted previously, you were on

13  parole at the time of your instant offense.

14  Panel recommends that you remain disciplinary-

15  free.   If available, try and upgrade yourself

16  vocationally.   In other words, the two vocations

17  you have, if it's possible try to update

18  yourself with them.   Educationally, we've said

19  it on numerous occasions, you're probably tired

20  of hearing those three letters, but one thing

21  you'll know is you have trouble with spelling

22  you surely are going to be able to spell G-E-D.

23  And that's the - that's you're (inaudible) and

24  that's going to take you a time to work on

25  between the work that you're doing now, your

26  self-help programs that you're - you're going in

27  **ROGELIO PEREZ D-03602 DECISION PAGE 14  6/1/06**

1  and to finish this GED is probably going to take

2  you a year or two to get that accomplished.  And

3  you should put your full attention to it.  And,

4  of course, if available continue to participate

5  in self-help programs.  Deputy commissioner,

6  anything else to say?

7          DEPUTY COMMISSIONER MOORE:  What are you

8  going to do before the next hearing?

9          INMATE PEREZ:  Get a GED.

10          DEPUTY COMMISSIONER MOORE:  Thank you.

11          PRESIDING COMMISSIONER INGLEE:  See you

12  can spell it already.

13          DEPUTY COMMISSIONER MOORE:  Okay, good

14  luck to you, Mr. Perez.

15          PRESIDING COMMISSIONER INGLEE:  Good

16  luck, Mr. Perez.  This hearing is now over.  The

17  time is 3:44.

18                  --oOo--

19

20

21

22

23  PAROLE DENIED TWO YEARS

24  THIS DECISION WILL BE FINAL ON: SEP 2 9 2006_____

25  YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  ROGELIO PEREZ D-03602 DECISION PAGE 15  6/1/06

1                              CERTIFICATE AND
                        DECLARATION OF TRANSCRIBER


          I, TRACY RICHARDSON, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total two in number and

cover a total of pages numbered 1 - 97 and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF ROGELIO

PEREZ, CDC NO. D-03602, on JUNE 1, 2006, and that the

foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

          I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

          Dated AUGUST 28, 2006, at Sacramento,

California.



                              _____
                              TRACY RICHARDSON
                              TRANSCRIBER
                              **PETERS SHORTHAND REPORTING**

EXHIBIT 2

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JUNE 2005 CALENDAR

PEREZ, ROGELIO                                                   D-03602

I.    **COMMITMENT FACTORS:**

A.    **Life Crime:** PC 187, Murder 2nd Degree with PC 12022.5 (A), Use of Weapon
      (.22 caliber semi-automatic pistol); 15 year base term sentence with a 7 year
      enhancement for a total term of 22 years to Life; received by the California
      Department of Corrections (CDC) from San Bernardino County on 3/28/85;
      MEPD: 2/22/98. Victim: Javier Bravo Ortiz, age unknown.

   1.   **Summary of Crime:** Per the Probation Officer's Report (POR) dated,
        2/21/85, (Page 1). Rogelio Perez was involved in an argument on 5/27/84,
        at the Tres Hermanos Bar located in Fontana, California. The dispute
        escalated into a physical fight inside the bar, which was stopped when
        both parties were ordered to go outside the bar by the bartender, Feliciano
        Perez. The fight continued in the parking lot. Perez obtained a .22 caliber
        semi-automatic pistol from his vehicle. The victim, (Javier Ortiz)
        proceeded to walk to his vehicle which was located on the opposite side
        of the parking lot and attempted to open his vehicle door. Perez returned
        to the scene and positioned himself directly in front of Ortiz' vehicle.
        Perez fired 4 rounds from the pistol, striking the victim twice in his left
        neck area and once in the lower left corner of his mouth. The POR notes
        that Perez and a second suspect fled from the scene.

   2.   **Prisoner's Version:** After interviewing Perez for this report, Perez stated
        that his version of the crime remains the same as stated in prior reports.
        The report reads as follows: Perez was at the Tres Hermanos Bar and
        became involved in an argument and fight with Javier Ortiz (the victim),
        on the night of the murder. He stated that he had been drinking, two
        or three beers, at his house prior to a friend asking him for a ride to the
        Tres Hermanos Bar. After Perez and his friend arrived, the victim, Javier
        Ortiz , who Perez didn't know, started to "bad mouth" Perez'
        uncle, who managed the bar. Perez stated that he told the victim to relax
        and back off from his uncle. The victim approached Perez and started to
        (swing) at him, at that time Perez began to defend himself. The fight was
        broken up and the victim was told to leave first. About three or four
        minutes later, Perez and his friend were told to leave, which they did. As

PEREZ, ROGELIO          D03602              CTF-SOLEDAD          JUN/2005

SENT TO I/M ON  1-4-06

C-FILE

they were walking out, Perez heard Javier Ortiz loudly calling him names. Perez thought he had a gun or something in his hand as Perez stood by his car door. At this point, the victim said "You guys are through, I'm going to kill you". At this time, Perez' friend went to the car and got out Perez' gun, returned and gave it to Perez. Perez started shooting first. He stated that he was scared after the first shot went off and the gun just kept going off. Perez stated that he didn't know if he had wounded Javier Ortiz, (victim). Perez didn't tell his uncle about what happened because he didn't want to involve him. Perez and his friend ran to his car and drove to Perez' house, where his friend then left to go home. Perez stated that he told his brother, Matias, what had happened and he stated that his brother took the gun to his trailer, to hide it and to protect Perez. Perez stated that he didn't know the victim, he had never seen him before, and that everything just happened wrong.

3. **Aggravating/Mitigating Circumstances:**

    a. **Aggravating Factors:**

        1. Perez had a clear opportunity to cease his involvement, but chose to continue.

        2. Perez was on parole with the California Department of Corrections as a result of a 1980, 4 year conviction for Burglary First Degree, for which he paroled on 4/21/83.

    b. **Mitigating Factors:**

        1. Perez had no apparent disposition to commit the instant offense.

B. **Multiple Crime(s):** None.

    1. **Summary of Crime:** None.

    2. **Prisoner's Version:** None.

II. **PRECONVICTION FACTORS:**

A. **Juvenile Record:** No known juvenile history.

B. **Adult Convictions and Arrests:** Per Federal Bureau of Investigations ( FBI) report dated, 10/9/87, the Los Angeles Police Department (LAPD) arrested Perez on 5/11/80 on four (4) counts of PC 459 Burglary. The State of California

Department of Justice (DOJ) report CI&I dated 5/12/87, states that Perez plead guilty on 5/13/80 on the above burglary offenses. He was sentenced to 12 months without supervision, 30 days jail term on 2 counts, with the remaining 2 counts dismissed. Perez was also arrested on 8/12/80 by the LAPD on charges of 1 count of PC 459, Burglary. The CI&I Report dated 5/12/87 shows that Perez was convicted and sentenced to a 4 year term with the California Department of Corrections, from which he paroled on 4/21/83,

C. **Personal Factors:** Perez is a 46 year old Mexican National. He was born on October 25, 1957 in Zacatecas, Mexico to Matias and Juana Perez. The family was supported by his father's factory employment in Mexico. His mother was a homemaker until she and her husband purchased a small grocery store that she manages. In addition to his parents, Perez has multiple brothers and sisters who currently reside in Mexico and the United States. Perez came to the United States in 1975 to visit and decided to stay with his family members in southern California. He attended Bellmont Elementary School until completing the 8th grade at which time he dropped out of school to go to work making furniture. The POR page 2, dated 2/21/85 identified Perez as being affiliated with the "Ninety Street" Gang in Los Angeles County. Also noted, that he is associated with the members of the "South Fontana" Gang, which had affiliations with the Los Angeles Gangs. The POR dated 2/21/85, indicates that Perez was arrested on 4/9/84, by the California Highway Patrol (CHP) on charges of drunk driving. Disposition was pending at the time of his arrest for murder. Perez states that he did not use narcotics and there is no information regarding substance abuse.

## III. POSTCONVICTION FACTORS:

A. **Special Programming/Accommodations:** None.

B. **Custody History:** Inmate Perez was received into the Department of Corrections on March 28, 1985 from San Bernardino County. He was housed at Deuel Vocation Institute (DVI) from California Institute for Men, (RCC-CIM) on 4/22/85. Perez transferred to Richard J. Donovan (RJD-CF) on 1/27/88, and then to Soledad Correctional Training Facility (CTF) on 2/8/93. On 7/9/96, he was transferred to the California Correctional Institution (CCI). Perez transferred to Solano State Prison (CSP-SOL) on 5/29/97. He was received at Avenal State Prison on 5/19/98. On 5/31/00, Perez was received at Corcoran State Prison and on 7/12/00, he transferred to Avenal State Prison. Perez then transferred on 4/5/01, to the Correctional Training Facility (CTF). He remains at CTF with Medium A custody.

C. **Therapy and Self-Help Activities:** Perez received a certificate and a laudatory chrono for participating and completing a 44 week anger management course in the project change program. He has been an active member in the Spanish

Alcoholic Anonymous program during the first, second, third and fourth quarter of 2003.

**D.**    **Disciplinary History:**  During this review period, Inmate Perez remained disciplinary free.

**E.**    **Other:**  On 6/17/03, Perez was seen by the Board of Prison Terms for his Subsequent Parole Consideration Hearing #3. The Board's decision was to deny parole for two years, and recommend the following: 1) Remain disciplinary free, 2) Upgrade vocationally/educationally and 3) Participate in self help programs.

## IV.    FUTURE PLANS:

**A.**    **Residence:**  Perez plans to reside with his parents, Matias and Juana Perez in their home in Zacatecas, Mexico.

**B.**    **Employment:**  Fernando Almaraz Adame has offered Perez employment at his grocery store located at RFC AAAF 660107T95 Avenue, Trevino No. 205 Pte. Matamoros De La Laguna, Coah.

**C.**    **Assessment:**  Perez has support letters from both family and friends.

## V.    USINS STATUS:  Perez has a USINS Hold, #A27149524.

## VI.    SUMMARY:

**A.**    Prior to release the prisoner could benefit from:

   1.    Remaining disciplinary free.
   2.    Obtaining his GED.
   3.    Continuing his participation in self help programs when available.

**B.**    This report is based upon an interview with the prisoner on 2/7/05, lasting approximately 1/2 hour and a complete review of his Central File lasting 2 hours.

**C.**    Prisoner was afforded an opportunity to examine his Central File, per the Olson Decision. On 2/7/05, Perez reviewed his Central File.

**D.**    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

_J. Palmer_     4/5/05
Correctional Counselor I     Date

_G. Williams_     4.5.05
Correctional Counselor II(A)     Date

_R. Pope_     4-5-05
Facility Captain     Date

_D. S. Levorse_  C&PR     4/8/05
Classification and Parole Representative     Date

PEREZ, ROGELIO          D03602               CTF-SOLEDAD          JUN/2005

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING

☐  PROGRESS HEARING

INSTRUCTIONS
   TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
   TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
         ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 3/03 to 2/04 | | | **PLACEMENT:** He remained at CTF among the general population. **CUSTODY:** Medium A. **VOC. TRAINING:** On 10/8/03 Perez was assigned to the PIA "Y" Shift as a Sewing Machine Operator. There were no work supervisory reports during this review period. **ACADEMICS:** He remained assigned to ABE III with satisfactory ratings per CDC 128-E, dated: 4/1/03, 6/30/03 and 9/03. Supervisory comments: Inmate Perez actively participated in class. He works diligently on his self study packet. On 9/22/03, he successfully completed a voluntary independent learning course in fractions, decimals and percentages. **WORK RECORD:** None noted during this period. **GROUP ACTIVITIES:** Perez received a certificate and a laudatory chrono dated, 6/20/03 for participating and completing a 44 week Anger Management course in the Project Change Program, per CDC 128B, dated, 6/20/03. He has been an active member in the Spanish Alcoholic Anonymous Program during the first, second, third and fourth quarter of 2003, dated 4/2/03, 8/2/03, 11/20/03 and 2/17/04. **PSYCH. TREATMENT:** None. **PRISON BEHAVIOR:** He remained disciplinary free during this review period. **OTHER:** On 7/8/02, Perez received a certificate for completing a 14 week Impact Program. |

CORRECTIONAL COUNSELOR'S SIGNATURE

DATE
4/5/05

PEREZ                                D-03602                    CTF-SOLEDAD                    JUN/2005

PT 1004 (REV 7/86)                              Page _1_

CONTINUATION SHEET - LIFE PRISONER - POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 03/04 to 2/05 (Present) | | | **PLACEMENT:** He remained at CTF among the general population. **CUSTODY:** Medium A. **VOC. TRAINING:** Perez remained assigned to the PIA "Y" Shift as a Sewing Machine Operator. He received satisfactory ratings on his work performance per CDC 101's dated, 4/1/04, 7/1/04, 10/1/04 and 1/1/05. On 10/1/04, Perez received an annual work experience evaluation. He received the following ratings: Under Job Skills and Equipment he was rated 3 (trainee/skilled worker with limited knowledge, requiring close supervision and guidance. He received formal job training on 10/20/03 in the following: injury/illness prevention program, operator mechanic training single needle, employee safety orientation and safety data sheet. Perez received satisfactory work ratings on his work attitude and performance. **ACADEMICS:** None during this review period. **WORK RECORD:** None during this review period. **GROUP ACTIVITIES:** None. **PSYCH. TREATMENT:** None noted. **PRISON BEHAVIOR:** He remained disciplinary free during this review period. **OTHER:** N/A. |

**ORDER:**

☐ BPT date advanced by ____ months.
☐ PBR date advanced by ____ months.
☐ BPT date affirmed without change.
☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

| PEREZ | D03602 | CTF-SOLEDAD | JUN/2005 |
|---|---|---|---|

BOARD OF PRISON TERMS                                                                                                    STATE OF CALIFORNIA

| | |
|---|---|
| ☐ | DOCUMENTATION HEARING |
| ☒ | PAROLE CONSIDERATION HEARING |
| ☐ | PROGRESS HEARING |

**ADDENDUM**

INSTRUCTIONS
    TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
                ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 2/1/05 to 1/31/06 | | | **PLACEMENT:** Remained at CTF Soledad and housed with the general population. <br> **CUSTODY:** Medium A. <br> **VOC. TRAINING:** None noted. <br> **ACADEMICS:** None noted. <br> **WORK RECORD:** Perez continued with his PIA Work assignment as a Sewing Machine Operator in Textiles. CDC 101's dated 3/1/05, 5/1/05 and 8/1/05 reflect grades of "satisfactory" in all categories, with CDC 101's dated 5/1/05 and 8/1/05 reflecting his supervisor's rating Perez' "Teamwork and Participation" as "above average". There are also three CDC 128B training certification chronos (dated 1/12/06) reflecting Perez' training in the proper operation and safety procedures of the single needle sewing machine, overlock sewing machine, and the bar tack sewing machine. Lastly, CDC 128B Laudatory chrono dated 10/25/05 is authored by his work supervisor who commends Perez for his team efforts in achieving more than a $700,000.00 production level with no past due orders for the month of September 2005. Refer to the Miscellaneous section of the C-File to view CTF memo dated 12/2/05 authored by PIA Superintendent II Charlie Walker which indicates Perez' most recent PIA work experience evaluation as well as a "former PIA worker card". <br> **GROUP ACTIVITIES:** CDC 128B Laudatory chrono dated 12/30/05 reflects Perez' active participation in Alcoholics Anonymous/Narcotic Anonymous. He has been an active participant since 12/2005. CDC 128B Laudatory chrono dated 12/2/05 reflects Perez' participation in 3 hours of Video Instruction/Discussion as part of the Inmate Employability Program (I.E.P.). CDC 128 B Laudatory chrono dated 12/23/05 reflects Perez' participation in 3 hours of I.E.P. Video Review and dialogue of issues related to Anger Management. <br> **PSYCH. TREATMENT:** None noted. <br> **PRISON BEHAVIOR:** Remained disciplinary free during this period of review. <br> **OTHER:** On 1/10/06, Perez was granted a "Postponement" (by the BPT) based on his own request for a postponement until the next calender date after he receives an updated Psychological Evaluation Report. Refer to BPT 1001A form dated 1/10/06 located in the BPT section of the C-File. |

CORRECTIONAL COUNSELOR'S SIGNATURE _C. Eltita_          DATE _5-19-06_

PEREZ          D03602          CTF-SOLEDAD

SENT TO I/M ON _5/25/06_

'T 1004 (REV 7/86)          Page _1_

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 2/1/06 to 5/15/06 (Present) | | | **PLACEMENT:** Remained at CTF Soledad and continues to be housed with the general population. **CUSTODY:** Medium A.. **VOC. TRAINING:** None noted. **ACADEMICS:** None noted. **WORK RECORD:** Continues with his PIA work assignment as a Sewing Machine Operator in Textiles. CDC 101 dated 2/1/06 reflects ratings of mostly satisfactory with ratings of above average in four categories. His supervisor comments that Perez has a good attitude towards his job assignment. **GROUP ACTIVITIES:** CDC 128B Laudatory chrono dated 3/31/06 reflects Perez' active participation in Alcoholics Anonymous/Narcotics Anonymous. **PSYCH. TREATMENT:** None noted. **PRISON BEHAVIOR:** Remained disciplinary free during this period of review. **OTHER:** None noted. |

ORDER:

☐ BPT date advanced by ___ months.   ☐ BPT date affirmed without change.
☐ PBR date advanced by ___ months.   ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

| PEREZ | D03602 | CTF-SOLEDAD |
|---|---|---|

PT 1004 (REV 7/86)            Page _2_

C. Ellison 5-19-06
C. Ellison                          Date
Correctional Counselor I


L M Leach 5-19-06
L. Leach                          Date
Correctional Counselor II


5-19-06
L. Pope                          Date
Facility Captain


S. Levorse CPR 5.22.06
S. Levorse                          Date
Classification and Parole Representative


PEREZ                    D03602                    CTF-SOLEDAD

BOARD OF PRISON TERMS
STATE OF CALIFORNIA

EXHIBIT 3

MENTAL HEALTH EVALUATION FOR
THE BOARD OF PRISON HEARINGS
June, 2006 Lifer Calendar

CORRECTIONAL TRAINING FACILITY SOLEDAD
MAY, 2006

**NAME:** PEREZ, ROGELIO
**CDC#:** D-03062
**DOB:** 10/25/57
**OFFENSE:** PC 187 MURDER, SECOND DEGREE
**DATE OF OFFENSE:** 6/26/84
**SENTENCE:** 22 YEARS TO LIFE
**MEPD:** 2/22/98
**EVALUATION DATE:** 5/9/06

I.    IDENTIFYING INFORMATION:

Mr. Rogelio Perez is a 48 year old, second term, single, Hispanic male from San Bernardino County. He is a Christian. He has served 22 years in custody on this term. He has a US-INS hold and will be returning to Mexico, when he is released.

SOURCES OF INFORMATION:

This evaluation is based upon a single 90 minute interview, plus review of the central and medical files.

The psychological evaluation, dated 3/17/99, from Avenal State Prison by Dr. Kroes, Psychologist, contains a Psychosocial Assessment. This information was reviewed with the inmate and is still current and valid. As a result, this information will not be repeated at this time.

PEREZ, ROGELIO
D-03802
5/9/06
PAGE 2

## CLINICAL ASSESSMENT

**XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS**

Mr. Perez related during the interview in an open, friendly and cooperative manner. His mental status was within normal limits. He was alert and well oriented. His thinking was rational, logical and coherent. His speech was normal, fluent and goal oriented. English is his second language. However, he communicates quite well in English. There is no need for an interpreter. His eye contact was good. His affect was appropriate. There was no evidence of anxiety or of depression. Intellectually, he was functioning in the average ranges. His memory was intact. His judgment was intact. His insight and self-awareness were good.

In the past, the use of alcohol has been a problem in his life. This was related to the commitment offense. He has been clean and sober now for 20 years. The 115 that he received 20 years ago, he stated was for alcohol that belonged to his cellie. He continues to attend Alcoholics Anonymous and has certificates to prove his attendance. He is now a Christian, and he is determined not to drink. He understands how destructive the use of alcohol can be. Alcohol is available in the institution. The fact that he has not been involved in it is proof that he is exercising good self-control, maturity and responsibility. It is evident that this is not a problem in his life.

Prior to coming to prison he worked as a forklift operator in a warehouse. He also worked in upholstery. He has skills in these areas. He is currently working in PIA Textiles as a machine operator and sewing machine mechanic. In addition, he has completed Vocational Graphic Arts.

Mr. Perez has also attended several self-help programs. He has attended Anger Management, Alternatives to Violence Program, Breaking Barriers, Impact Program, and Project Change.

## CURRENT DIAGNOSTIC IMPRESSION

| | |
|---|---|
| Axis I: | No mental disorder |
| Axis II: | No personality disorder |
| Axis III: | No physical disorder |
| Axis IV: | Life term incarceration |
| Axis V: | Current GAF: 85 |

PEREZ, ROGELIO
D-03802
5/9/06
PAGE 3

## XIII.   REVIEW OF LIFE CRIME

Mr. Perez accepts full responsibility for the commitment offense. He accepts the written version of the commitment offense. He does feel very badly about the victim's loss of life. He understands now that his behavior at that time was wrong and out of control. He was young, immature, in his 20s, and not living in a responsible way. His feelings of remorse appear to be sincere and genuine. Mr. Perez is no longer the person who committed the commitment offense. He is now 48 years of age. He is a mature, responsible person, who has made significant changes in his life over his 22 years of incarceration. He now actively attends church, and he knows that irresponsible behavior is not appropriate. He does not intend to engage in irresponsible behavior or alcohol in the future.

## XIV.   ASSESSMENT OF DANGEROUSNESS

A.  In considering potential for dangerous behavior in the institution, he has remained disciplinary free for 20 years. Soledad is a prison that has frequent racial riots, disturbances and altercations. He has not been involved in any of these activities. As a result, his potential for dangerous behavior compared to other inmates, is definitely below average.

B.  In considering potential for dangerous behavior when released to the community, the Level of Service Inventory-Revised was administered. This is an actuarial measure that assesses criminal history, substance abuse history, institutional adjustment, social relationships and other factors to determine current risk level on parole. He obtained a score in the low risk range. As a result, compared to the average citizen in the community, at this point in his life, he does not pose any more risk than the average citizen in the community.

C.  There are no significant risk factors in this case.

---

PEREZ, ROGELIO
D-03802
5/9/06
PAGE 4

## XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere with
routine parole planning. He plans on returning to Mexico as soon as he is
released from prison. He has family support in Mexico, including his mother and
father who are waiting for him to return and to help out on the family farm. He
has job offers and residence offers in the file from Mexico. He has skills that will
enable him to support himself in the community. He is in the process of studying
to complete his GED. However, since he plans on returning to Mexico, it is not
necessary for him to finish his GED in order to get a parole date. The prognosis
for successful adjustment in the community is very good.

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

D:    5/9/06
T:    5/10/06

---

Perez            D-03802            CTF-Soledad            5/9/06

EXHIBIT 4

LIFE-TERM INMATE MENTAL HEALTH EVALUATION FOR
THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
AVENAL STATE PRISON
FEBRUARY 1999 CALENDAR

NAME: Perez, Rogelio
CDC #: D-03602
DATE OF EVALUATION: 3/13/99

PROCEDURE UTILIZED: Inmate Perez was clinically interviewed by the undersigned clinician in an approximately 60-minute interview. The Medical and Central Files were reviewed for background data. Inmate was made aware that the purpose of the evaluation was for submission to the Board of Prison Terms (BPTs), and as such was not a confidential exchange. Having been duly informed, inmate agreed to the interview process on this basis.

### PSYCHOSOCIAL ASSESSMENT

IDENTIFYING INFORMATION: This Life-Term Inmate Mental Health Evaluation is submitted to the BPTs on Perez, CDC#: D-03602, for the upcoming Subsequent Board Hearing # 1. Inmate is a 41-year-old Hispanic single male. He identifies his religious preference as Christian. The inmate had no unusual physical characteristics that were readily apparent. He reports that he is not using any nicknames or aliases at present, nor has he in the past.

DEVELOPMENTAL HISTORY: Inmate was born in Mexico and raised by both natural parents. He could not recall his parents telling him of any problems or concerns during his prenatal or perinatal periods and he is not aware of any known birth defects. He states he was not a drug baby. Developmental milestones such as speech, language and motor development were reported to have been normal. Socialization also appears to have been normal and inmate reports having made friends easily and maintained such throughout his school years. Inmate denies any significant health problems as a child. He denies a childhood history of cruelty to animals, enuresis, arson or physical or sexual abuse as perpetrator or victim. He denies violent or aggressive acts through his early teen years. At the age of seventeen he joined the Third Street Gang.

EDUCATIONAL HISTORY: Inmate reports having completed through the 8th grade. He then dropped out of school because "I had to work." Since incarceration, he reports no further educational activities, "just been taking vocational."

FAMILY HISTORY: Inmate relates that his mother was a house wife and his father did both field and factory work. He believes his father is educated

**INMATE COPY**

LIFE-TERM INMATE MENTAL HEALTH EVALUATION
FOR THE BOARD OF PRISON TERMS
PEREZ   CDC#: C-20413 , ASP
Page 2

through the 10th grade. He has three brothers and six sisters. The inmate is aware of no family history of mental illness, substance abuse or problems with the law, commenting "I'm the black sheep of the family." He states that his family was and remains "real close."

PSYCHOSOCIAL DEVELOPMENT AND SEXUAL ORIENTATION:
Psychosocial development appears to have been normal. He recalls his first sexual encounter occurring at the age of 15/16. Inmate considers his sexual orientation to be heterosexual. He denies having had high-risk behaviors that would place him at risk for AIDS. He denies forcing himself on any other person sexually, nor does he fantasize about doing so.

MARITAL HISTORY: Inmate Perez appears not to have had any long-term relationships. He has never been married, nor has he fathered any children.

MILITARY HISTORY: None.

EMPLOYMENT/INCOME HISTORY: Prior to incarceration inmate worked only a few jobs. He states, "I was working in a warehouse, using forklift, before that I was working upholstery." Since incarceration inmate reports having received training in computer repair and has experience working in the print shop. At Avenal, he is learning "electrical work," which he enjoys. In his words, "It's pretty good. I really like it."

SUBSTANCE ABUSE HISTORY: Inmate reports that he was a weekend drinker. He has two drunk driving arrests. He feels his alcohol problem is behind him and proudly stated, "I haven't drank since a week before I got busted." Inmate undertook AA because "they told me to go." He found AA to be "pretty good, I learn all different experiences people had."

PSYCHIATRIC AND MEDICAL HISTORY: Inmate Perez denies prior treatment by mental health professionals, or of having been prescribed psychotropic medication, or having been hospitalized for any mental health problem. He denies history of serious accident or head injury. He denies prior history of suicidal/homicidal or assaultive behavior. He denies seizure or other neurological conditions. In regards to his physical health condition, inmate denies any past disabilities, significant impairments or illnesses. With regards to his present physical condition, inmate reports he is in good health. While incarcerated, inmate has received no psychological treatment, nor has he been prescribed any psychotropic medication.

INMATE COPY

LIFE-TERM INMATE MENTAL HEALTH EVALUATION
FOR THE BOARD OF PRISON TERMS
PEREZ   CDC#: C-20413 , ASP
Page 3

Past evaluations are relatively uniform in giving him an Axis I diagnosis of
(303.90) Alcohol Dependence, in institutional remission and also Psychoactive
Substance Abuse (Alcohol), in institutional remission, and an Axis II diagnosis
of(301.70) Antisocial Personality Disorder.

PLANS IF GRANTED RELEASE:  Inmate is under an USINS hold and
anticipates that, if released, he would be deported to Mexico.  His plans, if
deported, are to live with his family (mother and father) and work with his
brother-in-law in construction.   He appears to have a supportive network in
Mexico and with the job potential provided through the family member, he should
have the financial support needed to help him readjust.  His prognosis for
community living is assessed at being good.

CLINICAL ASSESSMENT: A Mental Health Status Review reveals the following:
Appearance: Clean, well-groomed.
Orientation: Oriented to person, place, time and situation.
Speech: Organized, coherent and clear.
Behavior and Psychomotor Activity: No signs of unusual mannerisms such as
twitches, tics, stereotyped behavior. Inmate appeared somewhat nervous.
Thought Processes: Organized, coherent.
Thought Content: Normal.
Perceptual Processes: Normal.
Insight: Average.
Judgment: Good.
Mood: Within normal limits.
Affect: Appropriate to thought content.
Memory: Appears intact for Immediate, Recent and Long Term Memory
Estimated Intellectual Functioning: Average.
Suicidal Risk: None.

DIAGNOSTIC IMPRESSIONS:

AXIS I:  CLINICAL DISORDERS
        V71.09 No Diagnosis or Condition

AXIS II: PERSONALITY DISORDERS/MENTAL RETARDATION
        V71.09 No Diagnosis

AXIS III: MEDICAL CONDITION
        None

**INMATE COPY**

LIFE-TERM INMATE MENTAL HEALTH EVALUATION
FOR THE BOARD OF PRISON TERMS
PEREZ   CDC#: C-20413 , ASP
Page 4

AXIS IV: PSYCHOSOCIAL STRESSORS
        Incarceration
AXIS V: GLOBAL ASSESSMENT OF FUNCTIONING (GAF)
        72 (Current)

REVIEW OF LIFE CRIME: Inmate Perez acknowledges the official version of his
offense, commenting, "I feel remorse for that person".  He was not very
expressive in his feelings, but he appers to have an understanding now of the
wrong he committed and his responsibility for it.

For psychopathology that related to his crime, inmate's alcohol
abuse/dependence and antisocial personality disorder as succinctly reported by
Dr. W. White had "a direct relationship to his criminal behavior."  Precursors and
causal factors involved in setting the stage for his violent act were his substance
abuse with diminished capacity to control his actions, his involvement in gang-
related activities, his previous life of crime with its disregard for the welfare of
others and the consequences of potentially violent actions.

ASSESSMENT OF DANGEROUSNESS:

Within a controlled setting, based on inmate's incarceration record and present
personality, there is no manifest danger to self or others. If released to the
community inmate should not present a problem to society. Inmate appears,
while incarcerated, to have developed adequate impulse control and should be
capable of controlling any sexual, anger or aggressive impulses. Significant risk
factors and precursors to violence are considered to be less than average in
comparison to other inmates if he continues to stay away from alcohol or other
substance abuse.

CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

Inmate appears to be slowly improving in regards to his personality growth and
development.  In 1991, Dr. White writes that; "During his incarceration he has
improved from a psychological point-of-view only very slightly.  He does not
appear to have profited from programmatic offerings.  The effects of age/time
would probably account for any improvement."  Since then, in this examiner's
opinion, inmate has matured to a degree.  He has remained disciplinary free for
many years now.  His last write up was in 1986, and inmate maintains it was his
cell mate who was at fault.  Age may be the guiding light in his continued
improvement since 1991 (as age  is for many of us), but inmate at this

INMATE COPY

LIFE-TERM INMATE MENTAL HEALTH EVALUATION
FOR THE BOARD OF PRISON TERMS
PEREZ   CDC#: C-20413 , ASP
Page 5

assessment presented with more understanding and insight than he apparently
had in the past.  There is room for more growth, but he is on a better path now.

Regarding recommendations, Perez should continue in his present program,
continue to be disciplinary free, should definitely continue to remain active in AA,
and avail himself of self-help opportunities that are made available within the
prison setting.  In regards to  psychiatric or psychological treatment, inmate
would benefit from group therapy in a group comprised of individuals in similar
circumstances to himself.


_William H. Kroes_                    _3/17/99_
WILLIAM H. KROES, Ph.D.               Date
Staff Psychologist


**INMATE COPY**

**A T T A C H M E N T   A**

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF SAN BERNARDINO

ACIS Case No.:

CASE NO.:SWHSS – 8994

DEPT.: S-16

JUDGE:  BOB N. KRUG

CLERK: V. GAYTON

BAILIFF: --

DATE: January 4, 2007

COUNSEL:

CASE TITLE:     In the Matter of the Application of
**ROGELIO PEREZ**
on Habeas Corpus

NATURE OF PROCEEDINGS:

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

MINUTE ORDER:

The court has received, read and considered the Petition for Writ of Habeas Corpus filed on October 19, 2006; the Informal Response filed by the Respondent on November 27, 2006; and the Informal Reply filed by the Petitioner on December 11, 2006.

The Petitioner has filed his Petition for Writ of Habeas Corpus contending that the Board of Parole Hearings improperly found him on June 1, 2006, unsuitable for parole. He contends that his due process rights were violated in that the Board continued to use the facts of the underlying crime as a basis for denial. He also contends that the hearing held by the Board was arbitrary and capricious and without lawful basis.

The Petitioner was convicted of a violation of Penal Code § 187(a), murder in the second degree with a gun enhancement and was sentenced to a period in State Prison of twenty-two years to life. He was received at the institution on March 28, 1985. Apparently, the Petitioner had four appearances before the Board seeking parole.

A review of the file on record reveals that on May 27, 1984, the Petitioner was involved in a fight with a Mr. Ortiz. It is unclear to the court whether the fight between the Petitioner and Mr. Ortiz was concerning the Petitioner's uncle or exactly the circumstances that gave rise to the fight. Apparently, the Petitioner and Mr. Ortiz were told to leave the bar and the Petitioner obtained a .22 caliber handgun from his vehicle and shot Mr. Ortiz three or four times.

The Petitioner claims he shot the victim because he was afraid the victim was going to "get a gun or something" and kill him. As it turns out the victim was completely unarmed. The Petitioner fired the

1

gun apparently three or four times and the victim was struck three times. The Petitioner was on parole from State Prison when the crime was committed.

The court has reviewed the record of the proceedings before the Board of Prison Terms on June 1, 2006 and finds that the Board considered each and every element or criteria it is required to consider in making it's findings as set forth in <u>In re Rosenkrantz</u> 29 Cal. 4th 616.

The last and most definitive word on the area of law controlling judicial review of Board of Parole Hearing decisions denying a finding of suitability for parole has been made by the Supreme Court in <u>In re Rosenkrantz</u>, Supra, and in <u>In re John E. Dannenberg</u> 34 Cal. 4th 1061(2005).

Penal Code Section 3041(b) provides for parole review of inmates such as Petitioner and further provides that such inmates shall be given a release date <u>unless</u> the Board determines that the gravity of the current convicted offense is such that consideration of the public safety requires a more lengthy period of incarceration. California Code of Regulations, Title 15, Section 2402(a)(b)(c)(d) sets forth the rules by which the Board is to make its determination. As stated by the Court, parole applicants have an expectation of being granted parole unless the Board finds <u>in the exercise of its discretion</u> that the applicant is unsuitable.

The operative words are "in the exercise of its discretion". Judicial review of this discretion is limited only to a determination of whether there is "some evidence" in the record to support the decision. As held by the Court, this standard of "some evidence" is extremely deferential.

The reviewing Court is prohibited from conducting an independent assessment of merits or considering whether substantial evidence supports the findings of the Board and its underlying decision. The Board is required to consider the Petitioner's background, his institutional participation, post-parole plans, as well as the psychological evaluations. The High Court held, however, that the nature of the inmate's offense, <u>alone</u>, could constitute a sufficient basis for denying parole. This does not permit the paroling authority to automatically exclude parole for individuals who have been convicted of a particular type of offense.

A review of the record supports a finding that there was "some evidence" which led the Board to its finding of unsuitability of the Petitioner for parole, for as the High Court described such evidence, it need be only a "modicum" of evidence.

The Board did consider the positive factors which favored parole and made its finding that these did not outweigh the factors surrounding the circumstances of the crime. While the decision did not reflect the weighing process of the Board, the <u>Rosenkrantz</u> Court, at page 677, clearly states that the Board need not explain its decision or the precise manner in which the specific facts were relevant to parole suitability. This consideration and balancing lie within the discretion of the Board.

It is plain and the Board stated in its decision that the primary basis for the finding of the Petitioner being unsuitable for parole and that he would impose an unreasonable risk or threat to society was the circumstances of the committed offense. The Board considered the actions of the Defendant particularly violent in that he shot and killed an unarmed man while being involved with a fight that started in a bar. Apparently the Board felt that the shooting was done from a short distance and that

2

the victim was shot three times in the head. The Board felt that the killing demonstrated a disregard for human life and that the victim was killed without motive except for the involvement in the fist fight.

The Board further considered that the Petitioner was apparently on parole at the time of the killing and that the killing resulted from a fight started in a bar where the Petitioner had been drinking.

The Board found that the Petitioner had a history of an escalating pattern of violence and criminal conduct. The Board considered that he had dropped out of school at the eighth grade level and became involved with street gangs. The Board further found that the Petitioner had failed in society's previous attempts to correct his behavior by probation, a time of confinement in the County Jail and State Prison and parole.

The Board considered the mental health evaluation done in May of 2006, the Petitioner's parole plans and employment plans and found that he needed to upgrade him employment skills. The Board recommended that the Petitioner obtain his G.E.D. and continue to participate is self-help programs.

The court finds that there was more than "some evidence" to justify the finding of unsuitably of the Petitioner for parole and to impose a two year denial on that finding.

The Petition for Writ of Habeas Corpus is denied.

3

PROOF OF SERVICE BY MAIL

CASE NAME:  PEREZ v. CURRY

CASE NO. :  To be assigned

I, Rogelio Perez        , hereby declare that I am a party to the above titled action and am over the age of eighteen (18), and I did serve a true copy of the following:

WRIT OF HABEAS CORPUS WITH EXHIBITS

by placing a true copy in an envelope with first class postage fully prepaid and said envelope surrendered to correctional staff at the Correctional Training Facility for delivery to the prison mail room and therefrom delivered to the local United States Post Office the next business day from which there is postal service between the place of mailing and the addressee:

Jerry Brown
Attorney General
110 West A St., #1100
San Diego, CA 92101

I declare under penalty of perjury that the foregoing is true and correct, doing so this 12Th day of  February    , 2007 , at Soledad, California.

R. Perez

# EXHIBIT 3

RECEIVED IN CRIMINAL DOCKETING

**GLORIA**

COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO

### ORDER



MAR 14 2007

COURT OF APPEAL FOURTH DISTRICT

In re

~~ROGELIO PEREZ~~

on Habeas Corpus.

~~E042379~~

(Super.Ct.Nos. SCR41741 &
SWHSS8994)

The County of San Bernardino

THE COURT

The petition for writ of habeas corpus is DENIED.

~~MILLER~~
_____
Acting P.J.

cc:    See attached list



MAILING LIST FOR CASE: E042379

Correctional Training Facility
Rogelio Perez
D03602 (ED-28U)
P.O. Box 689
Soledad CA 93960

District Attorney Appellate Services Unit
San Bernardino County
412 Hospitality Lane, First Floor
San Bernardino CA 92415 0042

Office of the State Attorney General
P. O. Box 85266
San Diego CA 92186 5266

Superior Court Clerk
San Bernardino County
401 N. Arrowhead Ave.
San Bernardino CA 92415

# EXHIBIT 4

MC-275

Name **Rogelio Perez**

Address **Correctional Training Facility**

**P.O. Box 689 (ED-28U)**

**Soledad, CA 93960**

CDC or ID Number **D-03602**

SUPREME COURT
# FILED

SEP 2 8 2007

Frederick K. Ohlrich Clerk

Deputy

IN THE SUPREME COURT
STATE OF CALIFORNIA

(Court)

| |
|---|
| **ROGELIO PEREZ,** |
| Petitioner |
| vs. |
| **BEN CURRY (Warden),** |
| Respondent |

PETITION FOR WRIT OF HABEAS CORPUS

No. **S156734**

*(To be supplied by the Clerk of the Court)*

**(App.Ct.No. E042379,**
**Fourth Appellate District;**
**Supp.Ct.No. SWHSS8994,**
**San Bernardino County)**

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

RECEIVED

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

PETITION FOR WRIT OF HABEAS CORPUS

SEP  2007

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

CLERK SUPREME COURT

This petition concerns:

☐ A conviction ☐ Parole

☒ A sentence ☐ Credits

☐ Jail or prison conditions ☐ Prison discipline

☒ Other (specify): **Parole suitability hearing**

1. Your name: **Rogelio Perez**

2. Where are you incarcerated? **Correctional Training Facility, P.O. box 689, Soledad, CA 93960**

3. Why are you in custody? ☒ Criminal Conviction ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   **Second degree murder with use of a firearm**

   b. Penal or other code sections: **187 / 12022.5**

   c. Name and location of sentencing or committing court: **Superior Court, San Barnardino County**

   d. Case number: **SCR-41741**

   e. Date convicted or committed: _____

   f. Date sentenced: _____

   g. Length of sentence: **15 years to life**

   h. When do you expect to be released? **To be determined**

   i. Were you represented by counsel in the trial court? ☐ Yes. ☐ No. If yes, state the attorney's name and address:
   **N/A**

4. What was the LAST plea you entered? *(check one)*

   ☐ Not guilty ☐ Guilty ☐ Nolo Contendere ☐ Other: _____
   **N/A**

5. If you pleaded not guilty, what kind of trial did you have?

   ☐ Jury ☐ Judge without a jury ☐ Submitted on transcript ☐ Awaiting trial
   **N/A**

6. GROUNDS FOR RELIEF

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

**PLEASE SEE APPENDIX "A" AT PAGE 5 FOR ANSWER TO 6**

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)

**PLEASE SEE APPENDIX "A" AT PAGE 5 FOR ANSWER TO 6a**

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

**PLEASE SEE APPENDIX "B" STARTING AT PAGE 14 FOR ANSWERS TO 6b**

8. Did you appeal from the conviction, sentence, or commitment?  ☐ Yes.  ☐ No.  If yes, give the following information:
   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):  N/A

   b. Result: _____  c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised:  (1) _____

      (2) _____

      (3) _____

   f. Were you represented by counsel on appeal?  ☐ Yes.  ☐ No.  If yes, state the attorney's name and address, if known:

      _____

9. Did you seek review in the California Supreme Court?  ☐ Yes.  ☐ No.  If yes, give the following information:

   a. Result: _____  b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised:  (1) _____

      (2) _____

      (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
    N/A
    _____

    _____

11. Administrative Review:
    a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

    THERE IS NO ADMINISTRATIVE REVIEW

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    b. Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.
       *Attach documents that show you have exhausted your administrative remedies.*  N/A

MC-275 (Rev. January 1, 1999)                    PETITION FOR WRIT OF HABEAS CORPUS

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  ☒ Yes. If yes, continue with number 13.  ☐ No. If no, skip to number 15.

13. a. (1) Name of court: Superior Court, San Bernardino County

(2) Nature of proceeding (for example, "habeas corpus petition"):  Habeas Corpus petition

(3) Issues raised:  (a)  SAME AS RAISED HEREIN

(b) _____

(4) Result (Attach order or explain why unavailable): DENIED (ATTACHMENT A, after exhibits)
The decision was a rubber stamping of the parole board's decision, making no rational connection between immutable factors and CURRENT threat to public safety.

(5) Date of decision:  1/4/2007

b. (1) Name of court: Appellate Court of California, Fourth Appellate DIstrict

(2) Nature of proceeding:  Habeas Corpus

(3) Issues raised:  (a) SAME AS RAISED HEREIN

(b) _____

(4) Result (Attach order or explain why unavailable) DENIED (Unnecessary, postcard denial)

(5) Date of decision:  3/14/2007

c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
No delay.  On 3/20/2007 Petition for Review was sent.  After 120 days passed, Petitioner enquired of status and informed no petition had been filed.  Now he resorts to habeas corpus.

16. Are you presently represented by counsel?  ☐ Yes.  ☒ No.  If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes.  ☒ No.  If yes, explain:

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date:  9-25-2007                   ▶  Rogelio Perez
                                              (SIGNATURE OF PETITIONER)

MC-275 [Rev. January 1, 1999]          PETITION FOR WRIT OF HABEAS CORPUS
                                                    - 4 -

A P P E N D I X  "A"

Answers to 6, et seq.

### Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION TO FIND HIM UNSUITABLE FOR
PAROLE FOR THE FIFTH TIME AFTER TWENTY-TWO YEARS BASED ON
IMMUTABLE FACTORS WHEN THOSE FACTORS ARE NO LONGER
RELIABLE EVIDENCE AND OTHER FINDINGS ARE NOT
"CIRCUMSTANCES SPECIFIED BY STATUTE AND BY REGULATION,"
THE DECISION BEING ARBITRARY AND AN ABUSE OF DISCRETION.

Answers to 6a: supporting facts

Only facts relative to the decision to deny parole will be
presented.

On June 1, 2006, twenty-two years after his arrest for the
commitment offense, and being convicted by a jury for second degree
murder in violation of Penal Code § 187,[1] Rogelio Perez (hereafter
Petitioner) appeared before the Board of Parole Hearings (hereafter
Board) for his FIFTH parole suitability hearing. Petitioner's life
term commenced on March 28, 1985, with his minimum eligible parole
date being fixed at February 22, 1998 (EXHIBIT 1, HT 1:11-12).[2]

Petitioner was sworn to tell the truth (HT 14:4-10).

The commitment offense

The Board incorporated the facts from the Probation Officer's
Report, p. 1 (HT 14:11-15). A summary of the commitment offense
is taken from the Life Prisoner Evaluation Report (hereafter LPER)
(EXHIBIT 2, p. 1), which was taken from the Probation Officer's
Report, which Petitioner does not have a copy of. In short:

---

1. All and codes and regulations are California, unless otherwise noted.

2. Reference to parole hearing transcript will be designated by HT followed
   by page and, when necessary, line number, e.g., (HT 1:1).

Rogelio Perez was involved in an argument on 5/27/84, at the Tres Hermanos Bar located in Fontana, California. The dispute escalated into a physical fight inside the bar, which was stopped when both parties were ordered to go outside the bar by the bartender, Feliciano Perez. The fight continued in the parking lot. Perez obtained a .22 caliber semi-automatic pistol from his vehicle. The victim (Javier Ortiz) proceeded to walk to his vehicle which was located on the opposite side of the parking lot and attempted to open his vehicle door. Perez returned to the scene and positioned himself directly in front of Ortiz' vehicle. Perez fired 4 rounds from the pistol, striking the victim twice in his left neck area and once in the lower left corner of his mouth.

The Board went over the commitment offense with Petitioner (HT 14-32). When asked, when the victim was not armed, why he shot the victim, Petitioner responded, "I was scared that he was going to get a gun or something. That he was going to kill me, you know" (HT 18:7-9). Although Petitioner could not see Mr. Ortiz' hands because it was dark (HT 23:3-6), while arguing Ortiz said "fuck you, I'm going to kill you" (HT 17:6-9; 24:9-10); it was then when Petitioner obtained his pistol (HT 23:10-16), being in fear for his life thinking Ortiz was going to get a gun and kill him (HT 18:7-9). Petitioner fired at Ortiz four times from over Ortiz' car (HT 27:7-15), striking him three times, "twice in his left neck area and once in the lower left corner of his mouth" (EXHIBIT 2, p.1).

Prior criminal history

Petitioner has no juvenile record (HT 33:23-24).

As an adult, on May 13, 1980, Petitioner pled guilty to two counts of burglary and sentenced to unsupervised probation. While on probation, on August 12, 1980, Petitioner was again arrested for one count of burglary, for which he was convicted and sentenced to four years, being paroled on April 21, 1983 (HT 34:1-10). Petitioner does not know if he was on parole at the time of the instant offense, the Board assuming he was (HT 34:9-26).

///////

Prior Social History

Petitioner is a Mexican National, born October 25, 1957, being 46 years old (HT 36:4-6), his parents still being married (HT 45:4-7). Petitioner came to visit the United States in 1975 and stayed with family members in southern California (HT 36:27-37:2).

Petitioner attended elementary school until the eighth grade, at which time he dropped out of school to work (HT 37:3-6), to help support the family. There is also evidence in the record that Petitioner was employed as a forklift operator and upholsterer (EXHIBIT 3, p. 2).

Although there is information in Petitioner's LPER that he "is associated with the members of the 'South Fontanta' Gang" (EXHIBIT 2, p. 3), he denies any gang affiliation but admits that he sometimes hung around with the "3rd Street" gang, which does not exist anymore (HT 38:5-7). The San Bernardino Deputy District Attorney admits there is no information on Petitioner being a gang member or affiliation (HT 39:22-25). The Board admits that there are sometimes misinformation on the LPER's (HT 40:13-15).

Petitioner admitted to using alcohol prior to and the night of the offense, and had an arrest for drunk driving pending at the time of the instant offense (HT 40:17-27).

Parole plans

Petitioner has an INS hold for Mexico and knows that he will be deported upon parole (HT 41:22-25), where he would live with his parents (HT 42:2-7). Petitioner has job offers from Mexico (HT 42:8-43:18).

The Board told Petitioner, although he has an INS hold for

Mexico, to have parole plans for "both Mexico and California" at his next hearing (HT 44:14-21).

Opposition to parole

The Chief of Police of Fontana, California sent a letter opposing parole in which he stated Petitioner had a "complete disregard for human life in that, after shooing the victim three times, he walked closer to the helpless man and fired a final bullet – final bullet into his head" (HT 46:1-4), recommending that Petitioner never be paroled. All official reports confirm that although four rounds were fired Ortiz was struck three times, "twice in the lower neck area and once in the lower corner of the mouth" (HT 47:10-12). Petitioner admits firing four rounds, but denies walking over to Ortiz and shooting him in the head (HT 48:1-20).

The San Bernardico County District Attorney's Office opposed parole, basically, due to Petitioner not agreeing to all the facts alleged by the deputy district attorney's rendition of the instant offense, prior criminal history, and was told to get a GED and has yet to do so (HT 76:7-78:9).

Psychological evaluation

Petitioner's psychological evaluation was conducted by Dr. Macomber, one of the Board's own forensic experts and reviewed by Dr. Zika. The evaluation "is based upon a single 90 minute interview, plus review of the central and medical files" (EXHIBIT 3, p. 1). Dr. Macomber refers to Petitioner's 1999 psychological evaluation as still being valid, thus it is provided as additional evidence in support of Petitioner's suitability for parole (EXHIBIT 4).

Deputy Commissioner Moore goes over Dr. Macomber's psycholigical

evaluation (HT 63:11-67:6). Taking directly from the evaluation,
Petitioner's "insight and self-awareness were good" (EX. 3, p. 2).
Petitioner continues to attend Alcoholics Anonymous, is now a
Christian and is determined not to drink, understanding the
destructive use of alcohol, and although alcohol is readily available
in the prison has refrained from its use, proving "that he is
exercising good self-control, maturity and responsibility" (EX. 3,
p. 2).

Petitioner has attended several self-help programs, to include
"Anger Management, Alternatives to Violence Program, Breaking
Barriers, Impact Program, and Project Change" (EX., p. 2).

Petitioner has no diagnosed disorders, with a current Global
Assessment of Functioning (GAF) score of 85 (EX. p. 2 [GAF is one's
ability to function compared to the world population, the highest
score being 90]).

"Soledad is a prison that has frequent racial riots, disturbances
and altercations. He has not been involved in any of these
altercations. As a result, his potential for dangerous behavior
compared to other inmates, is definitely below average" (EX. p. 3).

In clinically assessing Petitioner's current level of threat
to public safety when released to the community, "the Level of Service
Inventory-Revised was administered." This clinical tool is "am
actuarial measure that assesses criminal history, substance abuse
history, institutional adjustment, social relationships and other
factors to determine current risk level on parole" (EX. p. 3). Taking
all into consideration, it is Dr. Macomber's expert opinion, that
"compared to the average citizen in the community, at this point

in his life, he does not pose any more risk than the average citizen
in the community" (EX. p. 3).  "There are no significant risk
factors."

   Dr. Macomber noted that Petitioner has family support in Mexico
with offers of residence, job offers in Mexico, and "skills that
will enable him to support himself in the community."  Additionally,
"since he plans on returning to Mexico, it is not necessary for him
to finish his GED in order to get a parole date.  The prognosis for
successful adjustment in the community is very good" (EX. p. 4).
That is the evaluation of the Board's own forensic expert.  See also
EXHIBIT 4, p. 4, assessment of dangerousness in 1999 forensic
evaluation: "If released to the community inmate should not present
a problem to society."

                          D E C I S I O N

   The decision is long, repetitive and convoluted, but Petitioner
believes the reasons the Board concluded that he would "pose an
unreasonable risk of danger to society or a threat to public safety
if released from prison" (HT 83:11-14) are:

1.  The first being "the gravity of the crime" (HT 83:17-18).
Reiterating the facts of the offense: (a) "The offense was carried
out in a manner which was dispassionate, calculated to the effect
that you felt threatened and you then went to your automobile,
retrieved a weapon, your .22, and returning to the kill the victim"
(HT 83:26-84:4); (b) "The offense was carried out in a manner which
demonstrates exceptional disregard for human life"; and (c) "The
motive for the crime was truly inexplicable.  You murdered a man
over a fistfight" (HT 84:15-19).

2.  The second being that Petitioner "had an escalating pattern of criminal conduct and violence" (HT 85:20-21).  This finding was based on Petitioner dropping out of school in the 8th grade, and in spite of the lack of evidence, becoming involved in street gangs (HT 85: 23-26), and prior non-violent convictions (HT 86: 1-3).

3.  The third being "an unstable social history, prior criminality in this regard" (HT 86:4-5).  This finding was based on Petitioner entering the United States as a child to visit and staying, thereafter becoming "an illegal alien," attending school in the United Sates but dropping out in the 8th grade, and again, absent any evidence, alleging he "became a member of the 3rd Street Gang" (HT 86:6-10).

4.  The fourth finding, Petitioner having to obtain his GED, is based on the fact that Petitioner does not have a GED, although he has marketable skills that can be put to use upon release and will be returning to Mexico.  Commissioner Inglee is not certain Dr. Macomber's statement that since Petitioner is returning to Mexico he does not need a GED is correct (HT 89:3-9), and "why the doctor would say that I'm not entirely sure" (HT 89:21-22).  Deputy Commissioner Moore tells Petitioner if he gets his GED that to find him unsuitable next time "[w]e're going to have to come up with a new note, a new song" (HT 93:13-19).

The Board commended Petitioner for the following: (1) having "developed...two marketable skills that can be taken into the free world" (HT 87:6-7; 91:6-8);  (2) having "participated in beneficial self-help programs" (HT 87:12-13); (3) "should be congratulated for his lack of 115 disciplinary reports"; maintaing "a disciplinary-free record, basically, for 19 and a half years on your 115's.  Very good

- 11 -

job" (HT 87:19-20; HT 92:1-4); (4) and although noting the forensic expert's finding that Petitioner, "at this point in his life he does not pose any more risk than the average citizen" editorializes, commenting, "Even though most of the average citizens in the community have not murdered somebody in a parking lot in front of a bar" (HT 88:16-23); (5) acknowledged that Petitioner has parole plans for Mexico but wants letters written in English (HT 90:8-91:4); (6) having "very good work reports" (HT 92:9-10); and (7) "attending AA meetings consistently" (HT 92:1718).

## C O N C L U S I O N

Based on the foregoing facts, Petitioner being convicted of second degree murder and now, with conduct credits, has exceeded the term for first degree murder under similar circumstances, and the Board having no evidence, forensic or otherwise, contravening evidence that Petitioner is not a <u>current</u> threat to public safety, and therefore not "presently too dangerous to grant a fixed parole release date," it is respectfully requested that the Court order the respondent to show cause why the writ should not be granted and the Board ordered to fix Petitioner's term and, why any excess conduct credits should not applied to any period of parole.

Date: ___9-25-2007___

Respectfully submitted,

*Rogelio Perez*

Rogelio Perez
Petitioner in pro per

- 12 -

# V E R I F I C A T I O N

I, __Rogelio Perez__ , declare under penalty of perjury that I have read the foregoing facts and hereby state them to be true and correct, and that the exhibits attached hereto in support of the facts are true copies of the original documents, doing so this __25th__ day of __September__ , __2007__ at Soledad, California.

_Rogelio Perez_
Rogelio Perez
Petitioner in pro per

# P R A Y E R   F O R   R E L I E F

I, __Rogelio Perez__ , hereby state that I have no other plain or speedy remedy save habeas corpus, and therefore pray that this Honorable Court will:

1. Order the respondent to show cause why the writ should not be granted;

2. Appoint counsel to protect the rights of Rogelio Perez against the weight and resources of the state;

3. Declare the rights of the parties;

4. Order discovery and/or an evidentiary hearing as needed to further develop the facts of the case;

5. Allow counsel to orally argue the case before the Court;

6. Grant the writ of habeas corpus; and

7. Grant any other relief in the furtherance of justice.

Date: __9-27-2007__

Respectfully submitted,

_Rogelio Perez_
Rogelio Perez
Petitioner in pro per

PROOF OF SERVICE BY MAIL

CASE NAME: PEREZ v. CURRY

CASE NO. : To be assigned

I, Rogelio Perez            , hereby declare that I am a party
to the above titled action and am over the age of eighteen (18),
and I did serve a true copy of the following:

WRIT OF HABEAS CORPUS WITH EXHIBITS

by placing a true copy in an envelope with first class postage fully
prepaid and said envelope surrendered to correctional staff at the
Correctional Training Facility for delivery to the prison mail room
and therefrom delivered to the local United States Post Office the
next business day from which there is postal service between the
place of mailing and the addressee:

       Jerry Brown
       Attorney General
       110 West A St., #1100
       San Diego, CA 92101

    I declare under penalty of perjury that the foregoing is true
and correct, doing so this 25th day of September   , 2007 , at
Soledad, California.

RECEIVED IN CRIMINAL DOCKETING

AURORA

# IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

In the matter of:

   ROGELIO PEREZ

Petition for Review
on Habeas Corpus.

_____/

CASE NO.: _____

(Court of Appeals No. E042379,
Fourth Appellate District;
Superior Court Nos. SCR41741 &
SWHSS8994, County of San
Bernardino)

# P E T I T I O N   F O R   R E V I E W

**After Decision of the Court of Appeal, Fourth Appellate District**

Denying the Petition   for Writ of Habeas Corpus on March 14, 2007

Rogelio Perez, D-03602
Correctional Training Facility
P.O. Box 689
Soledad, CA 93960

**Petitioner in pro per**

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

In the matter of:

ROGELIO PEREZ

Petition for Review
on Habeas Corpus.
_____/

CASE NO.: _____

(Court of Appeals No. E042379,
Fourth Appellate District;
Superior Court Nos. SCR41741 &
SWHSS8994, County of San
Bernardino)

## PETITION FOR REVIEW

TO: THE HONORABLE RONALD M. GEORGE, CHIEF JUSTICE, AND THE HONORABLE
ASSOCIATE JUSTICES OF THE SUPREME COURT OF THE STATE OF CALIFORNIA:

COMES NOW Rogelio Perez (hereafter Petitioner) respectfully
requesting review following the decision of the Court of Appeal,
Fourth Appellate District, filed on March, 14, 2007, and appended
hereto as ATTACHMENT A, denying Petitioner's writ of habeas corpus.

In February, 1985 Petitioner was convicted of one count of second
degree murder in violation of Penal Code § 187 and thereafter
sentenced to an indeterminate term of 15 years to life pursuant to
Penal Code § 190.

### QUESTIONS FOR REVIEW

1. DOES RECENT UNITED STATES SUPREME COURT PRECEDENCE HOLDING
   THAT THE "SOME EVIDENCE" STANDARD OF PROOF VIOLATES DUE
   PROCESS IN ADMINISTRATIVE DECISIONS BY THE EXECUTIVE WHEN
   PRISONERS HAVE A LIBERTY INTEREST OVERTURN THIS COURT'S
   "SOME EVIDENCE" STANDARD OF PROOF FOR PAROLE BOARD
   DECISIONS?

2. WAS IT A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
   GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
   UNITED STATES CONSTITUTION TO FIND HIM UNSUITABLE FOR
   PAROLE FOR THE FIFTH TIME AFTER TWENTY-TWO YEARS BASED
   ON IMMUTABLE FACTORS THAT ARE NO LONGER RELIABLE EVIDENCE
   AND OTHER FINDINGS THAT ARE NOT "CIRCUMSTANCES SPECIFIED
   BY STATUTE AND BY REGULATIONS"?

- 1 -

3. WAS IT A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION TO FIND HIM UNSUITABLE FOR
PAROLE CLAIMING HE IS A GANG MEMBER WHEN THERE IS NO
EVIDENCE TO SUPPORT THE FINDING?

## NECESSITY FOR REVIEW

Petitioner submits that the issues raised by this petition for review are of statewide importance. The first question settles a conflict between this Court's 2002 holding that the "some evidence" standard of proof applies to parole suitability hearings conducted by an administrative agency of the Executive, and the United States Supreme Court's holding in 2004 that administrative agency hearings by the Executive, where there is a "liberty interest" held by the prisoners, the standard of proof is "a preponderance of the evidence." The second and third questions are standard questions that come before this Court every day and are summarily denied, then in many instances, granted by a Federal District Court, suggesting that this Court is giving adequate review on parole matters, especially like question three presented where the Board can manufacture a finding and state courts will rubber stamp the finding. This is especially true of the third, fourth and fifth appellate districts. A prisoners freedom should not depend on which judge he or she gets on a given day and how that judge feels.

## STATEMENT OF THE CASE

This Court has before it the record of the appellate court, to include the writ of habeas corpus. Petitioner incorporates by reference the facts of the case as presented at pages 5 - 12 of the writ of habeas corpus.

- 2 -

## ARGUMENTS

1.  DOES RECENT UNITED STATES SUPREME COURT PRECEDENCE HOLDING
    THAT THE "SOME EVIDENCE" STANDARD OF PROOF VIOLATES DUE
    PROCESS IN ADMINISTRATIVE DECISIONS BY THE EXECUTIVE WHEN
    PRISONERS HAVE A LIBERTY INTEREST OVERTURN THIS COURT'S
    "SOME EVIDENCE" STANDARD OF PROOF FOR PAROLE BOARD
    DECISIONS?

---

Relying on Superintendent v. Hill (hereafter Hill) (1985) 472

U.S. 445, this Court held in In re Rosenkrantz (2002) 29 Cal.4th

616, 656, that due process requires the Governor's decision to reverse

a finding of suitability for parole by the Board need only be

supported by "some evidence." The "some evidence" standard being

the standard of proof, for both the Governor and Board of Parole

hearings (hereafter Board). Petitioner asks, logically: If the

standard of proof is "some evidence," and the standard of judicial

review is "some evidence," how then does the "some evidence" standard

apply itself?

Hill, supra, was ambiguous as to when the "some evidence"

standard applied -- at the administrative decision level, or upon

judicial review? That ambiguity was clarified in the recent decision

of Hamdi v. Rumsfeld (2004) 542 U.S. 507, 124 S.Ct. 2633, at 2651,

the High Court holding that the "'[some evidence]' standard therefore

is ill suited to the situation in which a habeas petitioner has

received no prior proceedings before any tribunal and had no prior

opportunity to rebut the Executive's factual assertions before

a neutral decisionmaker." The Executive is not a "neutral

decisionmaker" (In re Dannenberg (2005) 34 Cal.4th 1061, 1105,

dissenting opinion [the Executive has "little to gain and potentially

much to lose by granting parole, and accordingly, the incentive to

- 3 -

give only pro forma consideration to the parole decision is strong."

The Supreme Court, in <u>Carey v. Musladin</u> (2006) 549 U.S. ___,
2006 DJDAR 16061, 16064 (DJDAR 12/12/06), plurality opinion, internal
citations omitted:

> "Virtually every one of the Court's opinions announcing a new application of
> a constitutional principle contains some explanatory language that is intended
> to provide guidance to lawyers and judges in future cases. It is quite wrong
> to invite state court judges to discount the importance of such guidance on the
> ground that it may not have been strictly necessary as an explanation of the
> Court's specific holding in the case. 'As a general rule, the principle of <u>stare
> decisis</u> directs us to adhere not only to the holdings of our prior cases, but
> also their explanations and the governing rules of law'; 'Although technically
> dicta, ... an important part of the Court's rationale for the result that it
> reaches[s] is entitled to greater weight...'."

<u>Hamdi v. Rumsfeld</u>, <u>supra</u>, 542 U.S. 507, 124 S.Ct. 2633, is United
States Supreme Court precedence clearing up the ambiguity in <u>Hill</u>
that the standard of proof at the Executive level is "a preponderance
of the evidence" and judicial review is then "some evidence," thus
it is the law of the land (<u>Yarborough v. Alvarado</u> (2004) 541 U.S.
652, 664 [AEDPA does not require that state and federal courts to
wait for nearly identical factual case before a legal rule must be
applied]), nullifying <u>In re Rosenkrantz</u>, <u>supra</u>, 29 Cal. 616 on the
holding of "some evidence" as a standard of proof.  This Court is
bound by <u>Hamdi</u>.

Whether by "a preponderance of the evidence" or "some evidence,"
the Board's decision was arbitrary, being unsupported by any evidence
Petitioner is a <u>current</u> threat to public safety.

///////
///////
///////

- 4 -

2.  WAS IT A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
    GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
    UNITED STATES CONSTITUTION TO FIND HIM UNSUITABLE FOR PAROLE
    FOR THE FIFTH TIME AFTER TWENTY-TWO YEARS BASED
    ON IMMUTABLE FACTORS THAT ARE NO LONGER RELIABLE EVIDENCE AND
    OTHER FINDINGS THAT ARE NOT "CIRCUMSTANCES SPECIFIED
    BY STATUTE AND BY REGULATION"?

---

A.  The Circumstances Of This Offense Is Not Evidence That Petitioner
    Is Currently A Threat To Public Safety 22 Years After The Fact.

Petitioner's offense was a run of the mill bar fight that too

often ends in murder.  As far as murders go, it is a garden variety

second degree murder, taking place in 1985, twenty-two years prior

the parole suitability hearing in question, Petitioner's FIFTH.

As the Board noted, Petitioner has an exemplary postconviction record.

There is just no evidence Petitioner is a current threat to public

safety.

Assuming, argumendo, the "some evidence" standard will be the

standard for both Executive level decisions and judicial review by

this Court, recently opined by the Second Appellate District in

In re Lee (2006) 143 Cal.App.4th 1400, 49 Cal.Rptr.3rd 931, 936-937:

> "The test is not whether some evidence supports the reasons the Governor cites
> for denying parole, but whether some evidence indicates a parolee's release
> unreasonably endangers public safety.  (Cal. Code Regs. tit. 15, § 2402, subd.
> (a) [parole denied if prisoner 'will pose an unreasonable risk or danger to
> society if released from prison'], see e.g. In re Scott (2005) 133 Cal.App.4th
> 573, 595 ['The commitment offense can negate suitability [for parole] only if
> circumstances of the crime...rationally indicate that the offender will present
> an unreasonable public safety risk if released from prison'], but see In re Lowe
> (2005) 130 Cal.App.4th 1405 [suggested 'some evidence' applies to the factors,
> not dangerousness].)  Some evidence of the existence of a particular factor does
> not necessarily equate to some evidence the parolee's release unreasonably
> endangers public safety."  (Emphasis in original.)

The question is not was Petitioner a threat to public safety

22 years ago, but rather, is Petitioner currently a threat to public

safety.  The only statutory reason to deny Petitioner parole is the

"timing and gravity" of the offense (Penal Code § 3041(b)).  This
Court has taken this to mean an indeterminately sentenced prisoner
is to be granted parole unless the prisoner "is presently too
dangerous to grant a fixed parole release date" (In re Dannenberg,
supra, 34 Cal.4th, at 1080; see also Sass v. California Board of
Prison Terms (9th Cir. 2006) 461 F.3d 1123, 1135, Reinhardt, Circuit
Judge, dissenting [evidence must show current threat to public
safety).  As recently opined by the Sixth Appellate District, "The
nature of human activity is such that, given its subjective
assessment, the Board could always find some aspect of the crime
that exceeds the minimum elements.  Rather, an unsuitability
determination must be predicated on 'some evidence that the particular
circumstances of [the prisoner's] crime -- circumstances beyond the
minimum elements of his conviction -- indicated exceptional
callousness and cruelty with trivial provocation, and thus suggested
he remains a danger to public safety.' (In re Dannenberg, supra,
34 Cal.4th at p. 1098)" (In re Weider (2006) ___ Cal.App.4th ___,
2006 DJDAR 15795, 15801 c. 1 (DJDAR 12/6/06)).

(In re Elkins (2006) 144 Cal.App.4th 475, 50 Cal.Rptr.3d 503, 518-519
["On the facts of this case, with the victim continuing to move after
the first blow, Elkins had to strike his victim multiple times in
order to kill him. ...Governor could not rely on the fact that Elkins
might have avoided killing to show his killing to be especially
brutal"]).

B.  **Based On The Only Reliable Factor--Postconvistion Behavior--There
    Is Zero Evidence Petitioner Is A Current Threat To Public Safety.**

    The United States Supreme Court, in a series of decisions over
the years, has instructed the states how to consider and weigh

evidence in parole decisions. Recently opined by the High Court
in <u>Carey v. Musladin</u>, <u>supra</u>, 549 U.S. ___, 2006 DJDAR 16061, 16064
(DJDAR 12/12/06), plurality opinion, internal citations omitted:
"'As a general rule, the principle of <u>stare decisis</u> directs us to
adhere not only to the holdings of our prior cases, but also their
explanations and the governing rules of law'; 'Although technically
dicta, ... an important part of the Court's rationale for the result
that it reache[s] is entitled to greater weight...'." Thus, the
principles and instructive language of United States Supreme Court
decisions, and Ninth Circuit decisions interpreting those Supreme
Court decisions, are controlling.

The offense and preconviction behavior is not to be viewed in
a vacuum as though it is current, but is to be placed into perspective
relative to time, "entailing primarily what a man is and what he
may become rather then simply what he has done" (<u>Greenholtz v. Inmates
of Nebraska Penal and Correctional Complex</u> (hereafter <u>Greenholtz</u>)
(1979) 442 U.S. 1, 10). Moreover, "the long range purpose of parole
is...the long-range objective of rehabilitation" (<u>Id</u>., at 13); and,
although the commitment offense is a consideration, over time it
is a smaller consideration, "[t]he behavior record of the inmate
during confinement is critical in the sense that it reflects the
degree to which the inmate is prepared to adjust to parole release"
(<u>Id</u>., at 15; <u>Moody v. Daggett</u> (1976) 429 U.S. 78, 89; <u>In re Minnis</u>
(1972) 7 Cal.3d 639, 645). As it was observed in <u>In re Andrade</u> (2006)
141 Cal.App.4th 807, at 823, Pollak J., dissenting, "This record,
like that in numerous recent cases, strongly suggests that
California's [Executive is] losing sight of that fact." Executive

- 7 -

parole decisions, having become impregnated with politics, has lost sight of the fact that parole is the rule rather than the exception and is to be granted as early as possible, based primarily on postconviction behavior, to alleviate cost to the taxpayers, as well as mental anguish of prisoners.

As opined by the First Appellate District in In re Scott II (2005) 133 Cal.App.4th 573, at 594-595:

> "The Governor's assumption that a prisoner may be deemed unsuitable for release on the basis of the commitment offense 'alone' is correct [citation], but the proposition must be properly understood. The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being 'Previous Record of Violence'). Reliance on such an immutable factor 'without' regard to or consideration of subsequent circumstances' may be unfair [citation]; and 'runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.' [Citation.] The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time. [Citation.] Thus, denial of release based solely on the basis of the gravity of the commitment offense warrants especially close scrutiny."

See In re Weider (2006) ___ Cal.App.4th ___, 2006 DJDAR, at 15802; In re Elkins (2006) 144 Cal.App.4th 475, 50 Cal.Rptr.3d, at 518, 520, 521; In re Lee (2006) 40 Cal.App.4th 1400, 49 Cal.Rptr.3d, at 937); In re Shaputis (2005) 135 Cal.App.4th 217, 231-232 [accord, after 15 to 20 years the commitment offense has zero predictive value of future dangerousness and therefore is not reliable evidence; thus, parole decisions must be based on current threat to public safety.] Cf. In re Andrade, supra, 141 Cal.App.4th 807 [after 14 years the appellate court relied on commitment offense to sustain denial of parole.]

The forensic evidence provided by Dr. Macomber clearly stated that Petitioner's current threat to public safety is no more than the average citizen in the community. Commissioner Inglee took

exception to that in the decision stating that "average citizens
in the community have not murdered somebody in a parking lot in front
of a bar" demonstrating that he cannot get past the events of 22
years ago.  Dr. Macomber's expert opinion was based on <u>current</u> threat
to public safety, not threat to public safety 22 years ago.


3.  **WAS IT A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
    GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
    UNITED STATES CONSTITUTION TO FIND HIM UNSUITABLE FOR
    PAROLE CLAIMING HE IS A GANG MEMBER WHEN THERE IS NO
    EVIDENCE TO SUPPORT THE FINDING?**

        During Petitioner's parole suitability hearing the question
of him actually being a "member" of a street gang came up.  Petitioner
admitted knowing members of and sometimes hanging around with the
"3rd Street" gang, he absolutely denied belonging to the gang or
being an associate of the gang.  The San Bernardino Deputy District
Attorney admitted there is no information of Petitioner being a gang
member or affiliation with a gang.  The Board admitted that there
are sometimes misinformation on the Life Prisoner's Evaluation Report,
but then turned right around, in spite of the lack of evidence, and
denied Petitioner parole because he belonged to a street gang.

        It is apparent that this finding was based on, what the Board
had just stated was unreliable, misinformation being in prisoners
files.  The Board should have relied on Petitioner's statements
(<u>Sanchez v. Kane</u> (C.D. Cal. 2006) 444 F.Supp.2d 1049, 1061),
especially in light of the fact that even the Deputy District Attorney
admitted there was no evidence of Petitioner being a member of a
street gang.  This is a perfect example of the Board manufacturing
reasons to deny parole to support a decisions already made.  And

- 9 -

the Board keeps doing it because this Court lets the Board get away with it.

This, like other findings by the Board, are without evidence, rendering the decision arbitrary, violating Petitioner's right to due process.

### CONCLUSION

The decision to find Petitioner unsuitable for parole, and the state court decisions rubber stamping the Board's decision, is contrary to evidence, and not supported by a preponderance of the evidence, violating Petitioner's right to due process.

WHEREFORE, petition for review should be granted, or in the alternative, the Court issue an Order to Show Cause on the writ returnable to a lower court.

Date: 3/20/2007

Respectfully submitted,

Rogelio Perez
Petitioner in pro per

# ATTACHMENT "A"

COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO

**ORDER**



MAR 1 4 2007

COURT OF APPEAL FOURTH DISTRICT

In re

ROGELIO PEREZ

on Habeas Corpus.

E042379

(Super.Ct.Nos. SCR41741 &
SWHSS8994)

The County of San Bernardino

THE COURT

    The petition for writ of habeas corpus is DENIED.

MILLER

Acting P.J.

cc:    See attached list



## PROOF OF SERVICE BY MAIL

CASE NAME: <u>ROGELIO PEREZ v. BEN CURRY (Warden)</u>

CASE NO. : <u>Fourth Appellate No. E042379</u>

I, <u>Rogelio Perez</u>, hereby declare that I am a party to the above titled action and am over the age of eighteen (18), and I did serve a true copy of the following:

PETITION FOR REVIEW

by placing a true copy in an envelope with first class postage fully prepaid and said envelope surrendered to correctional staff at the Correctional Training Facility for delivery to the prison mail room and therefrom delivered to the local United States Post Office the next business day from which there is postal service between the place of mailing and the addressee:

Jerry Brown
Attorney General
P.O. Box 85266
San Diego, CA 92186

Court of Appeals
Fourth Appellate District
3389 Twelfth Street
Riverside, CA 92501

I declare under penalty of perjury that the foregoing is true and correct, doing so this <u>20th</u> day of <u>March</u>, 2007, at Soledad, California.

_Rogelio Perez_
Rogelio Perez

# EXHIBIT 5

S156734

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

---

In re ROGELIO PEREZ on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

SUPREME COURT
FILED

MAR 2 6 2008

Frederick K. Ohlrich Clerk

Deputy

Chief Justice